Exhibit 1

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Illinois

| | | |
|---|---|---|
| Jose Cruz | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   23 CV 4268 |
| Guevara, et al., | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Cook County State's Attorney's Office, c/o Chief ASA Jessica Scheller,
        Civil Actions Bureau, Richard J. Daley Center, Room 500, 50 W. Washington St., Chicago, IL 60602
_____
_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: PLEASE SEE ATTACHED RIDER.

| Place: The Sotos Law Firm, P.C. | Date and Time: |
|---|---|
| 141 W. Jackson Blvd, Suite 1240A | |
| Chicago, IL 60604        or elindsley@jsotoslaw.com | 10/02/2023 10:00 am |

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:        09/11/2023

_CLERK OF COURT_
                                        OR
                                        /s/ Alexis M. Gamboa
_____        _____
_Signature of Clerk or Deputy Clerk_        _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Defendant Officers
Rogers as Special Rep for Cappitelli                        , who issues or requests this subpoena, are:
Alexis M. Gamboa, The Sotos Law Firm, P.C., 141 W. Jackson Blvd, Suite 1240A,Chicago, IL 60604, (630) 735-3300

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 23 CV 4268

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*   Cook County State's Attorney's Office

on *(date)*   09/11/2023   .

☑ I served the subpoena by delivering a copy to the named person as follows:   via certified mail to the Cook

County State's Attorney's Office, Richard J. Daley Center, Room 500, 50 W. Washington St., Chicago, IL 60602

_____   on *(date)*   09/11/2023   ; or

☐ I returned the subpoena unexecuted because: _____

_____   .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____   .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date:   09/11/2023                          /s/Elise Lindsley
                                          *Server's signature*

                                          Elise Lindsley, Paralegal
                                          *Printed name and title*
                                          The Sotos Law Firm, P.C.
                                          141 W. Jackson Blvd, Suite 1240A
                                          Chicago, IL 60604
                                          (630) 735-3300, Fax (630) 773-0980
                                          *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
**(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
**(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
**(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
**(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
**(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

*Jose Cruz v. Guevara, et al, Case No. 23-cv-4268*

### SUBPOENA RIDER TO COOK COUNTY STATE'S ATTORNEY'S OFFICE

Any and all records, files, and documents relating to the investigation, Felony Review, habeas corpus petitions, criminal prosecution, trial, appeals, post-conviction investigation and proceedings, and certificate of innocence proceedings in the cases of:

**People v. Jose Cruz, Case No. 93 CR 25151 (Appellate Case No. 99-3215)**

including but not limited to:

1.  Pleadings, motions, discovery requests, documents tendered in discovery and discovery receipts, subpoenas, subpoenas *duces tecum*, court orders, and correspondence;

2.  Police reports;

3.  Felony Review folders and notes;

4.  Photographs (including but not limited to line-up photos, photo arrays and crime scene photos) and physical evidence relating to the investigation and prosecution;

5.  Any statements of all the defendants and witnesses whether oral, handwritten, court reported, or audio and/or video recorded;

6.  Any requests or protocols for the testing and/or analysis of DNA, fingerprints, blood and other bodily fluids, and any other materials or physical evidence, and any laboratory reports and test results relating to such testing and/or analysis;

7.  All investigators' reports and notes;

8.  Transcripts of court proceedings (including but not limited to status hearings, pretrial motions, grand jury, trial, post-conviction, and certificate of innocence proceedings);

9.  All records, documents, and files compiled by the Conviction Integrity Unit of the State's Attorney's Office, including but not limited to investigators' reports and notes, evaluation memorandums, and reports and recommendations memorandums;

10. Any exhibits marked for identification and/or admitted into evidence, and any evidence used or available for use at trial, sentencing, post-conviction, or certificate of innocence proceedings;

11. All communications with any attorney representing *Jose Cruz;*

12. All of the records regarding the post-conviction and COI process including all communications with plaintiff *Jose Cruz* or his attorney;

1

*Jose Cruz v. Guevara, et al, Case No. 23-cv-4268*

13.     Any and all communications, including but not limited to, written correspondence, memoranda, electronic mail, text messages, iMessages, and any recordings of communications, including voicemails, between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Chanen & Olstein, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jose Cruz relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Jose Cruz*, Case No. 99 CR 25151 (Appellate Case No. 99-3215);

14.     Any and all documents which memorialize or summarize any communications, including but not limited to written correspondence, memoranda, electronic mail, text messages, and iMessages, between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Chanen & Olstein, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jose Cruz relating to relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Jose Cruz*, Case No. 99 CR 25151 (Appellate Case No. 99-3215);

15.     Any and all power points or other presentation materials used in any in-person meeting between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Chanen & Olstein, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jose Cruz relating to relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Jose Cruz*, Case No. 99 CR 25151 (Appellate Case No. 99-3215).

For any document requested for which you claim a privilege, please provide a privilege log, identifying or otherwise describing each document and the specific privilege under which you are claiming a right of non-disclosure.

S SUBURBAN IL 604
12 SEP 2023 PM

7019 1640 0001 2646 0487

US POSTAGE PITNEY BOWES

ZIP 60604
02 7H
0001334031

$ 008.53⁰

SEP 12 2023

**S**

THE
SOTOS
LAW FIRM. P.C.

141 W. Jackson Blvd.
Suite 1240A,
Chicago, IL 60604

COOK COUNTY
STATE'S ATTORNEY'S
OFFICE

SEP 27 2023

RECEIVED

Cook County State's Attorney's Office
c/o Chief ASA Jessica Scheller
Civil Actions Bureau, Daley Center, Room 500
50 W. Washington St.
Chicago, IL 60602

60602-135625

# Exhibit 2

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 93 CR 25151 |
| | ) | |
| v. | ) | |
| | ) | Hon. Judge Erica L. Reddick |
| JOSE CRUZ, | ) | |
| | ) | |
| Defendant. | ) | |

**FILED**

**MAR 0 8 2024**

IRIS Y MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

### <u>MOTION TO RELEASE GRAND JURY MATERIALS</u>

Reynaldo Guevara, Anthony Wojcik, Robert Rutherford, Anthony Riccio, Robert Boris, Stephen Gawrys, Sergeant Edward Mingey, Geri Lynn Yanow, as the Special Representative of Ernest Halvorsen, deceased, the City of Chicago, and former Assistant State's Attorney Edward Maloney (collectively "Petitioners"), by and through their undersigned attorneys, respectfully request that this Honorable Court enter an Order releasing the grand jury materials in this case, including transcripts, evidence, and subpoenas, and state as follows:

### INTRODUCTION

Twenty-eight years ago, Jose Cruz ("Cruz") was convicted of first-degree murder and attempted murder, and sentenced to ninety years in prison. In 2022, Cruz's conviction was vacated, and he was released from prison. Now, Cruz is suing Chicago police officers, Reynaldo Guevara, Anthony Wojcik, Robert Rutherford, Anthony Riccio, Robert Boris, Stephen Gawrys, Sergeant Edward Mingey, Ernest Halvorsen (through his estate), the City of Chicago, and former Assistant State's Attorney Edward Maloney ("Petitioners"), alleging that he was wrongfully prosecuted and convicted. Cruz has filed suit in federal court and is seeking compensatory and punitive damages, *Cruz v. Guevara, et al.*, 23 CV 4268 (N.D. Ill).

1

What happened during Cruz's criminal case is central to his claims in the federal lawsuit. For example, one of the ultimate questions in the federal lawsuit is whether there was probable cause for Cruz's arrest and prosecution. In the underlying criminal case, Cruz was indicted by a grand jury. An indictment by a grand jury is *prima facie* evidence that there was probable cause. *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Cruz can rebut this presumption by presenting evidence that Petitioners obtained the indictment through improper or fraudulent means. *Id.* Therefore, transcripts of the grand jury proceedings, which contain a record of the evidence and testimony presented, are central to Cruz's claims and Petitioners' defenses.

Additionally, the grand jury materials will shed light on: (1) Cruz's guilt or innocence, (2) which officers and witnesses were interviewed by the Cook County State's Attorney ("CCSAO") before Cruz's indictment, (3) the knowledge and information the CCSAO had at the time the indictment was sought, (4) whether evidence was fabricated, and (5) whether witnesses were coerced. These matters are squarely at issue in the federal lawsuit.

Petitioners thus have a compelling and particularized need for the grand jury materials. Without the grand jury materials, Petitioners will be prevented from presenting a fulsome and effective defense to the claims against them. Additionally, the grand jury materials are necessary for impeachment, refreshing the recollections of witnesses, and testing witnesses' credibility. Petitioners would be greatly prejudiced if they were denied this crucial evidence for their defense.

The reasons for keeping the grand jury materials secret in this case are no longer compelling. The grand jury proceedings in this case occurred over twenty-eight years ago, and the jurors have been long since discharged. Cruz has been tried, convicted, sentenced, and released. At this juncture, there is no concern that Cruz will escape from custody, that the grand jury's deliberations will be improperly influenced, that witnesses will commit perjury before the grand

jury or at the criminal trial, or that witnesses will be discouraged from testifying freely. Additionally, there is no reason to protect Cruz from unwarranted exposure. He has already brought exposure by filing a federal lawsuit.

The grand jury materials in this case are necessary to prevent a substantial injustice in the federal lawsuit. At this stage, over twenty-eight years after the indictment, the need for disclosure far outweighs the need for continued secrecy. Petitioners' request is narrowly tailored to cover only those materials needed for defense of the federal claims. Petitioners are only seeking the grand jury materials from this criminal case. For all of these reasons, Petitioners respectfully request that this Honorable Court grant this Motion, and enter the attached proposed order allowing Petitioners to obtain the grand jury materials in this case. (Ex. A, Proposed Order.)

## FACTUAL BACKGROUND

On October 6, 1993, Antwane Alfonso Douglas ("Douglas") and Vernon Jay Meadors ("Meadors") were shot while standing near the intersection of North and Kedzie in Chicago. Douglas died from his wounds. After an investigation by Chicago police and the CCSAO, Jose Cruz was charged and later indicted by a grand jury. On January 30, 1996, Cruz was convicted of the first-degree murder of Douglas and the attempted murder of Meadors. Cruz was sentenced to ninety years in prison. On July 11, 2022, Cook County Circuit Court Judge Tyria Walton vacated Cruz's conviction and dismissed his indictment. Cruz was released from prison the next day.

On July 4, 2023, Cruz filed a federal lawsuit against Reynaldo Guevara, Anthony Wojcik, Robert Rutherford, Anthony Riccio, Robert Boris, Stephen Gawrys, Sergeant Edward Mingey, Ernest Halvorsen (through his estate), Assistant Cook County State's Attorney Edward Maloney, and the City of Chicago, in United States District Court for the Northern District of Illinois, styled *Jose Cruz v. Reynaldo Guevara, et al.*, Case No. 23-cv-04268 (the "Civil Action") *See*, Ex. B, First

Amended Complaint. In the Civil Action, Cruz alleges that the Petitioner Chicago Police officers who investigated the shootings of Douglas and Meadors violated his civil rights and caused his alleged wrongful conviction. The allegations of the Civil Action include, *inter alia*, violations of due process, withholding exculpatory evidence, malicious prosecution, unlawful detention, failure to intervene, conspiracy to violate constitutional rights, intentional infliction of emotional distress, and willful and wanton conduct. Petitioners bring the present Motion to Release Grand Jury Materials, including transcripts and subpoenas in this case, for use in the Civil Action.

## ARGUMENT

### I. Petitioners Have a Compelling and Particularized Need for the Grand Jury Materials

This Court should permit the disclosure of the grand jury materials in this case because Petitioners have a compelling and particularized need which vastly outweighs any continued need for secrecy. Section 112-6(b)(3) of the Illinois Code of Criminal Procedure states that grand jury materials may be disclosed "when the court, preliminary to or in connection with a judicial proceeding, directs such in the interest of justice or when the law so directs." 725 ILCS 5/112-6(b)(3). In deciding whether to permit disclosure, Illinois courts apply a three-pronged test: (1) whether the material is needed to avoid a possible injustice in another judicial proceeding; (2) whether the need for disclosure is greater than the need for continued secrecy; and (3) whether the request is structured to cover only the materials needed. *Board of Educ. v. Verisario*, 143 Ill. App. 3d 1000, 1010-11 (2nd Dist. 1986); *see also Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222 (1979) ("Parties seeking grand jury transcripts under [Fed. R. Crim. Pro.] 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.") In this case, all three prongs favor disclosure.

4

The grand jury materials in this criminal case are crucial to the Civil Action. For example, one of the ultimate questions in the Civil Action is whether there was probable cause for Cruz's arrest, detention, and prosecution. The existence of probable cause defeats many of Cruz's claims. *See e.g.*, *Haynes v. City of Chicago*, 2022 WL 1016392, *2 (N.D. Ill. Apr. 5, 2022) ("The existence of probable cause defeats an unlawful detention claim."); *Johnson v. Target Stores, Inc*., 341 Ill. App. 3d 56, 73 (1st Dist. 2003) ("[T]he failure to prove a lack of probable cause is fatal to a claim of malicious prosecution.").

"[T]he purpose of the grand jury is to decide whether probable cause exists such that a charge should be brought." *People v. O'Dette*, 2017 IL App (2d) 150884, ¶ 67. An Illinois grand jury indictment is *prima facie* evidence of probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019). In this case, Cruz was indicted by a grand jury. This is *prima facie* evidence of probable cause that can only be rebutted by evidence that the Petitioners obtained the indictment through improper or fraudulent means. *Id*. Therefore, the grand jury materials are necessary to show what evidence and testimony were presented to obtain the indictments.

The materials also will reveal the evidence that Petitioners had available at the time and that formed their good faith basis for the existence of probable cause. This is critical to the Petitioner officers' affirmative defense of qualified immunity. Thus, the entirety of the grand jury materials in this case is relevant to the claims and defenses in the Civil Action. If Petitioners are denied access to the grand jury materials it will cause a substantial injustice and Petitioners will be severely prejudiced.

The grand jury materials also are needed for impeachment, refreshing witnesses' recollection, and testing credibility. *See In re Cement-Concrete Block, Chicago Area*, 381 F. Supp. 1108, 1110 (N.D. Ill. 1974) (permitting disclosure of grand jury transcripts to attorneys in

5

subsequent civil case "for use in litigation only for purposes of impeachment, refreshing the witnesses' recollection, and testing credibility"). In this case, multiple witnesses identified Cruz as a shooter. Upon information and belief, one or more of these witnesses may have testified before the grand jury. The grand jury transcripts are therefore necessary to refresh these witnesses' recollections and for impeachment in the Civil Action if necessary.

Additionally, the surviving victim of the shooting, Meadors, passed away in 2020. During the initial investigation of the shooting, Meadors identified Cruz as a shooter to Petitioner officers. Petitioners do not know if the State presented Meadors for testimony at the grand jury. If he did testify, this testimony will be especially important because he is no longer available to testify in the Civil Action.

Furthermore, the grand jury materials will shed light on Cruz's guilt or innocence, which officers and witnesses were interviewed by the CCSAO, what knowledge and information the CCSAO had prior to seeking the indictment, whether evidence was fabricated, and whether witnesses were coerced. This is all highly relevant to Cruz's claims in the Civil Action. For all of these reasons, there is a compelling and particularized need for the grand jury materials in the Civil Action and they should be released.

## II.     There is No Compelling Need for the Continued Secrecy of the Grand Jury Materials

Considering this criminal case's age and ultimate conclusion, there is no compelling need for the continued secrecy of the grand jury materials. Grand jury proceedings are kept secret for the following reasons: (1) to prevent the escape of an indicted person; (2) to ensure the grand jury freedom; (3) to prevent perjury of witnesses before the grand jury and later at the criminal trial; (4) to encourage witnesses to freely testify about the commission of crimes; and (5) to protect an

innocent person who is accused but exonerated against unwarranted exposure. *Verisario*, 143 Ill. App. 3d at 1010-11. None of these reasons is compelling here.

In this case, the grand jury returned its indictment in the mid-1990s. There is no fear that Cruz will flee, that the grand jury deliberations will be improperly influenced, or that witnesses will testify falsely before the grand jury or at the criminal trial. The release of the grand jury materials, after a delay of twenty-eight years, will do little to discourage witnesses from testifying freely. To be sure, any testimony by the now-deceased victim of the underlying crime has become more crucial in light of his death. Furthermore, there is no need to protect the privacy of the accused because Cruz was indicted. *See Verisario*, 143 Ill. App. 3d at 1011 ("The fifth reason is inapplicable where the accused is indicted."). Indeed, it is Cruz himself who brought attention to his criminal case by filing a federal lawsuit. For all of these reasons, there is no compelling need for continued secrecy, and the grand jury materials should be released.

## III. Petitioners Seek Indispensable Materials

Petitioners seek these grand jury materials needed for their defense in the Civil Action. Cruz has put his criminal case (including the grand jury proceedings) at issue by filing the Civil Action and accusing Petitioners of, *inter alia*, arresting and prosecuting him absent probable cause. *See Anilao v. Spota*, 918 F. Supp. 2d 157, 164 (E.D.N.Y 2013) (holding that all of the grand jury materials were "indispensable" to addressing probable cause determinations at issue in false arrest and malicious prosecution claims). As explained, *supra*, Petitioners seek the grand jury materials here because they are relevant and indispensable to the Civil Action.

## IV. This Court Consistently Allows Parties to Obtain Grand Jury Materials in Reversed Conviction Cases

In reversed conviction civil cases such as the Civil Action, courts consistently permit parties to obtain grand jury materials including transcripts from the underlying criminal cases,

even when the CCSAO objects. *See e.g.*, Orders granting motion to obtain grand jury materials in reversed conviction civil cases, *People v. Jaime Rios*, Case No. 1989 CR 16525 (May 23, 2023) Ex. C; *People v. Iglesias*, Case No. 1993 CR 15199 (March 25, 2022) Ex. D; *People v. D. Johnson*, Case No. 1991 CR 19833 (January 12, 2022) Ex. E; *People v. C. Johnson*, 1996 CR 497 (July 26, 2019) Ex. F. In this case, the claims in the Civil Action are similar or identical to those in the cases cited above, and, accordingly, should be released here for the same reasons.

**V.     Cruz Does Not Oppose This Motion**

On March 7, 2024, Mr. Cruz's counsel in the Civil Action indicated that Mr. Cruz does not oppose this Motion.

**CONCLUSION**

WHEREFORE, Petitioners respectfully request that this Honorable Court enter an order releasing the grand jury materials in this case, and allowing the Public Defender's Office and Cook County State's Attorney's Office to produce the grand jury materials in their possession to Petitioners, and allowing the transcription of the proceedings by Official Court Reporters to be produced to Petitioners.

Dated: March 8, 2024                    RESPECTFULLY SUBMITTED,

s/ Catherine M. Barber                  /s/ Jeffrey C. Grossich
CATHERINE M. BARBER                     JEFFREY C. GROSSICH, Atty No. 6316511
*One of the Attorneys for Defendant*    *One of the Attorneys for Defendant Wojcik, Riccio*
*City of Chicago*                        *Rutherford, Boris, Gawrys, Mingey, and Yanow*

Eileen E. Rosen                         James G. Sotos
Theresa B. Carney                       Josh M. Engquist
Austin G. Rahe                          Lisa M. Meador
Catherine M. Barber                     Alexis M. Gamboa
Lauren M. Ferrise                       Jeffrey C. Grossich
Andrew Grill                            THE SOTOS LAW FIRM, P.C.
Jessica Zehner                          141 W. Jackson Blvd., Suite 1240A
ROCK FUSCO & CONNELLY, LLC              Chicago, IL 60604
333 W. Wacker, 19th Floor               Tel: (630) 735-3300

8

Chicago, IL 60606
P: (312) 494-1000
cbarber@rfclaw.com

jgrossich@jsotoslaw.com

/s/ Emily E. Schnidt

EMILY E. SCHNIDT
*One of the Attorneys for Defendant*
*Guevara*

s/ Kevin C. Kirk

KEVIN C. KIRK
*One of the attorneys for Edward Maloney*

Steven B. Borkan
Timothy P. Scahill
Graham P. Miller
Emily E. Schnidt
Molly Boekeloo
Borkan & Scahill, Ltd.
20 S. Clark St., Suite 1700
Chicago, Illinois 60603
P: (312) 580-1030
eschnidt@borkanscahill.com

William B. Oberts
Kevin C. Kirk
Tribler Orpett and Meyer, P.C.
225 West Washington St., Suite 2550
Chicago, IL 60606
P: (312) 201-6400
kckirk@tribler.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2024, I filed the foregoing **Motion to Release Grand Jury Materials** with the Clerk of the Court and will send notification of such filing to the following participants listed on the below Service List via email:

***<u>Attorneys for Plaintiff</u>***
Stuart J. Chanen ([Stuart@ChanenOlstein.com](mailto:Stuart@ChanenOlstein.com))
Ariel Olstein ([Ariel@ChanenOlstein.com](mailto:Ariel@ChanenOlstein.com))
CHANEN & OLSTEIN LLP
7373 Lincoln Ave., Suite 100
Lincolnwood, IL 60712
P: 847-469-4669

Jack Samuel Tenenbaum
Northwestern Pritzker School of Law
375 E. Chicago Ave., Suite 411
Chicago, IL 60611
P: 312-503-4808
[s-tenenbaum@law.northwestern.edu](mailto:s-tenenbaum@law.northwestern.edu)

***<u>Attorneys for the City of Chicago</u>***
Eileen E. Rosen ([erosen@rfclaw.com](mailto:erosen@rfclaw.com))
Andrew J. Grill ([agrill@rfclaw.com](mailto:agrill@rfclaw.com))
Austin G. Rahe ([arahe@rfclaw.com](mailto:arahe@rfclaw.com))
Catherine M. Barber ([cbarber@rfclaw.com](mailto:cbarber@rfclaw.com))
Jessica Zehner ([jzehner@rfclaw.com](mailto:jzehner@rfclaw.com))
Lauren M. Ferrise ([lferrise@rfclaw.com](mailto:lferrise@rfclaw.com))
Theresa B. Carney ([tcarney@rfclaw.com](mailto:tcarney@rfclaw.com))
Rock, Fusco & Connelly
333 West Wacker Drive, 19th Floor
Chicago, IL 60606
P: (312) 494-1000

***<u>Attorneys for Reynaldo Guevara</u>***
Steven B. Borkan ([Sborkan@borkanscahill.com](mailto:Sborkan@borkanscahill.com))
Timothy P. Scahill ([tscahill@borkanscahill.com](mailto:tscahill@borkanscahill.com))
Graham P. Miller ([gmiller@borkanscahill.com](mailto:gmiller@borkanscahill.com))
Emily E. Schnidt ([eschnidt@borkanscahill.com](mailto:eschnidt@borkanscahill.com))
Molly Boekeloo ([mboekeloo@borkanscahill.com](mailto:mboekeloo@borkanscahill.com))
Whitney Hutchinson ([whutchinson@borkanscahill.com](mailto:whutchinson@borkanscahill.com))
Mischa Itchhaporia ([mitchhaporia@borkanscahill.com](mailto:mitchhaporia@borkanscahill.com))
Krystal Gonzalez ([kgonzalez@borkanscahill.com](mailto:kgonzalez@borkanscahill.com))
Borkan & Scahill
20 S. Clark Street, Suite 1700
Chicago, IL 60603

P: (312)-580-1030

***__Attorneys for Edward Maloney__***
William B. Oberts ([wboberts@tribler.com](mailto:wboberts@tribler.com))
Kevin C. Kirk ([kckirk@tribler.com](mailto:kckirk@tribler.com))
Tribler Orpett and Meyer, P.C.
225 West Washington St., Suite 2550
Chicago, IL 60606
P: (312) 201-6400

/s/ Jeffrey C. Grossich
JEFFREY C. GROSSICH

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

PEOPLE OF THE STATE OF ILLINOIS,    )
                                     )
                   Plaintiff,      )     Case No.: 93 CR 25151
                                     )
     v.                         )
                                   )     Hon. Judge Erica L. Reddick
JOSE CRUZ,                   )
                                   )
               Defendant.     )

## <u>ORDER</u>

This cause coming to be heard on Petitioners' Motion to Release Grand Jury Materials in Case No. 93 CR 25151 for the purpose of the federal case, *Jose Cruz v. Reynaldo Guevara, et al.*, U.S. Dist. Ct. Case No. 23-cv-04268 (the "Civil Action"), due notice having been given, and the Court being fully advised in the premises, IT IS HEREBY ORDERED THAT:

Petitioners' Motion to Release Grand Jury Materials is GRANTED. If the grand jury proceedings have not been transcribed, the Court hereby orders the court reporter to transcribe the proceedings at Petitioners' expense. The Court further allows the Public Defender's Office and the Cook County State's Attorney's Office to produce the grand jury materials, including transcripts, evidence, and subpoenas, in their possession to the parties in the Civil Action.

ENTERED:

_____
Circuit Court Judge

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Jose Cruz, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | |
| Former Detective Reynaldo Guevara, | ) | No. 23 cv 4268 |
| Former Detective Anthony Wojcik, | ) | |
| Former Detective Robert Rutherford, | ) | The Honorable Jeremy Daniels |
| Former Detective Anthony Riccio, | ) | |
| Former Detective Robert Boris, | ) | **JURY TRIAL DEMANDED** |
| Former Detective Stephen Gawrys, | ) | |
| Sergeant Edward Mingey, | ) | |
| Attorney Geri Lynn Yanow, as the | ) | |
|    Special Representative of Former | ) | |
|    Detective Ernest Halvorsen, deceased, | ) | |
| Asst. Cook County State's Attorney | ) | |
|    Edward Maloney, and | ) | |
| The City of Chicago, | ) | |
| | ) | |
| *Defendants.* | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Jose Cruz complains against former Chicago Police Department ("CPD")

Detectives (1) Reynaldo Guevara (#20681), (2) Anthony Wojcik (#20834), (3) Robert Rutherford

(#20720), (4) Anthony Riccio (#20870), (5) Robert Boris (#20670), (6) Stephen Gawrys (#20689),

(7) former sergeant Edward Mingey (#1731), (8) Attorney Geri Lynn Yanow, as the Special

Representative of Ernest Halvorsen (#20692), deceased (collectively, the "Officer Defendants"),

(9) former Cook County Assistant State's Attorney Edward Maloney (with the Officer

Defendants, the "Individual Defendants"), and (10) the City of Chicago (with the Individual

Defendants, the "Defendants"), as follows:

### INTRODUCTION

1.    Jose Cruz spent 28-3/4 years wrongfully convicted and imprisoned for a murder

and attempted murder that he did not commit.

2.    Cruz's wrongful conviction and imprisonment resulted from the egregious

1

misconduct of disgraced former Chicago Police Detective Reynaldo Guevara and several of his most notorious Area 5 associates, including Defendants Halvorsen, Wojcik, and Mingey.

3.      Guevara and the other Officer Defendants framed Cruz for an October 6, 1993 shooting by, among other things:

(a) manipulating and pressuring a witness to falsely identify Cruz as one of the shooters;

(b) suppressing exculpatory evidence, including eyewitness statements that the shooters, unlike Cruz, were Black;

(c) fabricating false police reports, and

(d) purposefully failing to investigate the shooting and identify the actual perpetrators.

4.      At Cruz's January 1996 criminal trial (the "1996 trial"), aside from generic gang culture testimony, the only incriminating evidence that the State presented against Cruz was the single false identification of Cruz, which Guevara and the Officer Defendants had coerced from an eyewitness. The State did not present a single shred of physical or forensic evidence that connected Cruz to the shooting, nor does any such evidence exist. There is no credible evidence implicating Cruz in the shooting, and Cruz was not involved in the shooting.

5.      On January 30, 1996, however, despite the absence of any physical or forensic evidence linking Cruz to the October 6, 1993 shooting, a Cook County jury found Cruz guilty, and on the same day, the trial court sentenced Cruz to a prison term of 60 years for first-degree murder and 30 years for attempted murder, to be served consecutively to each other (and also consecutively to a 15-year imprisonment for a separate, unrelated conviction).

6.      After his conviction, Cruz continued to maintain his innocence and vigorously fought to have his conviction overturned, consistently maintaining that he was not involved in the October 6, 1993 shooting. The courts, however, repeatedly denied Cruz's appeals and rejected his postconviction petitions, in most instances on procedural grounds, without

2

reaching the merits.

7. On July 24, 2018, in the wake of several investigations that uncovered an avalanche of evidence that Detective Guevara, together with other Area 5 detectives and supervisors, had framed dozens of innocent men for crimes they did not commit — often by coercing false witness identifications — Cruz filed a successive petition for post-conviction relief, seeking to vacate his convictions and sentence.

8. Four years later, on July 11, 2022, prior to a third stage hearing on Cruz's post-conviction claims, the Cook County State's Attorney's Office announced it would no longer contest Cruz's petition, and the same day, Cook County Circuit Court Judge Tyria Walton vacated Cruz's convictions and dismissed his indictment. Cruz was released from prison the next day, July 12, 2022. On August 9, 2023, the Chief Judge of the Cook County Criminal Court, the Honorable Erica Reddick, granted Cruz a Certificate of Innocence ("COI") under the Illinois Innocence Act, 735 ILCS 5/2-702, a copy of which is attached to this Complaint as Exhibit A.

9. As already mentioned above, Cruz's wrongful conviction was *not* an isolated incident. Cruz is one of at least 38 men and women exonerated after being convicted on murder charges arising from corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

10. As set forth in greater detail in Section I below, Guevara and his fellow officers' malicious and unconstitutional conduct was part of a widespread pattern and practice at Area 5, which Defendant City of Chicago condoned, facilitated, and ratified, and under which police fabrication of incriminating evidence, withholding of exculpatory evidence, and perjured testimony to support the fabrication and concealment of evidence was routine at Area 5.

11. In court proceedings, Defendants Guevara, Halvorsen, and their associates have plead the Fifth Amendment right not to incriminate themselves in response to questions

3

about their misconduct as police officers. In fact, on December 9, 2020, during his deposition in *DeLeon-Reyes v. Guevara, et al.,* 18-CV-01028 (N.D. Ill.), Guevara repeatedly invoked the Fifth Amendment in response to questions about the investigation of the October 6, 1993 shooting that resulted in Cruz's wrongful conviction.

12.     Although Cruz has finally regained his freedom and has finally received judicial recognition of his innocence, the injuries he suffered as a result of Defendants' misconduct, and the nearly 29 years that he was deprived of his liberty and isolated from his family and society, are profound and incalculable. Cruz therefore brings this lawsuit, seeking compensation for those injuries and to hold Defendants accountable for their malicious and unconstitutional misconduct.

13.     Cruz asserts claims pursuant to 42 U.S.C. § 1983, the United States Constitution, the Illinois Constitution, and Illinois common law, and seeks compensatory damages and punitive damages in an amount to be determined at trial.

## JURISDICTION AND VENUE

14.     This Court has federal subject matter jurisdiction over Cruz's federal claims pursuant to 28 U.S.C. § 1331.

15.     This Court has federal subject matter jurisdiction over Cruz's state law claims pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

16.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because all the events giving rise to Cruz's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in his wrongful conviction and imprisonment.

## PARTIES

17.     Plaintiff Jose Cruz is a 54-year-old Hispanic male who presently resides in Chicago, Illinois.  On October 9, 1993, the day of his arrest, Cruz was 24 years-old, and he resided in the basement of his aunt's house in Chicago, Illinois. Cruz, at that time, was a

4

member of the Latin Kings gang.

18.     At all relevant times, each of the Officer Defendants identified on page 1 of this Complaint was an officer in the CPD, acting under color of law and within the scope of his employment for the City of Chicago. Cruz sues each of the Officer Defendants in their individual capacities.

19.     At all relevant times, Defendant Mingey held the rank of sergeant and supervised one or more of the other Officer Defendants. Mingey personally participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Officer Defendants whom he supervised.

20.     The City of Chicago (the "City") is an Illinois municipal corporation. The City, at all relevant times, employed each of the Officer Defendants. The City of Chicago is liable for all torts committed by the Officer Defendants pursuant to the doctrine of *respondeat superior* and it is also statutorily obligated to pay any compensatory tort judgment entered against the Officer Defendants pursuant to 745 ILCS 10/9-102. Additionally, the City of Chicago is responsible for the policies and practices of the CPD.

21.     At all relevant times, Defendant Edward Maloney was an employee of the Cook County State's Attorneys' Office (the "CCSAO"), who had non-prosecutorial, investigatory responsibilities during the investigation of the shooting at issue, and who acted under color of law and within the scope of his employment. ASA Maloney personally participated in the misconduct alleged in this Complaint, including the fabrication of at least one false police report. Cruz sues ASA Maloney in his individual capacity.

**FACTS**

**A.      The October 6, 1993 shooting.**

22.     On October 6, 1993, at approximately 3:30 a.m., three or four unknown assailants pulled up to a 24-hour gas station on the corner of North and Kedzie and shot 16-

5

year-old Antwane Alfonso Douglas and 40-year-old Vernon Jay Meadors, in an apparent gang-related shooting. Douglas died at the scene, and Meadors, who was shot in the arm, survived and was taken to the hospital.

23.     Prior to the shooting, Meadors had been waiting at a bus stop on the corner of North and Kedzie near the gas station. Meadors, as he would later testify, saw a Black teenager wearing a Duke Blue Devils sweatshirt, later identified as Douglas, pull up in a car into the gas station. Douglas' car had stopped running and Douglas asked Meadors where he could get a jump-start. Meadors responded that he doubted anything would be open and suggested leaving the car at the gas station. Douglas agreed and walked away.

24.     As Douglas walked away, a second car pulled into the station, about 15 feet from Meadors. This second car contained three or four men. According to Meadors, the area where the second car pulled up was well-lit, allowing him to see the front seat passenger's face, but he could not see the faces of the other men in the car. Meadors testified that he observed this car for a total of about four to five seconds.

25.     According to Meadors, within three or four seconds of the car pulling up, the man sitting in the front passenger seat asked Douglas if he was a Disciple, Douglas responded he was a Vice Lord, and the men exited the car and began firing at Douglas. At least 20 bullets were fired, and Douglas was killed.

26.     As soon as the shooting began, Meadors, by his own account, dove to the ground. He "listened to at least 20 bullets being shot." Then it got silent. Then, he "heard somebody holler out, 'Witness!'" and he was shot in the arm. Having been shot, Meadors laid on the sidewalk until he heard the car with the assailants drive away.

27.     Meadors, according to his own testimony, did not have an adequate opportunity to view the perpetrators during the shooting.

28.     After the car drove away, Meadors attempted to enter the gas station, but the

6

gas station attendant, later identified as Pedro Jaramillo, refused to let him in. Jaramillo told Meadors that he had called the police.

**B.** **The initial police investigation.**

29.     Shortly after the shooting, at approximately 3:35 a.m., police officers and paramedics arrived at the scene and transported Meadors by ambulance to St. Elizabeth's hospital.

30.     At approximately 4:00 a.m., Detectives McDonald, Rutherford, and Boris arrived at the scene and interviewed at least two witnesses there, Jaramillo, the gas station attendant, and Ivan Rios, a man who lived near the scene who told the police he saw the perpetrators drive "right past" him.

31.     Jaramillo observed the entire shooting from behind a glass window in the gas station and had a clear view of the perpetrators. Before the shooting, Douglas had asked Jaramillo for a jump for his stalled car, and Jaramillo told Douglas that he could not help him because the equipment was already put away for the night.

32.      When interviewed at the scene, Jaramillo told the Detectives that the second car with the shooters was a 1979-80 light brown Toyota. Jaramillo also told the Detectives that the person sitting in the front seat passenger of the second car was a Male, Black, 6'0" tall, weighing 170 lbs., approximately 27 in age, and dressed all in black. Jaramillo described the other people in the car as being male Blacks wearing dark clothing.

33.     When Rios was interviewed at the scene by the same Detectives, he explained that he lived near the scene, heard the gunshots and screams, and ran to the scene fearing his brother, who was not home yet, may have been involved.

34.     Rios told the Detectives that the car with perpetrators drove "right past" him and that it contained Black males.  Rios specifically testified: "I told [police] I saw 3-4 Black men in a car that sped away westbound on North Avenue."

7

35.     Despite Rios's eyewitness account, and although he gave the police his contact information, which they documented in a General Progress Report ("GPR"), the police never contacted Rios again after this interview at the scene. (Defendants' decision not to contact Rios is also discussed below).

36.     Cruz, as noted above, is a Hispanic male of light brown complexion, who at the time of the shooting was approximately 5'7" tall and weighed about 190 lbs. Cruz does not match either Jaramillo's or Rios's description of the perpetrators. When the shooting took place, Cruz was sleeping in the basement of his aunt's home in Chicago.

37.     At approximately 4:00 a.m., CPD Mobile Crime Lab Officers Ronald Ferrari and Joseph Bembynista arrived at the scene and began to collect evidence from it. Among other things, the officers photographed the scene and Douglas' body and also recovered and inventoried at least nine 22-caliber cartridges from the scene.

38.     Later the same night, the police recovered, from the Cook County Medical Examiner's Office, the bullet that killed Douglas, a vial of his blood, as well as the clothes Douglas had been wearing when he was shot, which a police inventory report describes as one nylon "Knicks" jacket, one pair of purple pants, and one multicolored shirt. As set forth in Section G below, none of the physical evidence connects Cruz to the shooting in any way.

39.     Later the same night, Detectives McDonald, Rutherford, and Boris left the scene and went to St. Elizabeth's hospital and interviewed Meadors there. Meadors told the Detectives that as soon as he saw that the perpetrators had guns, he dove to the ground. He also told the Detectives that there were three shooters and that he "thinks they were all Hispanic."

40.     In addition, Meadors told the Detectives that each shooter carried a grey colored handgun, two of them "small guns" and one larger, and that the shooters sped away in a small car, possibly a Toyota. Meadors, according to the police reports, described the shooter

8

who had exited the front passenger seat as Hispanic, 5'4" tall, 145-160 lbs., chubby, and with a little mustache.

41.     In the early morning or afternoon hours of the same day, Meadors was released from St. Elizabeth's hospital and returned to his home, located at 1318 North Kedzie, Chicago, IL 60651.

42.     On information and belief, at or near this point in the investigation, given the contradictory eyewitness descriptions of the shooters, and given the police's inability to identify the perpetrators, the Officer Defendants conspired to coerce Jaramillo and Meadors to identify Cruz as one of the shooters, as well as to discredit and suppress Jaramillo and Rios' statements that the shooters were Black. The Officer Defendants, on information and belief, specifically targeted Cruz because they knew that Cruz had been involved, five months earlier, in a May 26, 1993 shooting near Humboldt Park, in which Latin Kings and other rival gang members had fired at CPD patrol officers.

43.     In other words, for Defendant Guevara and the other Officer Defendants, it did not matter at all that Cruz was, in fact, not involved in the October 6, 1993 shooting, nor did they care to properly investigate the shooting to identify the real perpetrators. Rather, because Cruz had been implicated in an incident in which gang members fired at police officers, Guevara and the other Officer Defendants decided to frame Cruz for the October 6, 1993 shooting.

## C.     Defendant Guevara and his partners pressure and manipulate Meadors into falsely identifying Cruz as one of the shooters.

44.     On the evening of October 6, 1993, after Meadors returned home from the hospital, Detective Guevara, Sergeant Mingey, and Detective Halvorsen paid Meadors a visit at his house. There, although two eyewitnesses, Rios and Jaramillo, had already told the police that the shooters were Black, the officers showed Meadors a photo lineup consisting of

21 Hispanic males, including Cruz.

45.     During this visit, Guevara, Mingey, and Halvorsen repeatedly tried to pressure and manipulate Meadors to identify Cruz (and possibly other members of the Latin Kings) as the shooters. However, despite these efforts, after reviewing the photos, Meadors was unable to make any identification from the photo lineup. Meadors failure to identify Cruz, on information and belief, infuriated Guevara and the other officers.

46.     Guevara and the other Officer Defendants consequently devised a plan to intimidate Meadors and coerce him into identifying Cruz by making him believe that he and his family were in immediate danger and that they needed police protection, which the CPD would only provide if he "cooperated" by identifying Cruz.

47.     Guevara and the other officers did this by leaking or causing the leak of information concerning the shooting to the Chicago Tribune, including Meadors' name and address. Specifically, on the next morning, October 7, 1993, the Chicago Tribune published, and Meadors read, an article about the shooting, which identified Meadors by name and included information about his family home, referencing the block he lived on with his wife and children. Meadors, as he would later testify, "really got upset and frightened then" because he lived within walking distance to the crime scene in a neighborhood with a large gang presence.

48.     The following day, October 8, 1993, Detective Wojcik visited Meadors at his house and told Meadors that the Chicago Police Department would do "whatever we had to do to make sure he was safe… [and] to take care of him." Wojcik, however, made it clear to Meadors, directly or indirectly, that the CPD would only ensure his and his family's safety if Meadors would identify Cruz as one of the shooters.

49.     Despite not being able to previously make any identification, Meadors told Wojcik that he would be able to identify the shooter, but that he would first need to talk it

over with his family. Meadors said this, on information and belief, because he feared for his and his family's life.

50.    Several hours later, after Meadors spoke with his family, Meadors' father called Detective Wojcik and said that his son was willing to make an identification. The police then, *and only then*, arranged to put Meadors and his family into witness protection.

51.    Later the same day, after the police relocated his family, Meadors went to the police station, where Wojcik showed him a *second* photo array containing multiple members of the Latin Kings, including Cruz. This second photo array also included only Hispanics, despite the fact that Jaramillo and Rios both described the shooters as Black.

52.    Cruz was the only recurring participant between the first photo array the officers showed Meadors at his home, from which Meadors *could not* identify Cruz or anyone else, and the second set of photos Wojcik showed Meadors at the police station.

53.    On information and belief, during this second photo array, aside from ensuring that Cruz was the only recurring participant in the array, Wojcik also used other improper suggestive tactics to get Meadors to identify Cruz, such as, repeatedly showing Meadors Cruz's photo, pointing to it, making remarks about it, such as "are you sure you didn't see this person shoot the victims?," or by otherwise singling out Cruz.

54.    After being intimidated and frightened by the police leak to the Chicago Tribune, being subjected to Guevara, Mingey, Halvorsen, and Wojcik's other pressure tactics and manipulations, and after being shown a photo of Cruz twice, Meadors, for the very first time, identified Cruz in the second set of photos.

55.    Later the same day, Sergeant Mingey showed Meadors the 21 photos from the original stack in which Meadors had previously failed to identify Cruz. On information and belief, during this second showing of the first photo array, aside from the fact that this was the third time the police were showing Meadors a photo of Cruz, Mingey also used other

11

improper suggestive tactics to get Meadors to identify Cruz, such as the ones described above with respect to Wojcik and the second photo array.

56.     After reviewing the photos a second time, and being shown a photo of Cruz a third time, Meadors identified Cruz again.

**D.     The Officer Defendants conduct a tainted and suggestive live lineup.**

57.     Following Meadors' identification, on October 9, 1993, at approximately 1:15 p.m., police officers arrested Cruz, and later the same day, at approximately 5:45 p.m., they had Meadors and Jaramillo view a live lineup.

58.     Meadors, as he would later testify, believed that the police had already arrested the person whose picture he picked out and that the live lineup was simply a matter of having him identify the person he had been shown by the police repeatedly in the photographs.

59.     Despite this, in order to ensure that Meadors identified Cruz again in the live lineup, Detectives Wojcik, Riccio, and Gawrys, in conspiracy with the other Individual Defendants, employed unduly suggestive procedures during the live lineup, including but not limited to, having Cruz, unlike any other participant, sit atop a yellow phone book so that he stood out from the fillers.

60.     The yellow phone book that the Detectives had Cruz sit on during the live lineup is visible in the following photo from the lineup:

12



61.     The Detectives also used only three fillers in the lineup, giving Meadors a one-in-four shot of selecting Cruz, even before considering how Cruz was singled out in the lineup, how the officers repeatedly pressured and coerced Meadors to identify Cruz, and how the offers repeatedly showed Meadors photos of Cruz. From this live lineup, Meadors identified Cruz a third time, and he later also identified Cruz again at the 1996 trial.

62.     Meadors' identification of Cruz is the product of the highly suggestive and unlawful tactics used by Defendants Guevara, Mingey, Halvorsen, and Wojcik, who each have an established history of framing innocent men for crimes they did not commit through, among other things, coercing and manipulating false witness identifications.

63.     Meadors, according to his own testimony, did not have an adequate opportunity to view the perpetrators during the shooting.

64.     Meadors failed to identify Cruz in the first photo array, which was shown to him only hours after the shooting.

65.     Meadors and the perpetrators were complete strangers.

13

66.     Numerous studies have shown that identifications of strangers are proverbially untrustworthy and include very high error rates.

67.     Meadors testified at Cruz's 1996 trial that he did not have an adequate opportunity to view the shooters. As Meadors put it, "I saw them, *but yet I didn't see them*, because things started going pretty quick." Trial Transcript, at I-35-36 (emphasis added).

68.     The Officer Defendants coerced and manipulated Meadors' identification of Cruz because they knew that, in the absence of properly investigating the shooting, that identification was their only chance at "closing" the case and obtaining a conviction against Cruz.

**E.     Guevara and the Officer Defendants make repeated attempts to coerce Jaramillo into falsely identifying Cruz and to recant his statement to the police, at the scene, that the shooters were Black.**

69.     Aside from coercing Meadors to falsely identify Cruz, Defendant Guevara, and on information and belief one or more of the other Officer Defendants, also made repeated attempts to coerce Jaramillo, the gas station attendant, into falsely identifying Cruz as one of the shooters, and to recant his statement to the police at the crime scene that the shooters were Black males.

70.     Defendant Guevara visited Jaramillo at least three times during the investigation and showed him photo arrays of only Hispanic men, even though Jaramillo told the police immediately after the shooting that the shooters were Black.

71.     At these meetings, as Jaramillo remembers, "[Guevara] told [me] to say who it was," and when Jaramillo refused to falsely identify Cruz, "Reynaldo Guevara would get furious." Guevara's psychological pressure and anger caused Jaramillo to fear him: "I felt scared."

72.     Jaramillo's fear of Guevara was so intense that he reported Guevara's intimidation and harassment to his employer, Francisco Valverde, who retained a criminal defense attorney, Robert Fisher, on Jaramillo's behalf. As Jaramillo later stated in a sworn

14

affidavit, "[m]y boss got me an attorney because I felt pressured because [Guevara] would tell me that he wanted [me to pick out the wrong person]."

73.     Valverde witnessed Guevara's intimidation and harassment of Jaramillo and has also provided an affidavit corroborating Jaramillo's account of how Guevara repeatedly tried to coerce Jaramillo into falsely identifying Cruz. As Valverde recalls, after Cruz's conviction, Cruz's attorneys asked Jaramillo to sign an affidavit about his interactions with Guevara, and Jaramillo initially refused that request because, even then, he still feared Guevara and believed "he would go to jail."

74.     There are no police reports in the police file documenting any of Guevara's interactions with Jaramillo.

75.     Detective Guevara either purposefully did not document these interactions with Jaramillo, in violation of CPD's own rules and regulations, or he destroyed the documents, also in violation of the CPD's own rules and regulations, as well as in violation of Cruz's constitutional rights.

76.     Guevara concealed his interactions with Jaramillo in order to hide his and the other Officer Defendants' misconduct and in furtherance of the Officer Defendants' unconstitutional and malicious conspiracy to frame Cruz for Douglas' murder.

77.     The Officer Defendants, and on information and belief, ASA Maloney, were all aware of Guevara's intimidation and harassment of Jaramillo.

78.     Aside from the above-described efforts to coerce Jaramillo into falsely identifying Cruz, on October 9, 1993, at approximately 5:45 p.m., Detectives Wojcik, Riccio, and Gawrys also had Jaramillo brought to Area 5, where they had him view a live line-up consisting of only Hispanic males, despite his repeated statements that the shooters were Black. This was the same tainted and improperly suggestive live lineup from which the Defendants had Meadors identify Cruz, as described above.

15

79.     Jaramillo, however, did not relent to Guevara and the other Officer Defendants'
efforts to coerce him into falsely identifying Cruz. Jaramillo never identified Cruz and
remains adamant to this day that the shooters, unlike Cruz, were Black males.

**F.      The Officer Defendants fabricated false police reports to discredit
Jaramillo and Rios's statements that the shooters were Black.**

80.     Unable to coerce Jaramillo into falsely identifying Cruz, especially after his
employer retained a lawyer for him, and well aware that Jaramillo and Rios identified the
shooters as Black, Guevara and the other Officer Defendants conspired with one another to
discredit Jaramillo and Rios through false police reports.

81.     One such false police report is Jaramillo's October 9, 1993 8:45 p.m. statement
to Detective Wojcik and ASA Maloney ("Jaramillo's Statement"), taken about three hours
after Jaramillo failed to identify Cruz in the live lineup.

82.     Jaramillo's native language is Spanish, and Jaramillo to this day cannot read,
write, speak, or understand English beyond what is necessary to help run a gas station.
Jaramillo's Statement is written in English, and it lists Detective Maria Soto as the
translator.

83.     Despite Jaramillo's repeated descriptions of the shooters as Black, and his
statement to the police at the scene that the shooter who had exited the front passenger seat
of the perpetrators' car was a Black male, Jaramillo's Statement states: "***Witness Jaramillo
describes the shooter as male*** ~~***of unknown***~~ ***olive complexed Hispanic or light skinned
Black***." (emphasis added.)  The words "of unknown" are crossed out in Jaramillo's Statement,
as depicted here.

84.     Jaramillo never described the shooter to the police as an "olive complexed
Hispanic or light skinned Black."

16

85.     In Cruz's post-conviction proceedings, Jaramillo firmly denied making any such statement to the police, and when asked if it was even possible that he told the police that the shooter was an "olive complexed Hispanic or light skinned Black," Jaramillo stated, "[n]o, it's not possible… because those words were put on me by the police" and the statement is "false."

86.     As Jaramillo remembers, the police tried to change his mind for him to say the shooter was a light skinned Black or olive-skinned Hispanic male, "Yes I remember they tried to change the mind."

87.     ASA Maloney wrote Jaramillo's Statement, including the false statement that the shooter was an "olive complexed Hispanic or light skinned Black."

88.     ASA Maloney, Detective Wojcik, and the other Officer Defendants conspired to fabricate this false statement because they were concerned that Jaramillo would be called as a defense witness to testify that the shooters, unlike Cruz, were Black, which would undermine their effort to frame Cruz for the shooting and possibly also expose their misconduct throughout the homicide investigation.

89.     A second false police report is a typed GPR dated October 6, 1993, 1st Watch (the "False GPR"). The False GPR identifies the reporting officers as Detectives Boris, McDonald, and Rutherford. The False GPR states:

> **Vernon Meadors, who was shot in the arm and lying on the ground was approached by a M/WH [Male/White Hispanic], who walked up to him stared at him in a very threatening way but said nothing. This is apparently Ivan Rios a known local gang banger. Ivan Rios, it was later learned, approached the gas station attendant and told him something. Rios also stated that there were three Blacks in the car that sped away. The attendant also said Black offenders. Meadors stated that he thinks all were Hispanic. Was Rios trying to sidetrack the investigation? Meadors observed the man walking back and forth at the crime scenes [sic] when the police were there closely watching everything.**

90.     Rios never approached Jaramillo, nor did he speak to him at the scene.

91.     Rios never walked up to Meadors and stared at him in a very threatening way.

92.     As Jaramillo states in his affidavit, "[b]esides the two victims and police officers, I did not speak with anyone else at the crime scene, nor did anyone speak to me."

93.     As Rios has also affirmed in his affidavit, he neither spoke to Jaramillo nor menacingly stared at Meadors at the crime scene. "After I was interviewed by the police officers, I walked back home. I did not interact with anyone other than the police officers at the crime scene. I never approached or spoke to the gas station attendant (Jaramillo). I never (approached) anyone lying on the ground and never stared (at) them in a threatening manner or any other way."

94.     On information and belief, Detectives Boris, McDonald, and Rutherford did not complete this typed GPR on October 6, 1993 during the 1st Watch, but sometime later during the investigation, when the Officer Defendants schemed to discredit Rios and Jaramillo and frame Cruz for the shooting.

95.     Other *handwritten* GPRs completed by same Detectives at the scene, including the GPRs specifically relating to the interviews of Jaramillo and Rios at the scene, make no mention of Rios approaching Jaramillo, speaking to Jaramillo, or staring at Meadors in a threatening way.

96.     On the bottom of the False GPR there are boxes where the Detectives' supervisor was supposed to sign his or her name, as well as identify the date and time that he or she received the GPR. All of those boxes are completely blank in this GPR.

97.     Detectives Boris, McDonald, and Rutherford, in conspiracy with Guevara the other Officer Defendants, fabricated the statement that Rios spoke to Jaramillo at the scene because they wanted to discredit both Rios and Jaramillo and their statements that the perpetrators were Black.  The Detectives did this to falsely imply that Rios had intimidated Jaramillo into stating that the perpetrators were Black and also to discredit Rios as a "known local gang banger."

18

98. A third false police report is Detectives Wojcik and Riccio's Supplementary Report concerning the October 9, 1993 live lineup shown to Meadors and Jaramillo (the "False Lineup Report").

99. In the False Lineup Report, the Detectives wrote that during the live lineup Jaramillo, "again informed the R/Ds [Reporting Detectives] that at no time did he get a look at the face of the shooter." Jaramillo never said this to Detective Wojcik, Detective Riccio, or to any other police officer.

100. The Detectives fabricated this statement to discredit Jaramillo's numerous statements to the police that the shooter he saw exiting the front passenger side of the perpetrators' car was Black, as were the other two perpetrators that he saw in the same vehicle.

101. Unfortunately, the Officer Defendants' malicious efforts to discredit Jaramillo and Rios through, among other things, the above-described false police reports were successful. Cruz's defense counsel at his 1996 trial did not call Jaramillo or Rios to testify because, on information and belief, he knew they could easily be impeached and discredited through the police reports and police testimony. After all, no reasonable defense counsel—in the trial of a Hispanic defendant— would risk calling a witness who purportedly told the police he saw "a light skinned Black or olive-skinned Hispanic" commit the shooting, certainly not without the benefit of having the Guevara-related misconduct evidence, which was uncovered decades later.

**G. The additional ways in which the Officer Defendants caused Cruz's wrongful conviction.**

102. Aside from coercing a false identification from Meadors, suppressing evidence of that coercion, and fabricating false police reports to discredit Jaramillo and Rios, the Officer Detectives ensured Cruz's wrongful conviction by intentionally ignoring evidence and leads

available to them, and by failing to investigate the shooting.

103. For example, after his arrest on October 9, 1993, Detectives Wojcik and Riccio transported Cruz to Area 5 where they interrogated him. Cruz denied any involvement in the shooting and told the Detectives exactly where he was and what he was doing when the shooting occurred on October 6, 1993, at 3:30 a.m.—he was sleeping in the basement of his aunt's home, where he was living.

104. Specifically, Cruz told the Detectives that he arrived home around 12:30 a.m. and went to his bedroom in the basement around 1:00 a.m. Cruz further told the Detectives that he remained there until he awoke at 5:00 a.m., when his aunt, Ms. Ada Pacheco, left for Puerto Rico. In addition, Cruz told the Detectives that his aunt's husband, Santiago McClaren, and his cousins, 24-year-old Luis Tartabu ("Tito") and 13- year-old Luis Rodriguez ("Danny"), also lived in the same house.

105. Cruz informed the Detectives that two witnesses could corroborate his alibi, his aunt, Ms. Pacheco, and his cousin Tito, who were both awake around 1:00 a.m. when Cruz went down to the basement to go to sleep.

106. Despite Cruz volunteering this information, the police never even tried to contact, let alone take a signed statement, from Ms. Pacheco, nor did they take a signed statement from Tito. Instead, on October 9, 1993, at 11:25 p.m., inside an interrogation room at Area 5, without a youth officer or parent present, ASA Maloney and Detective Riccio took a singular signed statement from Danny, Cruz's 13-year-old cousin, even though Cruz had already told the police that Danny could not corroborate his alibi because he was asleep when Cruz had arrived at the house on the night of the shooting.

107. On information and belief, Danny's purported statement to the police, at least in part, contains false information that ASA Maloney and/or Detective Riccio fabricated in whole or in part and manipulated Danny into saying.

20

108. The Officer Defendants and ASA Maloney purposefully failed to investigate Cruz's alibi because they knew such an investigation could turn up exculpatory evidence supporting Cruz's alibi defense and because they knew such evidence could also possibly ruin their plan to frame Cruz for the shooting, as well as expose their misconduct.

109. Another example of the Officer Defendants' failures to investigate the shooting is the fact that the police failed to even try to search for, let alone find, any physical evidence connecting or linking Cruz to the shooting in any way.

110. The police never obtained a search warrant, nor performed any search, at Cruz's aunt's house for weapons matching the eyewitness descriptions of the guns used by the perpetrators and/or for clothes matching the eyewitness descriptions of the clothes worn by the perpetrators.

111. The police also never identified or attempted to recover any vehicle matching the eyewitness descriptions of the vehicle used by the perpetrators, nor did they make any effort to connect Cruz in any way to any such vehicle.

112. The police never made any effort to identify any of the two or three other assailants who, according to the police, had committed the shooting with Cruz. In fact, although all indications were that the shooting was gang-related, and although the police apparently believed that Latin Kings committed the shooting, the police apparently never attempted to question any gang members (other than Cruz) or any gang informants about the shooting, nor did they investigate at all who within the Latin Kings had purportedly ordered or directed the shooting, when that happened, and whether the Latin Kings had any specific grievance with Douglas or Meadors.

113. Likewise, the police never questioned any member of the Disciples about the shooting, or for that matter any family, friends, or associates of Douglas, even though the police purportedly believed that the perpetrators were Latin Kings who shot Douglas because

21

he was a member of a rival gang, the Disciples.

114. If the police conducted any such investigation, then they failed to document it in police reports, in violation of the CPD's rules and regulations, as the police file contains no indication that any such investigation ever occurred. Alternatively, the police destroyed any such documents, in violation of the CPD's rules and regulations and Cruz's constitutional rights.

115. Finally, although the police recovered physical evidence from the crime scene, and although it appears that the police forwarded at least some of that evidence to the CPD's Crime Lab for testing, not a single shred of physical or forensic evidence implicates Cruz in the shooting in any way.

116. The police never recovered, or even seriously attempted to recover, any fingerprints connecting Cruz to the shooting.

117. The police never recovered, or even seriously attempted to recover, any of the guns involved in the shooting, let alone any evidence connecting Cruz to any such guns.

118. The police never recovered, or even seriously attempted to recover, the vehicle used by the perpetrators, let alone any evidence connecting Cruz to any such vehicle.

119. The police never recovered, or even seriously attempted to recover, any gunshot residue or ballistics evidence, let alone any such evidence connecting Cruz to the shooting.

120. The police never recovered, or even seriously attempted to recover, any hairs or fibers connecting Cruz to the shooting.

121. The police never recovered any DNA or serology evidence connecting Cruz to the shooting.

122. The police never recovered, or even seriously attempted to recover, any video or photograph connecting Cruz to the shooting.

123. The police never obtained any inculpatory statement from Cruz connecting him to the shooting. In fact, Cruz repeatedly insisted he had nothing to do with the shooting.

124. As already noted above, aside from Meadors' identification of Cruz and general gang culture testimony, the State did not present any evidence incriminating Cruz at his 1996 trial.

125. Notably, according to the State's own purported gang culture expert, Frank Petrone, who testified at Cruz's 1996 trial, there were approximately 10,000 Latin Kings and a total of 50,000 gang members hostile to Disciples in Chicago at the time of the October 6, 1993 shooting.

126. Guevara and the other Officer Defendants intentionally failed to investigate the shooting and pursue the leads available to them because they were not invested in "solving" the crime. Instead, despite the absence of any credible evidence implicating Cruz in the shooting, they focused on framing Cruz for the shooting by pressuring witnesses to falsely identify him as one of the shooters, fabricating false police reports, and suppressing exculpatory evidence, as set forth above.

### H. The immeasurable harms Cruz suffered because of his wrongful conviction and imprisonment.

127. As already stated above, as a result of Individual Defendants' misconduct, on January 30, 1996, a Cook County jury found Cruz guilty of Douglas' murder and Meadors' attempted murder and the trial court sentenced Cruz to 90 years of imprisonment.

128. As also stated above, on July 11, 2022, after several investigations uncovered Detective Guevara and his fellow Area 5 detectives and supervisors' misconduct, the Cook County State's Attorney's Office announced it would no longer contest Cruz's post-conviction petition and the Cook County Circuit Court vacated Cruz's convictions and dismissed his indictment.

129.     Between his arrest on October 9, 1993 and his release from prison on July 12, 2022, Cruz spent 28 years, 9 months, and 3 days wrongfully incarcerated.

130.     Throughout that time, Cruz was consumed by the horror of his wrongful conviction, was living with the constant fear that the truth would never be revealed, and that he —forever—would be falsely branded as a murderer.

131.     Throughout his nearly 29-years of wrongful imprisonment, Cruz suffered tremendous physical and psychological pain and suffering, humiliation, constant fear, anxiety, depression, despair, and other physical and psychological effects, as well as reputational harm. Because of his wrongful conviction and imprisonment, Cruz, during the prime of his young adulthood, was deprived of, among many other things, the opportunity to meet a spouse, start a family of his own, grow old with his extended family, and make a life with them.

132.     Cruz was also stripped of opportunities to engage in meaningful labor, develop skills, pursue his interests and passions, and enjoy the basic pleasures of the human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

133.     Cruz's wrongful conviction and imprisonment, to this day, have left him with psychological pain and suffering, fear, anxiety, and related trauma.

## I.     Defendant Guevara and the other Officer Defendants' extensive history of framing innocent persons for crimes they did not commit.

134.     As a result of certain City and CPD policies, practices, and customs, discussed separately in Section J below, Detective Guevara, together with other Area 5 officers and supervisors, including the Defendant Officers in this case, framed dozens of innocent men and women for crimes they did not commit, over the span of at least two decades. Like Cruz, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara and his fellow Area 5 officers and supervisors.

135. As of the filing of this Complaint, at least 38 men and women have had their convictions dismissed (or were acquitted) because of Defendant Guevara's misconduct, and those men and women, collectively, spent more than 790 years incarcerated. A list identifying these individuals and the years each spent incarcerated is attached to this Complaint as Exhibit B.

136. Defendant Guevara and the other Officer Defendants have a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, fabricating evidence, and suppressing exculpatory evidence, all in the course of maliciously prosecuting innocent persons.

137. Illinois courts have repeatedly recognized Detective Guevara's pattern of malicious misconduct. In *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64, the Illinois Appellate Court, referred to Guevara as "a malignant blight on the Chicago Police Department and the judicial system," and held that "Detective Guevara has an extensive history of misconduct, including influencing witnesses to obtain false identifications." *Id.*

138. On December 13, 2017, in Gabriel Solache and Arturo Reyes' post-conviction proceedings, Cook County Circuit Court Judge James Obbish found that Guevara told "bald-faced lies" during court testimony, despite being granted immunity from prosecution, and had "eliminated any possibility of being considered a credible witness in any proceeding." Judge Obbish declared, "I can't give an ounce of credibility to something [Guevara] did 20 years ago. If he would lie after being given immunity under oath, why would this court . . . believe that he was telling the truth when he first testified?"

139. On May 22, 2022, in David Gecht's post-conviction proceedings, Cook County Circuit Court Judge Diana Kenworthy found that Guevara "engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations."

Judge Kenworthy further held that "Guevara had a pattern and practice of threatening the girlfriends and wives of suspects to give false testimony," and that Guevara also "engaged in multiple, repeated and various instances of physical abuse [of suspects and witnesses] in this case as well as other homicide investigations."

140.    In addition to the cases in which individuals have already has their convictions dismissed, there are dozens of other identified cases in which Defendant Guevara and several of the Officer Defendants in this case engaged in serious investigative misconduct.

141.    Given this extensive history of misconduct and the City's failure to meaningfully supervise or discipline Guevara and his fellow Area 5 officers, it is apparent that Guevara engaged in such misconduct because he believed, and had every reason to believe, that the City and the CPD condoned his behavior.

142.    In addition, Defendant Guevara has repeatedly invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he manipulated dozens of witnesses to provide false identifications, fabricated false evidence, suppressed and destroyed exculpatory evidence, including documentary evidence, tortured and abused suspects and witnesses and coerced false statements from them, as well as the instances of misconduct detailed below.

143.    The following are a few more specific examples of Defendant Guevara and his fellow Area 5 officers' misconduct:

(a)    William (Bill) Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, in 1992, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided,

26

Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admitted that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

(b)    In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

(c)    In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification.

27

As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence. Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him. After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey, who are both Defendants in this case.

(d)      In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

(e)      In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify, and making a veiled threat as to what would happen if he did not comply.

(f)      In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in

28

the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

(g)　　In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Guevara's misconduct.

(h)　　In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

(i)　　In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

(j)　　In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

(k)　　In 1995, Defendants Guevara and Halvorsen coerced Luis Figueroa to falsely identify Angel Diaz as the perpetrator of the January 27, 1995 murder of Yolanda Leal, even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

(l)     In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight-hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

(m)    In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

(n)     In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

(o)     In 1996, Defendant Guevara coerced Maria Rivera into making a false identification by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution abandoned murder charges against that individual.

(p)     In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom.

Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

(q)     In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses to be excluded from the courtroom to prevent witness collusion.

(r)     In 2011, the Illinois First District Appellate Court granted Tony Gonzalez a post-conviction hearing based on evidence that Defendant Guevara conducted an unduly suggestive lineup. In this instance, Guevara had concocted a photo array in which Gonzalez's photo was the only one that stood out from the rest.

(s)     In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards ("OPS").

(t)     In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd,

31

her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

(u)     In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with OPS. Witnesses who saw Hunt while in custody corroborated his claims that Area Five police officers beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

(v)     In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year-old sister, Ana, during a search of their home. During the search, officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch," and pulled her hair. As a result of this incident, Graciela's arm was put in a sling, and she spent one week in the hospital.

(w)     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied any knowledge of the incident Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

(x)     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him, and hit him in the head. Garcia filed a

32

complaint with OPS. Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as Garcia was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident but recommended that Guevara only be suspended for two days.

(y)     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands, and about the groin and thighs with flashlights. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising on Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

(z)     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him but recommended only that Guevara be reprimanded.

(aa)    In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

(bb)    In 1991, Defendant Guevara coerced David Rivera into signing a confession for

33

murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

(cc)     In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

(dd)     In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

(ee)     In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison, and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

(ff)     In 1993, Defendant Guevara physically abused and threatened Francisco

Vicente into providing false statements implicating Geraldo Iglesias in a murder.

Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of

the crime for which Guevara had arrested him. Vicente has since testified that his

statements were false, and that Defendant Guevara and his colleagues beat him,

threatened him, and fed him facts to ensure that he told their story.

(gg)     In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a

confession from Adrian Duta by hitting him in the face with an open palm,

punching him in the stomach, and telling him he could go home if he signed a

statement. When Duta's father came to see Duta at the station house, Duta was

exhausted and crying. Duta repeatedly said that he did not know what he had

signed and had only signed the document so he could go home. Duta complained to

his father of being struck in the head and stomach by Guevara.

(hh)     In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-

old Santos Flores after handcuffing him to the wall of a locked interview room and

refusing his requests for an attorney. During the course of the 11-hour

interrogation, Guevara yelled at him, slapped him numerous times on the side of

his head, and told him that, if he did not confess, he would never see the light of

day. Flores eventually gave a statement to the police indicating his involvement in

the crime. Flores' statement was ruled inadmissible on appeal on the grounds that

it was elicited in violation of Miranda.

(ii)     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by

beating him while he was chained to a wall in a locked interrogation room.

Dembski, a Polish national who did not speak English, was interrogated by

Guevara without Miranda warnings, without notification to the Polish consulate,

35

and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

(jj)　　In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Yalda, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

(kk)　　In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

(ll)　　In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara *never* took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

(mm)　　In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

(nn)　　In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

36

(oo)  In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during an interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge. In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

(pp)  In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

144.  At least 23 of the 39 men and women who have had their convictions dismissed in connection with Defendant Guevara's misconduct have alleged that Defendant Halvorsen, who was Guevara's partner, participated in the misconduct resulting in their convictions and imprisonment.

145.  At least four of the 39 men who have had their convictions dismissed in connection with Defendant Guevara's misconduct, have alleged that Defendant Wojcik participated in the misconduct resulting in their convictions and imprisonment.

146.  Defendant Wojcik also participated in the CPD's cover up of the October 20,

37

2014 murder of 17-year-old Laquan McDonald by CPD officer Jason Van Dyke.

147.  In 2017, the City of Chicago Office of Inspector General (OIG) published an investigation report on that shooting, which found that Wojcik fabricated and approved false police reports to exaggerate the threat that McDonald posed before he was shot, as part of an effort to justify the police shooting. The OIG later published an additional summary report on Wojcik, detailing how he "improperly disposed of three original general progress reports containing CPD detectives' handwritten notes of the statements three civilian witnesses made the night of the [Laquan McDonald] shooting." Wojcik committed similar misconduct in this case, fabricating false police reports, as set forth above, and on information and belief, he also concealed or destroyed other police reports, notes, and exculpatory evidence.

148.  In June 2018, a federal jury in Jacques Rivera's civil rights case found that Guevara, Mingey, and Gawrys violated Rivera's due process and other constitutional rights by suppressing exculpatory evidence and pressuring a witness to falsely identify Rivera as the triggerman in Felix Valentin August 1988 murder. The jury also found that the City was responsible for the CPD's practice of withholding police reports and other investigative materials from criminal defense attorneys. The jury awarded Rivera $17 million in compensatory damages against the City and a combined $175,000 in punitive damages against Guevara, Gawrys, and Mingey.

149.  Defendant Guevara and the other officers who repeatedly engaged in the police misconduct set forth above never received any significant discipline from the City of Chicago or the CPD. In fact, the City repeatedly and intentionally failed to supervise and discipline its police officers, including Defendants Guevara and the other Officer Defendants, who engaged in the misconduct set forth in this Complaint.

**J.    The City of Chicago's policies and practices permitting CPD officers to repeatedly engage in misconduct causing innocent persons to be wrongfully convicted and imprisoned.**

150.    The City of Chicago is responsible, by virtue of its policies and practices, and especially its historical failure to discipline officers repeatedly engaged in misconduct, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Cruz in this case.

151.    Since the 1980s, no fewer than 250 cases have come to light in which CPD officers fabricated false evidence, suppressed exculpatory evidence, and/or provided perjured testimony to support the wrongful convictions of innocent persons, as occurred in Cruz's case.

152.    From 2017-2022, Chicago led all other municipalities in criminal exonerations, and according to the Annual Report from the National Registry of Exonerations, in 2022 alone, more than half of all criminal exonerations across the United States took place in Cook County, the vast majority of them in Chicago, and nearly all of them resulting from repeated misconduct committed by specific CPD officers or units, such as Guevara and his fellow Area 5 officers.

153.    As an example, from at least 1980 to at least 1991, former CPD Commander Jon Burge and the unit of corrupt officers that he led, first at Area 2 and later at Area 3, engaged in widespread police misconduct that included, among other things, the torture and abuse of more than 120 men and boys in police custody, fabricating incriminating evidence, suppressing exculpatory evidence, and lying under oath about such activities in court proceedings. A chart that includes a partial list of these police torture victims is attached to this Complaint as Exhibit C.

154.    At least 29 of the more than 120 victims tortured by Burge and his men had their convictions dismissed, but only after collectively spending more than 607 years incarcerated for crimes they did not commit. A list identifying these individuals and the years each spent incarcerated is attached to this Complaint as Exhibit D.

39

155.  As another example, from 2002 to 2009, former CPD Sergeant Ronald Watts, and a squad of corrupt officers that he led, repeatedly engaged in police misconduct that included, among other things, extortion, false arrests, planting evidence, and perjury in criminal proceedings, leading to hundreds of false drug convictions. To date, Cook County judges have vacated and dismissed more than 200 felony convictions stemming from Sgt. Watts and his unit's misconduct, and the victims of those false arrests and wrongful convictions, before being released, had been sentenced collectively to over 274 years in prison.

156.  A third (and most obvious) example is the mass exonerations that have resulted from Defendant Guevara and his fellow Area 5 officers' misconduct, as set forth in ¶135 above.

157.  These examples of widespread police misconduct in Chicago occurred as a result of the City and the CPD's policies and practices, which permitted CPD officers, including the Officer Defendants in this case, to regularly engage in malicious and unconstitutional conduct with impunity.

158.  For example, for decades, it was the accepted and widespread practice among CPD officers, including the Officer Defendants in this case, to keep secret files in homicide cases, which files the officers withheld from criminal defendants, their attorneys, and other participants of the criminal justice system, and which the officers would routinely destroy or conceal at the close of investigations, rather than preserving as part of the official police file.

159.  The existence of this CPD practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.). The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue in this case.

160. In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

161. The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue in this case.

162. As another example, as a matter of widespread custom and practice, members of the CPD, including the Officer Defendants in this case, routinely used illegal tactics, including psychological and physical coercion, to extract involuntary and false statements and identifications from suspects and witnesses, as well as fabricated false police reports, precisely as occurred in this case. Specific examples of this CPD practice include those outlined in ¶143(a)-(pp) above, and also in the Burge-related torture cases referenced in ¶153 above.

163. In addition, as a matter of custom and practice, the City and the CPD routinely failed to investigate cases in which CPD detectives recommended charging an innocent person with a serious crime or had engaged in the other types of police misconduct. In fact, prior to and during the period in which Cruz was falsely charged and convicted, the City operated a dysfunctional disciplinary system for CPD officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public.

164. Further, the City's disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct, even though high-ranking CPD supervisors and City policy makers were well-aware that dozens of civilians had lodged repeated complaints against certain officers, including, as examples only, Guevara and Burge.

41

165. Another significant part of the City's dysfunctional disciplinary system, which directly resulted in repeated instances of widespread police misconduct in Chicago, including the misconduct of the Defendant Officers in this case, was the fact that municipal policy makers and high ranking CPD supervisors condoned and facilitated a "code of silence" within the CPD.

166. In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed CPD officers (operating out of the very same police facilities as the Officer Defendants in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations.

167. Similarly, in the case of *Obrycka v. City of Chicago*, 07 C 2372 (N.D. Ill. 2012), a federal jury in Chicago returned a verdict against the City, finding that the City had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence.

168. As a matter of both policy and practice, City policy makers and CPD supervisors condoned and facilitated this code of silence within the CPD, and in recent years, elected City leaders, including former Mayors Rahm Emanuel and Lori Lightfoot, have publicly acknowledged that the code of silence within the CPD, for decades, kept corrupt officers, such as Guevara and his crew, from being held accountable for their illegal and unconstitutional conduct.

169. In accordance with the code of silence, officers and CPD bosses refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case. As a result of the City's established practices, officers, including the Officer Defendants here, came to believe that they may violate the civil rights

42

of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

170. The policies and practices that enabled this belief included failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the CPD. As a result of these policies and practices of the City, members of the CPD, including the Officer Defendants in this case, acted with impunity when they violated the constitutional and civil rights of citizens.

171. In addition, the City and the CPD failed, in the years prior to Cruz's wrongful conviction, to provide adequate training to CPD detectives and other officers in many areas, including the following:

(a) conducting live lineups, photo arrays, and other identification procedures;

(b) the constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding;

(c) the need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses;

(d) the risks of wrongful conviction and the steps police officers should take to minimize such risks;

(e) the risks of engaging in tunnel vision during investigation; and

(f) the need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, as well as the need to report misconduct committed by fellow officers.

172. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train CPD officers as alleged in the preceding paragraph caused Cruz's wrongful conviction and his injuries.

173. The City's failure to train, supervise, and discipline its officers, including the Officer Defendants in this case, condones, ratifies, and sanctions the kind of misconduct committed against Cruz in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* policies, as alleged above.

174. The City and its final policy making officials failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct rampant within the CPD, and especially at Area 5 during all relevant times. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Cruz's ongoing injuries.

175. The policies and practices described in the foregoing paragraphs were also approved by City policy makers, who were deliberately indifferent to the violations of constitutional rights described in this Complaint. The City had notice of each of the widespread practices described in the foregoing paragraphs long before the events at issue in this case. Consistent with the municipal policies and practices described in the preceding paragraphs, the Officer Defendants engaged in the illegal and unconstitutional conduct that caused Cruz's wrongful conviction and imprisonment, as alleged in this Complaint.

## LEGAL CLAIMS

### COUNT I – 42 U.S.C. § 1983
### The Individual Defendants
### <u>Violation of Due Process – Fabrication of Evidence Used at Trial</u>

176. Cruz incorporates each preceding paragraph as if restated here.

177. As described above in greater detail, the Individual Defendants, acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, violated Cruz's constitutional right to due process and a fair trial by fabricating false incriminating evidence against him and using that evidence at Cruz's 1996 trial.

44

178.   Among other things, the Individual Defendants, acting individually, jointly, and in conspiracy with one another, fabricated or manufactured: (a) Meadors' false identification of Cruz through their coercive tactics and tainted identification procedures, (b) at least parts of Jaramillo's Statement, (c) on information and belief, at least parts of Danny's Statement, (d) the other police reports that falsely implicated Cruz in the October 6, 1993 shooting described above, and (d) other false evidence, not yet known to Cruz.

179.   Through the conduct identified in this Count, the Individual Defendants proximately caused Cruz's unjust criminal conviction and his continued wrongful imprisonment. Without their misconduct of fabricating evidence against him, Cruz would not have been prosecuted or convicted.

180.   The Individual Defendants deprived Cruz of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

181.   The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Cruz's constitutional rights.

182.   The Individual Defendants' misconduct proximately caused Cruz to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as set forth above.

### Count II – 42 U.S.C. § 1983
### The Individual Defendants
### _Brady_ Violation – Withholding Exculpatory Evidence

183.   Cruz incorporates each preceding paragraph as if restated here.

184.   The Individual Defendants, acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deliberately deprived Cruz of his constitutional right to due process and a fair trial by withholding and

45

suppressing exculpatory evidence from him and his attorneys.

185.   As set forth above in greater detail, among other things, the Individual Defendants withheld  from Cruz exculpatory evidence including: (a) evidence of the systematic police misconduct occurring at Area 5 at the time of the investigation at issue in this case, including documents and instruments relating to that misconduct and investigations of the same, (b) evidence that the Defendants had coerced and pressured Meadors' false identification of Cruz, including police reports and/or notes relating to the Individual Defendants interactions with Meadors, which the Defendants, on information and belief, destroyed or concealed, (c) evidence that Defendants had attempted to coerce Jaramillo into falsely identifying Cruz, including police reports and/or notes relating to Guevara and other officers interactions with Jaramillo, which the Defendants also destroyed or concealed, and (d) other exculpatory evidence, not yet known to Cruz, which the Defendants concealed or destroyed.

186.   Through the conduct identified in this Count, the Individual Defendants proximately caused Cruz's unjust criminal conviction and his continued wrongful imprisonment. Without their misconduct of withholding exculpatory evidence, Cruz would not have been prosecuted or convicted.

187.   By withholding exculpatory evidence from Cruz and his attorneys, the Individual Defendants deprived Cruz of his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

188.   The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Cruz's constitutional rights.

189.   The Individual Defendants' misconduct proximately caused Cruz to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing

injuries and damages, as set forth above.

## Count III – 42 U.S.C. § 1983
### The Individual Defendants
#### Malicious Prosecution and Unlawful Detention

190.  Cruz incorporates each paragraph of this Complaint as if restated here.

191.  As described above, the Individual Defendants individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Cruz of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause for doing so and in spite of the fact that they knew Cruz was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

192.  In so doing, the Individual Defendants maliciously prosecuted Cruz and caused him to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in Cruz's injuries.

193.  The Individual Defendants' misconduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Cruz's constitutional rights and his innocence.

194.  The Individual Defendants' misconduct proximately caused Cruz to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as set forth above.

## Count IV – 42 U.S.C. §§ 1983, 1985
### The Individual Defendants
#### Federal Conspiracy to Deprive Cruz of His Constitutional Rights

195.  Cruz incorporates each preceding paragraph as if restated here.

196.   After the October 6, 1993 shooting, the Individual Defendants, acting within the scope of their employment and under color of law, agreed to frame Cruz for the shooting and deprive him of his constitutional rights, including but not limited to his rights to due process and a fair trial and the right to be free from evidence fabricated against him, and which conspiracy was subsequently used to convict Cruz at trial and otherwise deprive him of liberty in some way.

197.   The Individual Defendants further conspired to deprive Cruz of exculpatory evidence and information to which he was lawfully entitled, and which would have led to the evidence against Cruz being recognized as false, which in turn would have led to Cruz not being charged, not being convicted, and to Cruz's more timely exoneration.

198.   The Individual Defendants, in concert with one another and other unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

199.   In furtherance of that conspiracy, each of the co-conspirators committed overt acts and was a willful participant in joint activity.

200.   The Individual Defendants engaged in this conspiracy with the knowledge and purpose of depriving Cruz, who is Hispanic, and numerous other Hispanic victims of Area 5 police misconduct, of the equal protection of the laws and/or equal privilege and immunities under the law.

201.   The conspiracy was racially motivated. The Individual Defendants willfully conspired with racial animus toward Cruz and the many other Hispanic Area 5 victims identified above.

202.   The Individual Defendants willfully conspired with malice and/or reckless indifference to the rights of Cruz.

203. Through their conspiracy, the Individual Defendants deprived Cruz of his right to equal protection of the laws under the Fourteenth Amendment, and 42 U.S.C. § 1985.

204. Through the Individual Defendants' misconduct identified in this Count, the Defendants violated Cruz's rights, and he suffered injuries, including but not limited to loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages, as set forth above.

### Count V – 42 U.S.C. §§ 1983, 1986
### The Individual Defendants
### Failure to Intervene

205. Cruz incorporates each preceding paragraph as if restated here.

206. The Individual Defendants, by their conduct and under color of law, stood by without intervening to prevent the violation of Cruz's constitutional rights, even though they had the ability and opportunity to do so.

207. The Individual Defendants' conduct was objectively unreasonable, and the Defendants acted intentionally and with willful indifference to Cruz's constitutional rights.

208. The Individual Defendants, knowing of the conspiracy to frame Cruz, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused so to do, in violation of 42 U.S.C. § 1986.

209. As a direct and proximate cause of the Individual Defendants' failure to intervene to prevent the violation of Cruz's constitutional rights, Cruz suffered injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above. The Defendants had a reasonable opportunity to prevent this harm but failed to do so.

49

## Count VI – 42 U.S.C. § 1983
### The City of Chicago
### Policy and Practice *Monell* Claim

210. Cruz incorporates each preceding paragraph as if restated here.

211. The Individual Defendants committed and caused the commission of the above-alleged constitutional violations pursuant to one or more *de facto* policies, practices, and/or customs of the City.

212. At the time of Cruz's arrest, as set forth above in greater detail, the City had a policy or practice at Area 5 that included: (a) officers keeping secret files in homicide cases and withholding such files from criminal defendants and their attorneys, as well as routinely destroying or concealing such files; (b) officers routinely using illegal tactics, including psychological and physical coercion, to extract involuntary and false statements and identifications from suspects and witnesses; (c) officers routinely fabricating evidence to support false charges and wrongful convictions; and (d) officers lying about police misconduct at hearings and trials in order to support false charges and wrongful convictions.

213. The City and the CPD intentionally failed to adequately supervise and/or discipline Area 5 detectives and supervisors who repeatedly engaged in such misconduct.

214. At least by October 1993, the City's top policy makers, including but not limited to, the CPD Superintendent and the Mayor of the Chicago, knew that it was highly predictable that such police misconduct would occur at Area 5 if the City continued to fail to supervise and/or discipline Area 5 detectives and supervisors adequately, because there was a pattern of similar constitutional violations at Area 5.

215. More specifically, at all times material to this Complaint, the City, through the CPD, its Superintendents, the Police Board, the City's Mayors, the City Council, and/or the Corporation Counsel's Office, established and implemented *de facto* policies, practices, and customs that allowed CPD officers:

50

(a) to keep secret files in homicide cases and to withhold such files from criminal

defendants and their attorneys, as well as to routinely destroy or conceal such files;

(b) to suppress exculpatory evidence, including but not limited to, false witness

identifications and witness and suspect statements;

(c) to file false police reports and to give false statements and testimony about such

false reports to support false charges and wrongful convictions;

(d) to fabricate other types of false evidence to support false charges and wrongful

convictions;

(e) to routinely use illegal tactics, including psychological and physical coercion, to

extract involuntary and false statements and identifications from suspects and

witnesses, and most specifically the tactics repeatedly and routinely used by

Detective Guevara and his associates at Area 5;

(f) to lie about police misconduct during investigations of the same and to cover up the

true nature of police misconduct at Area 5; and

(g) to fail to document and/or record interrogations and interviews with suspects and

witnesses in homicide investigations.

216.    In addition, the City and the CPD failed to properly train, supervise, discipline,

monitor, or otherwise control police officers engaged in police brutality and misconduct,

particularly officers such as the Officer Defendants in this case, who were repeatedly

accused of making false arrests, destroying or withholding evidence, fabricating police

reports, making false statements, providing false testimony, and otherwise engaging in

malicious prosecutions and wrongful convictions.

217.    The City and the CPD, in fact, encouraged and facilitated the police code of

silence, under which CPD officers refused to report, covered up, suppressed and destroyed

evidence of police misconduct at Area 5, despite their obligation under the law and police

51

regulations to report such misconduct, as set forth more fully above.

218.  Further, the City and the CPD encouraged prosecutors and CPD officers to either remain silent or give false and misleading information in official investigations of Area 5 misconduct to protect the City from civil liability and CPD officers from the same, as well as from internal discipline and criminal charges.

219.  The pattern and practice of police misconduct at Area 5, and the cover-up of that misconduct, was known both before and after Cruz was framed and wrongfully convicted, including by the command officers and supervisors at Area 5, policy makers for the City, CPD Superintendents and various other CPD Command Personnel, including OPS Directors, the City Council,  the Chicago Police Board, and other high ranking and policy making officials, who collectively and individually participated in the cover-up and suppression of Detective Guevara and his Area 5 associates' repeated misconduct.

220.  The City and final policy making officials within the CPD failed to act to remedy the pattern of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. The City had notice of a widespread practice by officers and agents of the CPD under which individuals like Cruz, who were suspected of criminal activity, were routinely framed by Detective Guevara and his Area 5 associates for crimes they did not commit.

221.  The above-identified policies, practices and customs, both individually and together, were maintained and implemented with deliberate indifference; they encouraged, among other things, the construction and fabrication of statements, identifications, and other false witness evidence; the suppression and destruction of evidence of police misconduct and other exculpatory evidence; the intimidation and manipulation of witnesses; the making of false statements and reports; the giving of false testimony; the obstruction of justice and manipulation and obstruction of the State and Federal courts; and the pursuit

and continuation of wrongful convictions and false arrests and imprisonments.

222. The intentional ignoring and thereby facilitating police misconduct at Area 5 was so prevalent and widespread that it constituted the *de facto* policy and practice of the City and the CPD. Policy making officials of the City and the CPD knew about it and should have remedied it, but intentionally chose not to take the steps required to do so. Such failure to do so was deliberately indifferent and violated the victims' constitutional rights, including the rights of Cruz.

223. Separately and together, the above-listed interrelated policies, practices, and customs, directly and proximately caused the unconstitutional violations committed by the Individual Defendants, and the resulting injuries suffered by Cruz.

224. Additionally, the City's failure to properly train, discipline, monitor, control, supervise, and counsel the Individual Defendants was also done with deliberate indifference and likewise directly and proximately caused the unconstitutional violations committed by the Individual Defendants and the resulting injuries suffered by Cruz.

225. The City and County's policymakers' involvement in, and ratification of, the unconstitutional policies, practices and customs directly and proximately caused the unconstitutional violations of the Individual Defendants and the resulting injuries suffered by Cruz, as set forth above.

### Count VII
### The Individual Defendants
### State Claim for Malicious Prosecution

226. Cruz incorporates each preceding paragraph as if restated here.

227. The Individual Defendants, individually, jointly, and in conspiracy, initiated a malicious prosecution without probable cause against Cruz, and continued that prosecution without probable cause.

228. That prosecution was ultimately terminated in Cruz's favor.

229. The Individual Defendants' actions were done in a willful and wanton manner, and directly and proximately caused Cruz's injuries, including but not limited to his loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count VIII**
**The Individual Defendants**
**State Claim for Intentional Infliction of Emotional Distress**

230. Cruz incorporates each preceding paragraph as if restated here.

231. The Individual Defendants individually, jointly, and in conspiracy, by committing and causing the commission of the unconstitutional acts set forth above, engaged in extreme and outrageous conduct.

232. The Individual Defendants intended, by subjecting Cruz to their misconduct, to inflict severe emotional distress on Cruz and knew that their conduct would cause him severe emotional distress.

233. As a direct and proximate cause of the Individual Defendants' outrageous conduct, Cruz suffered injuries, including but not limited to his loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**Count IX**
**The Individual Defendants**
**State Claim for Conspiracy**

234. Cruz incorporates each preceding paragraph as if restated here.

235. The Individual Defendants reached an understanding together to engage in the unconstitutional overt acts set forth in detail above and jointly acted and/or conspired among and between themselves to commit those acts.

236. In furtherance of this conspiracy, the Individual Defendants jointly committed unlawful acts, including, among other things, fabricating incriminating evidence, destroying

and withholding exculpatory evidence, as well as maliciously prosecuting Cruz and intentionally inflicting continuing severe emotional distress on him.

237. This conspiracy was the direct and proximate cause of Cruz's injuries, including but not limited to loss of liberty, physical harm, and severe emotional distress and anguish, as set forth above in greater detail.

## Count X
## The Individual Defendants
## State Claim for Willful and Wanton Conduct

238. Cruz incorporates each paragraph of this Complaint as if restated here.

239. At all times relevant to this Complaint the Individual Defendants had a duty to refrain from willful and wanton conduct.

240. Notwithstanding that duty, the Individual Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Cruz's rights.

241. As a result of the Individual Defendants' misconduct described in this Count, Cruz suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count XI
## The City of Chicago
## State Law *Respondeat Superior* Claim

242. Cruz incorporates each preceding paragraph as if restated here.

243. The Officer Defendants were at all times relevant to this Complaint employees of the City acting within the scope of their employment. Their acts in violation of state law are therefore directly chargeable to the City pursuant to the doctrine of *respondeat superior*.

## Count XII
## The City of Chicago
## <u>745 ILCS 10/9-102 – Indemnification</u>

244.   Cruz incorporates each preceding paragraph as if restated here.

245.   Because the Officer Defendants were, at all times relevant to this Complaint, employees of the City acting under color of law and within the scope of their employment, the City, by statute, is responsible for paying for any compensatory tort judgment entered against them. 745 ILCS 10/9-102.

WHEREFORE, Plaintiff JOSE CRUZ respectfully requests this Court to:

(a)  enter judgment in his favor and against all Defendants jointly and severally;

(b)  award him compensatory damages jointly and severally,

(c)  award him attorneys' fees and costs against each Defendant jointly and severally;

(d)  enter punitive damages against each of the Individual Defendants;

(e)  award pre-judgment interest for all applicable damages;

(f)  award post-judgment interest for all applicable judgments; and

(g)  award such other relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiff Jose Cruz demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: September 1, 2023

Respectfully submitted,

PLAINTIFF JOSE CRUZ

By: /s/ *Ariel Olstein*

Stuart J. Chanen
Ariel Olstein
CHANEN & OLSTEIN LLP
7373 Lincoln Avenue, Suite 100
Lincolnwood, IL 60712
847-469-4669

Stuart@ChanenOlstein.com
Ariel@ChanenOlstein.com


J. Samuel Tenenbaum
Clinical Professor of Law
Director Complex Civil Litigation and Investor Protection Center
BLUHM LEGAL CLINIC
Northwestern Pritzker School of Law
375 East Chicago Avenue, Rubloff 863
Chicago, IL 60611
312-503-4808
s-tenenbaum@law.northwestern.edu

***Attorneys for Plaintiff Jose Cruz***

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT C

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  89 CR 16525 |
| | ) | |
| v. | ) | |
| | ) | Judge  Reddick |
| JAIME RIOS | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

This cause coming to be heard on Petitioners' motion to obtain the grand jury transcripts in Case No. 89 CR 16525 for purposes of litigating the federal case, *Jaime Rios v. Reynaldo Guevara*, et al., U.S. Dist. Ct. Case No. 22 CV 3973 (the "Civil Action"), due notice having been given, and the Court hearing argument, IT IS HEREBY ORDERED THAT:

Petitioners' Motion to Obtain Grand Jury Transcripts is granted as to the grand jury testimony of witnesses Benjamin Carrero, Michael Mason, and Luis Huertas, over the State's objection. If the testimony of these witnesses has not been transcribed, the Court hereby orders the court reporter to transcribe the testimony at Petitioners' expense. The Court further allows the Public Defender's Office and the Cook County State's Attorney's Office to produce the grand jury testimony of witnesses Benjamin Carrero, Michael Mason, and Luis Huertas, in their possession to the parties in the Civil Action subject to the Confidentiality Protective Order entered in the Civil Action on March 8, 2023 (Dkt. #56).

DATED: _23 May 2023_          _[signature]_ 2023

_____
JUDGE

ENTERED

MAY 23 2023

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT D

**IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION**

PEOPLE OF THE STATE OF ILLINOIS ) 
                                     ) 
                Plaintiff,         )     Case No. 1993 CR 15199 
                                       ) 
           v.                    ) 
                                       )     Judge Erica L. Reddick 
GERALDO IGLESIAS, et al.         ) 
                                       ) 
              Defendant.       )

## <u>ORDER</u>

Having heard Defendant's motion to release the grand jury transcripts in Case No. 93 CR 15199 for purposes of the federal case titled *Geraldo Iglesias v. Reynaldo Guevara,* et al., Case No. 19 cv 06508, the Court hereby grants, over the State's objections, Petitioners' Motion for Release of Grand Jury Transcripts regarding grand jury testimony from or about Reynaldo Guevara, Anthony Riccio, Steve Gawrys, Ernest Halvorsen, Hugo Rodriguez, Rosendo Ochoa, and Francisco Vicente. If the minutes have not been transcribed, the Court hereby orders the court reporter to transcribe the minutes at Petitioners' expense.

DATED: March, 25 2022

                                            *Erica L. Reddick 2638*

**ENTERED**

**MAR 25 2022**

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT E

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) |
| | ) |
| Plaintiff, | )     Case No. 1991 CR 19833 |
| | ) |
| v. | ) |
| | )     Judge Erica L. Reddick |
| DEMETRIUS JOHNSON, et al. | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Having heard Defendant's motion to release the grand jury transcripts in Case No. 91 CR

19833 for purposes of the federal case styled *Demetrius Johnson v. Reynaldo Guevara,* et al.,

Case No. 20 cv 4156, the Court hereby grants Petitioners' Motion for Release of Grand Jury

Transcripts. If the minutes have not been transcribed, the Court hereby orders the court reporter

to transcribe the minutes at Petitioners' expense. *This motion is granted over the State's Attorney's objection.*

DATED: 12 January 2022     Erica L. Reddick 1838

ENTERED
JAN 12 2022
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

6

*People v. Jose Cruz*
Case No.: 93 CR 25151

# EXHIBIT F

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

| | | |
|---|---|---|
| People of the State of Illinois, | ) | |
| | ) | Court No. 96 CR 497 |
| v. | ) | |
| | ) | Judge Leroy M. Martin |
| Charles Johnson, | ) | |
| LaShawn Ezell | ) | |
| Troshawn McCoy | ) | |
| Larod Styles | ) | |

## **ORDER**

This cause coming to be heard on Petitioners' Motion to Disclose Grand Jury Materials

Pursuant to Protective Order, the court being fully advised in the premises:


IT IS HEREBY ORDERED that Petitioners' Motion to Disclose Grand Jury Materials

Pursuant to Protective Order is GRANTED.


Entered:

Judge Adrienne E. Davis

JUL 2 6 2019

Circuit Court - 2193

Prepared By:

Rock, Fusco & Connelly, LLC
321 N. Clark St., Suite 2200
Chicago, IL 60654
(312) 494-1000
Firm No. 48719

# Exhibit 3

## OFFICE OF THE STATE'S ATTORNEY
## COOK COUNTY, ILLINOIS

**KIMBERLY M. FOXX**
STATE'S ATTORNEY

500 RICHARD J. DALEY CENTER
CHICAGO, ILLINOIS 60602
(312) 603-5440

NAYON OH
NON-711 BAR TAKER
CIVIL ACTIONS BUREAU

Direct: (312) 603-3182
Nayon.oh@cookcountyil.gov

November 9, 2023

*Via Electronic Mail*
agamboa@jsotoslaw.com
elindsley@jsotoslaw.com

Alexis M. Gamboa
Elise Lindsley, Paralegal
The Sotos Law Firm, P.C.
141 W. Jackson Blvd, Suite 1240A
Chicago, IL 60604

    **Re:**    **Subpoena in *Cruz, Jose v. Guevara, et al.*, Case No. 23 C 4268**
            **Requesting records of *People v. Jose Cruz*, Case No. 93 CR 25151 (Appellate Case No. 99-3215)**

Dear Ms. Gamboa and Ms. Lindsley:

Please allow this correspondence to serve as an acknowledgement of the subpoena served upon the Cook County State's Attorney's Office on September 27, 2023 and a follow up to the acknowledgment letter you received on October 4, 2023.
I will be the person assigned to this matter and will serve as your main point of contact.

As you may know, the Office values transparency and will endeavor to process your request in a timely fashion. However, the Office receives hundreds of subpoenas annually and will require an extension to process your request. This letter shall serve as the continued request for an extension.

All requests for Office files are processed in conjunction with our vendor, Array. You will next hear from Array with a quote related to the anticipated costs of reproduction. In the interim, please feel free to contact me directly with any questions.

                    Very truly yours,

                    */s Nayon Oh*
                    Nayon Oh
                    Non-711 Bar Taker

                    */s David A. Adelman*
                    David A. Adelman
                    Assistant State's Attorney

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Jose Cruz, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-CV- 4268 |
| | ) | Hon. Jeremy C. Daniel |
| Reynaldo Guevara, et al., | ) | Magistrate Judge Gabriel A. Fuentes |
| Defendants. | ) | |

## Declaration of Lyle K. Henretty

I, Lyle K. Henretty, do hereby state as follows:

1.    I am the Chief of the Advice, Business & Complex Litigation Division of the Civil Actions Bureau in the Cook County State's Attorney's Office ("CCSAO").  I have held this position since October 10, 2023

2.    In this role, I oversee the work of five sections of the Civil Action Bureau: Municipal Litigation; Advice, Transactions, & Complex Litigation; Real Estate Tax Litigation; Worker's Compensation Litigation; and Specialized Discovery.

3.    I am responsible for more than 400 subpoenas served upon the CCSAO annually for CCSAO documents and/or ASA or as in this case former ASA testimony.  I am further the decision-maker responsible for asserting or waiving deliberative process and/or other applicable privileges when producing documents or witnesses for testimony.

5.    I am also responsible for supervising all transparency litigation.

6.    As the Department head responsible for doing so, I have asserted and continue to assert the deliberative process privilege as well as the work-product privilege over testimony and materials related to the CCSAO decisions pertaining to  decisions made by the CCSAO with respect to the  CCSAO' internal memoranda and ASA Notes, unless there is a specific reason to do so, or if in my assessment a waiver has occurred.  I have not been presented with any materials or facts suggesting that the CCSAO, or any of its current or former staff, have publicly discussed these decisions in the instant case that would constitute a waiver of the deliberative process or work production privilege doctrines.

7.    I have personally considered the deliberative process objections set forth in the CCSAO's privilege logs for the instant case. The instant Defendant seeks discovery on the CCSAO's process and underlying decision-making set forth in ASA notes and a draft internal memorandum.  All of these documents are deliberative process materials. To divulge the process by which the CCSAO investigates and determines how it handles its cases would

open the process up to outside influence. Interested individuals outside of the CCSAO may try to manipulate the process itself in order to achieve a favored outcome.

9.    As the Department Supervisor responsible for doing so, I have asserted and continue to assert the deliberative process as well as the work-product privilege over materials related to the CCSAO decisions concerning litigation generally, unless there is a specific reason not to do so, or if in my assessment a waiver has occurred as to any particular fact or legal conclusion. I have not been presented with any materials or facts suggesting that the CCSAO, or any of its current or former staff, have publicly discussed the deliberative process or work production pertaining to the documents at issue in the Defendants' motion to compel.


I declare that as of 03/29/2024, pursuant to 28 U.S.C. 1746, the foregoing is true and correct.


By:    */s/ Lyle K. Henretty*
       Lyle K. Henretty
       Assistant State's Attorney
       Chief, Advice Business and Complex Litigation Division
       Cook County State's Attorney's Office
       Civil Actions Bureau