*Cruz v. Guevara, et al.*
Case No.: 23 CV 4268

# EXHIBIT B

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 97 CR 21329-01 |
| | ) | 97 CR 21329-02 |
| v. | ) | |
| | ) | Hon. Judge Erica L. Reddick |
| JUAN HERNANDEZ (01) and | ) | |
| ROSENDO HERNANDEZ (02), | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This cause coming to be heard on Petitioners' Motion to Release Grand Jury Materials in

Case No. 97 CR 213219-01 and Case No. 97 CR 213219-02 for the purpose of the federal case, *Juan*

*Hernandez and Rosendo Hernandez v. Reynaldo Guevara, et al.*, U.S. Dist. Ct. Case No. 23-cv-1737

(the "Civil Action"), due notice having been given, and the court being fully advised in the premises,

IT IS HEREBY ORDERED THAT:

Petitioners' Motion to Release Grand Jury Materials is GRANTED. If the grand jury

proceedings have not been transcribed, the Court hereby orders the court reporter to transcribe the

proceedings at Petitioners' expense. The Court further allows the Public Defender's Office and the

Cook County State's Attorney's Office to produce the grand jury materials, including transcripts,

evidence, and subpoenas, in their possession to the parties in the Civil Action. The Court further

orders that the grand jury materials be produced only to the attorneys and staff representing parties in

the Civil Action, and only to be used in the defense and/or prosecution of the Civil Action. The Court

further orders that, at the conclusion of the Civil Action, all grand jury materials be returned to the

Court or destroyed.

```
ENTERED
MAR 21 2024
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
```

ENTERED:

_____
Circuit Court Judge

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 97 CR 21329-01 |
| | ) | 97 CR 21329-02 |
| v. | ) | |
| | ) | Hon. Judge Erica L. Reddick |
| JUAN HERNANDEZ (01) and | ) | |
| ROSENDO HERNANDEZ (02), | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION TO RELEASE GRAND JURY MATERIALS**

Reynaldo Guevara, Joseph Miedzianowski, Joel Bemis, Robert Biebel, Geri Lynn Yanow,

as special representative of the Estates of Ernest Halvorsen and Robert DeGraff, and the City of

Chicago (collectively "Petitioners"), by and through their undersigned attorneys, respectfully

request that this Honorable Court enter an Order releasing the grand jury materials in this case,

including transcripts, evidence, and subpoenas, and state as follows:

**INTRODUCTION**

Over twenty years ago, brothers Juan and Rosendo Hernandez were convicted of the first-

degree murder of Jorge Gonzalez. In July 2022, both brothers had their convictions reversed. Now,

Juan and Rosendo (the "Hernandez brothers") are suing Chicago police officers, Reynaldo

Guevara, Joseph Miedzianowski, Joel Bemis, Robert DeGraff (through his estate), Robert Biebel,

and Ernest Halvorsen (through his estate), and the City of Chicago ("Petitioners"), alleging that

they were wrongfully prosecuted and convicted. The Hernandez brothers have filed suit in federal

court and are seeking compensatory and punitive damages, *Juan Hernandez and Rosendo*

*Hernandez v. Reynaldo Guevara, et al.*, Case No. 23-cv-01737.

What happened during the Hernandez brothers' criminal case is central to their claims in the federal lawsuit. For example, one of the ultimate questions in the federal lawsuit is whether there was probable cause for the Hernadez brothers' detention and prosecution. In the underlying criminal case, the Hernandez brothers were indicted by a grand jury. An indictment by a grand jury is *prima facie* evidence that there was probable cause. The Hernandez brothers can rebut this presumption by presenting evidence that Petitioners obtained their indictments through improper or fraudulent means. Therefore, transcripts of the grand jury proceedings, which contain a record of the evidence and testimony presented, are central to the Hernandez brothers' claims and Petitioners' defenses.

Additionally, the grand jury materials will shed light on: (1) the Hernandez brothers' guilt or innocence, (2) which officers and witnesses were interviewed by the Cook County State's Attorney ("CCSAO") before the Hernandez brothers' indictments, (3) the knowledge and information the CCSAO had at the time the indictments were sought, (4) whether evidence was fabricated, and (5) whether witnesses were coerced. These matters are squarely at issue in the federal lawsuit.

Petitioners thus have a compelling and particularized need for the grand jury materials. Without the grand jury materials, Petitioners will be prevented from presenting a fulsome and effective defense to the claims against them. Additionally, the grand jury materials are necessary for impeachment and refreshing the recollections of witnesses, and testing witnesses' credibility. There were at least five eyewitnesses to Jorge Gonzalez's murder, one of whom (Daniel Violante) has already changed his story multiple times. Violante testified before the grand jury, and it is likely that the other eyewitnesses did as well. In addition to shedding light on probable cause, the

2

grand jury transcripts are needed to test witnesses' credibility. It would be a substantial injustice to deprive Petitioners of this crucial evidence for their defense.

The reasons for keeping the grand jury materials secret are no longer compelling. The grand jury proceedings in this case occurred over twenty years ago, and the jurors have long since been discharged. The Hernandez brothers have been tried, convicted, sentenced, and released. At this juncture, there is no concern that the Hernandez brothers will escape from custody, that the grand jury's deliberations will be improperly influenced, that witnesses will commit perjury before the grand jury or at the criminal trial, or that witnesses will be discouraged from testifying freely. Additionally, there is no reason to protect the Hernandez brothers from unwanted exposure. They have already brought exposure by filing a federal lawsuit and publicizing it in the media.

The grand jury materials in this case are necessary to prevent a substantial injustice in the federal lawsuit. At this stage, over twenty years after the indictments, the need for disclosure far outweighs the need for continued secrecy. Petitioners' request is narrowly tailored to cover only those materials needed for defense of the federal claims. Petitioners are only seeking the grand jury materials from this criminal case. For all of these reasons, Petitioners respectfully request that this Honorable Court grant this Motion, and enter the attached proposed order releasing the grand jury materials in this case. (Ex. A, Proposed Order).

## FACTUAL BACKGROUND

In 1999, Rosendo Hernandez was convicted of the first-degree murder of Jorge Gonzalez and aggravated battery with a firearm. In 2001, Juan Hernandez was convicted of the first-degree murder of Jorge Gonzalez, attempted first-degree murder of Juan Carlos Cruz, and aggravated battery with a firearm. In July 2022, Judge Rosado of the Cook County Circuit Court vacated Juan and Rosendo's convictions.

On March 21, 2023, the Hernandez brothers filed a federal lawsuit against Petitioners Reynaldo Guevara, Joseph Miedzianowski, Joel Bemis, the Estate of Robert DeGraff, Robert Biebel, the Estate of Ernest Halvorsen, and the City of Chicago in United States District Court for the Northern District of Illinois, styled *Juan Hernandez and Rosendo Hernandez v. Reynaldo Guevara, et al.*, Case No. 23-cv-01737 (the "Civil Action") *See*, Ex. B, Complaint. In the Civil Action, the Hernandez brothers allege that Petitioners, Chicago Police officers who investigated the Jorge Gonzalez murder, violated their civil rights and caused their alleged wrongful convictions. The allegations of the Civil Action include, *inter alia*, violations of due process, malicious prosecution, unlawful detention, failure to intervene, conspiracy to violate constitutional rights, intentional infliction of emotional distress, willful and wanton conduct, and civil conspiracy. Petitioners bring the present Motion to Release Grand Jury Materials, including transcripts and subpoenas in this case, for use in the Civil Action.

## ARGUMENT

### I. Petitioners Have a Compelling and Particularized Need for the Grand Jury Materials

This Court should permit the disclosure of the grand jury materials in this case because Petitioners have a compelling and particularized need which vastly outweighs any continued need for secrecy. Section 112-6(b)(3) of the Illinois Code of Criminal Procedure states that grand jury materials may be disclosed "when the court, preliminary to or in connection with a judicial proceeding, directs such in the interest of justice or when the law so directs." 725 ILCS 5/112-6(b)(3). In deciding whether to permit the disclosure of grand jury materials, courts apply a three-pronged test: (1) whether the material is needed to avoid a possible injustice in another judicial proceeding; (2) whether the need for disclosure is greater than the need for continued secrecy; and

4

(3) whether the request is structured to cover only the materials needed. *Board of Educ. v. Verisario*, 143 Ill. App. 3d 1000, 1010-11 (2nd Dist. 1986). In this case, all three prongs favor disclosure.

The grand jury materials in this criminal case are crucial to the Civil Action. For example, one of the ultimate questions in the Civil Action is whether there was probable cause for the Hernandez brothers' detention and prosecution. The existence of probable cause defeats many of the Hernandez brothers' claims. *See e.g.*, *Haynes v. City of Chicago*, 2022 WL 1016392, *2 (N.D. Ill. Apr. 5, 2022) ("The existence of probable cause defeats an unlawful detention claim."); *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 73 (1st Dist. 2003) ("[T]he failure to prove a lack of probable cause is fatal to a claim of malicious prosecution.").

"[T]he purpose of the grand jury is to decide whether probable cause exists such that a charge should be brought." *People v. O'Dette*, 2017 IL App (2d) 150884, ¶ 67. An Illinois grand jury indictment is *prima facie* evidence of probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019). In this case, the Hernandez brothers were indicted by the grand jury. This is *prima facie* evidence of probable cause that can only be rebutted by evidence that the Petitioners obtained the indictment through improper or fraudulent means. *Id*. Therefore, the grand jury materials are necessary to show what evidence and testimony were presented to obtain the indictments.

The grand jury materials will also reveal the evidence that Petitioners had available at the time and that formed their good faith basis for the existence of probable cause. This is critical to Petitioners' affirmative defense of qualified immunity. Thus, the entirety of the grand jury materials in this case is relevant to the claims and defenses in the Civil Action. If Petitioners are denied access to the grand jury materials, it will cause a substantial injustice and Petitioners will be severely prejudiced.

The grand jury materials are also needed for impeachment, refreshing witnesses' recollection, and testing credibility. *See In re Cement-Concrete Block, Chicago Area*, 381 F. Supp. 1108, 1110 (N.D. Ill. 1974) (permitting disclosure of grand jury transcripts to attorneys in subsequent civil case "for use in litigation only for purposes of impeachment, refreshing the witnesses' recollection, and testing credibility"). After Jorge Gonzalez was shot and murdered on June 27, 1997, four eyewitnesses identified Juan Hernandez as one of the shooters. Five eyewitnesses identified Rosendo Hernandez as the other shooter. At least one of these eyewitnesses, Daniel Violante ("Violante"), testified before the grand jury that the Hernandez brothers were the shooters. It is likely that the other eyewitnesses (and Petitioners) testified before the grand jury as well. The grand jury transcripts thus are necessary for impeachment, refreshing recollection, and testing the credibility of these witnesses in the Civil Action.

The conduct of eyewitness Daniel Violante illustrates the importance of the importance of the grand jury transcripts. Violante was a member of the Maniac Latin Disciples street gang, while the Hernandez brothers were members of the Spanish Cobras, a rival gang. (Violante Trial Testimony, attached as Ex. C, at 15:9-14, 27:16-18). Violante witnessed the shooting of Jorge Gonzalez. (*Id*. at 15:9-16:6). During a police lineup, Violante identified Juan and Rosendo Hernandez as the shooters. (*Id*. at 15:19-17:7). Violante repeated this identification before the grand jury. (*Id*.)

After testifying before the grand jury, Violante was approached by two fellow Maniac Latin Disciple gang members who pressured him into signing a statement recanting his identification of the Hernandez brothers. (Ex. C, Violante Trial Testimony at 18:7-19:13). This was part of a broader conspiracy between members of the Maniac Latin Disciples and Spanish Cobras to exchange false witness recant statements to get their respective gang members out of jail. (*Id*. at 26:9-27:23). In a

subsequent criminal case arising out of this conspiracy (*People v. Robert Lopez*, Case No. 99 CR 9384) Violante testified that his grand jury testimony in the Hernandez brothers' case was true, and that the recant statement he signed was false. (*Id*. at 29:5-15). Violante later testified as a State's witness in at least one of the Hernandez brothers' criminal trials. (*Id*. at 17:1-22).

Upon information and belief, Violante has changed his story again and now claims that his initial identification, grand jury testimony, and criminal trial testimony in this case were false, and that his recant statement was true. The grand jury transcripts are therefore necessary to impeach Violante's credibility and to show that he did in fact identify the Hernandez brothers as the shooters, while under oath. Violante is just one example, and it is likely that some or all of the other eyewitnesses also testified before the grand jury and may have similar credibility issues.

Furthermore, the grand jury materials will shed light on the Hernandez brothers' guilt or innocence, which officers and witnesses were interviewed by the CCSAO, what knowledge and information the CCSAO had prior to seeking the indictment, whether evidence was fabricated, and whether witnesses were coerced. This is all highly relevant to the Hernandez brothers' claims in the Civil Action. For these reasons, there is a compelling and particular need for the grand jury materials in this case and they should be released.

## II.    There is No Compelling Need for the Continued Secrecy of the Grand Jury Materials

Considering this criminal case's age and ultimate conclusion, there is no compelling need for the continued secrecy of the grand jury materials. Grand jury proceedings are kept secret for the following reasons: (1) to prevent the escape of an indicted person; (2) to ensure the grand jury freedom; (3) to prevent perjury of witnesses before the grand jury and later at the criminal trial; (4) to encourage witnesses to freely testify about the commission of crimes; and (5) to protect an

innocent person who is accused but exonerated against unwanted exposure. *Verisario*, 143 Ill. App. 3d at 1010-11. None of these reasons is compelling here.

In this case, the grand jury returned its indictments in the late 1990s. There is no fear that the Hernandez brothers will flee, that the grand jury deliberations will be improperly influenced, or that witnesses will testify falsely before the grand jury or at the criminal trial. The release of the grand jury materials, after a delay of over twenty years, will do little to discourage witnesses from testifying freely. The fifth reason, to protect the privacy of the accused, does not apply here because the Hernandez brothers were indicted. *See Board of Educ.*, 143 Ill. App. 3d at 1011. Furthermore, it was the Hernandez brothers themselves who brought attention to their criminal case by filing a federal lawsuit and publicizing it in the press. For all of these reasons, there is no compelling need for continued secrecy, and the grand jury materials should be released.

## III.   Petitioners' Request is Structured to Cover Only the Materials Needed.

Petitioners seek these grand jury materials needed for their defense in the Civil Action. The Hernandez brothers have put their criminal case (including the grand jury proceedings) at issue by filing the Civil Action and accusing Petitioners of, *inter alia*, detaining and prosecuting them absent probable cause. *See Anilao v. Spota*, 918 F. Supp. 2d 157, 164 (E.D.N.Y 2013) (holding that all of the grand jury materials were "indispensable" to addressing probable cause determinations at issue in false arrest and malicious prosecution claims). As explained, *supra*, Petitioners seek the grand jury materials here because they are relevant and indispensable to the Civil Action.

## IV.   Courts Consistently Allow Parties to Obtain Grand Jury Materials in Reversed Conviction Cases

In reversed conviction civil cases such as the Civil Action, courts consistently permit parties to obtain grand jury materials including transcripts from the underlying criminal cases, even when the CCSAO objects. *See e.g.*, Orders granting motion to obtain grand jury materials in

reversed conviction civil cases, *People v. Jaime Rios*, Case No. 1989 CR 16525 (May 23, 2023)

Ex. D; *People v. Iglesias*, Case No. 1993 CR 15199 (March 25, 2022) Ex. E; *People v. D. Johnson*,

Case No. 1991 CR 19833 (January 12, 2022) Ex. F; *People v. C. Johnson*, 1996 CR 497 (July 26,

2019) Ex. G. In this case, the claims in the Civil Action are similar or identical to those in the cases

cited above, and, accordingly, should be released here for the same reasons.

## CONCLUSION

WHEREFORE, Petitioners respectfully request that this Honorable Court enter an order

allowing them to have the grand jury testimony in this case transcribed by the Official Court

Reporters and produced in the Civil Action, and allowing the Public Defender's Office and Cook

County State's Attorney's Office to produce the grand jury materials in their possession to

Petitioners.

Dated: February 13, 2024                    Respectfully Submitted,

/s/ Eileen Rosen                            /s/ Jeffrey C. Grossich
EILEEN ROSEN                                JEFFREY C. GROSSICH, Attorney No.
*One of the Attorneys for the City*         6316511
*Of Chicago*                                *One of the Attorneys for Defendants Geri Yanow, as*
                                            *Special Representative of Ernest Halvorsen*
Eileen E. Rosen                             *deceased and Robert DeGraff deceased,  Robert*
Catherine M. Barber                         *Biebel and Joel Bemis*
Theresa B. Carney
Austin G. Rahe                              James G. Sotos
Rock Fusco & Connelly, LLC                  Josh M. Engquist
333 West Wacker, 19th FL                    Jeffrey R. Kivetz
Chicago, IL 60606                           Allison L. Romelfanger
(312)494-1000                               Kyle T. Christie
tcarney@rfclaw.com                          Tommy J. Sotos
                                            Jeffrey C. Grossich
                                            THE SOTOS LAW FIRM, P.C.
                                            141 W. Jackson Blvd, Suite 1240A
                                            Chicago, IL 60604
                                            P: (630) 735-3300
                                            jgrossich@jsotoslaw.com

/s/Timothy Scahill
TIMOTHY SCAHILL
*One of the Attorneys for Reynaldo Guevara*

Whitney Hutchinson
Steven B. Borkan
Timothy P. Scahill
Graham P. Miller
Misha Itchhaporia
Emily E. Schnidt
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
whutchinson@borkanscahill.com

/s/ Brian Gainer
BRIAN GAINER
*One of the Attorneys for Joseph Miedzianowski*

Brian Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
(312)372-0770
gainer@jbltd.com

## CERTIFICATE OF SERVICE

I, Tonet Ballard, a non-attorney, hereby certify that on February 13, 2024, I caused to be served upon the above party by hand-delivering a copy of the attached Motion to Release Grand Jury Materials to the court and served on the attorneys of record listed in the below service list by electronic mail.

**_Attorneys for Plaintiff_**

Steven E. Art
Anand Swaminathan
Sean Starr
Annie D. Prossnitz
Jonathan I. Loevy
Arthur R. Loevy
Daniel J. Stohr
Isabella Aguilar
Loevy & Loevy
311 North Aberdeen St, Suite
(312)243-5900
steve@loevy.com
anand@loevy.com
sean@loevy.com
prossnitz@loevy.com
jon@loevy.com
arthur@loevy.com
dan@DanStohr.com
aguilar@loevy.com

**_Attorney for Reynaldo Guevara_**

Misha Itchhaporia
Graham P. Miller
Emily E. Schnidt
Timothy P. Scahill
Steven B. Borkan
Whitney N. Hutchinson
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
mitchhaporia@borkanscahill.com
gmiller@borkanscahill.com
eschnidt@borkanscahill.com
tscahill@borkanscahill.com
sborkan@borkanscahill.com
whutchinson@borkanscahill.com
mboekeloo@borkanscahill.com

**Attorney for City of Chicago**

Eileen E. Rosen
Theresa Carney
Catherine Barber
Austin Rahe
Andrew Grill
Jessica Zehner
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606
(312)494-1000
erosen@rfclaw.com
tcarney@rfclaw.com
cbarber@rfclaw.com
arahe@rfclaw.com
agrill@rfclaw.com
jzehner@rfclaw.com
lferrise@rfclaw.com

**Attorney for Joseph Miedzianowski**

Brian P. Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
312-372-0770
gainerb@jbltd.com
mcelroyl@jbltd.com

/s/Tonet Ballard
TONET BALLARD
Paralegal

11

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| | ) | Case No.: 97 CR 21329-01 |
| v. | ) | 97 CR 21329-02 |
| | ) | |
| JUAN HERNANDEZ and | ) | Hon. Judge Erica L. Reddick |
| ROSENDO HERNANDEZ, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

## NOTICE OF FILING

To: See Attached Service List

On March 13, 2024, the Cook County State's Attorney's Office has filed a RESPONSE TO
PETITIONER CIVIL DEFENDANTS' MOTION TO UNSEAL GRAND JURY MATERIALS, a
copy of which is attached hereto and served upon you.

Dated March 13, 2024

Respectfully submitted,
KIMBERLY M. FOXX
State's Attorney of Cook County

By: /s/ Olivia R. Blauert
Olivia R. Blauert
Assistant State's Attorney
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-3184
olivia.blauert@cookcountysao.org.
Attorney No. 10295

## CERTIFICATE OF SERVICE

I hereby certify that on March 15, 2024, I electronically filed the foregoing document with the Clerk of the Court for the Circuit Court of Cook County, using the electronic case filing system of the Court. I emailed a copy to the attorney for each party and had a courtesy copy delivered to the Court.

/s/ Olivia R. Blauert

**Attorneys for Plaintiff**
Steven E. Art
Anand Swaminathan
Sean Starr
Annie D. Prossnitz
Jonathan I. Loevy
Arthur R. Loevy
Daniel J. Stohr
Loevy & Loevy
311 North Aberdeen St, Chicago, IL 60607
steve@loevy.com
anand@loevy.com
sean@loevy.com
prossnitz@loevy.com
jon@loevy.com
arthur@loevy.com
dan@DanStohr.com

**Attorneys: for City of Chicago**
Eileen E. Rosen
Theresa Camey
Catherine Barber
Austin Rahe
Andrew Grill
Jessica Zehner
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker Drive, 19th Floor Chicago, IL 60606
erosen@rfclaw.com
tcamey@rfclaw.com
cbarber@rfclaw.com
arahe@rfclaw.com
agrill@rfclaw.com
jzehner@rfclaw.com
lferrise@rfclaw.com

**Attorneys for Renaldo Guevara**
Misha Itchhaporia
Graham P. Miller
Emily E. Schnidt
Timothy P. Scahill
Steven B. Borkan
Whitney N. Hutchinson
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700,
Chicago, IL 60603
mitchhaporia@borkanscahill.com
gmiller@borkanscahill.com
eschnidt@borkanscahill.com
tscahill@borkanscahill.com
sborkan@borkanscahill.com
whutchinson@borkanscahill.com
mboekeloo@borkanscahill.com

**Attorney for Joseph Miedzianowski**
Brian P. Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
gainerb@jbltd.com
mcelroyl@jbltd.com

**Attorneys for Teri Yanow, Robert Biebei and Joe Semis**
Jeffrey C. Grossich
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd, Suite 1240A
Chicago, IL 60604
jgrossich@jsotoslaw.com

**IN THE CIRCUIT COURT OF COOK COUNTY**
**COUNTY DEPARTMENT, CRIMINAL DIVISION**

THE PEOPLE OF THE STATE OF ILLINOIS,       )
                                           )
                                           )    Case No.: 97 CR 21239-01
       v.                                  )              97 CR 21239-02
                                           )
JUAN HERNANDEZ, and                        )
ROSENDO HERNANDEZ,                         )    Hon. Judge Erica L. Reddick
                                           )
              Defendants,                  )
                                           )

## RESPONSE TO PETITIONER CIVIL DEFENDANTS' MOTION
## TO UNSEAL GRAND JURY MATERIALS

NOW COMES the Cook County State's Attorney's Office ("CCSAO"), by its attorney, Kimberly M. Foxx, State's Attorney of Cook County, through her Assistant State's Attorney, Olivia Blauert, to move this Court to deny the motion of release of grand jury materials in this case brought by Civil Defendants Reynaldo Guevara, Joseph Miedzianowski, Joel Bemis, Robert Biedel, Geri Lynn Yanow, as special representative of the Estates of Ernest Halvorsen and Robert DeGraff, and the City of Chicago (collectively "Petitioners"). In support, the CCSAO states:

## INTRODUCTION

On March 21, 2023, brothers Juan and Rosendo Hernandez ("Plaintiffs") filed a twelve-count complaint in federal court stemming from allegations Plaintiffs were wrongly convicted of a 1997 murder. *See* Exhibit (Ex.) 1. Plaintiffs' convictions were vacated in July 2022. *Id.* On August 29, 2023, Petitioners issued a subpoena upon the CCSAO requesting documents related to this case. Ex. 2. After receiving the requested documents, Petitioners filed a motion with this Court to grant release of grand jury materials that had been redacted by the CCSAO on February 13, 2024. Ex. 3. The CCSAO responds to this motion as follows:

## ARGUMENT

### I. THE RELEASE OF GRAND JURY MATERIALS IS PROHIBITED BY ILLINOIS LAW

Illinois law prohibits the release of grand jury materials absent certain limited circumstances. *Grand Jury Secrecy Act*, 725 ILCS 5/112-6. These limited circumstances provide only for exceptions for the State's Attorney's use and other personnel authorized by the State's Attorney, or pursuant to a court's order when it "directs such in the interest of justice or when a law so directs." *Id.* Here, the Petitioners do not fall into the limited exceptions carved out by law; they are not authorized by the State's Attorney pursuant to official duties. Additionally, the Court should not order the release of grand jury materials because there are not applicable exceptions directed by the statute. As such, Illinois law prohibits the release of grand jury materials in this case.

### II. THE PETITIONERS DO NOT MEET THE STANDARD FOR THE RELEASE OF GRAND JURY MATERIALS.

A party seeking release of grand jury transcripts must show "that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for secrecy, and that their request is structures to cover only materials so need." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979); *see also Lucas v. Turner*, 725 F.2d 1095, 1101 (7th Cir. 1984)) ("this burden is a heavy one to overcome"). This test is applicable even to closed cases. *Id.* ("Such a showing must be made even when the grand jury whose transcripts are sought has concluded its operations").

#### A. Petitioners will not suffer an injustice in their civil suit if grand jury materials are not disclosed.

Petitioners have failed to establish they would be "greatly prejudiced or that without reference to it an injustice would be done." *Douglas Oil Co.*, 441 U.S. 211 at 220 (quoting *United*

States v. Procter & Gamble Co., 356 U.S. 667, 682 (1958)). Petitioners cite the need to establish the affirmative defense of qualified immunity, the need to refresh witnesses' memory, and the need to impeach witnesses' credibility as essential to their case. See Ex. 3 at 2, 4-7. Petitioners, however, failed to demonstrate how failure to meet the alleged needs would amount to an injustice.

i.    Failure to prove an affirmative defense is not an injustice.

Petitioners have asserted grand jury materials are indispensable to their affirmative defense of qualified immunity. Ex. 3 at 5, 8. The possibility of losing a civil case is not an injustice. Unlike criminal defendants, civil defendants are not entitled to all and any possible exculpatory information. The law is clear, the failure to prevail on a claim or defense is not an injustice or prejudice that warrants disclosure.

In *Lucas*, civil plaintiff Lucas sought disclosure of grand jury material in his civil rights action and was denied access. 725 F.2d 1095 (7th Cir. 1984). That court found that the petitioner failed to demonstrate in both his affidavits and briefs the grand jury material was "absolutely necessary, rather than simply beneficial to their § 1983 action and that the information contained therein could not have been obtained through normal discovery channels." *Id.* at 1102. This was despite the affidavits asserting the grand jury material would be "perhaps critical" to the petitioners' ability to present their case. *Id., see also United States v. Viereckl* No. 94-1960, 1995 U.S. App. LEXIS 7832, at *4-5 (7th Cir. Apr. 6, 1995) (a criminal defendant was denied grand jury transcripts that he predicted will "show an error occurred in the grand jury proceedings and prosecutorial misconduct). Additionally, the court in *Lucas* noted that "While the plaintiffs' action is a legitimate means to vindicate Mr. Lucas' civil rights '[a] legitimate interest . . . [in obtaining disclosure] is not necessarily compelling.'" *Id.* (quoting *In Re Grand Jury Investigation No.* 78-

184, 642 F.2d 1184, 1191 (9th Cir. 1981), *affirmed sub nom. United States v. Sells Engineering, Inc.*, 463 U.S. 418, 103 S. Ct. 3133, 77 L. Ed. 2d 743 (1983)).

Here, Petitioners make sweeping generalized claims that "the grand jury material will shed light on: (1) the Hernandez brothers' guilt or innocence…(4) whether evidence was fabricated, and (5) whether witnesses were coerced" as well as what information that the CCSAO had at the time of indictment. Ex. 3 at 2. Believing this information could possibly rebut the assumption of probable cause and harm their affirmative defense, Petitioners want to review confidential grand jury material. *Id.* at 5. Yet, Petitioners have failed to state why they believe that the grand jury materials will provide that information to them. As such, they have failed to show why the grand jury materials are a need rather than merely beneficial.

     ii.    <u>Petitioners allege need to refresh witnesses' recollections has not been established as particularized need and there is other less burdensome means to refresh recollection.</u>

Petitioners have not shown a need to refresh witnesses' memory with grand jury materials. *See Lucas*, 725 F.2d at 1105 ("Because plaintiffs have not shown the inability of witnesses to recall past events upon which they might be questioned, or that … deposition testimony will be somehow inadequate to refresh recollection, if necessary, they have again failed to establish a particularized need, and thus no compelling reason exists at this time to order disclosure to refresh recollection"). Here, Petitioners have failed to provide any concrete examples of the need to refresh their own memories or witnesses' memories

Other avenues that do not endangers the public interest are available to the Petitioners to meet their goal of refreshing witnesses recollections. *See Board of Education v. Verisario*, 143 Ill. App. 3d 1000, 1010, 97 Ill. Dec. 692, 698, 493 N.E.2d 355, 361 (1986) ("The party must show … that the information contained therein could not be obtained through other channels"). As part of

production, Petitioners received police reports and investigatory notes, these documents are also available from their original source the City of Chicago, the Petitioners themselves. When information requested "...can be obtained from some other source that is more convenient..." it becomes and unreasonable cumulative or duplicative request. Fed. R. Civ. Pro. 26(b)(2)(C)(i), *See also* Fed. R. Civ. Pro. 45(d)(1) (stating "a party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena"). The request to produce sensitive information is an undue burden of the CCSAO and is against the public interest.

     iii.    <u>There is no need to obtain grand jury materials to discredit witnesses.</u>

Impeachment by grand jury testimony is not the only way to discredit witnesses in this case. Once again Petitioner must show that the information sought could not be obtained through other means of discovery. *See Bd. of Educ. v. Verisario*, 143 Ill. App. 3d at 1010. Daniel Volante has already established himself as an incredible witness. He has given testimony, recanted that testimony, reversed to his original position, and then recanted again. Ex. 3 at 6-7. Moreover, Petitioners seem to already know who all the witnesses are they need to discredit and what their testimony was. Their motion explicitly notes "four eyewitnesses identified Juan Hernandez as one of the shooters" and "five eyewitnesses identified Rosendo Hernandez as the other shooter" Ex. 3 at 6. Additionally, "Cook County courts have found that 'Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations...'" Ex. 1 at 3. The practice witness tampering of Petitioner Guevara has been noted, as well as the gang conspiracies addressed in *People v. Robert Lopez* No. 99 CR 9384, these incidents establish a means of attacking credibility for every single possible witness involved, not

l st Mr. Volante, witho a grand jury material. Consequently, the Petitioners have failed to prove any injustice they would face in the civil case without gra .. jury materials.

### B. The CCSAO's need for secrecy outweighs that of the Petitioners need.

The Petitioners fail to meet the burden put forth in the balancing test requiring their need be greater than the need for public secrecy. The factors considered in this determination can include the need "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt." *Douglas Oil Co.*, 441 U.S. 211 at 219 n.10 (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681-682, n. 6 (1958)).

Here, the balancing factors weigh in favor of the CCSAO. Namely, whether there will be negative implications when looking to future grand juries. *See Id.* at 222 (considering that there could be sever negative implications towards grand juries in the future); *See also City of Chi. v. Office of the Special Prosecutor (In re Special Prosecutor)*, 2017 IL App (1st) 161376, ¶ 39, 418 Ill. Dec. 723, 731, 91 N.E.3d 424, 432 (rejecting the City of Chicago's claim that disclosure might undermined future investigations was unjustified). If grand jury materials were released to Petitioners, there would be a risk of subverting the importance of grand juries, as well as dissuading those who are called to serve on them. The secrecy of the grand jury process exists to help protect those who testify, as well as the jurors themselves. Disclosure of grand jury materials may make

both witnesses and jurors more hesitant to participate in the process. This public interest concern goes directly to factors three, four, and five.

As noted by Petitions witnesses tampering is a major concern and witnesses in this criminal case were subject to witness tampering. *See* Ex. 3 at 6. Certainty Daniel Volasic who's identify is clearly identifiable did not feel "free and untrammeled" to make disclosures. *See* Ex. 3. At 6-7. This only goes to show the need protect witnesses in future situations. Thus, factor three and four weighs heavily in the CCSAO favor. Finally, this is the Petitioners' motion for release of grand jury material, not the Plaintiffs.' The Plaintiffs' case does not strongly rest on the credibility of witness testimony, but instead heavily on the individual actions of the Petitioners such as suggestive witness identification, engaging in the drug trade, and the fabrication and concealment of evidence. *See* Ex. 1 at 8-19. This is a strong indication that the Plaintiffs' do not, at this time, want to bring attention to grand jury material. Hence, factor five weights in the CCSAO favor, demonstrating once again that the Petitioners have failed to meet their burden.

### C. The Petitioners' request is not narrowly tailored.

Requests by parties seeking grand jury materials must be formulated as to only cover the necessary material. *Douglas Oil Co.,* 441 U.S. 211 at 222. This is not the instant case. The request from Petitioners included a rider with no less than sixteen items. *See* Ex. 1. at 4-5. Petitioners seek to access the whole file in the off chance they will find something of use. *See In re EyeCare Physicians of Am.* 100 F.3d 514, 518 (7th Cir. 1996) (quoting *Lucas v. Turner,* 725 F.2d 1095, 1101 (7th Cir. 1984) ("The 'request for grand jury material [must be] more that a request for authorization to engage in a fishing expedition'")). Nor, does that fact that allegedly similar cases were granted release of grand jury material require that grand jury materials be disclosed in this case as Petitioners allege. *See* Ex. 3 at 8-9. The balancing standard in *Douglas Oil Co.,* requires a

EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JUAN HERNANDEZ and ROSENDO HERNANDEZ | ) | |
| | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, GERI LYNN | ) | |
| YANOW, as special representative of the | ) | |
| ESTATE OF ERNEST HALVORSEN, | ) | |
| JOSEPH MIEDZIANOWSKI, JOEL BEMIS, | ) | |
| ROBERT DEGRAFF, ROBERT BIEBEL, and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

NOW COME Plaintiffs, JUAN HERNANDEZ and ROSENDO HERNANDEZ, by their

attorneys LOEVY & LOEVY, and complaining of Defendants REYNALDO GUEVARA, GERI

LYNN YANOW, as special representative of the ESTATE OF ERNEST HALVORSEN,

JOSEPH MIEDZIANOWSKI, JOEL BEMIS, ROBERT DEGRAFF, ROBERT

BIEBEL, and the CITY OF CHICAGO, states as follows:

### INTRODUCTION

1.      Plaintiffs Juan and Rosendo Hernandez ("Juan," "Rosendo," and collectively, "the

Hernandez Brothers") were wrongly convicted of the 1997 shooting of Jorge Gonzalez. They

spent decades in prison for a crime they did not commit.

2.      Plaintiffs had nothing to do with the murder. Not one piece of physical evidence

connected them to the Gonzalez shooting, and they had no motive to commit the crime.

3. Instead, Plaintiffs' arrest, prosecution, and conviction were based entirely on false evidence knowingly manufactured by Defendants, including false eyewitness identifications. This was done in conjunction with the suppression of evidence of Plaintiffs' innocence, and that could have been used to impeach the testimony of the witnesses against them, including the statements and testimony of Defendants.

4. The framing of Plaintiffs for a crime they did not commit was the work of notorious Chicago Police Detectives Reynaldo Guevara and his long-time partner, Ernest Halvorsen, in concert with the other named Defendants.

5. One of the other Defendants Guevara and Halvorsen conspired with to frame the Hernandez Brothers was former Chicago Police Department gang crimes officer Joseph Miedzianowksi, who was convicted for running a vast criminal enterprise out of the Chicago Police Department and is serving a life sentence in federal prison.

6. That criminal enterprise included brazen official misconduct, including the use of Miedzianwoski's police powers to extort and terrorize communities. Among other things, he would force people to assist him in identifying places where drugs were stashed, so that Miedzianowski could seize the drugs, and then hand them over to others to resell, splitting the pronceeds. Those who refused to work with or cooperate with Miedzianowski would face his wrath, which included using his police powers to frame people for crimes they did not commit.

7. Several of the other Defendants, including at minimum Defendants Guevara and Bemis (known in the streets as "P. Man"), were part of Miedzianowski's criminal enterprise. Their involvement in the criminal enterprise was obvious to anyone who was paying attention. They were seen regularly with Miedzianwoski and his criminal associates, and at their regular meeting locations. Guevara, as a homicide detective, was particularly useful to Miedzianowski

he could assist Miedzianowski in making good on his threats, by pinning murder cases on those who did not do Miedzianowski's bidding.

8.     The Hernandez Brothers fell victim to this criminal enterprise. They ended up in Miedzianowski's sights, and so Miedzianowski instructed Defendant Guevara to pin a murder pinned on Juan Hernandez. Sure enough, within weeks of these instructions, Guevara and the other Defendants fabricated a case against the Hernandez Brothers.

9.     Because of the scandalous lack of accountability in the Chicago Police Department, discussed in detail below, Defendants Guevara, Bemis and others who were associated with Miedzianowski's criminal enterprise have never faced consequences, let alone been meaningfully investigated, by the Chicago Police Department, despite their close involvement with Miedzianowski.

10.     Indeed, Defendants' misconduct resulting in Plaintiff's wrongful conviction was just part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants.

11.     Plaintiffs are two of at least 39 men and women who have had convictions on murder charges vacated after being framed in corrupt homicide investigations conducted by Defendant Guevara and his fellow Area Five detectives and supervisors.

12.     The Illinois Appellate Court has called Defendant Guevara "a malignant blight on the Chicago Police Department and the judicial system."

13.     Cook County courts have found that "Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations," and that Defendant Guevara had told "bald-faced lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

3

14. In court proceedings, Defendants Guevara, Halvorsen, and their associates have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct as police officers, and Defendants Guevara and Halvorsen have pleaded their Fifth Amendment right not to incriminate themselves in response to questions about their misconduct during the investigation of the Gonzalez murder.

15. Plaintiffs have maintained their innocence since the day they were arrested. They took the stand in their own defense, presented solid alibi defenses, and have never stopped fighting to prove their innocence.

16. In his statement at allocution—after his conviction and awaiting sentencing, when admitting to the crime could garner leniency from the Court—Juan Hernandez again cried out about their innocence, and the CPD corruption at the core of the case:

> "First, I declare, I and my brother are innocent........ My family has stood by my side, and fought vigorously in my behalf. And I know they won't stop until police who frame innocent citizens are stopped......My heart goes out to the Gonzalez family, and my condolences for the huge loss they have suffered. They have been deceived through lies that I and my brother are the guilty parties. However, I am not the one they should be angry at. Their outrage is misplaced. Detective Guevara is the one they should be mad at, because he deceitfully convinced them the wrong men are responsible, which means, the real killers are still free on the streets, free to kill again."

17. Juan Hernandez's words have proven prescient. After a combined 50 years in prison for a crime they did not commit, the truth about Defendant Guevara's misconduct has finally come to light, and the Hernandez Brothers were exonerated. Last year their convictions were vacated and all charges against them were dropped.

18. But justice comes far too late. Plaintiffs now seek justice for the harm that Defendants have caused, and redress for the loss of liberty and the terrible hardship that they have endured and continue to suffer as a result of Defendants' misconduct

4

## JURISDICTION AND VENUE

19.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to address the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

20.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction.

## PARTIES

22.     Plaintiffs Juan Hernandez and Rosendo Hernandez each spent 25 years wrongfully incarcerated for a murder they did not commit.

23.     At all times relevant to the events described in this complaint, Defendants Reynaldo Guevara, Ernest Halvorsen, Joseph Miedzianowski, Joel Bemis, and other unknown law enforcement officers were Chicago Police officers, acting under color of law and within the scope of their employment.

24.     Geri Lynn Yanow, the special representative for the Estate of Ernest Halvorsen, deceased, is named as a Defendant in her capacity as Special Representative for the Estate of Ernest Halvorsen, as successor in interest and to defend this action on behalf of Defendant Ernest Halvorsen.

25.     At all times relevant to the events described in this complaint, Robert Degraff and Robert Biebel and other unknown law enforcement officers supervised the Police Officer Defendants. These Defendants participated in the misconduct alleged in this complaint and also

5

facilitated, condoned, approved, and turned a blind eye to the misconduct of the Defendants whom they supervised.

26. The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Police Officer Defendants. Each of the individual Defendants named in this complaint acted during their investigation of the Hernandez murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Police Officer Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

27. Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS
### The Crime

28. On the night of June 27, 1997, under the dim light of a single street lamp, teenagers Nancy G., Maribel G., and Juan Carlos C. were sitting on the porch of 2208 N. Mobile while another set of teenagers, Daniel V., Jesus G., Jose Martin G., and Jorge G.,[1] were sitting next door on the porch of 2212 N. Mobile.

29. Shortly after 11:00 PM, a purple vehicle described as a Lincoln Town Car drove down Mobile Avenue twice.

30. Three men then approached the group of teenagers, waving gang signs and indicating their affiliation with the Maniac Latin Disciples, to which one teenager, Daniel V. returned Maniac Latin Discipline gang signs in a brief exchange.

---

[1] The names of victims and third party witnesses are abbreviated in consideration of their privacy.

31.     Once Daniel V. identified himself as affiliated with the Maniac Latin Disciple, the shooters then indicated their affiliation with a rival gang, the Spanish Cobras, and drew their weapons on the group.

32.     The shooters began firing, killing Jorge G. and wounding Juan Carlos C.

33.     The shooters then turned and fled down Mobile Avenue, returning to the purple getaway car.

34.     Witnesses were interviewed that evening and early next morning, where the only distinguishing characteristic of the shooter that any of the witnesses on the two front porches could provide was that one of the shooters was bald.

35.     No weapons, forensics or any other physical evidence of any kind was found at the scene or during the initial investigation to connect the Hernandez brothers to the crime in any way.

36.     The purple car was never identified by the witnesses at the scene.

**The Initial Descriptions of the Perpetrator By Scene Witnesses**

37.     When the eyewitnesses on the two porches—Nancy G., Maribel G., Juan Carlos C., Daniel V., Jesus G., Jose Martin G.—were interviewed by officers and detectives in the hours after the shooting, they explained what they could observe about the shooters.

38.     None of them recognized any of the perpetrators to be people they were familiar with.

39.     Instead, they could provide only vague descriptions of the perpetrators, such as their clothing and in some cases general descriptions of height and weight. None of the eyewitnesses could identify any distinguishing characteristics or facial features.

40.     A number of factors prevented the witnesses from viewing the shooters and being able to identify them. The shooting occurred late at night, with very little light illuminating the

7

area. The shooting occurred first, with the perpetrators walking up, shooting, and then fleeing, creating a very limited viewing opportunity. In that short window, the witnesses' attention was distracted across three perpetrators, and multiple guns, and the witnesses ducked or ran when the shooting started. In addition, the witnesses could not see the perpetrators' faces, because their view was either obstructed, and/or they only got partial, profile views.

41.     Because the perpetrators had proclaimed their affiliation with the Spanish Cobras before shooting, the initial detectives assigned to the case had the witnesses view albums containing hundreds of photos of known members of the Spanish Cobras. None of the witness could make an identification.

### Defendants Manufacture Suggestive Identification Procedures That Were Designed to Implicate the Hernandez Brothers

42.     At that point, there were no leads.

43.     That all changed on June 29, 1997, when Defendants Guevara and Halvorsen became involved in the investigation. Suddenly, working with Defendants Bemis and Degraff, Defendants claimed to have cracked the case.

44.     Defendant Bemis, a Patrolman named in the 25th District, purportedly received a tip from "an unknown informant" that Juan and Rosendo Hernandez were the perpetrators.

45.     Defendants Bemis and the 25th District Gang Tactical Sergeant he worked with, Defendant Degraff made up this false tip. There is no documentation of this supposed tip, or who the supposed informant was. To this day, Defendants have never identified the supposed informant.

46.     Defendants Guevara and Halvorsen claim to have received this tip from Defendants Degraff and Bemis on June 29, 1997, the same day they just happened to have been assigned to the case.

8

47.     And Defendants Guevara and Halvorsen claim that when they received the information about the tip from Defendants Bemis and Degraff, they just happened to have several of the witnesses from the scene at the police station for further investigation.

48.     These claims were not mere coincidences; they were lies. Defendants fabricated police reports documenting this made-up chain of events in order to create a justification for making Juan and Rosendo Hernandez suspects so that they could be framed for the Gonzalez murder.

49.     Working together, Defendants then created a deliberately suggestive photo array containing the pictures of Juan and Rosendo Hernandez.

50.     When they conducted these identification procedures, Defendants had no intention of accurately identifying the Andujar shooter. Instead, they rigged the photo identification procedures with the sole purpose of framing Plaintiffs, and knowing that the witnesses—all friends and family members of the victim—could be manipulated into selecting Defendants' chosen suspects.

51.     Defendants conducted the photo identification procedures despite knowing that none of the scene witnesses could identify the person who had shot Gonzalez.

52.     Defendants manipulated the identification procedures so that the scene witnesses would select Plaintiffs. Based on police manipulation and suggestion, several of the scene witnesses falsely identified Plaintiffs.

53.     After Defendants showed them Plaintiffs' photo, Defendants had the scene witnesses view a live lineup in which Plaintiffs stood. Through the use of police manipulation and suggestion, the scene witnesses identified Plaintiffs.

9

54. Before the lineups, Plaintiffs' lawyer, Kent Brody, arrived at the police station. In order to ensure that nothing improper occurred during the lineup procedures, he requested to be present in the lineup room as the witnesses viewed the lineups. Defendants refused to permit Brody to be present with the witnesses viewing the lineup.

55. This was highly unusual. Brody, an experience criminal defense lawyer, had been permitted to ensure the lineups were conducted fairly on many other occasions.

56. Following the lineup, Defendants, with the participation and approval of Defendant Biebel, wrote police reports that falsely recounted the tip and the lineup procedures that they had performed. These reports falsely made it appear that the scene witnesses had selected Plaintiffs as the perpetrators during legitimate identification procedures.

57. But in fact, the identification procedures were rigged all along to frame Plaintiffs for the crime.

**Defendant Miedzianowksi Was the Leader of a Criminal Drug Enterprise That Included Patrol Officers, Gang Crimes Officers and Detectives, Including Some of the Defendants**

58. During the 1990's, Detective Miedzianowski operated a drug ring utilizing the knowledge, connections, and imprimatur as a Gang Specialist for the Chicago Police Department.

59. Miedzianoswki would notoriously protect his drug operation through brutal force, instilling fear and framing those who fell out of line.

60. In multiple wiretapped conversations, Miedzianoswi referenced hurting the families of people who had crossed him as a way of getting back at them.

61. He was later convicted and sentenced to life in federal prison for his criminal activity.

62. Miedzianowski did not one one alone. In fact, Miedzianowski operated his criminal drug enterprise in uniform, and openly out of the Gang Crimes Unit's offices, and in cooperation with other police officers, including gang tactical officers and Area 5 homicide detectives.

63. Two of the officers indicted as part of Miedzianowksi's criminal enterprise who pleaded guilty, Edgar Placencio and Ruben Oliveras, admitted to falsifying police reports to wrongfully charge someone for a crime they did not commit, and to covering up their colleagues' crimes. Placencio also worked as an Area 5 detective.

64. Another officer who pleaded guilty, Jon Woodall, was also an Area 5 detective, involved in investigating homicides. He admitted to his role in Miedzianowski's criminal enterprise and the actions of his co-conspirators, and agreed to a sentence of nine years.

65. These were not the only police officers involved in Miedzianowski's criminal enterprise.

66. The prosecution and conviction of Miedzianoewski and his police co-conspirators was the product of a federal investigation, not any cooperation or assistance from the Chicago Police Department.

67. To the contrary, the Chicago Police Department never conducted its own investigation of the many allegations of misconduct against Miedzianowski or his associates. And it never conducted an investigation to examine the full scope of corruption within the Gang Crimes Unit, tactical units and Area 5 Detective Division from which Miedzianowski and his police co-conspirator operated.

68. In fact, senior officials in the Chicago Police Department, including the Head of Internal Affairs, Richard Risley, were actively involved in trying to cover up the misconduct of

34

Miedzianowski and his police co-conspirators. Risley, for example was caught on wiretaps actively scheming with Miedzianowski to conceal evidence of his misconduct.

69. The code of silence that permitted Defendant Miedzianowski and his co-conspirators to operate a criminal enterprise out of the Chicago Police Department, and resulted in official efforts to cover-up their misconduct, was partially revealed in a lawsuit brought by two Bureau of Alcohol, Tobacco and Firearms ("ATF") agents, *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.). The ATF agents, who observed Miedzianowski's misconduct as part of their work in joint operations with the Chicago Police Department, blew the whistle on Miedzianowski. Rather than take the allegations of these ATF agents seriously, CPD tried to discredit them.

70. Ultimately, the Klipfel lawsuit resulted in a $9.75 million verdict against the City of Chicago based on a finding that there was a code of silence within the Chicago Police Department.

71. Because the Chicago Police Department tried to cover-up the actions of Miedzianowski and his associates, rather than determine the full scope of corruption within the department, other police officers involved in the criminal enterprise got away scot-free.

72. That includes Defendants Guevara, Halvorsen and Bemis.

73. Multiple witnesses have given sworn testimony about the involvement of Guevara, Halvorsen and Bemis in Miedzianowski's criminal enterprise.

74. For example, in a June 2001 FBI 302 report of Mohammed O., who was charged as part of the Miedzianowski criminal enterprise, Mohammed O. discussed Miedzianowski and Galligan's criminal schemes at length, and Defendant Guevara's participation in that conspiracy. Mohammed O. stated that Guevara's policy was to "catch a person with drugs or guns, but let

12

them buy their way out of trouble," and that he "was also said to have accepted bribes to change positive or negative identifications during line-ups for murder cases."

75.     In a July 2007 FBI 302 report of Samuel P., he too discussed his involvement in a criminal enterprise with Miedzianowski, Galligan, and other officers including Guevara. He stated "Guevara had a reputation for arresting people who he had a grudge against and arranging false identifications during line-ups."

76.     Another witness, George L. has testified under oath that in 1993, he was at the Area 5 homicide division meeting with Defendants Guevara, Halvorsen and Miedzianowski about a murder on Keystone and Cortland. They told George L., "Bro, we need a favor. We don't like this Asshole [named Chino], and we just need you to say it was him. He is a jag off, we don't like him, and we want to put this case on him."

77.     And one of the twenty individuals exonerated based on Geuvara's misconduct, Jose Maysonet, alleges that in 1988 Guevara and Miedzianowski raided his home and then shortly thereafter he entered into an agreement to pay Guevara $1,000 per week for protection from the police. Maysonet eventually refused to keep paying the protection money, and alleges that in retaliation Defendants Guevara and Halvorsen framed him for murder.

78.     Not even the complaints of Philip Cline, the former CPD Superintendent, resulted in any action against Defendant Miedzianowski or any attempt to determine the extent to which homicide investigations were being tainted by criminal corruption within CPD. Cline testified that when he was a supervisor overseeing homicide investigations he twice believed that Miedzianowski had interfered in homicide investigations. This included by removing documents from the files and in one case giving them to street gangs. Cline reported both incidents to

Internal Affairs, but neither incident resulted in discipline or sustained findings against Miedzianowski or any of his associates.

### Even Before the Gonzalez Murder, Defendant Miedzianwoski Directed the Other Defendants to Frame Juan and Rosendo Hernandez For A Murder

79.    Juan and Rosendo Hernandez were the victims of the corrupt criminal enterprise of Defendants Miedzianowski, Guevara, Halvorsen, Bemis and others.

80.    In the months before the Gonzalez murder, a drug associate of Defendant Miedzianwoski got in a confrontation with Juan Hernandez. Consistent with his practice of protecting his drug associates and attacking their enemies, Miedzianowski decided to target Juan Hernandez.

81.    Consistent with the wiretaps in which Miedzianowski discussed targeting not only his enemies, but their families, Miedzianowski also targeted Juan's brother Rosendo Hernandez.

82.    Fred Rock, an FBI informant who was one of Miedzianowski's drug associates and would become one of the United State Attorney's Office's star witnesses against Miedzianowski during his criminal trial, was present for multiple conversations in which Defendant Miedzianowski met with Defendant Guevara and directed him to frame Juan Hernandez for a murder.

83.    One of those conversations between Fred R., Miedzianowski and Guevara, in which Miedzianowski instructed Guevara to frame Juan Hernandez, occurred at the Area 5 Detective Division.

84.    Another witness, Jonathyn F., has corroborated Fred R.'s statements about Defendants Miedzianowski and Guevara's plan to frame Juan Hernandez.

85.     Both Fred R. and Jondalyn F. have also testified that Defendant Bemis, who went by "P chan," was also involved in criminal activity with Defendants Miedzianowski and Guevara.

86.     Defendant Guevara did as Defendant Miedzianowski asked. Just weeks after their conversations about framing Juan Hernandez, Defendant Bemis claimed to get the fabricated tip that the Gonzalez murder was committed by Juan and Rosendo Hernandez.

### Defendants Fabricate and Conceal Evidence to Undermine Plaintiffs' Alibis

87.     When Defendants questioned Juan and Rosendo Hernandez about their involvement in the Gonzalez shooting, they both denied any knowledge and any involvement in the crime.

88.     When Defendants revealed to them the date and time of the shooting of which they were being accused, Juan and Rosendo each provided an alibi that proved they could not have committed the Gonzalez shooting, each of which was corroborated by multiple witnesses.

89.     However, in order to frame Juan and Rosendo for the murder, Defendants created police reports containing false information about their alibis in order to undermine their credibility, and their ability to present an alibi defense.

90.     In the case of Juan's alibi, two Assistant State's Attorney's at the police station on the night Juan and Rosendo were questioned stipulated to evidence at trial that proved Guevara and Halvorsen had written a police report deliberately falsifying Juan's alibi statement.

91.     When Defendants questioned Juan, he told them that until 1 a.m. he had been at a pizza restaurant owned by friends to help them prepare decorations for their daughter's cotillon the next night, which was corroborated by others. However, Defendants Guevara and Halvorsen wrote a police report claiming that Juan had not said anything about his alibi, and instead had claimed that he never left his house that night.

17

92.     However, two Assistant State's Attorneys were present for the interview of Juan at the police station. At trial, they stipulated to what Juan had actually told them—that he had been at the pizza restaurant that night. Their stipulation directly contradicted Guevara and Halvorsen's false police report.

93.     This was consistent with a pattern of deliberately falsifying alibi evidence that Defendants Guevara and Halvorsen have used in other cases.

**Defendants Fabricate and Conceal Additional Evidence**

94.     In addition to the misconduct above, Defendants fabricated additional evidence against Juan and Rosendo Hernandez.

95.     Consistent with the misconduct discussed above, Defendants wrote false police reports documenting the fabricated evidence they had created.

96.     The false police reports were approved by Defendant Biebel.

97.     The false police reports were used to cover up the evidence of Defendants' misconduct. They were provided to state prosecutors and became a basis for charging and prosecuting Plaintiffs.

98.     Defendants gave false statements to state prosecutors and provided false testimony at Plaintiffs' criminal trial. For example, in those statements they made it appear that Plaintiffs had become suspects in the investigation for legitimate reasons, and that the scene witnesses had legitimately selected Plaintiffs as the shooters in Gonzalez's murder.

99.     At all times, Defendants suppressed the true reasons for targeting Plaintiffs, and the circumstances of their manipulative identification procedures and their interactions with the scene witnesses.

16

100. Defendants did not disclose any of their misconduct to Plaintiffs or their attorneys.

101. At all times, Defendant Biebel was aware of the Defendants' misconduct and their fabrication of a case against Plaintiffs. Defendant Biebel nevertheless intentionally ignored the Defendants' misconduct, and decided to make Plaintiffs liable for a crime they did not commit, rather than directing the officers to find the person who had actually committed the crime.

102. In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

### Plaintiffs' Wrongful Convictions

103. On March 9, 2000, Juan Hernandez's initial trial in the Circuit Court of Cook County ended in a mistrial due to an undisclosed conflict regarding Juan's attorney, Richard Bueke, who failed to disclose that he had previously represented Defendant Guevara.

104. On November 19, 2001, Juan was retried.

105. During his trial, Juan testified in his own defense. He asserted his innocence and explained that he had been at the pizza restaurant assisting the owner in preparing for her daughter's cotillon.

106. The restaurant owner and her daughter testified at trial and corroborated Juan's alibi.

107. Defendant Guevara testified at the trial consistent with the evidence Defendants had fabricated and concealed all evidence of Defendants' myriad misconduct discussed above.

108. During jury deliberations, the jurors were deadlocked, having no unanimous decision and were told to continue deliberating. At one point, the sheriff was told that one of the

17

jurors was having an anxiety attack and was "ready to leave. He's had it. That's it. He feels like he just has to go."

109.    Before releasing the juror and after contacting and alternate, the jury decided to take another vote which came back as a unanimous verdict of guilty on all three counts.

110.    Juan Hernandez was convicted of the first-degree murder of Jorge Gonzalez, attempted first-degree murder of Juan Carlos Cruz, and aggravated battery with a firearm.

111.    At his sentencing, Juan Hernandez maintained his innocence, denounced police who frame innocent citizens, and gave condolences to the Gonzalez family.

112.    Juan was sentenced to 86 years of imprisonment.

113.    Rosendo Hernandez was tried in the Circuit Court of Cook County on August 12, 1999.

114.    Rosendo also presented his alibi defense, testifying that he was innocent, and that at the time of the shooting he was at a bowling alley 2.5 miles away from the shooting.

115.    Multiple witnesses, including an employee of the bowling alley, testified and corroborated Rosendo's alibi.

116.    Defendant Guevara testified at Rosendo's trial consistent with the evidence Defendants had fabricated, and concealed all evidence of Defendants' myriad misconduct discussed above.

117.    Rosendo was found guilty of attempted first-degree murder, and aggravated battery with a firearm

118.    Rosendo was sentenced to 55 years on the murder conviction, 25 years on the attempt first-degree murder, those sentences to run concurrently, and 20 years on the aggravated battery with a firearm to run consecutive to the other two sentences.

18

119.    Without the false statements and identifications entered by the Defendants, and the suppression of evidence of their innocence, Plaintiffs would have never been convicted of the Gonzalez murder.

### Plaintiffs' Wrongful Imprisonments

120.    Plaintiffs Rosendo and Juan Hernandez were just 19 and 20 years old at the time of their arrests. The following decades of their lives were consumed by the horror of wrongful imprisonment.

121.    Because of the Defendants' misconduct, Plaintiffs' opportunity to grow older with their family and make a life with them was taken away. Plaintiffs' relationships with their families and friends were severely harmed.

122.    Plaintiffs were stripped of their young adulthood and deprived of opportunities to gain an education, to engage in meaningful labor, to develop skills and a career, and to pursue their interests and passions.

123.    Plaintiffs have been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

124.    Plaintiffs never knew whether the truth would come out or whether they would ever be exonerated for a crime they had not committed.

125.    Plaintiffs spent a combined 60 years in prison before being released. In addition to the severe trauma of wrongful imprisonment and Plaintiffs loss of liberty, the Defendants' misconduct continues to cause Plaintiffs extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, rage, and other physical and psychological effects.

126. Plaintiffs were branded murderers. They have suffered profound emotional harm as a result.

**Plaintiffs' Exoneration**

127. On April 13, 2018, Plaintiff Juan and Rosendo Hernandez filed a Joint Amended/Successive Petition for Post Conviction Relief.

128. In July 2022, after a lengthy hearing in which evidence of Plaintiffs' innocence was presented, as well as ample evidence of a pattern of egregious misconduct by several of the Defendants, Judge Rosado of the Cook County Circuit Court vacated Plaintiffs' convictions.

129. In her ruling, Judge Rosado granted post-conviction relief and vacated Plaintiffs' convictions on all grounds, including a finding that Plaintiffs were actually innocent of the Gonzalez murder.

130. The State immediately dismissed the charges and Petitioners were released from custody.

131. Following the ruling, the Cook County State's Attorney's Office issued a statement saying it "agree[d] with the Judge's decision."

132. At the time of their exoneration, Plaintiffs had been fighting the false charges against them for more than half their lives.

**Chicago's Policy and Practice of Wrongly Convicting Innocent Persons in Violation of the Constitution**

133. The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like the one endured by Plaintiff.

134. Since the 1980s, no fewer than 100 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they did not commit.

135. These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, coercing confessions and statements through physical and psychological abuse, manipulating witnesses in order to influence eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause and without regard for the person's actual guilt or innocence.

136. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications that they knew to be inaccurate.

137. At all relevant times, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

138.  Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

139.  The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, inter alia, Rivera v. Guevara, No. 12 C 4428 (N.D. Ill.), Fields v. City of Chicago, No. 10 C 1168 (N.D. Ill.), and Jones v. City of Chicago, No. 87 C 2536 (N.D. Ill.).

140.  The policies and practices of file suppression at issue in Fields applied throughout the timeframe from the 1980s through the 2000s, including at the time of the investigation at issue here.

141.  In addition, a set of clandestine files related to Area Five homicides—the same Detective Division involved in this case—was found in the case of Rivera v. Guevara, No. 12 C 4428 (N.D. Ill.). Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

142.  The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at all relevant times, including at the Area Five Detective Division during the investigation at issue here.

143.  In addition, the City of Chicago and the Chicago Police Department routinely used illegal tactics, including torture, physical coercion, and psychological coercion, to extract involuntary and false confessions and statements from suspects and witnesses. There are well over 250 documented cases of Chicago Police officers using torture and coercion to illegally obtain confessions in homicide cases. The City had notice of this widespread practice of procuring false and coerced confessions long before the events at issue in this case.

22

144.    Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

145.    Prior to and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

146.    For instance, multiple witnesses have come forward with evidence that Defendant Guevara was part of Miedzianowski's criminal enterprise. Defendant Guevara and Miedzianowski worked together in gang crimes before Defendant Guevara became homicide detective. Defendant Guevara used his status as a detective to advance the criminal drug enterprise he participated in with Miedzianowski, and to pressure drug dealers that did not do their bidding. Guevara's assistance included working with Miedzanowski to pin murders on innocent men.

147.    In the case of Klipfel v. Bentsen, No. 94 C 6415 (N.D. Ill), a federal jury in Chicago returned a Monell verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that allowed Chicago police officers (operating out of the very same police facilities as the Defendant Officers in this case) to operate a far-reaching, long-running criminal enterprise that included the subversion of homicide investigations

23

148.     The Klipfel plaintiffs were two former federal agents from the Bureau of Alcohol, Tobacco and Firearms who brought allegations of rampant criminal misconduct among Gang Crimes officers to the attention of CPD officials. The evidence in that litigation included, Philip Cline, an Area Commander and future Chief of Detectives and Superintendent, personally filed two Internal Affairs complaints against Miedzianowski for tampering in homicide investigations, that resulted in no discipline whatsoever; and that Raymond Risley, an assistant deputy superintendent and head of Internal Affairs, not only knew about misconduct in homicide cases but actively participated in efforts to subvert the disciplinary investigation into Miedzianowski that was at the heart of the Klipfel litigation.

149.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department, which has been acknowledged by leaders of the Chicago Police Department and elected officials in Chicago. In accordance with the code of silence, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

150.     As a result of the City of Chicago's established practices, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

151. This belief extends to the Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case. There are dozens of known cases in which Guevara and other Chicago police officers engaged in serious investigative misconduct similar to that described above. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

152. The City of Chicago and its Police Department also failed in the years prior to the Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

    a. The conduct of live lineup, photographic, and other identification procedures.

    b. The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

    c. The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

    d. The risks of wrongful conviction and the steps police officers should take to minimize risks.

    e. The risks of engaging in tunnel vision during investigation.

    f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

153. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

154. The city's failure to train, supervise, and discipline its officers, including the Police Officer Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto policies, as alleged above.

155. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

156. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

### Defendant Guevara's History of Framing Innocent Persons

157. As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men and women over the span of two decades. Like Plaintiff, these men and women have lodged independent accusations of similar misconduct against Defendant Guevara.

158. As of the filing of this complaint, 39 men and women have had their convictions thrown out because of Defendant Guevara's misconduct. They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose

Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Juan Hernandez, Rosendo Hernandez, Jay Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Eruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, and John Martinez. These men and women served hundreds of years in prison for crimes they did not commit.

159. Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, manipulating witnesses, fabricating evidence, suppressing exculpatory evidence, and coercing false confessions and false statements from suspects and witnesses using physical and psychological violence, all in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara engaged in serious investigative misconduct.

160. Given this extensive history of misconduct and the City of Chicago's failure to meaningfully supervise or discipline Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his behavior.

161. Repeatedly, Defendant Guevara has invoked his Fifth Amendment right to not answer questions about allegations against him because truthful responses could subject him to criminal liability. The allegations Defendant Guevara has refused to respond to include allegations that he has manipulated dozens of witnesses to provide false identifications, he has

27

fabricated false evidence, he has suppressed exculpatory evidence, including documentary evidence, he has tortured and abused suspects and witnesses and has coerced false statements from them, as well as every single instance of misconduct detailed below.

.62.    A few examples of Defendant Guevara's misconduct include:

a.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago Police Department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought to the police station two juveniles purporting to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided. Detective Dorsch created a photo array for the juveniles in an attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "That's him." The juvenile then agreed with Guevara, identifying the flagged individual as the shooter. Following this, Dorsch directed Defendant Guevara to leave the room and had the other juvenile view the same photo array; this juvenile was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles outside of Defendant Guevara's presence. The juveniles admit that they were paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.    Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity

Chicago police officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara made Perez get inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Johnson to take the blame for the murder. Unsurprisingly, Perez went on to falsely identify Johnson as one of the murderers.

d. In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e. Juan Johnson was exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f. In 1988, Defendant Guevara caused 12-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of the Valentin murder. In 2011, Lopez testified at an evidentiary hearing that he knew Rivera was the "wrong guy" when he made the identification. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges and Rivera was granted a certificate of innocence.

g.  Also during the Felix Valentin shooting Investigation, Defendant Guevara falsely claimed that the victim, Valentin, identified Jacques Rivera as his shooter before he died. Defendant Guevara reported to have obtained this identification at a time when the victim was in a medically induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him. Valentin could not possibly have provided the information that Defendant Guevara attributed to him.

h.  After Jacques Rivera's exoneration, he brought suit against Defendant Guevara. A federal jury found that Guevara had violated Rivera's civil rights and awarded Rivera $17 million in damages, as well as $175,000 in punitive damages against Defendant Guevara, his partner Steve Gawrys, and his supervisor Ed Mingey.

i.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz, saying that if Muniz did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

j.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not comply.

k.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the grand jury. Guevara threatened that if Rosario did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the

30

participants in the crime. Rosario recanted his identification of Arcos at trial. Although Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

l.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick Daniel Colon out of a lineup. As a result, these men falsely accused Colon of committing a murder, but later came forward to recant and shed light on Defendant Guevara's misconduct.

m.   In 1993, Defendant Guevara coerced an identification from Carl Richmond with threats, saying that he could make Richmond's life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

n.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained Davila to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila maintained that he was uninvolved, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite that each of those witnesses previously told the police that they had not been able to see the shooter.

o.   In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that, if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

p. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

q. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand," saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

r. In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragoza was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

s. In 1995, Defendant Guevara told Jose Melendez to falsely identify Thomas Sierra as the shooter of Noel Andujar, even though Melendez had not seen the shooter and told Defendant Guevara as much. In addition, Defendant Guevara wrote false reports saying that Jose Melendez and Alberto Rodriguez had identified a car as the one used in the Andujar shooting, when in fact both men had told Defendant Guevara that the car in question was not the one used in the shooting.

t.   In 1996, Defendant Guevara coerced Maria Rivera into making a false
identification by unzipping his pant and propositioning her. Rivera later told the
prosecutor that she had falsely identified an individual in a lineup at Guevara's
direction. The prosecution abandoned murder charges against that individual.

u.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false
identification. Guevara detained Ruiz repeatedly over the course of a ten-day
period, locking him in an interrogation room without food, water, or a bathroom.
Though Ruiz kept telling Guevara that he had not seen the shooter or the driver
involved in the crime, Guevara told Ruiz whom to identify and what to say in his
statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder
because Ruiz believed that Guevara would continue to harass him until he
changed his story. Ruiz recanted his identification at trial, and the judge found
Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing
that Guevara was the lead detective in the case because the victim was Guevara's
nephew.

v.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a
trial in which Guevara was testifying and observed the testimony of trial
witnesses. She then conferred with Guevara, even though the Court had ordered
fact witnesses to be excluded from the courtroom to prevent witness collusion.

w.   In 2011, the First District Appellate Court granted Tony Gonzalez a post-
conviction hearing based on evidence that Defendant Guevara conducted an
unduly suggestive lineup. In this instance, Guevara had concocted a photo array in
which Gonzalez's photo was the only one that stood out from the rest.

x. In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out of the back door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS).

y. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and her two children, and left the home in shambles. Lloyd filed a complaint with OPS the next day.

z. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw him while in custody corroborated his claims that the Area Five police beat him. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action against the City of Chicago on Hunt's claim of excessive detention.

34

aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela
Flores and her 13-year old sister, Ana, during a search of their home. During the
search, officers did not identify themselves as police. Guevara repeatedly slapped
Graciela, called her a "bitch," and pulled her hair. As a result of this incident,
Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo
Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When
Munoz denied any knowledge of the incident Guevara was asking about, Guevara
repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival
gang territory where he allowed rival gang members to spit on Munoz and beat
Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the
face several times, kicked him, and hit him in the head. Garcia filed a complaint
with OPS. Although Guevara denied the charges, Garcia's complaints were
corroborated by physical evidence, as Garcia was treated at the hospital for
lacerations to the head. After an investigation into the incident, OPS found that
Guevara had lied about the incident and recommended that Guevara be suspended
for two days.

dd. In 1986, Defendant Guevara and two other officers coerced a confession from
Daniel Pena by beating him about the face and ribs with their hands and about the
groin and thighs with flashlights. Pena was taken to see a doctor where he
complained about being beaten by the police. The doctor found bruising to Pena's

legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claims that he had been beaten while in police custody.

ee. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with OPS. OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff. In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime that he had nothing to do with.

gg. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed, he would serve seven years in prison; if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if signed a statement, he could go home.

hh. In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was

the defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police.

ii. In 1993, Defendant Guevara arrested 15-year-old Eliezar Cruzado and threatened him with life imprisonment if Cruzado did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

jj. In 1992, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of the two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an Assistant State's Attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement that he could not read.

kk. In 1992, Defendant Guevara physically abused and threatened Francisco Vicente into providing false statements implicating Geraldo Iglesias in a murder. Vicente claimed that Iglesias spontaneously confessed to him that he was guilty of the

...ime for which Guevara had arrested him. Vicente has since testified that his statements were false and that Defendant Guevara and his colleagues beat him, threatened him, and fed him facts to ensure that he told their story.

ll. In 1994, Defendant Guevara, after 17 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying. Duta repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that, if he did not confess, he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores' statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while he was chained to a wall in a locked interrogation room. Dembski, a Polish national who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate,

and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1997, Defendant Guevara used threats and physical force against Ariel Gomez, Paul Y_ _ a, and several of their co-defendants to try to get them to sign false statements incriminating Gomez in the shooting of Concepcion Diaz. Guevara also used pressure and threats to try to force three eyewitnesses, Ruth Antonetty, Debbie Daniels and Maria Castro, to falsely identify Ariel Gomez as the shooter even after they informed Guevara that they could not identify him as the shooter.

pp. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq. In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated. She asserts that Guevara never took an accurate statement from her, despite that she did have real knowledge of the crime he was questioning her about.

rr. In 1998, Defendant Guevara repeatedly threatened and beat Arturo DeLeon-Reyes in order to coerce DeLeon-Reyes into giving an incriminating statement. After two days of isolation and interrogation, DeLeon-Reyes provided a false statement implicating himself in a murder in which he was not involved.

ss. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false

39

statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

tt. In 1999, Defendant Guevara and his colleagues repeatedly punched David Gecht in the stomach and back and struck him during his interrogation. After this prolonged abuse, Gecht told Guevara and the other officers he would do "whatever they wanted," and adopted a fabricated statement, fed to him by Guevara, confessing to a shooting of which he had no knowledge.

uu. In addition, Guevara threatened Gecht's girlfriend, Colleen Miller, telling her that she would be arrested and that the child she was expecting would be born in prison and then taken from her if she did not cooperate with them. Guevara used Miller's fear for herself and her unborn child to extract a fabricated statement from her implicating Gecht in the shooting.

vv. In 1991, Defendant Guevara framed Demetrius Johnson for killing Edwin Fred. Guevara suppressed a lineup report documenting that a key eyewitness had identified a different person as the perpetrator in a lineup, and he fabricated a false police report to make it appear as if that identification had never occurred. In addition, to support his case against Johnson, Guevara manipulated and fabricated eyewitness identifications of Johnson as the shooter from witnesses Rosa Burgos, Ricardo Burgos, and Elba Burgos.

163. Defendant Guevara never received discipline from the City of Chicago or the Chicago Police Department for any of the conduct set out above.

164. In fact, the City of Chicago failed to supervise or discipline its police officers, including Defendants Guevara and the other Defendants. Defendants engaged in the misconduct

set forth in this complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

## COUNT I
## 42 U.S.C. § 1983 – Due Process
### (Fourteenth Amendment)

165.    Plaintiff incorporates each paragraph of this complaint as if fully restated here

166.    As described in detail above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

167.    In the manner described more fully above, Defendants fabricated witness statements falsely implicating Plaintiff in the crime.

168.    Defendants knew this evidence was false.

169.    Defendants obtained Plaintiff's conviction using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

170.    Defendants procured supposed eyewitness identifications of Plaintiff, which they knew to be false and unreliable, using unduly suggestive procedures. Despite this, Defendants caused these false identifications to be used during Plaintiff's criminal trial.

171.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that that Defendants had manufactured false identifications of Plaintiff, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

41

172. In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff

173. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

174. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

175. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

176. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT II
### 42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

177. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

178. In the manner described above, Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

179. In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. The judicial proceedings were instituted and continued maliciously, resulting in injury.

180. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

181. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

182. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

### COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

183. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

184. In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

185. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

186. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

187. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, and other grievous and continuing injuries and damages as set forth above.

188. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV
### 42 U.S.C. § 1983    Conspiracy to Violate Constitutional Rights

189. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

190. In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Hernandez shooting, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

191. In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

192. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

193. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

194. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

195. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more

fully described below in Count V.

## COUNT V
### 42 U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

196.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

197.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

198.     At all times relevant to the events described in this complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of criminal suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

199.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

200.     In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom

45

by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

201.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

202.    In addition, at all times relevant to the events described in this complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports; did

46

not maintain proper investigative files, or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses, (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers pursued wrongful convictions through profoundly flawed investigations.

203.    These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

204.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

205.    As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly convicted of crimes that they did not commit.

206.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

207. Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI
### State Law Claim – Malicious Prosecution

208. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

209. In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

210. In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

211. The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in April 2022.

212. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

213. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

214. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

215. The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

216. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
### State Law Claim – Willful and Wanton Conduct

217. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

218. At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Hernandez murder investigation.

219. Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

220. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT V
### State Law Claim – Civil Conspiracy

221.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

222.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators known and unknown reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

223.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

224.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

225.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

226.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT VI
### State Law Claim – *Respondeat Superior*

227.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

228.    While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

229.     Defendant City of Chicago is liable as principal for all torts committed by its
agents.

## COUNT XIII
### State Law Claim - Indemnification

230.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

231.     Illinois law provides that public entities are directed to pay any tort judgment for
compensatory damages for which employees are liable within the scope of their employment
activities.

232.     The Defendants were employees, members, and agents of Defendant City of
Chicago, acting at all relevant times within the scope of their employment in committing the
misconduct described herein.

233.     Defendant City of Chicago is responsible to pay any judgment entered against the
Police Officer Defendants.

WHEREFORE, Plaintiffs JUAN HERNANDEZ and ROSENDO HERNANDEZ,
respectfully request that this Court enter a judgment in his favor and against Defendants
REYNALDO GUEVARA, GERI LYNN YANOW, as special representative of the ESTATE OF
ERNEST HALVORSEN, JOSEPH MIEDZIANOWSKI, JOEL BEMIS, ROBERT DEGRAFF,
ROBERT BIEBEL, and the CITY OF CHICAGO, awarding compensatory damages, attorneys'
fees, and costs against each Defendant, punitive damages against each of the Individual
Defendants, and any other relief that this Court deems just and appropriate.

### JURY DEMAND

Plaintiffs JUAN and ROSENDO HERNANDEZ, hereby demand a trial by jury
pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

JUAN & ROSENDO HERNANDEZ

BY:    s/ Anand Swaminathan
       *One of Plaintiffs' Attorneys*

       Jon Loevy
       Anand Swaminathan
       Steve Art
       Sean Starr
       Annie Prossnitz
       **LOEVY & LOEVY**
       311 N. Aberdeen, Third Floor
       Chicago, IL 60607

       Daniel J. Stohr
       Attorney at Law
       222 North LaSalle Street
       Chicago, IL 60601

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS

Juan Hernandez and Rosendo Hernandez

**(b)** County of Residence of First Listed Plaintiff  Cook
*(Except in U.S. plaintiff cases)*

**(c)** Attorneys *(firm name, address, and telephone number)*

Loevy & Loevy, 311 N. Aberdeen, Chicago, IL 60607
(312) 243-5900

## DEFENDANTS

Reynaldo Guevara, et al.,

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government not a party.)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

| CONTRACT | TORTS | | PRISONER PETITIONS | LABOR | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 510 Motions to Vacate Sentence | ☐ 710 Fair Labor Standards Act | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 530 General | ☐ 530 General | ☐ 720 Labor/Management Relations | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 535 Death Penalty **Habeas Corpus:** | ☐ 740 Railway Labor Act | ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition | ☐ 751 Family and Medical Leave Act ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement | ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt |
| ☐ 151 Medicare Act ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans) | ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Personal Injury - Medical | **PERSONAL PROPERTY** ☐ 370 Other Fraud | ☐ 560 Civil Detainee - Conditions of Confinement | Income Security Act | Organizations ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Veteran's Benefits | Malpractice | ☐ 371 Truth in Lending | | **PROPERTY RIGHTS** | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | | ☐ 380 Other Personal Property Damage | | ☐ 820 Copyright ☐ 830 Patent | Protection Act (TCPA) ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract ☐ 195 Contract Product Liability ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 (DTSA) | Exchange ☐ 890 Other Statutory Actions ☐ 891 Agricultural Arts |

| REAL PROPERTY | CIVIL RIGHTS | BANKRUPTCY | FORFEITURE/PENALTY | SOCIAL SECURITY | ☐ 893 Environmental Matters |
|---|---|---|---|---|---|
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | ☐ 422 Appeal 28 USC 158 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 861 HIA (1395ff) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 423 Withdrawal 28 USC 157 | ☐ 690 Other | ☐ 862 Black Lung (923) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/Accommodations | **IMMIGRATION** | | ☐ 864 SSID Title XVI | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/ Disabilities- Employment | ☐ 462 Naturalization Application | | ☐ 865 RSI (405(g)) | Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other ☐ 448 Education | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) ☐ 465 Other Immigration Actions | | **FEDERAL TAXES** ☐ 870 Taxes (U.S. Plaintiff or Defendant) ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Check one box, only.)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District (specify)
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION *(Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)*

42 U.S.C. § 1983

## VII. PREVIOUS BANKRUPTCY MATTERS *(For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)*

## VIII. REQUESTED IN COMPLAINT:

☐ Check if this is a class action under Rule 23, F.R.CV.P.

Demand $

CHECK Yes only if demanded in complaint.
Jury Demand: ☒ Yes ☐ No

## IX. RELATED CASE(S) IF ANY *(See instructions.)*

Judge                          Case Number

## X. Is this a previously dismissed or remanded case? ☐ Yes ☒ No    If yes, Case #              Name of Judge

Date: 3/21/2023    Signature of Attorney of Record  /s/ Anand Swaminathan

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority for Civil Cover Sheet

The ILND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use
**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. **(See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# EXHIBIT 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Northern District of Illinois

| | | |
|---|---|---|
| Juan Hernandez and Rolando Hernandez | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 23 CV 01707 |
| | ) | |
| Guevara, et al., | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: 
Cook County State's Attorney's Office, Chief ASA Jessica Scheller,
Civil Actions Bureau, Richard J. Daley Center, Room 500, 50 W. Washington St., Chicago, IL 60602

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: SEE ATTACHED RIDER

| Place: The Sotos Law Firm, P.C. | Date and Time: |
|---|---|
| 141 W. Jackson Blvd, Suite 1240A Chicago, IL 60604 or tballard@jsotoslaw.com | 09/12/2023 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/28/2023

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | /s/Allison L. Romelfanger |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* **Defendants Joel Bemis and Robert Biebel** _____ , who issues or requests this subpoena, are:

Allison L. Romelfanger, The Sotos Law Firm, P.C., 141 W. Jackson Blvd, Suite 1240A, Chicago, IL 60604, 630-735-3300

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 23 CV 0172

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*

☑ I served the subpoena by delivering a copy to the named person as follows: **Cook County State's Attorney's Office, Chief ASA Jessica Scheller, Civil Actions Bureau, Richard J. Daley Center, Room 500, 50 W. Washington St., Chicago, IL 60602, Via Certified Mail** on *(date)* **08/29/2023** ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ .

My fees are $              for travel and $              for services, for a total of $ **0.00** .

I declare under penalty of perjury that this information is true.

Date:    **08/29/2023**

/s/Tonet Ballard
*Server's signature*

**Tonet Ballard, Paralegal**
*Printed name and title*
**The Sotos Law Firm, P.C.
141 W. Jackson Blvd, Suite 1240A
Chicago, IL 60604
(630) 735-3300, Fax (630) 773-0980**
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
**(A) Appearance Not Required.** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B) Objections.** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
**(A) When Required.** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
**(B) When Permitted.** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C) Specifying Conditions as an Alternative.** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
**(A) Documents.** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B) Form for Producing Electronically Stored Information Not Specified.** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C) Electronically Stored Information Produced in Only One Form.** The person responding need not produce the same electronically stored information in more than one form.
**(D) Inaccessible Electronically Stored Information.** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
**(A) Information Withheld.** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B) Information Produced.** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

*Hernandez v. Guevara, et al,* Case No. 23 CV 1737

## DOCUMENT RIDER TO COOK COUNTY STATE'S ATTORNEY'S OFFICE

Any and all records, files, and documents relating to the investigation, Felony Review, criminal prosecution, trial, appeals, post-conviction investigation and proceedings, and certificate of innocence proceedings in the cases of

***People v. Juan & Rosendo Hernandez,*** Case No. 97 CR 21329

including but not limited to:

    a)    pleadings, motions, discovery requests, documents tendered in discovery and discovery receipts, subpoenas, subpoenas *duces tecum*, court orders, and correspondence;

    b)    police reports, crime lab records, and school records;

    c)    Felony Review folders and notes and notes including any continued investigation(CI) tasks or list and witness or offender statements or statement summaries whether oral, handwritten, court reported, or audio and/or video recorded, CRIMES fact sheet, disposition worksheet and PEN letter;

    d)    photographs (including but not limited to line-up photos, photo arrays and crime scene photos) and physical evidence relating to the investigation and prosecution;

    f)    any requests or protocols for the testing and/or analysis of DNA, fingerprints, blood and other bodily fluids, and any other materials or physical evidence, and any laboratory reports and test results relating to such testing and/or analysis;

    g)    all investigators' reports and notes;

    h)    transcripts of court proceedings (including but not limited to status hearings, pre-trial motions, grand jury, trial, post-conviction, and certificate of innocence proceedings);

    i)    all records, documents, and files compiled by the Conviction Integrity Unit of the State's Attorney's Office, including but not limited to investigators' reports and notes, evaluation memorandums, and reports and recommendations memorandums;

    j)    any and all digitally retained files, documents, videos, audio recordings, photographs, including files retained on evidence.com/sharepoint, and any metadata associated with the files.

    k)    any exhibits marked for identification and/or admitted into evidence, and any evidence used or available for use at trial, sentencing, post-conviction, or certificate of innocence proceedings;

l) all communications with any attorney representing **Juan Hernandez and Rosendo Hernandez**;

m) all documents relating to the murder of Jorge Gonzalez and the attempted murder of Juan Carlos Cruz; including but not limited to physical evidence collected during the course of the investigation of same or used at trial;

m) all of the records regarding the post conviction and COI process including all communications with plaintiff or his attorney;

o) Any and all communications, including but not limited to, written correspondence, memoranda, electronic mail, text messages, iMessages, and any recordings of communications, including voicemails, between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Loevy & Loevy, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jorge Gonzalez relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Juan and Rosendo Hernandez, 97CR21329*;

p) Any and all documents which memorialize or summarize any communications, including but not limited to written correspondence, memoranda, electronic mail, text messages, and iMessages, between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Loevy & Loevy, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jorge Gonzalez relating to relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Juan and Rosendo Hernandez, 97CR21329*;

q) Any and all power points or other presentation materials used in any in-person meeting between any and all employees, agents, officers, advisors, or other representative of the Cook County State's Attorney's Office and any and all employees, agents, officers, advisors, director, member, manger, partner or other representative of Loevy & Loevy, the Exoneration Project, Northwestern Center on Wrongful Convictions, any family members, friends or any other person or organization advocating on behalf of or for Jorge Gonzalez relating to relating to the criminal prosecution or post-conviction proceedings, including but not limited to certificate of innocence proceedings in the cases of *People v. Juan and Rosendo Hernandez, 97CR21329*.

For any document requested for which you claim a privilege, please provide a privilege log, identifying or otherwise describing each document and the specific privilege under which you are claiming a right to non-disclosure.

**NOTE:** In lieu of a personal appearance you may comply with this subpoena by mailing responsive documents and materials, along with a certification that you have made a diligent search of your records and submitted all records requested in response to this subpoena, to:

Allison L. Baselfanger
The Sachs Law Firm, P.C.
111 W. Jackson Blvd.  Suite 1240A
Chicago, Illinois 60604



# EXHIBIT 3

*[handwritten: 4/24 — OC Grd Jy Continued to 3/14-2023 for adjourn'ts 8/12]*

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS          )
                                          )
                    Plaintiff,            )     Case No.: 97 CR 21329-01
                                          )              97 CR 21329-02
        v.                                )
                                          )     Hon. Judge Erica L. Reddick
JUAN HERNANDEZ (01) and                   )
ROSENDO HERNANDEZ (02),                   )
                                          )
                    Defendants.           )

*[FILED stamp: IRIS Y MARTINEZ CLERK OF THE CIRCUIT COURT OF COOK COUNTY 2024 FEB P3 AM 11:3? FILED]*

### NOTICE OF MOTION

TO:    See attached Service List

        **PLEASE TAKE NOTICE** that on, February 21, 2024, at 9:30 a.m., I shall appear before
the Honorable Judge Erica L. Reddick in Courtroom 101, where she usually presides, or before
anyone sitting in her stead, in the Circuit Court of Cook County, 2600 S. California Avenue,
Chicago, Illinois, and then and there present the **MOTION TO RELEASE GRAND JURY
MATERIALS.**

        A copy is attached hereto and herewith served upon you.

Dated: February 13, 2024                  Respectfully Submitted,


                                          /s/ Jeffrey C. Grossich
                                          JEFFREY C. GROSSICH, Attorney No. 6316511
                                          *One of the Attorneys for Defendant Geri Yanow, as
                                          Special Representative of Ernest Halvorsen,
                                          deceased, Robert DeGraff, deceased, Robert Biebel
                                          and Joel Bemis*

James G. Sotos
Josh M. Engquist
Jefferey R. Kivetz
Allison L. Romelfanger
Kyle T. Christie
Tommy J. Sotos
Jeffrey C. Grossich
**THE SOTOS LAW FIRM, P.C.**
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
(630) 735-3300
jgrossich@jsotoslaw.com

1

# CERTIFICATE OF SERVICE

I, Tonet Ballard, a non-attorney, hereby certify that on February 13, 20__, I caused to be served upon the above party by hand-delivering a copy of the attached Motion to Release Grand Jury Materials to the court and served on the attorneys of record listed in the below service list by electronic mail.

**Attorneys for Plaintiff**
Steven E. A...
Anand Swaminathan
Sean Starr
Annie D. Prossnitz
Jonathan I. Loevy
Arthur R. Loevy
Daniel J. Stohr
Isabella Aguilar
Loevy & Loevy
311 North Aberdeen St, Suite
(312)243-5900
steve@loevy.com
anand@loevy.com
sean@loevy.com
prossnitz@loevy.com
jon@loevy.com
arthur@loevy.com
dan@DanStohr.com
aguilar@loevy.com

**Attorney for City of Chicago**
Eileen E. Rosen
Theresa Carney
Catherine Barber
Austin Rahe
Andrew Grill
Jessica Zehner
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606
(312)243-1000
erosen@rfclaw.com
tcarney@rfclaw.com
cbarber@rfclaw.com
arahe@rfclaw.com
agrill@rfclaw.com
jzehner@rfclaw.com
lferrise@rfclaw.com

**Attorney for Reynaldo Guevara**
Misha Itchhaporia
Graham P. Miller
Emily E. Schmidt
Timothy P. Scahill
Steven B. Borkan
Whitney N. Hutchinson
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
mitchhaporia@borkanscahill.com
gmiller@borkanscahill.com
eschnidt@borkanscahill.com
tscahill@borkanscahill.com
sborkan@borkanscahill.com
whutchinson@borkanscahill.com
mboekeloo@borkanscahill.com

**Attorney for Joseph Miedzianowski**
Brian P. Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
312-372-0770
gainerb@jbltd.com
mcelroyl@jbltd.com

/s/Tonet Ballard
TONET BALLARD
Paralegal

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
)
Plaintiff, )
) Case No.: 97 CR 21329-01
) 97 CR 21329-02
v. )
) Hon. Judge Erica L. Reddick
JUAN HERNANDEZ (01) and )
ROSENDO HERNANDEZ (02), )
)
Defendants. )

## MOTION TO RELEASE GRAND JURY MATERIALS

Reynaldo Guevara, Joseph Miedzianowski, Joel Bemis, Robert Biebel, Carl Lynn Yanow,

as special representative of the Estates of Ernest Halvorsen and Robert DeGraff, and the City of

Chicago (collectively "Petitioners"), by and through their undersigned attorneys, respectfully

request that this Honorable Court enter an Order releasing the grand jury materials in this case,

including transcripts, evidence, and subpoenas, and state as follows:

### INTRODUCTION

Over twenty years ago, brothers Juan and Rosendo Hernandez were convicted of the first-

degree murder of Jorge Gonzalez. In July 2022, both brothers had their convictions reversed. Now,

Juan and Rosendo (the "Hernandez brothers") are suing Chicago police officers, Reynaldo

Guevara, Joseph Miedzianowski, Joel Bemis, Robert DeGraff (through his estate), Robert Biebel,

and Ernest Halvorsen (through his estate), and the City of Chicago ("Petitioners"), alleging that

they were wrongfully prosecuted and convicted. The Hernandez brothers have filed suit in federal

court and are seeking compensatory and punitive damages. *Juan Hernandez and Rosendo*

*Hernandez v. Reynaldo Guevara, et al.*, Case No. 23-cv-01737.

1

What happened during the Hernandez brothers' criminal case is central to their claims in the federal lawsuit. For example, one of the ultimate questions in the federal lawsuit is whether there was probable cause for the Hernandez brothers' detention and prosecution. In the underlying criminal case, the Hernandez brothers were indicted by a grand jury. An indictment by a grand jury is *prima facie* evidence that there was probable cause. The Hernandez brothers can rebut this presumption by presenting evidence that Petitioners obtained their indictments through improper or fraudulent means. Therefore, transcripts of the grand jury proceedings, which contain a record of the evidence and testimony presented, are central to the Hernandez brothers' claims and Petitioners' defenses.

Additionally, the grand jury materials will shed light on: (1) the Hernandez brothers' guilt or innocence, (2) which officers and witnesses were interviewed by the Cook County State's Attorney ("CCSAO") before the Hernandez brothers' indictments, (3) the knowledge and information the CCSAO had at the time the indictments were sought, (4) whether evidence was fabricated, and (5) whether witnesses were coerced. These matters are squarely at issue in the federal lawsuit.

Petitioners thus have a compelling and particularized need for the grand jury materials. Without the grand jury materials, Petitioners will be prevented from presenting a fulsome and effective defense to the claims against them. Additionally, the grand jury materials are necessary for impeachment and refreshing the recollections of witnesses, and testing witnesses' credibility. There were at least five eyewitnesses to Jorge Gonzalez's murder, one of whom (Daniel Violante) has already changed his story multiple times. Violante testified before the grand jury, and it is likely that the other eyewitnesses did as well. In addition to shedding light on probable cause, the

2

grand jury transcripts are needed to test witnesses' credibility. It would be a substantial injustice to deprive Petitioners of this crucial evidence for their defense.

The reasons for keeping the grand jury materials secret are no longer compelling. The grand jury proceedings in this case occurred over twenty years ago, and the jurors have long since been discharged. The Hernandez brothers have been tried, convicted, sentenced, and released. At this juncture, there is no concern that the Hernandez brothers will escape from custody, that the grand jury's deliberations will be improperly influenced, that witnesses will commit perjury before the grand jury or at the criminal trial, or that witnesses will be discouraged from testifying freely. Additionally, there is no reason to protect the Hernandez brothers from unwanted exposure. They have already brought exposure by filing a federal lawsuit and publicizing it in the media.

The grand jury materials in this case are necessary to prevent a substantial injustice in the federal lawsuit. At this stage, over twenty years after the indictments, the need for disclosure far outweighs the need for continued secrecy. Petitioners' request is narrowly tailored to cover only those materials needed for defense of the federal claims. Petitioners are only seeking the grand jury materials from this criminal case. For all of these reasons, Petitioners respectfully request that this Honorable Court grant this Motion, and enter the attached proposed order releasing the grand jury materials in this case. (Ex. A, Proposed Order).

## FACTUAL BACKGROUND

In 1999, Rosendo Hernandez was convicted of the first-degree murder of Jorge Gonzalez and aggravated battery with a firearm. In 2001, Juan Hernandez was convicted of the first-degree murder of Jorge Gonzalez, attempted first-degree murder of Juan Carlos Cruz, and aggravated battery with a firearm. In July 2022, Judge Rosado of the Cook County Circuit Court vacated Juan and Rosendo's convictions.

3

On March 21, 2023, the Hernandez brothers filed a federal lawsuit against Petitioners Reynaldo Guevara, Joseph Miedzianowski, Joel Bemis, the Estate of Robert DeGraff, Robert Biebel, the Estate of Ernest Halvorsen, and the City of Chicago in United States District Court for the Northern District of Illinois, styled *Juan Hernandez and Rosendo Hernandez v. Reynaldo Guevara, et al.*, Case No. 23-cv-01737 (the "Civil Action") *See*, Ex. B, Complaint. In the Civil Action, the Hernandez brothers allege that Petitioners, Chicago Police officers who investigated the Jorge Gonzalez murder, violated their civil rights and caused their alleged wrongful convictions. The allegations of the Civil Action include, *inter alia*, violations of due process, malicious prosecution, unlawful detention, failure to intervene, conspiracy to violate constitutional rights, intentional infliction of emotional distress, willful and wanton conduct, and civil conspiracy. Petitioners bring the present Motion to Release Grand Jury Materials, including transcripts and subpoenas in this case, for use in the Civil Action.

## ARGUMENT

### I. Petitioners Have a Compelling and Particularized Need for the Grand Jury Materials

This Court should permit the disclosure of the grand jury materials in this case because Petitioners have a compelling and particularized need which vastly outweighs any continued need for secrecy. Section 112-6(b)(3) of the Illinois Code of Criminal Procedure states that grand jury materials may be disclosed "when the court, preliminary to or in connection with a judicial proceeding, directs such in the interest of justice or when the law so directs." 725 ILCS 5/112-6(b)(3). In deciding whether to permit the disclosure of grand jury materials, courts apply a three-pronged test: (1) whether the material is needed to avoid a possible injustice in another judicial proceeding; (2) whether the need for disclosure is greater than the need for continued secrecy; and

4

(3) whether the request is structured to cover only the materials needed. *Board of Educ. v. Verisario*, 143 Ill. App. 3d 1000, 1010-11 (2nd Dist. 1986). In this case, all three prongs favor disclosure.

The grand jury materials in this criminal case are crucial to the Civil Action. For example, one of the ultimate questions in the Civil Action is whether there was probable cause for the Hernandez brothers' detention and prosecution. The existence of probable cause defeats many of the Hernandez brothers' claims. *See e.g., Haynes v. City of Chicago*, 2022 WL 1016392, *2 (N.D. Ill. Apr. 5, 2022) ("The existence of probable cause defeats an unlawful detention claim."); *Johnson v. Target Stores, Inc.*, 341 Ill. App. 3d 56, 73 (1st Dist. 2003) ("[T]he failure to prove a lack of probable cause is fatal to a claim of malicious prosecution.").

"[T]he purpose of the grand jury is to decide whether probable cause exists such that a charge should be brought." *People v. O'Dette*, 2017 IL App (2d) 150884, ¶ 67. An Illinois grand jury indictment is *prima facie* evidence of probable cause. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019). In this case, the Hernandez brothers were indicted by the grand jury. This is *prima facie* evidence of probable cause that can only be rebutted by evidence that the Petitioners obtained the indictment through improper or fraudulent means. *Id.* Therefore, the grand jury materials are necessary to show what evidence and testimony were presented to obtain the indictments.

The grand jury materials will also reveal the evidence that Petitioners had available at the time and that formed their good faith basis for the existence of probable cause. This is critical to Petitioners' affirmative defense of qualified immunity. Thus, the entirety of the grand jury materials in this case is relevant to the claims and defenses in the Civil Action. If Petitioners are denied access to the grand jury materials, it will cause a substantial injustice and Petitioners will be severely prejudiced.

The grand jury materials are also needed for impeachment, refreshing witnesses' recollection, and testing credibility. *See In re Cement-Concrete Block, Chicago Area*, 381 F. Supp. 1108, 1110 (N.D. Ill. 1974) (permitting disclosure of grand jury transcripts to attorneys in subsequent civil case "for use in litigation only for purposes of impeachment, refreshing the witnesses' recollection, and testing credibility"). After Jorge Gonzalez was shot and murdered on June 27, 1997, four eyewitnesses identified Juan Hernandez as one of the shooters. Five eyewitnesses identified Rosendo Hernandez as the other shooter. At least one of these eyewitnesses, Daniel Violante ("Violante"), testified before the grand jury that the Hernandez brothers were the shooters. It is likely that the other eyewitnesses (and Petitioners) testified before the grand jury as well. The grand jury transcripts thus are necessary for impeachment, refreshing recollection, and testing the credibility of these witnesses in the Civil Action.

The conduct of eyewitness Daniel Violante illustrates the importance of the importance of the grand jury transcripts. Violante was a member of the Maniac Latin Disciples street gang, while the Hernandez brothers were members of the Spanish Cobras, a rival gang. (Violante Trial Testimony, attached as Ex. C, at 15:9-14, 27:16-18). Violante witnessed the shooting of Jorge Gonzalez. (*Id.* at 15:9-16:6). During a police lineup, Violante identified Juan and Rosendo Hernandez as the shooters. (*Id.* at 15:19-17:7). Violante repeated this identification before the grand jury. (*Id.*)

After testifying before the grand jury, Violante was approached by two fellow Maniac Latin Disciple gang members who pressured him into signing a statement recanting his identification of the Hernandez brothers. (Ex. C, Violante Trial Testimony at 18:7-19:13). This was part of a broader conspiracy between members of the Maniac Latin Disciples and Spanish Cobras to exchange false witness recant statements to get their respective gang members out of jail. (*Id.* at 26:9-27:9). In a

subsequent crim[...] case arising out of [...] conspiracy (*People [...] [...]obert Lopez*, Case No. [...] CR 9384) [...]iolante testified that h[...] grand jury testimony in [...]e Hernandez brothers' [...]e was true, and that the recant stat[...]ent he signed was fals[...]. *id.* at 29:5-15). Vi[...] later testified as a St[...] s witness [...] at least one of the He[...]andez brothers' crim[...] [...]ials. (*Id.* at 17:1-22)

Upon information and belief, Violante has changed his story again and now claims that [...] initial identification, grand jury testimony, and criminal trial testimony in this case were false, and that his recant statement was true. The grand jury transcripts are therefore necessary to impeach Violante's credibility and to show that he did in fact identify the Hernandez brothers as the shooters, while under oath. Violante is just one example, and it is likely that some or all of the other eyewitnesses also testified before the grand jury and may have similar credibility issues.

Furthermore, the grand jury materials will shed light on the Hernandez brothers' guilt or innocence, which officers and witnesses were interviewed by the CCSAO, what knowledge and information the CCSAO had prior to seeking the indictment, whether evidence was fabricated, and whether witnesses were coerced. This is all highly relevant to the Hernandez brothers' claims in the Civil Action. For these reasons, there is a compelling and particular need for the grand jury materials in this case and they should be released.

II.     **There is No Compelling Need for the Continued Secrecy of the Grand Jury Materials**

Considering this criminal case's age and ultimate conclusion, there is no compelling need for the continued secrecy of the grand jury materials. G[...]d jury proceedings [...] [...]ept secret for the following reas[...]: (1) to prevent the esc[...] of an indicted perso[...]; (2) to ensure the grand j[...]y freedom; (3) to prevent perjury of witnesses before the grand jury and later at the criminal trial; (4) to encourage wit[...]sses to freely testify about the commission of cri[...]es; and (5) to protect a[...]

7

innocent person who is accused but exonerated against unwanted exposure. *Verisario*, 143 Ill. App. 3d at 1010-11. None of these reasons is compelling here.

In this case, the grand jury returned its indictments in the late 1990s. There is no fear that the Hernandez brothers will flee, that the grand jury deliberations will be improperly influenced, or that witnesses will testify falsely before the grand jury or at the criminal trial. The release of the grand jury materials, after a delay of over twenty years, will do little to discourage witnesses from testifying freely. The fifth reason, to protect the privacy of the accused, does not apply here because the Hernandez brothers were indicted. *See Board of Educ.*, 143 Ill. App. 3d at 1011. Furthermore, it was the Hernandez brothers themselves who brought attention to their criminal case by filing a federal lawsuit and publicizing it in the press. For all of these reasons, there is no compelling need for continued secrecy, and the grand jury materials should be released.

## III.  Petitioners' Request is Structured to Cover Only the Materials Needed.

Petitioners seek these grand jury materials needed for their defense in the Civil Action. The Hernandez brothers have put their criminal case (including the grand jury proceedings) at issue by filing the Civil Action and accusing Petitioners of, *inter alia*, detaining and prosecuting them absent probable cause. *See Anilao v. Spota*, 918 F. Supp. 2d 157, 164 (E.D.N.Y 2013) (holding that all of the grand jury materials were "indispensable" to addressing probable cause determinations at issue in false arrest and malicious prosecution claims). As explained, *supra*, Petitioners seek the grand jury materials here because they are relevant and indispensable to the Civil Action.

## IV.  Courts Consistently Allow Parties to Obtain Grand Jury Materials in Reversed Conviction Cases

In reversed conviction civil cases such as the Civil Action, courts consistently permit parties to obtain grand jury materials including transcripts from the underlying criminal cases, even when the CCSAO objects. *See e.g.*, Orders granting motion to obtain grand jury materials in

8

reversed conviction civil cases, *People v. Jaime Rios*, Case No. 1989 CR 16525 (May 25, 2023)

Ex. D; *People v. Iglesias*, Case No. 1993 CR 15199 (March 25, 2022) Ex. E; *People v. D. Johnson*,

Case No. 1991 CR 19833 (January 12, 2022) Ex. F; *People v. C. Johnson*, 1996 CR 497 (July 26,

2019) Ex. G. In this case, the claims in the Civil Action are similar or identical to those in the cases

cited above, and, accordingly, should be released here for the same reasons.

## CONCLUSION

WHEREFORE, Petitioners respectfully request that this Honorable Court enter an order

allowing them to have the grand jury testimony in this case transcribed by the Official Court

Reporters and produced in the Civil Action, and allowing the Public Defender's Office and Cook

County State's Attorney's Office to produce the grand jury materials in their possession to

Petitioners.

Dated: February 13, 2024

/s/ Eileen Rosen
EILEEN ROSEN
*One of the Attorneys for the City
Of Chicago*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 West Wacker, 19th FL
Chicago, IL 60606
(312)494-1000
rcarney@rfclaw.com

Respectfully Submitted,

/s/ Jeffrey C. Grossich
JEFFREY C. GROSSICH, Attorney No.
6316511
*One of the Attorneys for Defendants Geri Yanow, as
Special Representative of Ernest Halvorsen
deceased and Robert DeGraff deceased, Robert
Biebel and Joel Bemis*

James G. Sotos
Josh M. Engquist
Jeffrey R. Kivetz
Allison L. Romelfanger
Kyle T. Christie
Tommy J. Sotos
Jeffrey C. Grossich
THE SOTOS LAW FIRM, P.C.
141 W. Jackson Blvd, Suite 1240A
Chicago, IL 60604
P: (630) 735-3300
jgrossich@jsotoslaw.com

9

/s/Timoth . Scahill
TIMOTHY SCAHILL
*One of the Attorneys for Reynaldo Guevara*

Whitney Hutchinson
Steven B. Borkan
Timothy P. Scahill
Graham P. Miller
Misha Itchhaporia
Emily E. Schnidt
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
whutchinson@borkanscahill.com

/s/ Brian Gainer
BRIAN GAINER
*One of the Attorneys for Joseph Miedzianowski*

Brian Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
(312)372-0770
gainer@jbltd.com

## CERTIFICATE OF SERVICE

I, Tonet Ballard, a non-attorney, hereby certify that on February 13, 2024, I caused to be served upon the above party by hand-delivering a copy of the attached Motion to Release Grand Jury Materials to the court and served on the attorneys of record listed in the below service list by electronic mail.

**Attorneys for Plaintiff**
Steven E. Art
Anand Swaminathan
Sean Starr
Annie D. Prossnitz
Jonathan I. Loevy
Arthur R. Loevy
Daniel J. Stohr
Isabella Aguilar
Loevy & Loevy
311 North Aberdeen St, Suite
(312)243-5900
steve@loevy.com
anand@loevy.com
sean@loevy.com
prossnitz@loevy.com
jon@loevy.com
arthur@loevy.com
dan@DanStohr.com
aguilar@loevy.com

**Attorneys for Reynaldo Guevara**
Misha Itchhaporia
Graham P. Miller
Emily E. Schmidt
Timothy P. Scahill
Steven B. Borkan
Whitney N. Hutchinson
Molly Boekeloo
Borkan & Scahill, Ltd
20 S. Clark Street, Suite 1700
Chicago, IL 60603
(312)580-1030
mitchhaporia@borkanscahill.com
gmiller@borkanscahill.com
eschnidt@borkanscahill.com
tscahill@borkanscahill.com
sborkan@borkanscahill.com
whutchinson@borkanscahill.com
mboekeloo@borkanscahill.com

**Attorney for City of Chicago**
Eileen E. Rosen
Theresa Carney
Catherine Barber
Austin Rahe
Andrew Grill
Jessica Zehner
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker Drive, 19th Floor
Chicago, IL 60606
(312)494-1000
erosen@rfclaw.com
tcarney@rfclaw.com
cbarber@rfclaw.com
arahe@rfclaw.com
agrill@rfclaw.com
jzehner@rfclaw.com
lferrise@rfclaw.com

**Attorney for Joseph Miedzianowski**
Brian P. Gainer
Lisa M. McElroy
Johnson & Bell, Ltd
33 W. Monroe, Suite 2700
Chicago, IL 60603
312-372-0770
gainerb@jbltd.com
mcelroyl@jbltd.com

/s/Tonet Ballard
TONET BALLARD
Paralegal

ii