UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSE CRUZ, ) | |
| ) | Case No. 23-cv-4268 |
| Plaintiff, ) | |
| ) | Honorable Judge Alexakis |
| v. ) | Magistrate Judge Fuentes |
| ) | |
| FORMER DETECTIVE REYNALDO ) | |
| GUEVARA, et al, ) | JURY DEMAND |
| ) | |
| Defendants. ) | |

**DEFENDANT'S MOTION TO COMPEL THIRD
PARTY WITNESS TO COMPLY WITH DOCUMENT SUBPOENA**

Defendant, Reynaldo Guevara, ("Defendant"), through his attorneys Borkan & Scahill, Ltd., pursuant to Federal Rule of Civil Procedure 37(a) and 45(c)(2)(B), moves this Honorable Court to enter an order compelling third-party witness, Margaret Byrne, ("Respondent") ("Ms. Byrne"), to comply with a subpoena for records. In support thereof, Defendant states as follow:

**INTRODUCTION**

As this Court is aware, Defendant Guevara served document subpoenas on a number of third-parties seeking communications and documents that these third-parties retain relating to Plaintiff and his underlying criminal case. *See* Dckt. No. 209. One of these persons is a documentary filmmaker named Margaret Byrne. As set forth below, it is entirely undisputed that Ms. Byrne had extensive communications with Plaintiff relating to his case including the facts thereof and his criminal proceedings), obtained extensive documents from both Plaintiff and persons working on his behalf, filmed interviews with Plaintiff and family members pertaining to his case, and closely monitored and recorded portions of his underlying criminal proceedings. Ms. Byrne has continued these communications with Plaintiff since his release including having him on her internet-based talk show *three times* last year alone, traveling to an innocence convention where both attended, and visited his

1

home here she filmed video footage. Ms. Byrne also is apparently in post-production of a documentary regarding Defendant Guevara which includes interviews with Plaintiff and others relating to his particular claims regarding Defendant Guevara.

Despite there being no dispute whatsoever that Ms. Byrne has relevant documents pertaining to this case, Ms. Byrne, through counsel, has refused to provide even a single document she retains based upon the non-existent reporter's privilege as well as boilerplate burden and relevance objections. After Defendant exhausted attempts to resolve this matter under Local Rule 37.2, Ms. Byrne, through her counsel, stood on her objections. Accordingly, Defendant now seeks an order from this Court compelling Ms. Byrne to comply with Defendant's document subpoena.

## FACTUAL BACKGROUND

The present case involves very serious allegations of misconduct in a 1993 murder Investigation. Plaintiff Jose Cruz, ("Plaintiff"), alleges he was wrongfully convicted of first degree murder and attempted murder. In this civil case, Plaintiff seeks exceptionally high damages based upon over two decades of imprisonment. These damages include not only compensatory damages from the City itself for Plaintiff's term of imprisonment but also substantial punitive damage awards against numerous (many now-retired) individual police officers including Defendant Guevara. Defendants vehemently deny the allegations of misconduct alleged by Plaintiff and intend to establish that Plaintiff's version of the events in this case is a fabrication. The credibility of Plaintiff and the soundness of his account of the events surrounding the murder and attempted murder investigation is crucial evidence in this case as is the nature and extent of any damages he has allegedly suffered.

During discovery, Defendants repeatedly asked Plaintiff to identify all persons whom he had spoken to about his underlying criminal case and the facts underlying the present civil case, including, but not limited to, any discussions with any journalists or media outlets. *See* Ex. 1 (Pl.'s Resp. Rogs Boris) at ¶¶ 2, 8. Plaintiff did not list Ms. Byrne in these discovery responses. Through their own

2

devices, Defendants were able to discover that these statements by Plaintiff in his discovery responses were wildly untrue.

Ms. Byrne is a journalist and apparently working on a documentary involving purported "victims" of Defendant Guevara. *See* https://www.betifilms.com/news/2023/12/19/any-given-day-featured-in-the-chicago-sun-times ("Byrne is now working on a film about a string of wrongful convictions tied to retired CPD Det. Reynaldo Guevara"); *see also* https://www.betifilms.com/work ("Filmmaker Margaret Byrne's documentary, To Catch A Case, exposes deep-rooted police corruption in Chicago's Cook County criminal courts. Inspired by a billboard pleading "Help Free Me, I Am Innocent," Byrne follows retired detective Bill Dorsch's quest to uncover wrongful murder convictions connected to corrupt officer Reynaldo Guevara.").

To that end, Ms. Byrne's communications with Plaintiff about his criminal case began in or around March of 2020 when Plaintiff remained incarcerated and was attempting to challenge his conviction. Ms. Byrne appears to have reached out to Plaintiff on March 10, 2020 with the express purpose of seeking Plaintiff's involvement in her forthcoming documentary and seeking to interview Plaintiff regarding same. *See* Group Ex. 2 at TOM-Cruz 116. Thereafter, Ms. Byrne and Plaintiff engaged in dozens of communications while he was in prison including dozens of times via e-mail, over a dozen times over the telephone (*see* Ex. 3 )(call logs), and via numerous video visits.

During these communications, Plaintiff and Ms. Byrne repeatedly discuss matters relating to Defendant Guevara, Plaintiff's post-conviction proceedings and the facts of his case and, indeed, there are repeated references that Plaintiff was sending Ms. Byrne case file materials (directly and through intermediaries), affidavits, and other documentary materials relating to his case. *See* Group Ex. 2 at TOM-Cruz 146-150, 156-168, 176-178, 196-204, 208, 218, 232, 1126, 1262, 1276, 1306, 1308, 1350-1354, 1368 (discussing facts of case and Guevara); *id.* at TOM-Cruz 138 ("Thank you for adding me to your visitor list. I requested to connect with you on video chat, I'll set up a meeting when it get's

3

approved. Also, I am meeting with Hector today to get your files. Not sure what he has, but I'll let you know when I've gone through it."); *id.* at TOM-Cruz 126; *id.* at TOM-Cruz 144 ("Hi Jose, I hope this note finds you well and healthy. Greg sent me your files, and I also picked them up from Hector."); *id.* at TOM-Cruz 374 ("Yesterday I send you the court papers, and also the affidavit of Ivan Rios, Pedro Jaramillo and his boss Francisco Valverde. The affidavit of Pedro Jaramillo is on spanish hope you have someone to help you with what it says. If you need help let me know I can write it for you on english."); *id.* at TOM-Cruz 1330 ("Hi Margaret, Hope to find you in the best of health, and in God's tender care! I am writing to ask you to p.s. whenever posible and when you have a little bit of time to see if you can send me a copy of the letters that I send you June or July 2020 concerning my life story."); *id.* at TOM-Cruz 800 ("I will see you Thursday, and of course, we can just talk about whatever you're comfortable with and just check in. I'm just looking for ways to include your story and open to suggestions. Take care and talk to you soon, Margaret."); *id.* at TOM-Cruz 880 ("Hello Margaret, Hope all is well with you. So last night I send you a copy of the affidavit's that I just recently got concerning the investigation that the State Attorney's Office conducted with the witnesses on this case."); *id.* at TOM-Cruz 892 ("Hi JC, I got the investigative reports you sent and read through them. I see Rios has now changed his statement. I will schedule a video visit so we can talk more about it. Happy Easter to you and I will talk with you soon. Margaret."); *id.* at TOM-Cruz 772 ("We will be recording so I will let you know what happens. Also, I scheduled a video visit on Thursday the 25th at 5pm. I was wondering if you could bring the affidavit's you sent and read them to me. Let me know if you're comfortable with that. I am working on getting more familiar with your case and reading through everything. Still hoping to spend more time talking with your family, and going with Esther to Ponce - when the weather gets warmer. Talk to you soon, Margaret."). To this end, Ms. Byrne promised Plaintiff she would retain all the communications between the two of them. *Id.* at TOM-

4

Cruz 208 ("Thank you for sharing more of your story. I will make sure I save everything for you that you've written about your story.").

Ms. Byrne also repeatedly indicates she interviewed persons relating to Plaintiff's case. Group Ex. 2 at TOM-Cruz 158-168, 178, 196-206, 324, 334, 1349; *see also id.* at TOM-Cruz 318 ("[T]he meeting was great last night. Your nephew is such an intelligent young man and had a lot to contribute. I'm setting a time up to film with him before they go out for the next rally."); *id.* at TOM-Cruz 326, 328 ("I'm planning on filming with your nephew Jose on October 10th. Do you think you'd be able to call him that morning?"), *id.* at TOM-Cruz 338; *id.* at TOM-Cruz 380 ("I was just looking through the footage I filmed with your family over the summer and thinking I would love to film with them more. I was reading through the transcriptions and wishing I had known what your aunt and uncle were saying because I would have asked them other questions. If you think of anything (other family gatherings) that might be good to film, let me know."); *id.* at TOM-Cruz 1434 ("I just got your legal mail thanks. I do not think that it would be a problem getting Margaret to give us a copy of the interview that she did with my aunt for the Guevara documentary.").

Ms. Byrne also closely monitored and recorded Plaintiff's post-conviction court proceedings and updated him about the outcome of these. Group Ex. 2 at TOM-Cruz at 318, 324, 400, 414, 800, 1268, 1306, 1320. Ms. Byrne also traveled to film his release from prison with his permission. *id.* at TOM-Cruz 1474-1476.

These communications appear to have continued after Plaintiff was released from prison. Plaintiff was interviewed on video by Ms. Byrne on at least three separate occasions last year alone and brief snippets of these interviews are available online. *See* https://www.youtube.com/watch?v=w9ZRWVoSFYs ("The MB Show: Jose Cruz pt 1")(May 1, 2023); https://www.youtube.com/watch?v=p_6FC0vC_Hc ("The MB Show: Jose Cruz pt 2")(March 8, 2023); https://www.youtube.com/watch?v=FmPDT34BMBI ("The MB Show: Jose Cruz pt

5

3")(June 8, 2023). During these edited videos, Ms. Byrne makes repeated reference to other communications and interactions she has had with Plaintiff since his release including attending an "innocence conference" with him in Arizona and visiting his home (of which a small snippet of such footage is displayed). *See* https://www.youtube.com/watch?v=FmPDT34BMBI; https://www.youtube.com/watch?v=w9ZRWVoSFYs at 1:05-1:20 ("We talked for years when you were incarcerated….We have been filming since you were exonerated and released, uh, this summer of 2022…").

Under Plaintiff's present version of the alleged facts rendered at his deposition, his theory is that officers generally fabricated evidence, and/or threatened witnesses to make false identifications in the Antwane Douglas homicide investigation. To this end, conversations that Plaintiff had with a third party about his case obviously provides fodder for potential inconsistent statements and admissions. This is especially so given that Plaintiff appears to have concealed or conveniently "forgot" during written discovery that he had dozens and dozens of communications with Ms. Byrne both during and after his release from prison. The critically important information possessed by Ms. Byrne is not limited to contradictory statements made by Plaintiff. Defendants sought to obtain discovery from Plaintiff at his deposition regarding Plaintiff's criminal attorney's efforts to locate witnesses and Plaintiff invoked attorney client privilege to refuse to answer such questions. Plaintiff is the "holder" of this evidentiary privilege, and Plaintiff's former criminal defense attorney, Fredrick Cohn, is deceased. Given Plaintiff's refusal to address this issue, defendants need Ms. Byrne to verify these statements. And, of course, it appears to be undisputed that Ms. Byrne was provided extesnive documentary materials to Ms. Byrne relating to his case which have never been explained or accounted for in this case. Simply stated, Ms. Byrne cannot be permitted to conceal highly probative evidence from Defendant in this case.

**COMPLIANCE WITH LOCAL RULE 37.2**

Defendant served Ms. Byrne with a subpoena seeking documents relating to Plaintiff. *See* Ex. 4. The records sought included "any audio or video recordings, notes (including interview notes), memorandums, reports, emails, or summaries, whether in written, electronic, audio or other reproducible format, of conversations and/or interviews with Jose Cruz made in connection to the homicide of Antwane Douglas and attempted murder of Vernon Meadors, and Cruz's arrest, prosecution, conviction, post-conviction and habeas petition for the homicide of Antwane Douglas and attempted murder of Vernon Meadors" including raw video or audio outtakes of such communications. *Id.* The subpoena further sought documents pertaining to communications relating to Plaintiff with other witnesses or family members and other matters in Ms. Byrne's possession, custody or control relating to Plaintiff. *Id.*

On September 16, Ms. Byrne, through attorney Brendan Healey, served objections to Defendant's subpoena and refused to provide any documents whatsoever in response. *See* Ex. 5 (Respondent Margaret Byrne's Objections and Responses to Reynaldo Guevara's Subpoena). The following day, counsel for Defendant held a Local Rule 37.2 conference with Mr. Healey to ascertain whether the matter could be resolved short of court intervention. During this communication, among other things, Ms. Byrne's attorney asked for clarification on whether Defendants were seeking the entirety of her materials relating to Defendant Guevara or only those that specifically pertained to Plaintiff. Given Plaintiff's attempt to interject the alleged experiences of other persons with Defendant Guevara as evidence in this case, Defendant Guevara would have been wholly within the bounds of the Federal Rules of Civil procedure to seek such materials. However, Defendant Guevara's counsel nonetheless indicated that they only sought those materials that specifically relating to Plaintiff and his case only so as to minimize the burden upon Ms. Byrne in responding to the subpoena. Mr. Healey indicated that he would speak to his client further. On Friday, September 20, Mr. Healey indicated that Ms. Byrne would be standing on her objections to the subpoena and still declined to provide any

7

materials. Accordingly, pursuant to Local Rule 37.2, after consultation in person or by telephone and good faith attempts to resolve differences, Defendant Guevara and Ms. Byrne are unable to reach an accord on this matter.

## ARGUMENT

### THE MATERIALS SOUGHT BY DEFENDANT'S SUBPOENA ARE WELL WITHIN THE CONSTRAINTS OF RULE 26 AND 45.

**A. Ms. Byrne's Invocation of a Reporter's Privilege is Baseless**

At the outset, Ms. Byrne asserted several general objections to Defendant Guevara's subpoena including but not limited to privilege, immunity, and/or privacy right objections. Ms. Byrne asserts the qualified reporter's privilege as a basis for refusing to comply with defendant's subpoenas, specifically federal reporters privilege and the Illinois Reporter's Privilege Act, 735 Ill. Comp. Stat. 5/8-901, et seq. *See* Ex. 5. These arguments are frivolous and can be dealt with in summary fashion by this Court. Stated simply, the Seventh Circuit and the courts of the Northern District of Illinois have repeatedly held that there are no such privileges applicable in federal court in cases arising under 42 U.S.C. § 1983. See *Taylor v. City of Chicago*, 2015 WL 6561437, at *2 (N.D.Ill., 2015); *McKevitt v. Pallasch*, 339 F.3d 530, 532 (7th Cir.2003); *Wilson v. O'Brien*, No. 07 C 3994, 2009 WL 763785, *7 (N.D. Ill. Mar. 20, 2009); *Thayer v. Chiczewski*, 257 F.R.D. 466, 468-69 (N.D. Ill. 2009); *Mosely v. City of Chicago*, 252 F.R.D. 421, 424-26 (N.D. Ill. Aug 11, 2008). As it stands, Ms. Byrne has not asserted a sufficient basis under federal law to refuse to comply with Defendant Guevara's subpoenas.

Moreover, even were such privileges are applicable, Ms. Byrne is unable to assert such privilege at this point. A person withholding subpoenaed information under a claim that it is privileged must "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii). This rule requires nonparties that claim a privilege against a discovery request to produce a privilege log. *Mosely*, 252 F.R.D. at 426 (citing *Hobley v. Burge*, 433 F.3d 946, 947

8

(7th Cir. 2006). The media does not have a special immunity from the application of general laws. *Branzburg v. Hayes*, 408 U.S. 665, 683 (1972).

Here, Ms. Byrne failed produce to any documents that are responsive to Defendant's subpoena. Moreover, Ms. Byrne has not provided a privilege log that identifies any privileged documents in violation of her obligation under Rule 45. By failing to comply with Rule 45, Respondent has waived whatever privilege she may have had in the requested documents. Accordingly, this Court should enter an order compelling Ms. Byrne to produce the records sought in Defendant Guevara's subpoena.

**B. Defendant's subpoena seeking discoverable communications and documents relating to Plaintiff satisfies R. 45.**

Subpoenas to members of the media must be treated like any third-party subpoena; Ms. Byrne, as a journalist, is entitled to no additional protections than anyone else responding to a subpoena issued under Rule 45. *McKevitt v. Pallasch*, 339 F.3d 530, 532 (7th Cir.2003)("[C]ourts should simply make sure that a subpoena duces tecum directed to the media, like any other subpoena duces tecum, is reasonable in the circumstances, which is the general criterion for judicial review of subpoenas. We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist.").

Whether a subpoena is "reasonable in the circumstances" or imposes an "undue burden" turns on a number of case-specific factors, including (1) the likelihood that compliance will result in production of the information, (2) whether the discovery is unreasonably cumulative or duplicative, (3) whether the information sought is readily obtainable from another, more convenient, less burdensome (but equally reliable) source, and (4) whether the burden of the proposed discovery outweighs its likely benefit. e, and (4) whether the burden of the proposed discovery outweighs its likely benefit. *Taylor v. City of Chicago*, 2015 WL 6561437, *3 (N.D.Ill., 2015); *Mosely v. City of Chicago*,

9

252 F.R.D. 421, 427 (N.D.Ill., 2008); *Watts v. SEC,* 482 F.3d 501, 509 (D.C. Cir. 2007); *Exxon Shipping Co. v. U.S. Dep't of Interior,* 34 F.3d 774, 780 (9th Cir. 1994)).

In this regard, courts have nearly uniformly permitted discovery into communications and statements between journalists and civil plaintiffs (as well as witnesses relevant to such plaintiff's case) in reversed conviction and other cases and have rejected claims of burden, irrelevance, work product and other such obstacles interposed by journalists objecting to same. *See Gaines v. Chicago Board of Education,* 2022 WL 1292248, *1 (N.D.Ill. 2022); *Taylor v. City of Chicago*, 2015 WL 6561437, *14 (N.D.Ill. 2015); *Tate v. City of Chicago*, 2020 WL 4437853, *3 (N.D.Ill., 2020); *Mosely v. City of Chicago*, 252 F.R.D. 421, 436 (N.D.Ill. 2008); *Wilson v. O'Brien*, 2009 WL 763785, *9 (N.D.Ill. 2009).

Ms. Byrne has possession, custody, and/or control of communications and other limited matters pertaining to Plaintiff's case that are the exclusive scope of Defendant's subpoena. Ms. Byrne is a documentary maker who maintained regular contact with Plaintiff, and often recorded her communications with Plaintiff. Ms. Byrne has had extensive communications with Plaintiff over a period of years about the factual predicate for his case including the time leading up to Plaintiff's successful pursuit of post-conviction relief leading to his release from prison. Ms. Byrne also apparently was provided significant documentary evidence relating to Plaintiff's case and recorded video footage relating to Plaintiff and his case.

This case is akin to *Taylor* where the Court found a compelling basis to require the Chicago Tribune, and its reporter employee, to comply with subpoenas for records and deposition. *Taylor v. City of Chicago*, 2015 WL 6561437, *1-22 (N.D.Ill., 2015). In *Taylor*, the Court analyzed and concluded Plaintiff was going to testify about the very same topics he described to the reporter during multiple interviews; the interviews had taken place closer in time to the events at issue than Plaintiff's deposition; and the Chicago Tribune and its reporter could provide Defendants with information useful for attacking witness credibility, impeachment, and/or otherwise admissible as evidence like an

10

admission of a party opponent pursuant to Fed. R. Evid. 801(d)(2). *Taylor*, 2015 WL 6561437, at *12-13 (N.D. Ill. 2015). Like *Taylor*, here Plaintiff's interviews with Ms. Byrne took place closer in time to the events at issue than Plaintiff's deposition in 2024, by the time of trial even more time will pass. *Id.* As Defendants vehemently deny Plaintiff's allegations, Plaintiff's credibility will be of central importance in this case. Defendants will seek to attack Plaintiff's credibility. As discussed in *Taylor*, anything Plaintiff said to Ms. Byrne about what happened on the day of his arrest, or the Douglas homicide investigation can be offered into evidence by Defendants as an admission of a party opponent pursuant to Fed. R. Evid. 801(d)(2). *Id.* Ms. Byrne's testimony will be used to impeach Plaintiff's testimony under oath by offering evidence of inconsistent statements made years earlier and much closer to the events in question. *Id.*

The following factors similarly supported the Court's conclusions in *Taylor*: Ms. Byrne will be able to provide important information about how many times she interviewed Plaintiff, his allegations of fabrication of evidence, alibi witnesses, how long each interview lasted, their format, and what Plaintiff said during each interview. *Id.* If Plaintiff testifies at trial, consistent with his deposition, Defendants want to offer evidence from Ms. Byrne as to how many times and when Plaintiff made inconsistent statements. *Id.* Defendants also want to elicit evidence these statements were made in a situation where Plaintiff was under no pressure, had access to his case files, and was given an opportunity to give narrative answers without time limitations. *Id.* Moreover, Ms. Byrne appears to be the only other person who can testify what Plaintiff said about his conversations with his criminal defense attorney Fred Cohn, his alibi, alibi witnesses, and other matters during multiple interviews with Ms. Byrne. And, of course, as set forth above, it remains a mystery what documentary case materials Ms. Byrne was provided by Plaintiff and his intermediaries in this case which is obviously highly relevant as well.

Other cases are in accord as well. In *Wilson v. O'Brien*, 2009 WL 763785 (N.D. Ill. Mar. 20. 2009), the plaintiff claimed that the police manipulated a victim to falsely identify him as her attacker and coerced his confession which led to his wrongful conviction for attempted murder. *Id.* Maurice Possley, a newspaper reporter for the Chicago Tribune, interviewed the victim during which the victim recanted her identification testimony. *Id.* Defendants subpoenaed Possley for a deposition and in turn Possley moved to quash the subpoena based on reporter privileges and violation of Rule 45(c). *Id.* The court found the defendants' subpoena was reasonable under the circumstances and did not impose an undue burden on Possley because defendants had established that Possley had relevant and identifiable information about statements made by the victim, which were crucial to the case. *Id.* Moreover, the court refused to limit the deposition to particular subjects or issues as the court had no way of knowing where the information revealed in the deposition would lead. *Id.*

Similarly, in *Moseley v. City of Chicago,* plaintiff alleged that several police officers physically and mentally coerced him into confessing to a murder and withheld exculpatory evidence in violation of *Brady*, 252 F.R.D. at 423. The officers denied doing any such things. *Id.* A journalist had written an article of plaintiff's case and, in connection therewith, had interviewed numerous individuals associated with the case (including the plaintiff himself). *Id.* In compelling the journalist to provide records relating to the interview of plaintiff, the Court stated that

> [The journalist's] article reveals that she had conversations with [plaintiff] about what occurred during the beating of [the murder victim] on August 6, 1999 as well as his arrest and subsequent treatment by the police officers, leading to his confession. As these are the events that are at the epicenter of his complaint in this case, the criticality of [plaintiff's] statements to [the journalist] on these issues is beyond debate. [Plaintiff] will be the central witness in the case, and its outcome may hinge in large measure on the defendants' ability to effectively cross-examine him. A component of that exercise is to point out to the jury statements made that would be inconsistent with [plaintiff's] version of events. *Id.* at 430-31.

With respect to the "reasonableness" of the discovery, the Court went even further and noted that "[t]he importance of and need for the information sought by the defendants in the instant case are in inverse proportion to the burden imposed on the Respondents" and that "the stakes for the

12

individual defendants could scarcely be greater. Not only is there the prospect of a crippling damage award, but their reputations will be ruined—justifiably so if they did what the complaint alleges." *Id.* at 433.

Indeed, even several of the cases relied on by Ms. Byrne in her written objections support enforcing this subpoena. *See Bond v. Utreras*, 2006 WL 1806387, *6 (N.D.Ill. 2006)(quashing subpoena for communications relating to two dozen persons and generalized evidence about police misconduct in a particular region but enforcing subpoena as to communications with plaintiff in lawsuit); *Hobley v. Burge*, 223 F.R.D. 499, 505 (N.D. Ill. 2004)(refusing to quash subpoena for communications between civil plaintiff and journalist).

Contrary to Respondent's position that the discovery sought is tangential, Ms. Byrne's compliance will provide relevant evidence of significant use to Defendants that cannot be obtained from any other source. Accordingly, the elements as to reasonableness of a subpoena weigh in favor of the Defendant.

### C. The benefit of the information sought outweighs any burden to Respondent

To the extent Ms. Byrne objects to the subpoena requests as being harassing, overly broad, vague, and unduly burdensome, Defendants are only interested in portions that relate to Plaintiff as opposed to other persons who allege transgressions by Defendant Guevara. While Defendant Guevara would have been justified in seeking all materials Ms. Byrne had relating to Defendant Guevara insofar as Plaintiff has attempted to interject the experiences of other so-called victims of Defendant Guevara, Defendant Guevara nonetheless narrowly tailored his subpoena to cover only those topics relating to Plaintiff's case to avoid any unnecessary burden on Ms. Byrne that could be caused by requesting more tangentially relevant matters which is highly relevant in determining the enforceability of the subpoena. *See Bond*, 2006 WL 1806387, *6 (N.D.Ill.,2006)(quashing subpoena for communications relating to two dozen persons and generalized evidence about police misconduct in

13

a particular region but enforcing subpoena as to communications with plaintiff in lawsuit). Ms. Byrne has not denied the existence of the requested records, nor has she asserted difficulty in procuring records for swift production. Insofar as Ms. Byrne is still in production of the documentary film "To Catch a Case" formerly known as "Corruption Capital", it stands to reason her records are easily accessible at present. Accordingly, Ms. Byrne has not established a sufficient burden that excuses her non-compliance with Defendant's subpoenas.

Ms. Byrne also objected that the turnover of the requested information will cause her to lose credibility with her sources and/or will cause a chilling effect with respect to her sources. Respondent merely speculates, and provides no evidence, that producing documents will jeopardize her ability to establish sources and conduct investigations. *See Taylor*, 2015 WL 6561437, at *13 (N.D. Ill. 2015). As it stands, Ms. Byrne's articulated burden appears to be an alternate route to a reporters' privilege, one that relies upon the same rationales that courts in this circuit have rejected. *Id.* (citing) E.g. *Mosely*, 252 F.R.D. at 431-32 (rejecting a journalist's assertion of these harms as "speculative," "illogical," and "not comport[ing] with the kind of specific and particularized demonstration courts have required to establish burden or 'good cause.'"); *Thayer*, 257 F.R.D. at 470 & n.5 (finding unpersuasive a journalist's "work product" and "loss of 'street cred'" arguments (regarding his future access to sources) for their absence of evidentiary support and a "showing of actual burden".

Put simply, there are communications and documents related to Plaintiff within Ms. Byrne's possession, custody, and/or control are ordinarily discoverable under R. 45. If the Court were to deny the requested discovery, it would effectively be applying a privilege that does not exist. Accordingly, the court should enter an order compelling Ms. Byrne to produce the records sought in Defendant's subpoena.

**CONCLUSION**

WHEREFORE Defendant prays this Court compel Respondent Margaret Byrne to comply with a subpoena for records attached hereto and for whatever other relief this Court deems fit.

        Respectfully submitted,

        BORKAN & SCAHILL, LTD.
        By: *s/Krystal Gonzalez*

Steven B. Borkan (6193463)
Timothy P. Scahill (6287296)
Emily Schnidt
Krystal Gonzalez
Andrea Checkai
BORKAN & SCAHILL, LTD.
Two First National Plaza
20 South Clark Street
Suite 1700
Chicago, Illinois 60603
(312) 580-1030