## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION

| | |
|---|---|
| JOSE CRUZ, | |
| Plaintiff, | Case No. 23-cv-04268 |
| v. | Honorable Georgia N. Alexakis |
| REYNALDO GUEVARA, et al., | Mag. Judge Gabriel A. Fuentes |
| Defendants. | |

## NONPARTY RESPONDENT MARGARET BYRNE'S RESPONSE TO MOTION TO COMPEL THIRD PARTY WITNESS TO COMPLY WITH DOCUMENT SUBPOENA

Margaret Byrne is an award-winning documentary filmmaker. She has been working for the past several years on a documentary entitled *To Catch a Case* (the "Film"). Defendant Reynaldo Guevara is a subject of the Film, and, at the eleventh-hour in the discovery process, he served Ms. Byrne with a document subpoena in which he seeks extraordinarily broad discovery. The discovery Mr. Guevara seeks is of marginal relevance. As Mr. Guevara freely admits, it is largely for impeachment purposes because Ms. Byrne is not a percipient witness to any of the events at issue. Compliance with the subpoena, nonetheless, would impose a weighty burden on Ms. Byrne. She operates a very small film production company, and it would be a time-consuming process to locate and produce the records Mr. Guevara seeks. Moreover, using Ms. Byrne as a back door to access information about Plaintiff Jose Cruz, could irreparably damage Ms. Byrne's relationship with her source Mr. Cruz and seriously hinder Ms. Byrne's future reporting efforts for the Film and other films as well as her efforts to have the Film reach its audience. Sources are naturally reluctant to speak with reporters if they have concerns that their interview will be disclosed to their adversary in litigation.

Mr. Guevara suggests that reporters are essentially without protection in the Seventh

Circuit. Although it is true that a Seventh Circuit panel stated in *McKevitt v. Pallasch*, 339 F.3d

530 (7th Cir. 2003), that there is no federal, common-law reporter's privilege with regard to non-

confidential sources, that does not preclude a court from offering protection for reporters from

discovery. *McKevitt* stands for the basic proposition that discovery must be reasonable under the

specific circumstances. Courts in the Seventh Circuit have not hesitated to limit subpoenas to

reporters when the courts deemed them unreasonable under the circumstances. Moreover, when

the reporter is the target, courts in the Seventh Circuit have analyzed reasonableness in the

context of concerns specific to reporters. The subpoena at issue here is unreasonable under the

circumstances, and Ms. Byrne respectfully requests that the Court deny Mr. Guevara's motion to

compel and quash the subpoena on Ms. Byrne.

## BACKGROUND

As this Court is undoubtedly well aware, the roots of this case trace back more than 30

years. Plaintiff Cruz alleges he was wrongly framed by Mr. Guevara and others for a 1993

murder. (*See* First Am. Compl. (Dkt. 44) ¶¶ 2-3.) Ms. Byrne was not a witness to that murder.

(*See* Dec. of Margaret Byrne ¶ 16, attached hereto as Ex. A.) Plaintiff was found guilty in a 1996

trial. (Dkt. 44 ¶¶ 4-5.) Plaintiff alleges that, at the trial, the State used a false identification of

Plaintiff from an eyewitness—a false identification that Plaintiff alleges had been coerced by Mr.

Guevara and others. (Dkt. 44¶ 4.) Ms. Byrne did not attend the trial, and she was not privy to any

aspect of the investigation. (*See* Byrne Dec. ¶ 16.)

Ms. Byrne is the director of the Film, and she has done extensive reporting for the Film.

(*See id*. ¶¶ 2, 6, 7.) The Film is a documentary feature focused on the post-conviction process in

Cook County. (*See id*. ¶ 2.) The Film is currently in post-production, although Ms. Byrne is still

doing interview and engaging in other reporting activities relating to the Film. (*See id*. ¶ 2.) In the Film, Ms. Byrne follows retired detective Bill Dorsch's quest to uncover wrongful murder convictions. (*See id*. ¶ 3.) The Jose Cruz case may or may not be discussed in the Film because the subject matter of the Film is much broader than the Jose Cruz case and editing is ongoing. (*See id*.)

The Film is being produced by Beti Films, which is an independent film company that specializes in visually rich, socially minded content. (*See id*. ¶ 4.) Ms. Byrne founded Beti Films in 2004, and she is the Director, Producer, and Cinematographer. (*See id*. ¶ 5.) Ms. Byrne is the only full-time employee of Beti Films. (*See id*.) Ms. Byrne has been working on the Film for more than six years. (*See id*. ¶ 6.) She is the principal camera person for the Film, and she captured all of the sound recordings with the assistance of a sound person. (*See id*.) In the course of reporting and researching the Film, she has done approximately 100 interviews. (*See id*. ¶ 7.) She has recorded approximately 1,000 hours of video footage and 1,000 hours of audio. (*See id*.)

If Ms. Byrne were directed to collect the materials called for in the subpoena, she estimates it would take her approximately 40 hours to go through the film, audio recordings, and written materials to collect responsive materials. (*See id*. ¶ 8.) If the material is limited to just Mr. Cruz (the subpoena is vague in this regard but Mr. Guevara states in his Motion to Compel that the requests are in fact limited to Mr. Cruz) Ms. Byrne estimates the collection would still take approximately 20 hours. (*See id*. ¶ 9.) Storing the film alone requires nearly 100 terabytes of storage. (*See id*. ¶ 10.)

Although there is a burden on Beti Films and Ms. Byrne in terms of time and resources devoted to collecting and producing responsive materials, Ms. Byrne also believes that being forced to disclose materials and information she collected through reporting would put a burden

on her reporting activities. (*See id.* ¶¶ 11, 12.) Ms. Byrne's relationships with sources are built on trust, and she believes those relationships would be damaged if sources knew that information they provided her, whether in the form of documents or interviews, would be disclosed to parties in litigation. (*See id.* ¶ 12.) Further, although she realizes that nonconfidential sources understand that portions of their interviews may be incorporated into publicly distributed documentaries, Ms. Byrne does not believe that means they would be comfortable with her being used as a conduit for a law firm to collect information. (*See id.*) She believes that would materially detract from her ability to report both for the Film and for future films. (*See id.*)

This harm to relationships has other ramifications. If Ms. Byrne's relationships with sources and subjects are damaged, she believes that may also affect their willingness to participate in social impact campaigns for the Film and other Beti Films documentaries. (*See id.* ¶ 13.) According to Ms. Byrne, these campaigns are integral to Beti Films' mission. (*See id.* ¶ 14.) Such campaigns involve direct collaboration with documentary participants during the outreach and distribution phases. (*See id.*) Beti Films productions, including *Raising Bertie* and *Any Given Day*, have actively engaged participants in impact campaigns, which include speaking engagements and panel discussions during screenings. (*See id.*) Ms. Byrne believes this involvement is crucial, because it honors the lived experiences of the participants and allows audiences to hear from those directly affected by the subject matter. (*See id.* ¶ 15.) Ms. Byrne believes the issuance of subpoenas could create barriers to their participation, hindering the distribution of the films and preventing Beti Films from fully executing an effective impact and engagement plan. (*See id.*) According to Ms. Byrne, without the active involvement of film subjects, Beti Films cannot effectively share its narratives with wider audiences, which is essential for achieving the intended social impact. (*See id.*)

4

Prior to receiving this subpoena, Beti Films did not have legal counsel for the Film. (*See id*. ¶ 18.) Ms. Byrne reached out to the Reporters Committee for Freedom of the Press for assistance, and they connected Ms. Byrne to Mr. Healey. (*See id*.) Mr. Healey is representing Ms. Byrne pro bono because neither she nor Beti Films have the funds to pay a lawyer. (*See id*. ¶ 19.) Beti Films is a small operation and what limited funds it does have go toward the films it creates. (*See id*.) Beti Films also does not have insurance coverage for subpoena responses. (*See id*.)

Ms. Byrne has served as the director or cinematographer on several award-winning films. (*See id*. ¶ 20.) Here is a partial list: *American Promise*, Emmy Nominated and Winner of the Jury Award at the 2013 Sundance Film Festival; *All the Queen's Horses*, Winner Best Documentary Run & Shoot Filmworks Martha's Vineyard African American Film Festival 2017; *Raising Bertie*, Winner Best Documentary Feature 2016 Atlanta Docufest; and *Any Given Day*, Named Best Film of Hot Docs 2021 Toronto Film Critique Association. (*See id*.)

The subpoena itself is broad. (*See* Mot. to Compel (Dkt. 246), Ex. 4.) The subpoena seeks documents relating to nine different categories (one of the 10 items on the list is repeated) ranging from "[a]ny and all video and audio related to Jose Cruz" to "[a]ny and all data, metadata, modifications, edits, documents, copies, memorandums, emails, etc. related to the syncing of audio and video related to Mr. Cruz." (*See id*.) There is no time limitation, and the document rider is not limited to video or audio created by Ms. Byrne. (*See id*.)

Finally, Mr. Guevara does not indicate in his motion that any party has identified Ms. Byrne as a potential witness in their Rule 26(a)(1) disclosures or elsewhere.

## ARGUMENT

**A.**      **Mr. Guevara Fails To Meet The High Burden For A Party Issuing A Subpoena**

In its September 26 Order, the Court asked Ms. Byrne to "address the question of burden, under Rule 45, relating to the recipients' protected First Amendment activities, including the burden involved in hiring counsel to litigate such subpoenas on their behalf." (Dkt. 257) Protections for subpoena targets are built in at all levels—from the Federal Rules of Civil Procedure through courts' interpretations of the Federal Rules. According to Federal Rule of Civil Procedure 45, a party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." The advisory committee notes emphasize that the issuing party must show "substantial need" for the discovery. The scale is tilted in favor of the subpoenaed entity. In ruling on the propriety of a subpoena, courts "weigh[] the benefits of producing the information sought, the burdens of compliance, whether the information is available from another source, the relevance and scope of the requests, and the interests of the non-parties as well as the parties." *Dirickson v. Intuitive Surgical*, 2020 U.S. Dist. LEXIS 258590, at *2 (N.D. Ill. Dec. 29, 2020) (granting motion to quash). Mr. Guevara's subpoena fails that test.

Ms. Byrne prevails on all factors. First, Mr. Guevara overstates the benefit of compliance. Ms. Byrne was not a percipient witness, and any statements Mr. Cruz made to her were years after the occurrence of the relevant events. Moreover, this is an unusual case because, as he admits, Mr. Guevara already has access to many communications between Ms. Byrne and Mr. Cruz. Mr. Guevara notes that several interview videos are already available online. (Dkt. 246 at 5-6.) In addition, Mr. Guevara has dozens of pages of emails between Ms. Byrne and Mr. Cruz. (*Id*. at Ex. 2.) Mr. Guevara appears to have received these emails from the Illinois Department of Corrections ("IDOC"), and he also has IDOC call logs for Mr. Cruz. (*Id*. at Ex. 3.) In addition, Mr. Guevara's document requests wander far afield. For example, it is hard to see the benefit of

searching for and producing "[a]ny and all data, metadata, modifications, edits, documents, copies, memorandums, emails, etc. related to the syncing of audio and video related to Mr. Cruz." (Dkt. 246, Ex. 4.) Also, Mr. Guevara specifically identifies documents he believes Ms. Byrne has that he does not have and Ms. Byrne's purported communications with Mr. Cruz regarding his attorney Mr. Cohn. (*Id.* at 6, 11.) To the best of her knowledge, though, the only documents Mr. Cruz provided her were those already in the public record, and she does not recall discussing Mr. Cohn with Mr. Cruz. (*See* Byrne Dec. ¶¶ 16, 17.) There is marginal benefit from additional disclosure.

The burden, however, is significant. As discussed above, simply collecting the materials would impose a weighty burden on a small company. (Byrne Dec. ¶¶ 7-9.) Plus, as this Court recognized in its September 26 Order, when analyzing what is "reasonable under the circumstances," a court need not ignore that a subpoena target is a reporter. Ms. Byrne discusses at length the burden that compliance would put on her in her role as a reporter. (*See* Byrne Dec. ¶¶ 11-15.) Ms. Byrne's Declaration sets forth very real concerns.

The concerns about overreaching discovery are particularly strong here where the Film is still in production. In fact, Ms. Byrne is still doing reporting in connection with the documentary. (*See id.* ¶ 2.) Any reporting done in connection with Mr. Cruz was decades after the events at issue in the lawsuit, and the reporting concerns many cases, not just Mr. Cruz's. It is possible that the finished Film will not even discuss Mr. Cruz's case. (*See id.* ¶ 3.) As the court emphasized in *Bond v. Utreras*, 2006 U.S. Dist. LEXIS 46279, at *13-14 (N.D. Ill. June 27, 2006), "concerns about the burden imposed on Mr. Kalven might be counterbalanced if the defendants could establish that the evidence they seek is highly probative of issues relevant to the case. But they have not. They have not established that the subpoena seeks information that they don't already

7

have or that is otherwise unavailable to them." *Id*. at 15. Mr. Guevara is unable to meet that

standard here. Accordingly, as in *Utreras*, "[b]ecause the defendants have failed to establish that

enforcing compliance with the subpoena will serve any real benefit, and because Mr. Kalven has

established that compliance will unduly burden him, the Court will deny the defendants' petition

regarding the subpoena." *Id*. at 17.

Another federal court within the Seventh Circuit, has recognized the special considerations

that can apply to a reporter when analyzing burden. In *Davis v. City of Springfield*, the court

stated that the magistrate judge "could have also considered the existence of the state reporter

privilege in Illinois." 2009 U.S. Dist. LEXIS 36756, at *6 n.1 (C.D. Ill. Apr. 28, 2009). This was a

post-McKevitt decision, but the court nonetheless noted: "State privileges do not apply in federal

court, but concerns for comity allow the Court to consider the existence of such privileges in

evaluating the burden imposed on persons protected by such privileges in state court." *Id*. (citing

*Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 933 (7th Cir. 2004)). The court's acknowledgment of

the existence of a statutory reporter's privilege is "another factor that would indicate that the

burden imposed by disclosure would have been even greater" than otherwise it may have been.

2009 U.S. Dist. LEXIS 36756, at *6 n.1

As Mr. Guevara's motion demonstrates, much of the information regarding Ms. Byrne's

communications with Mr. Cruz is available from other sources. In fact, he already has it. The

relevance is questionable when Mr. Guevara seeks to impose this burden solely in the hope that

he might dredge up something that might be used for impeachment. Also, in seeking things like

Ms. Byrne's social media postings and metadata for video, Mr. Guevara crosses well over the

line.

With regard to the interest of non-parties, the *Patterson v. Burge* case, which also involved accusations of impropriety against a former Chicago police officer who stood accused of years of abuse of power, is instructive. The court spoke at length about the special interests implicated when a journalist is the subject of a subpoena:

> To the extent the news organizations' resources are squandered providing information to civil litigants; or their ability to create sources hampered by judicial insensitivity to the value of their attempts to protect the confidentiality of the information they receive; or their motivation to develop their information and use it as they see fit; or the commercial value to the involved news organizations of the judgments investigating and selecting material for publication dissipated as their "work product" becomes fair game for civil litigants in their relentless quest to "discover" everything, the news organizations become the indentured servant of the litigants, and their ability to do their important work will be severely impaired. The kind of discovery requested here not only burdens the news organizations but burdens the public interest in a robust press.

2005 U.S. Dist. LEXIS 1331, at *11-12. In short, all society suffers, not just news organizations, when a reporter falls prey to an overly aggressive litigant and a burdensome and harassing subpoena. The factors weigh in Ms. Byrne's favor and militate in favor of denying the motion to compel and quashing the subpoena.

**B.      Courts In This Circuit Have Frequently Found Subpoenas Served On Reporters To Be Burdensome.**

Mr. Guevara claims that subpoenas to reporters "must be treated like any third party subpoena," but that is not consistent with precedent in the Seventh Circuit. (Dkt. 246 at 9.) For example, in *Bond v. Utreras*, another case in which a journalist was subpoenaed and that involved allegations of police wrongdoing, the court quashed the subpoena and stated: "Though clearly not free of bias here, Mr. Kalven is nonetheless a journalist and, according to his deposition testimony, his work at the Stateway Gardens development is ongoing. Given this, disclosure and production of his notes and his research materials would certainly harm Mr. Kalven's 'street cred'; he fancies himself as being a voice of the people in the projects; if he is seen as being one

9

who hands over people's stories to the Police - especially when those stories sometimes involve allegations that the Police have been abusive - people might be less willing to come to him, and his journalistic endeavors, such as they are, would be undermined." 2006 U.S. Dist. LEXIS 46279, at *13-14. Although the *Bond* court allowed some discovery of Mr. Kalven, Mr. Kalven was participating that case in more than his role as a journalist, and the plaintiff had identified him as a witness. *Id*. at *5-6. As was the case with Mr. Kalven, if Ms. Byrne were forced to disclose her reporting materials, she would also risk losing credibility with sources, and her reporting and sources would likely be chilled.

Other Northern District courts have taken into consideration the subpoena target's status as a journalist in limiting or quashing subpoenas. *See Hobley v. Burge*, 223 F.R.D. 499, 505 (N.D. Ill. 2004) (quashing subpoena for reporter's notes based on "undue burden"); *Patterson v. Burge*, 2005 U.S. Dist. LEXIS 1331, at **11-15 (quashing subpoena for reporters' video and audio footage); *Fairley v. Andrews*, No. 03 CV 5207, Dkt. 285 (July 13, 2005 order granting motion to quash subpoenas served on non-party journalists) (attached as Ex. B).

The *Hobley v. Burge* case is also instructive in this situation. In that case, Mr. Hobley, a reporter, had, like Ms. Byrne, spent many years and thousands of hours researching police brutality. 223 F.R.D. at 505. He argued, as Ms. Byrne does here, "that disclosing his notes would severely harm, if not irreparably injure, his ability to continue investigating allegations of police brutality, which is a still-developing story, as well as impair his ability to develop other confidential sources in the future." *Id*. The court agreed and stated "[t]here is nothing in the Federal Rules that suggests that research for the purpose of news reporting is to be given less protection than research for the purposes of product development." *Id*. Finally, the *Hobley* court noted that "[n]othing in *McKevitt* suggests that a reporter's notes are discoverable in civil

10

litigation simply because the reporter interviewed a party to that litigation." *Id*. Asserting the special interests that may arise when a reporter is subpoenaed is not an "alternate route" to the reporter's privilege as Mr. Guevara contends (Dkt. 246 at 14), but instead a recognition of the specific circumstances applicable to reporters.

Mr. Guevara presents Seventh Circuit case law on subpoenas to journalists as a virtually unbroken string of losses for journalists. In fact, the results are more mixed. For example, Mr. Guevara cites to *Mosely v. City of Chicago*, 252 F.R.D. 421 (N.D. Ill. 2008). (Dkt. 246 at 8, 10, 14.) In that case, though, the court emphasized that the "requirement that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance embarrassment, oppression, or undue burden or expense. . . ." *Id*. at 430. Accordingly, the court ruled that "the subpoenas will not be enforced to the extent they seek tapes or notes of interviews of the prosecutors and defense lawyers in the criminal case or others mentioned in the article." *Id*. *See also Thayer v. Chiczewski*, 257 F.R.D. 466, 470 (N.D. Ill. Apr. 30, 2009) (refusing to enforce subpoena against journalist that court deemed overly broad and unduly burdensome); *Taylor v. City of Chicago*, 2015 U.S. Dist. LEXIS 146954, (N.D. Ill. Oct. 29, 2015) (allowing certain discovery from reporter but also imposing "several other restrictions on Mills' deposition to curtail the risk that he will be subjected to an 'unrestrained deposition to probe his newsgathering and articles[,]' and inquire about his editorial judgment"); *Wilson v. O'Brien*, 2009 U.S. Dist. LEXIS 22967, at *24 n.6 (N.D. Ill. March 20, 2009) ("This Court does not disagree that First Amendment concerns might play a role in the Rule 45(c) analysis for confidential information obtained by non-party journalists."). These are all cases cited by Mr. Guevara, but they show that time and again courts in this district have recognized the special concerns that

11

factor into a determination of what is reasonable when a party subpoenas a reporter. This is entirely consistent with the *McKevitt* court's direction to consider specific circumstances when determining whether discovery is reasonable.

Finally, with regard to hiring counsel, that has been a burden, albeit not a financial one. Ms. Byrne was forced to find and enlist counsel to deal with the subpoena. (Byrne Dec. ¶ 18.) She reached out to the Reporters Committee for Freedom of the Press. (*Id*.) The Reporters Committee connected her to Brendan Healey, and Mr. Healey is representing her pro bono. (*Id*. ¶¶ 18, 19.)

**CONCLUSION**

WHEREFORE, nonparty respondent Margaret Byrne respectfully requests that this Court deny Mr. Guevara's motion to compel, quash the subpoena for Ms. Byrne in its entirety, and order such further relief as is just.

Dated: October 16, 2024                                    Respectfully submitted,

                                                           Margaret Byrne

                                                           By: /s/ Brendan J. Healey
                                                               Her attorney

Brendan J. Healey (ARDC #6243091)
BARON HARRIS HEALEY
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(312) 741-1030
bhealey@bhhlawfirm.com

*Counsel for Nonparty Respondent Margaret Byrne*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that a true and correct copy of the foregoing document has been served, via the Court's CM/ECF system, on all counsel of record who have consented to electronic service.

/s/ Brendan J. Healey