```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3
      JOSE CRUZ,                           )  No. 23 C 4268
 4                                         )
                      Plaintiff,           )
 5                                         )
                 vs.                       )  Chicago, Illinois
 6                                         )
      REYNALDO GUEVARA, et al.,            )
 7                                         )  September 26, 2024
                      Defendants.          )  9:15 a.m.
 8

 9                       TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HON. GABRIEL A. FUENTES, MAGISTRATE JUDGE
10

11    APPEARANCES:

12    For the Plaintiffs:    MR. STUART J. CHANEN
                             MR. ARIEL OLSTEIN
13                           Chanen & Olstein,
                             7373 Lincoln Avenue, Suite 100,
14                           Lincolnwood, Illinois  60712

15    For Defendant
      Reynaldo Guevara:      MS. ANDREA F. FABIAN-CHECKAI
16                           MS. KRYSTAL R. GONZALEZ
                             Borkan & Scahill, Ltd.,
17                           20 South Clark Street, Suite 1700,
                             Chicago, Illinois  60603
18
      For the Individual
19    Officer Defendants:    MR. JEFFREY C. GROSSICH
                             The Sotos Law Firm, P.C.,
20                           141 West Jackson Boulevard, Suite 1240A,
                             Chicago, Illinois  60604
21

22
                             PATRICK J. MULLEN
23                          Official Court Reporter
                         United States District Court
24                 219 South Dearborn Street, Room 1412
                          Chicago, Illinois  60604
25                            (312) 435-5565
```

```
1    APPEARANCES:   (Continued.)

2    For Defendant
     Edward Maloney:        MR. KEVIN C. KIRK
3                           Oberts Galasso Law Group,
                            161 North Clark Street, Suite 1600,
4                           Chicago, Illinois  60606

5    For Defendant
     City of Chicago:       MS. EILEEN E. ROSEN
6                           Rock, Fusco & Connelly, LLC,
                            333 West Wacker Drive, 19th Floor,
7                           Chicago, Illinois 60606

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings in open court.)

2          THE CLERK:  23 CV 4268, Cruz versus Guevara, et al.,

3    motion hearing.

4          THE COURT:  Okay.  Let's have counsel make their

5    appearances.  As usual, you're welcome to remain at counsel

6    table instead of coming up to the front, or you can do

7    whatever you'd like in terms of your positioning in the

8    courtroom.

9          So let's have plaintiff first.

10         MR. OLSTEIN:  Good morning, Your Honor.  Ariel

11   Olstein for plaintiff Jose Cruz, and Mr. Chanen is also on the

12   phone.

13         THE COURT:  Okay.  So is our telephone line open,

14   and, Mr. Chanen, are you there?

15         MR. CHANEN:  (Via telephone) Yes, yes, Your Honor.

16   Good morning.  Thank you for letting me participate by phone.

17   I was planning to -- I've been planning to be out of state

18   since six months ago, and I had to be in California this week

19   and I appreciate it.

20         THE COURT:  Are you in Florida right now?

21         MR. CHANEN:  No.  Did I say Florida?  California.

22         THE COURT:  You said California, but I'm just

23   wondering if anybody on the case is in Florida right now.

24         MR. OLSTEIN:  No, Your Honor.

25         MR. CHANEN:  No.

```
1              MR. OLSTEIN:  Sorry.
2              THE COURT:  It sounds like no.  Okay.  I was just
3    going to hope everybody is safe and everything else.  That's
4    all.
5              MR. CHANEN:  Yeah, Mr. Grossich and Olstein were
6    planning to be in Tampa, Florida, for a deposition, but when
7    the hurricane swooped in they both agreed to postpone that
8    deposition.
9              THE COURT:  Yes, that's the Rios deposition, right?
10             MR. CHANEN:  Yes, Your Honor.
11             THE COURT:  Okay.  We'll address that.
12             Okay.  How about our defense table maybe beginning
13   with the city?
14             MS. ROSEN:  Good morning, Your Honor.  Eileen Rosen
15   on behalf of defendant City of Chicago.
16             THE COURT:  Okay.  Defendant Guevara?
17             MS. GONZALEZ:  Good morning, Your Honor.  Krystal
18   Gonzalez on behalf of defendant Guevara.
19             THE COURT:  Other officer defendants, not Guevara?
20             MR. KIRK:  Go ahead.
21             MR. GROSSICH:  So, Your Honor, Jeff Grossich on
22   behalf of the other officer defendants.
23             THE COURT:  Okay.  Then I think I have some -- we
24   will refer to them as the county defendants.  Are you here for
25   them?  Who's here for them?
```

```
 1            MR. KIRK:  Kevin Kirk here on behalf of former ASA
 2   Edward Maloney.
 3            THE COURT:  Okay.  I think that's everyone, or am I
 4   missing anyone?
 5            No.  Go ahead.
 6            MS. CHECKAI:  Andrea Checkai, good morning, Your
 7   Honor, for defendant Guevara.
 8            THE COURT:  Okay.  Great.
 9            So why don't we begin our hearing.  I think there's a
10   couple of things we can dispense with relatively quickly.
11   There's a motion on the docket to seal.  This is a motion
12   docketed at docket entry number 243.  It's to seal the exhibit
13   to the clawback objections.  That exhibit is the engagement
14   letter between plaintiff's counsel, Mr. Chanen and his firm,
15   and plaintiff.  The motion was to seal that, and, Mr. Olstein,
16   I gather or I think I read that there was no objection to
17   that?
18            MR. OLSTEIN:  Correct, Your Honor.
19            THE COURT:  Okay.  So I did review that exhibit.  It
20   does appear to be a retainer agreement between client and
21   attorney.  I can't imagine that that ought to be on the public
22   docket, so I will grant the motion to seal, document number
23   243.  So that one is done.  How many motions does that leave
24   us with today, 10 or 20?
25     (Laughter.)
```

1          THE COURT:  I'm kidding.  Quite a few.  Let me

2    just -- we'll walk through and take them one at a time.  I

3    want to actually begin with the one that got filed at about

4    7:30 last night.  It's the officer defendants' motion to

5    compel production of the Meadors notes that apparently were

6    taken by Center on Wrongful Convictions attorney Greg Swygert.

7    I had some questions about it.

8          Are you the movant on that one, Ms. Rosen?

9          MR. GROSSICH:  No, it's the officer defendants.

10          THE COURT:  The officers, okay.  So it's you,

11    Mr. Grossich.  Remember a court reporter someday might have to

12    transcribe what we do today, and let's try to remember to

13    identify ourselves in case he or she can't get your voices.

14    So make sure we get that right.

15          So here's the thing.  Here's why I wanted to take

16    that up, Mr. Grossich.  My initial reaction to it was it was

17    filed so late that I didn't want to do it today.  I thought we

18    could do it at a later date just out of fairness to the

19    plaintiff and having them respond on such short notice to

20    that.

21          On the other hand, as you've probably seen probably

22    often in the case, if I get a motion that I'm prepared to deny

23    based on reading what the movant has submitted, sometimes I'll

24    deny it without requiring a response, and I wondered if this

25    was such a motion.

1           So I have some questions for you about it, and I hope

2     you can answer them.  The first one is that there was an email

3     that Mr. Swygert apparently wrote describing his conversations

4     with Meadors, and those conversations concerned

5     Mr. Cruz's involvement in the earlier homicide.  There was

6     some back-and-forth about that a few months ago.

7           Then there was a submission that I remember asking

8     for that your clients, Mr. Grossich, gave the Court that said

9     you had been provided by the state's attorney's office in

10    their production this email from Mr. Swygert to -- I don't

11    know who it was, but it contained discussion of his

12    discussions with Meadors.  You do still have that email, don't

13    you?

14          MR. GROSSICH:  Your Honor, to be honest with you, I

15    do not recall that email.  We may, in fact, have it, but I

16    don't remember having seen that.

17          THE COURT:  Well, okay.  I know you have it because

18    it's in a document.  Where is that now?  Now I actually have

19    to get the right stack of papers in front of me, so give me a

20    minute.

21      (Brief pause.)

22          THE COURT:  Okay.  Okay, document 171.  Actually,

23    this was signed by attorney Gamboa for the officer defendants:

24          "On March 19, 2024, the state's attorney's office

25    produced an 11/2/21 email from attorney Swygert to attorney

1    DeWald of CCSAO concerning statements made to Swygert by

2    deceased witness Meadors.  The only redactions to the CCAO --

3    the only redactions the CCSAO made to the email were of the

4    email addresses of Swygert and DeWald."

5         So you guys did say that, and I know it to be true.

6    I was going to ask you, what's in that email?  What did

7    Swygert say in that email about what Meadors told him, do you

8    remember?

9         MR. GROSSICH:  To be honest, I have to admit that I

10   do not know what was in that email.

11        THE COURT:  Okay.  I'm going to ask you to submit

12   that to me in camera.

13        MR. GROSSICH:  Okay.

14        THE COURT:  The other thing I'm going to ask to be

15   submitted in camera by the plaintiff are the notes that you

16   are withholding.  I'd like to see them because I want to take

17   a look at Mr. Grossich's offer.  Mr. Olstein and Mr. Chanen,

18   he offered to just produce them in redacted form, reduce it to

19   only:  Meadors said this happened.  Meadors said that

20   happened.

21        I want to consider that, but I'm a little concerned

22   about substantial need, Mr. Grossich, because, you know, this

23   is a wide volume of filings that were made yesterday, and in

24   one of them -- gosh, let's see.  It's going back.

25     (Brief pause.)

```
 1            THE COURT:  I think it was the clawback objection.
 2   Let's see.
 3     (Brief pause.)
 4            THE COURT:  Oh, maybe it was the ink dot testing
 5   motion response.  I'm just going to read it to you so we're
 6   really clear.  The ink dot testing response was document 250
 7   and, gosh, page 5, is it?  I think it is.  Let's see.
 8     (Brief pause.)
 9            THE COURT:  Oh, here it is, yes, page 5, paragraph
10   11.  This is a document filed by you, Mr. Grossich.
11            MS. ROSEN:  No.
12            THE COURT:  It says signature "Jeffrey Grossich," and
13   it's also signed by Catherine Barber.
14            MS. ROSEN:  That's fine, Judge.
15            THE COURT:  Okay.  Well, it just seems pretty clear
16   because this is what it says:
17            "It does not change the fact" -- and I'm reading from
18   paragraph 11 -- "that Vernon Meadors, who is now deceased,
19   maintained until the day he died that plaintiff, a Hispanic
20   male, was the person who shot him."
21            So it seems like you know a lot already,
22   Mr. Grossich.  You have the Swygert email.  We don't know what
23   that says yet.  So I'm trying to figure out what the
24   substantial need is for prying through the work product
25   objection to the Meadors notes.  Do you want to tell me more?
```

1          MR. GROSSICH:  Well, Your Honor, yes.  So we know,

2     counsel knows based upon the evidence that's been produced in

3     this case, meaning there's been no evidence that -- first of

4     all, there's been no evidence that Vernon Meadors ever

5     recanted or changed his identification of Cruz as the shooter.

6     I detailed in the motion I filed regarding the interview notes

7     that we have the deposition of Mr. Swygert who testified that

8     he met with Meadors in 2017 and at that time Meadors said,

9     yeah, Cruz was the shooter.  Then we have the testimony of the

10    plaintiff who said that he never met Meadors but to his

11    knowledge Meadors never recanted.

12          THE COURT:  And so --

13          MR. GROSSICH:  We have the testimony of those two

14    witnesses.

15          THE COURT:  So you have that already.

16          MR. GROSSICH:  Right, but it --

17          THE COURT:  Swygert makes the -- gives the hearsay

18    testimony that out of court, because Meadors is dead, Meadors

19    said to him Cruz was the shooter.  You have that, right?

20          MR. GROSSICH:  We have his, we have his deposition

21    testimony, but we don't have any other documentation of

22    Meadors maintaining that Cruz was the shooter, and it's our

23    belief that these notes that were taken contemporaneously with

24    this meeting reflect that.

25          THE COURT:  How much better is it going to get than

1  the guy who's in the room doing the interview telling you that

2  Meadors before he died said that?  How much better is it going

3  to get from some notes of an interview?

4          MR. GROSSICH:  We really don't have a whole lot other

5  than what Swygert said, and so we would like the notes because

6  that's really the only documentation we have other than

7  Swygert's testimony that, yes, Meadors maintained that Cruz

8  was the shooter.

9          THE COURT:  Okay.  So let's do this.  I want to make

10 relatively short work of this.  I'm going to deny the motion

11 for a couple reasons.  I don't think there's substantial need,

12 but the denial is subject to my review of the notes.  I think

13 I need to see them, so I'll have you submit them in camera to

14 me by the end of the day tomorrow.  Mr. Grossich, I also need

15 the Swygert email that we discussed.  I want to look at that,

16 too.  So the ruling is subject to that.

17          Further explanation for this ruling is as follows

18 because, Mr. Grossich, you looked at Rule 26(b)(4), I believe

19 it is, the rule about the work product applicability, and you

20 said it has to be prepared by or for a party.  That's right,

21 but interestingly that language from the rule doesn't say a

22 party to the litigation.

23          In other contexts, this has come up before where

24 maybe there's not a formal retainer agreement.  That was the

25 case in In Re Turkey Antitrust Litigation, an opinion I wrote

1    and that I rely heavily on.  Okay?  That one is -- I'll give

2    you the citation to it -- 22 Westlaw 797180.  That case

3    involved investigator notes that were made of interviews with

4    potential putative class action representatives who didn't

5    wind up being the class action representatives who filed the

6    lawsuit.  The other party wanted to pry those notes loose and

7    yet would purportedly have the same access to those people as

8    anyone else.

9         And here, through Swygert, you have significant

10   access to what Meadors told Swygert.  The items sought to be

11   learned from the notes, the information really is what did

12   Meadors tell Swygert and his associates, other lawyers.

13        Importantly, that case involved somebody trying to

14   present the Court with a strict construction of the rule from

15   Rule 26(b) to try to say that that limited the work product

16   doctrine, and the holding of Turkey Antitrust Litigation is

17   no, it's actually broader than that, because if we read the

18   rule as strictly codifying the work product doctrine and

19   excluding any other circumstances where it's by or for a

20   party, so that required that there actually be the same

21   litigation, because I think that's what you argued, these are

22   things that Meadors told Swygert in connection with some other

23   interview.  It had nothing to do with this litigation.  It

24   can't be work product.  I would disagree with you.  I do

25   disagree with you, and that's what Turkey Antitrust holds,

1    that "by or for a party" can mean a lot of things.  It's for a

2    party who may contemplate other litigation, perhaps litigation

3    not yet filed.

4              And interestingly enough in your own documents, I

5    can't remember which submission it was, but I can probably

6    tell you.  It was the clawback objection.  Swygert testified

7    that the Center or Wrongful Convictions helps Center clients

8    find civil litigation counsel after their exonerations.  You

9    put quotes around "exonerations."  Okay.

10             But there's clearly some further litigation that's

11   anticipated when criminal defense counsel represents somebody

12   who is potentially going to be exonerated, maybe in a

13   post-conviction petition, maybe even in an underlying criminal

14   prosecution.  There's certainly a potential for additional

15   litigation, and Swygert's testimony told you that they have

16   the common practice of referring these clients out to various

17   plaintiff's bar individuals.

18             So it's kind of hard to imagine that a discussion

19   with Meadors would not be prepared for a party, the party in

20   this case being Cruz, in connection with other litigation.

21   The Turkey Antitrust case, we actually mention the dictionary

22   definition for "for," you know, and it's pretty broad for

23   Cruz.  So that's another reason why I'm denying your motion,

24   but I am denying it subject to my review of these in camera

25   documents.

 1          If you can get it to me before the end of the day
 2   tomorrow, I'd love that because we're very busy, and tomorrow
 3   is going to be a really busy day around here, as is today.  So
 4   that's the ruling on the motion to compel the Meadors
 5   interview notes, which is document 251.  So that gets us to
 6   the next one.
 7          I know we put time limits on this, but I've got to
 8   tell you that when I got deep into preparation very early this
 9   morning, I was able to figure out what I think the questions
10   are and that's why I did it that way.  I suppose before we get
11   off this, to be fair, Mr. Grossich, is there anything you
12   wanted to add before the minute order gets entered?  I don't
13   want to cut you short.  I want to be fair.
14          MR. GROSSICH:  No, Your Honor.  I understand your
15   ruling.  The only question I have is on the in camera review.
16   Do you want us to submit that via the proposed order email
17   address or in person?
18          THE COURT:  That's fine.
19          MR. GROSSICH:  Okay.
20          THE COURT:  That's fine.
21          Mr. Olstein, you kind of won that one.  Have you got
22   anything to add?
23          MR. OLSTEIN:  No, Your Honor.
24          THE COURT:  Good call.
25          Okay.  So let's go to the next one, which is in the

1    order I have it in my notes.  Now we get to the ones I was

2    planning for today, the ink dot testing, the ink dot testing.

3           So, Mr. Chanen, were you going to take the lead on

4    this, yes or no?

5           MR. CHANEN:  Yes, I will, Your Honor.

6           THE COURT:  Okay.  So I read the motion, and I read

7    response.  Mr. Chanen, a question for you.  Same thing, my

8    preparation level is significantly greater now than it was

9    when I said you have eight minutes to argue it, but I'll ask

10   you this, Mr. Chanen.  It looks like, based on the response

11   that came in after you filed your motion, that there's

12   agreement as to a lot of this.  There's an agreement as to

13   when your expert is going to go back to police headquarters

14   and collect the additional ink samples from the document.

15           It looks like, if I'm right -- but I want you to

16   correct me if I'm wrong -- is the remaining disagreement the

17   defendants, the city defendants kind of, I will say

18   eleventh-hour because I think it is, eleventh-hour proposal to

19   put off the defense expert's testing until some later

20   undetermined time which would be after your expert,

21   Mr. Chanen, submits a report and, therefore, is it further

22   that you, Mr. Chanen, that your expert wouldn't be allowed,

23   would not be allowed to be present for the defense expert's

24   testing at that later time?  Have I identified the two things

25   still at issue, or am I wrong?

```
 1              MR. CHANEN:  You are 100 percent correct, Your Honor.
 2              THE COURT:  Okay.  So to cut this a little bit short
 3    because Mr. Chanen very thoroughly went through his reasons
 4    for filing the motion, and, Mr. Chanen, I won't not let you
 5    add anything to that, but I have some questions for the
 6    defense on this one.  Who's handling it for the defense?
 7              MS. ROSEN:  I am, Your Honor.  Eileen Rosen.
 8              THE COURT:  Okay.  Ms. Rosen, if you really wanted to
 9    not do your expert testing until some later time after you get
10    the report, why didn't that get raised earlier?  We've been
11    dealing with this for two months, and when we were here on the
12    13th -- I think it was the 13th, the 13th or the 20th.  It was
13    the 20, I think.  No, it the was 13th, and I said I want this
14    testing done October 4, and I want it done in a way in which
15    all experts, either side's experts who wants to observe the
16    other would be allowed to do that.  Then I see this email
17    through Ms. Barber that says:  Oh, by the way, Mr. Chanen,
18    your expert is not going to be allowed to be there.
19              If I read it, that's kind of a conflict, isn't it,
20    with what I wanted?
21              MS. ROSEN:  So, Judge, a couple points on that.
22              THE COURT:  Yes.
23              MS. ROSEN:  A couple points on that.  At that
24    hearing, I specifically indicated to the Court that the
25    defendants had not decided whether they actually needed to do
```

1    their own testing until they observed what Dr. Palenik was

2    going to do because we were unsure about the nature of the

3    testing.

4            THE COURT:  Yes.

5            MS. ROSEN:  We knew, so we knew that they were --

6    well, we first were under the impression that they were taking

7    microscopic holes.

8            THE COURT:  I know.  I don't want to hear about how

9    they weren't microscopic.  I don't think it's material, but go

10   on.

11           MS. ROSEN:  Okay.  But it has to do with our

12   analysis, right, Judge?  So if it were microscopic, it would

13   be -- well, our thinking was one way in terms of the kind of

14   testing that was going to be done.  When it became apparent

15   that it was going to be the plugs in the way that they were

16   done, then we had questions about the type of testing that was

17   going to be done.

18           We were not provided information specifically about

19   the testing that was going to be done until we actually

20   observed it.  We were given vague descriptions about the kind

21   of testing that was done, but then when our expert was out at

22   Dr. Palenik's lab last week and observed what Dr. Palenik was

23   doing, it became clear to us that we may not need to take any

24   plugs at all to rebut whatever Dr. Palenik's opinions are

25   regarding the samples that he took and the chemical testing

1     that he was going to do.

2         We do not want to unnecessarily poke holes in a

3     document if we don't need it, and so once we observed the type

4     of testing he was doing, the manner in which he was doing it,

5     the chemicals that he was using, and what was revealed when he

6     did the test of the single ink dot from what we've been

7     calling the 1-2-3 test that didn't actually get completed, but

8     once we observed all of that, it became clear to us that it is

9     likely -- and I can't definitively say it till I see his

10     report -- likely that we're not going to be doing any ink dot

11     testing at all.

12         If the issue for Mr. Chanen is observation of our

13     testing if we decide to do it, we can accommodate that if that

14     becomes the issue.

15         THE COURT:  Okay.  He'd have to be under my order,

16     right?

17         MS. ROSEN:  Sure, sure.

18         THE COURT:  It would be a must.

19         MS. ROSEN:  Fine.

20         THE COURT:  Okay.

21         MS. ROSEN:  We could accommodate that, but we are now

22     flying -- I have a suspicion about what Dr. Palenik is going

23     to conclude.  I have a suspicion about what he's going to base

24     his opinions on, but I don't know it and he hasn't completed

25     his testing.

1          So we aren't in expert testing.  We're not doing --

2     we aren't in the expert phase of the case.  This sort of got

3     pushed to the front, and I don't even remember why or how.

4     But here we are so, fine, let's finish this piece of it.  Let

5     Dr. Palenik opine, and then to the extent we decide that we

6     need to take additional plugs or, I suppose, do anything else,

7     we can let plaintiff know and we can accommodate a request for

8     observation.

9          THE COURT:  Okay.  Now, your expert was already there

10    for what Palenik did so far, right?

11         MS. ROSEN:  Correct.

12         THE COURT:  So do you anticipate any objection from

13    your side later to Palenik's report or conclusions or testing

14    methodology to the effect of:  We didn't have an opportunity

15    to see you do your sampling and testing?

16         Do you or do you not anticipate that?

17         MS. ROSEN:  We may challenge the methodology, but not

18    from lack of observation.

19         THE COURT:  Okay.  Okay.  I think that's important

20    because my initial reaction to this question -- and we have to

21    hear from Mr. Chanen still -- was that I said this had to be

22    done by the 4th of October.  That in part was for some

23    resource-saving purposes so that the plaintiff's expert isn't,

24    I guess, planning to make some further travel and incur

25    further expense at some future time.  It would all just simply

1   be done.

2           And it's objective scientific testing.  We may agree

3   to disagree later with the expert's conclusions, but he's

4   pulling ink off a document and he's running chemical tests off

5   the ink and then making conclusions from that.  So this idea

6   that you would need his opinions later to conduct meaningful

7   testing, I don't agree with you.  You could do that testing

8   now, but I think your argument is why do it now if you don't

9   know that maybe you ultimately you won't have to.  You won't

10  have to pay for that.  You won't have to take the time to have

11  that done.  I think that's your argument today.

12          MS. ROSEN:  Yeah.  I slightly disagree with it's

13  objective testing --

14          THE COURT:  Okay.  I'll grant you that.

15          MS. ROSEN:  -- because there's wiggle room in the

16  interpretation of the results.

17          THE COURT:  How many experts are really objective?

18          MS. ROSEN:  Well, that's always true.

19          THE COURT:  Okay.

20          MS. ROSEN:  So I take a little issue with that.  But

21  yes, the point is based on what we saw, based on what we

22  observed, and based on the testing that was done and that we

23  anticipate the rest of the testing being from these last four

24  holes that he's going to take -- and we have to be very clear

25  today, obviously, that that's going to be or that the

1    representations in the pleading about where the holes are

2    being taken from, this is happening tomorrow.  It's set up,

3    and we're ready to go.  It's these four additional holes, and

4    then I assume Mr. Palenik is going to do the same testing, the

5    same type of testing he did last week.

6          We don't even need to be there for that.  He can do

7    his testing and we can get his report, and then we will make a

8    decision on whether or not we want to incur the cost of doing

9    additional testing, which, like I said, based on what I know

10   right now is unlikely, and further destroy the document, which

11   we don't want to do.

12         THE COURT:  Okay.  I'm not going to make a finding on

13   the whole document destruction issue because there's obviously

14   a dispute over how serious a problem that potentially is and

15   I'm not resolving that, but do you acknowledge that your

16   potentially doing it later would mean, I guess, incurring some

17   additional or imposing some additional costs on the plaintiff

18   for having his expert having to do more work later when your

19   expert wants to do the testing if he does?  Would you

20   acknowledge that?

21         MS. ROSEN:  I suppose the time and observation of

22   observing the testing then.

23         THE COURT:  All right.  Do you think it's minimal

24   enough that under these circumstances it ought to be permitted

25   as opposed to requiring you to incur an expense now that might

1    be useless?

2            MS. ROSEN:  Sure.  I mean the testing, Mr. Palenik --

3    Dr. Palenik, excuse me, is local.  The testing would be done

4    locally.  It would be just the time, whatever hours it takes

5    to observe the testing.

6            THE COURT:  Okay.

7            MS. ROSEN:  I mean, to observe, yeah, observe the

8    testing.

9            THE COURT:  Okay.  So, Mr. Chanen, you've been

10   listening to this, and maybe you could tell I was very, very

11   firm with this idea that any side that wants to have its

12   expert observe is going to be allowed to do that.  So,

13   Mr. Chanen, I don't think you need to worry about the line in

14   Ms. Barber's email that suggested otherwise, and Ms. Rosen

15   agrees that that's how the city is going to proceed.  So that

16   leaves this question of them waiting until later to do theirs

17   until after you get Palenik's report.

18           You've heard I've expressed some concern about the

19   respective, you know, resource drains involved in that.  I'm

20   trying to think of the most efficient way to do it.  Why is it

21   inefficient or wrong or unfair to you to let them do their

22   testing later if they decide to do it at all?  Obviously,

23   they'd have the benefit of your expert's report in hand at the

24   time.  I don't know that that is -- how important a

25   consideration that is.

1        Why don't you tell me, or maybe you've heard enough

2   at this point to say "okay, if you want to do it later, you

3   can do it later," because yours is going to get done in the

4   next week and your expert is going to get to see what they do,

5   if they do it.  What do you say, Mr. Chanen?

6        MR. CHANEN:  Well, Your Honor, my first response is

7   that the same way that people are worried that Siri is

8   listening in on all their phone conversations, all their

9   kitchen conversations, so, too, I'm worried that you read my

10  outline for today's argument somehow.  You've covered every

11  single point I planned to address.

12       The expense involved is that instead of them taking

13  their ink dot plugs tomorrow when Dr. Palenik is present, they

14  will be making him come out a third time to watch them take

15  out the ink dots.  There's expense involved in that, but that

16  can be dealt with.  Either that can be charged to the city or

17  whatever.

18       The second concern we have is that they're going to

19  use it to delay the expert discovery process.

20       THE COURT:  Well, if I allow that, only if I allow

21  that.

22       MR. CHANEN:  Only if you law them.  So I just wanted

23  to express to you now, way ahead of time, that I hope that

24  three months from now, after Dr. Palenik has issued his

25  report, they don't try to ask for months and months and months

1    to do their rebuttal report on the grounds that they're

2    starting from ground zero and they've got to take the ink dots

3    and then they've got to transfer them over to their lab, and

4    then they've got to test.  So that was our second concern.

5              Our third concern --

6              THE COURT:  Well, can I interrupt you a little bit on

7    that one?  I'm sorry to interrupt you, but let me just suggest

8    to you that if I would allow them to not do it now and then to

9    do it later, that does leave an ability for you, Mr. Chanen,

10   and defense counsel to talk about what that protocol looks

11   like, what the timing is and how long after disclosure of the

12   Palenik report, you know, that additional testing, if any, how

13   long would be allowed for that and how quickly would the

14   further report have to be done.

15             Everybody ought to know I'm not giving anything away

16   by telling you that I'm going to want that to get done with

17   alacrity.  But I kind of think, Mr. Chanen, that this idea you

18   have that an officer or someone altered the report to change

19   the number in that box to reflect an initial statement

20   different than what has been reported ultimately in the report

21   seems really important to you.  It seems important to the

22   case, and so to me it seems important enough to be permissive

23   with the parties about how they want to go about doing this.

24             So rather than telling Ms. Rosen, hey, come back with

25   a motion to do this at your peril, I'm inclined to have her do

1    it later.  I think in balancing of the interests, I think it

2    is a greater burden on her and the city to go ahead and incur

3    the expense of their expert now doing testing, that it's

4    greater than the expense involved in your person observing

5    later their testing.

6         So that's where I'm coming from, but I did interrupt

7    you.  If I stopped you short of where you were going, I'd like

8    you to go ahead.

9         MR. CHANEN:  Your Honor, we're absolutely fine with

10   that ruling, but just to put it in a temporal perspective, we

11   are willing to accept that 100 percent, but when I got an

12   email that said they will make the decision as to whether to

13   collect additional samples until after Dr. Palenik closes his

14   report in this case, I went back in my memory because I did

15   not have it, and I remember Your Honor could not have been

16   more adamant on -- on September 13th that everything needed to

17   be completed by October 4th.  So I was troubled by that.

18        Then we filed the emergency motion, and they come

19   back and say that defendants are not willfully violating the

20   Court's order, as plaintiff suggests.  Rather, at this time

21   the defendants are merely requesting the Court to vacate its

22   order.  Well, that's not what Ms. Barber said, so again --

23        THE COURT:  I understand, but we've been over that,

24   though.  We've been over that.

25        MR. CHANEN:  So any, any ruling Your Honor makes on

1   this question is absolutely fine with us, but I am glad we

2   filed our emergency motion because we just can't stand by and

3   let them unilaterally reject what you said six different times

4   on September 13th.

5           THE COURT:  Okay.  Listen, I appreciate that, and if

6   I came across as being critical of you for filing the motion,

7   I certainly didn't intend to do that.  But the ruling is going

8   to be that I'm going to deny your motion without prejudice,

9   and that is because a great deal did get resolved, not only

10  here today but also in the response that the defendants filed

11  making clear that Palenik's testing, in fact, would go

12  forward.

13          And I think, you know, as you have mentioned in your

14  motion, Mr. Chanen, you know, I set that date for October 4.

15  We're not there yet.  I think it's in a very, very technical

16  sense, not criticizing you for bringing it, not telling you

17  you didn't shed some light on the events by bringing it, but I

18  think it's technically a little premature because we're not at

19  October 4 yet, and theoretically what that would mean is if

20  you're denied your access, if you're denied your opportunity

21  to test, I would expect a motion, you know, after October 4

22  that says:  Hey, they didn't comply.

23          That's the posture I think we're in, and if the

24  question then is going to be the defense didn't comply because

25  the defense expert didn't participate in the testing and

1   didn't run his own testing, you've kind of heard a little bit

2   today what my reaction to that would be, which is I'm going to

3   be pretty permissive about the defendant being able to do that

4   during further expert discovery.

5        Even if it costs you some, again, it's an important

6   issue.  We are all incurring costs in this case and it might

7   be a little additional cost for you, but it struck me as

8   potentially a significant cost saving for the city and the

9   other defendants.

10        So that's the ruling denying the ink dot testing

11   motion, which is which one?  It's the emergency motion that

12   you filed, Mr. Chanen, so it's document number 238.  So that

13   motion is denied without prejudice, and everything just goes

14   forward as we've discussed today.

15        MS. ROSEN:  If I could just to address one thing, I

16   know you've already ruled, but I do want to make clear for the

17   record that the city was never going to simply let the clock

18   run out and that we had conversations with Mr. Chanen about

19   dates for doing his testing and what further testing he was

20   going to be doing.

21        THE COURT:  I don't doubt you, and I read your

22   response to the effect that:  Hey, if we'd have talked some

23   more, you wouldn't have had to file your motion.

24        I get it but, you know, it's not the first nor the

25   last time that, you know, things have to get resolved in here,

1  so no hard feelings.

2          So we're done with that one, and so that gets us

3  to -- let's see.  There's the motion to extend which I've been

4  saving, so maybe what I'd like to do now is move to the

5  objections to the privilege and the clawback.

6          So, Mr. Chanen, on that issue we're talking about

7  your effort to claw back your engagement letter with Mr. Cruz,

8  the plaintiff in this case, and I think you're saying you

9  didn't really realize it had been inadvertently produced until

10  the Swygert deposition.  Am I right about that?

11          MR. OSTEIN:  I'm going to take the lead on this one.

12          THE COURT:  Mr. Olstein, go ahead.

13          MS. OSTEIN:  That's correct.

14          MR. CHANEN:  You are right about that, but

15  Mr. Olstein is going to argue this motion on behalf of

16  Mr. Cruz.

17          THE COURT:  Yes, let's give Mr. Olstein the floor.

18          So tell me, was I right in that supposition I just

19  threw at you?

20          MR. OLSTEIN:  Yes, Your Honor.

21          THE COURT:  Okay.  So obviously Mr. Grossich was

22  concerned because it's been six months.  You did a review.

23  You prepared a log.  You didn't log this document, and it got

24  produced.  What happened?

25          MR. OLSTEIN:  Your Honor, the factual background is

```
 1   very, very simple.  Defendants issue a subpoena.  We
 2   subsequently advise defense counsel that we're going to be
 3   helping the CWC with their document review and with preparing
 4   a privilege log.  They agreed to that.  The documents were
 5   shared with us electronically.  Mr. Chanen and I both did what
 6   we believe was a thorough review electronically of the
 7   documents.
 8           To the best of my ability to surmise as to what
 9   occurred as to why this document was produced, I believe that
10   in dragging files, somewhere along the line of our view of
11   looking at each file we dragged this particular file into the
12   wrong folder.  In other words, our process was to review each
13   file given to us by the CWC, to sequester the ones that we
14   believed were privileged, and I believe this file somewhere
15   along the line, either Mr. Chanen or me, I'm not going to
16   blame Mr. Chanen --
17           THE COURT:  That's okay.
18           MR. OLSTEIN:  -- we dragged the file into the wrong
19   folder.
20           THE COURT:  I appreciate you not throwing anybody
21   under the bus, even yourself.  Go ahead.
22           MR. OLSTEIN:  But in any case, it was a completely
23   innocent, inadvertent mistake.  It falls squarely under
24   Federal Rule of Evidence 502(b)'s requirements.  It was an
25   inadvertent disclosure.  We had taken reasonable steps to
```

1   prevent the disclosure.  We did present the privilege log.  We

2   did try to put the files that we believed were privileged into

3   that privilege folder, and we did take reasonable steps to

4   rectify the error.  We moved immediately.

5          I mean, we first learned about this on September 13th

6   at Mr. Swygert's deposition.  Mr. Chanen immediately invoked

7   the privilege and instructed Mr. Swygert not to answer

8   questions about the document.  On the third business day

9   following that, September 18th, we formalized the clawback

10  request in writing by sending an email to defendants.  There

11  was no dragging of the feet here.  There was not any sort of,

12  you know, lack of thorough work.  This is just human error.

13  It's exactly what the rule is meant to address to permit a

14  clawback.

15         THE COURT:  Okay.  Okay.  Mr. Grossich is the movant

16  on this one.  Mr. Grossich, you haven't been heard yet and I

17  haven't made up my mind yet, so I'd like to know what you want

18  to argue.  If you want to focus on anything, you could focus

19  on maybe the reasonableness of the steps taken to prevent

20  inadvertent disclosure or take issue with anything else

21  Mr. Olstein represented.

22         MR. GROSSICH:  Yes.  Thank you, Your Honor.  So I

23  just want to start by saying that this is an important

24  document for the case.  We had the deposition of Mr. Swygert,

25  and I tried to introduce this document as an exhibit.  As you

1   can see in my motion and as Your Honor already noted,

2   Mr. Swygert testified at the deposition that the CWC regularly

3   refers clients to plaintiff firms and those firms then have a

4   referral arrangement with the CWC and will give the CWC a

5   percentage of any recovery in these types of cases.

6        So clearly that goes to Mr. Swygert's bias as a

7   witness.  If his employer, the entity he works for and

8   obviously has a passion for, is going to receive funding from

9   this case, then that's something that the jury should know

10  about and that we should know about.  It goes to his

11  credibility which the caselaw clearly says is always at issue.

12       So I tried to introduce this document which we had

13  had in our possession for six months and, you know, I found it

14  in preparing for Cruz's -- I'm sorry -- for Mr. Swygert's

15  deposition.  Mr. Chanen and Mr. Olstein, you know, immediately

16  objected and said that I couldn't ask any questions about it,

17  that I couldn't use the document even when I wanted to ask

18  Mr. Swygert about the arrangements between the CWC and

19  plaintiff's firm without even, you know, referencing the

20  document specifically.  I was not permitted to ask those

21  questions and, of course, they're very relevant to this case.

22       Your Honor has the agreement.  I'm not going to go

23  into what it says because we're on the record, but if

24  Mr. Swygert's employer is going to receive a percentage of the

25  recovery in this case, that's something that's very relevant

1   and we want to know and want to put on the record.  We've had

2   this document.  I understand that they did a privilege review

3   but, you know, we have the document and we've had it for six

4   months, and apparently they never looked at the document

5   production anytime after that.

6          I will note that this is the second time that

7   plaintiff's counsel has attempted a clawback of a document in

8   this case.  The circumstances of the first time were a little

9   bit different.  It was a public defender document, a public

10  defender document.  But, you know, frankly we cannot -- the

11  defendants cannot be prejudiced by plaintiff's counsel's

12  failures to expeditiously assert privileges in this case, and

13  that's where we are.

14         THE COURT:  Okay.  Just a couple questions.  So

15  relevancy, you've asserted a relevancy to it.  I guess before

16  we really go there, I was wondering.  We already know that

17  Swygert presumably would testify and has testified that

18  Meadors fingers Cruz in this case.  Good for you or bad for

19  you?

20         MR. GROSSICH:  That's good for us.

21         THE COURT:  Was there stuff he gave you that was bad

22  for you and that you would want to challenge based on his

23  bias?

24         MR. GROSSICH:  Well to be honest, Your Honor, it was

25  a lengthy deposition.  I think we almost took the entire seven

1    hours, and I'm trying to remember exactly what he testified to

2    right now.  I know that there were things he said that were

3    not good for us.

4          He got affidavits from other witnesses who, you know,

5    we're going to say did not really have a good opportunity to

6    witness the actual shooting.  But, nonetheless, one of them

7    wrote an affidavit saying that the police pressured him in

8    some way to say something and, you know, Mr. Swygert had

9    asserted that in numerous court filings in the underlying

10    criminal case.  So there's certainly things that he is going

11    to say that are going to be bad for us.

12          THE COURT:  Okay.  So let's grant you that he

13    potentially had some unfavorable testimony to offer so that

14    any bias he has would be something that is relevant.  I'm

15    struggling a little with what authority may exist for the idea

16    that a document's relevance overrides or is really even

17    connected to whether it was a confidential communication from

18    lawyer to client or agent to lawyer to client made for the

19    purposes of the rendering of legal services, in other words,

20    the privileged character of the document.  Does a privileged

21    document become less privileged or more discoverable if it's

22    highly relevant?

23          MR. GROSSICH:  Well, Your Honor, I believe it's a

24    threshold issue as to whether or not the document is relevant.

25    If it's not relevant, then I think there's no real argument to

1  be made that we should have it.  So I was addressing that

2  first.

3          THE COURT:  Well, I agree with you, but you're saying

4  it is.  Then I guess my question to you was let's assume it's

5  relevant.  Does its relevancy or even extreme relevancy, does

6  that provide a ground to override a privilege or to find that

7  a privilege was waived?

8          MR. GROSSICH:  No, the relevancy alone does not.  But

9  the fact that the document was produced, it was not listed on

10 a privilege log, and it's been over six months since we

11 received it and we relied upon it, I think that does result in

12 waiver.  I've cited caselaw in my brief that production of a

13 document, you know, and then attempting a clawback five, six

14 months later is too little too late, and that's the case here.

15         THE COURT:  Yes.  In those cases you cited, did the

16 efforts to claw back the document occur close in time or not

17 close in time to counsel's discovery of the fact that it had

18 been produced?

19         MR. GROSSICH:  Well, I believe the attempted clawback

20 in those cases was relatively close in time to when counsel

21 said they discovered the inadvertent disclosure.  However, our

22 argument in this case is they did the privilege review back in

23 March.  They produced the document, and it has just been

24 sitting here.  So they should have discovered it at some point

25 in time.  Definitely when preparing for Mr. Swygert's

1    deposition which they knew would be covering the documents

2    that were produced by his employer, they should have seen

3    that, hey, look, this document has been produced, but that

4    never happened.

5         It's just if I had never, if I had never tried to

6    introduce it as an exhibit to Mr. Swygert's deposition, we

7    would still have the document and plaintiff or plaintiff's

8    counsel would be none the wiser.

9         THE COURT:  Yes.  I guess wouldn't you agree with me,

10   though, that an inadvertent production can mean that the

11   producing party has no idea that they produced it and,

12   therefore, would hardly be in a position to correct or remedy

13   that until they knew it had been produced, such as if it were

14   used at a deposition?

15        MR. GROSSICH:  Well, Your Honor, my response would be

16   when I think of an inadvertent disclosure, I think of, you

17   know, sending an errant email or something of that nature and

18   maybe they don't realize that it happened, but in this case

19   it's a Bates-stamped document.  It's a part of the record in

20   this case, and it's been in like all of our, you know,

21   computer files for the last six months.  So it's Bates

22   stamped, and they know it's been -- they have a record that

23   it's been produced.  That's what Bates stamping is for.  So

24   that's my response to that.

25        THE COURT:  But doesn't Bates stamping sometimes

1       occur after a party has determined what will be in the batch

2       for production?

3               MR. GROSSICH:  That's true.

4               THE COURT:  And here, didn't Mr. Olstein represent

5       that this particular document got dragged to a folder where

6       the batch for production, I guess, was being kept, got dragged

7       into that folder by someone inadvertently?  How would that be

8       different from somebody erroneously composing an email in the

9       example you gave me?

10              MR. GROSSICH:  Well, I don't know about dragging

11      documents into folders.  All I know is that my practice and

12      the practice at our firm is that every document that goes out

13      with a Bates stamp on it is reviewed before it's sent to

14      counsel.  I think that's best practice, and it obviously

15      didn't happen in this case.

16              THE COURT:  I'm going to go ahead and ask this

17      question, and you don't have to answer it if you don't want

18      to.  How long have you been practicing?

19              MR. GROSSICH:  Ten years.

20              THE COURT:  In your ten years, have you never

21      inadvertently produced a document?

22              MR. GROSSICH:  I can't remember one occasion when I

23      have, to be honest with you.

24              THE COURT:  Well, my hat is off to you.  You must be

25      very careful.

```
 1              MR. GROSSICH:  There have been times, I will say,
 2    when I sent an email to the wrong recipient, and there might
 3    have been one or two times when that happened and I
 4    immediately said:  I'm sorry.  I sent this to the wrong
 5    person.
 6              Then that was the end of it.  But I never had a
 7    situation, as here, where I produced a document with a Bates
 8    stamp on it that was inadvertent.
 9              THE COURT:  Okay.  And can you think of, can you
10    think of many classes of documents more sensitive as between
11    client and attorney than the retainer agreement, the
12    engagement letter, the legal services?  Is there any type of
13    document more sensitive?  Maybe than perhaps written
14    communications about "I did it" or "I didn't do it," it seems
15    like a pretty sensitive document to me.
16              MR. GROSSICH:  Well, I will say, Your Honor, that I
17    was previously a plaintiff's attorney and I've drafted many
18    retainer agreements with plaintiffs, and I've also had
19    situations where there's been a dispute over the amount of
20    attorney's fees and I've had to file a retainer agreement as
21    an attachment to a breach of contract action.
22              THE COURT:  Yes, but isn't that a privilege waiver
23    that gets affected, an at issue waiver when somebody says:
24    You didn't comply with the fee agreement, lawyer.
25              Oh, yeah?  You just waived your privilege over the
```

1    fee agreement.  Here it is.

2         Isn't that how that operates?

3         MR. GROSSICH:  Yes, Your Honor, but I can think of

4    other instances where a retainer agreement is disclosed and

5    not considered necessarily confidential.  It's a contract

6    between two individuals.

7         THE COURT:  Okay, all circumstances that don't really

8    apply here.  The heart of your argument is that they weren't

9    careful enough and they took too long to claw back, right?

10        MR. GROSSICH:  Correct, correct.

11        THE COURT:  Okay.  Let me think about this for a

12   minute.  I guess I had another question for you, and I hope

13   you don't take this the wrong way.  I don't think you were

14   really required to put them on notice of this document being

15   in the production, but I'm wondering.  Didn't it occur to you

16   when you saw this document in the production, given that it's

17   a retainer agreement, did it occur to you before the

18   deposition to reach out to them and say:  Hey, I have to tell

19   you, you guys produced your retainer agreement with the

20   adversary, your client?  Did you mean to do that?

21        Did that thought occur to you at all?

22        MR. GROSSICH:  It did not occur to me.

23        THE COURT:  Okay.  I'm just kind of gently suggesting

24   that it might have been the courteous thing to do

25   professionally, but I don't think there was an obligation for

```
 1    you to do it because they've got a structure in place to claw

 2    back.  That reminds me.  There's a document I want to look at

 3    that I can't get access to because we don't have a printer in

 4    here.

 5              Can you call it up on a machine?  Can I look at it on

 6    the terminal?

 7              THE CLERK:  Here?

 8              THE COURT:  Yes.

 9              THE CLERK:  Yes.

10              THE COURT:  All right.  I won't wander.

11              MR. GROSSICH:  If I can clarify my last answer, Your

12    Honor --

13              THE COURT:  Yes, go ahead.

14              MR. GROSSICH:  -- I think the thought process I had

15    when I saw the document was I think immediately I had the

16    thought that I was maybe a little bit surprised, but then I

17    thought to myself, well, they said they conducted a privilege

18    review and I have their privilege log, so whatever.

19              THE COURT:  Maybe they meant to produce it.  Maybe

20    they meant to.

21              MR. GROSSICH:  You know, that was my thought.

22              THE COURT:  Okay.  That's why I'm trying not to fault

23    you for it, but I sort of feel like, boy, it's not -- it's a

24    pretty significant document.

25              But Ms. Rosen wants to say something.
```

```
 1              MS. ROSEN:  Yeah, Judge.  I can tell you in some of
 2    these cases plaintiff's counsel does produce the retainer
 3    agreement.
 4              THE COURT:  Okay.
 5              MS. ROSEN:  So it just --
 6              THE COURT:  It's up to them, I guess.
 7              MS. ROSEN:  Yeah, you know, it's up to them, and I
 8    will say I have seen them over the years in many of these
 9    types of cases.
10              THE COURT:  Okay.  I'm just looking at something for
11    a minute, so hold on.
12       (Brief pause.)
13              THE COURT:  By the way, I apologize for being a few
14    minutes tardy to our hearing today.  This obviously is not our
15    regular courtroom.  Our regular courtroom is having a
16    facilities issue, and it is highly disruptive to me and this
17    is another example.  So I apologize I was not on time, but
18    that was why.  I left my notes in the other room, and I had to
19    go all the way back to get them.  So hold on.
20       (Brief pause.)
21              THE COURT:  Okay.  I was just looking at your
22    protective order which is document 111.  It does indicate that
23    reasonable efforts have to be undertaken.  I've heard enough
24    to make a finding that even if those efforts failed, even if
25    those efforts fell short of what anyone would consider best
```

1    practices -- well, I'm not sure how much of that was picked up

2    by our recording.  I'm going to do it again.

3          So I was looking at the protective order in the case,

4    and I'm ready to make a finding that an inadvertent disclosure

5    could occur outside of best practices.  I certainly think best

6    practices would have called for this document to not be

7    produced or for some later, post-production review to have

8    occurred to make sure there wasn't anything in there that

9    shouldn't have been in there.  I think all of that would have

10   been reasonable.

11         The order requires the parties to take reasonable

12   steps to prevent inadvertent disclosure.  We know that there

13   was a privilege review.  We know a log was prepared.  I think

14   those were reasonable steps.  It just turned out that they

15   were not executed adequately.  They were not executed

16   correctly, and nobody has challenged the veracity or the good

17   faith of Mr. Olstein's representation that someone dragged

18   this document into the wrong folder.  Maybe that's a function

19   of the fact that we do so much of our work now electronically

20   and it can make it difficult and can inject a greater

21   possibility for error and for error as a result of lack of

22   non-durable precaution.

23         So I just don't think this rose to the level of not

24   reasonably taking steps to prevent inadvertent disclosure.  I

25   think the disclosure was inadvertent, and I think instructing

1    the witness not to answer questions during the deposition,

2    that may be done to preserve privilege, and that represented a

3    prompt and reasonable step to rectify.  Defense counsel --

4    plaintiff's counsel waited no longer than pretty much

5    immediately to raise that issue.

6          In terms of relevance, it may or may not have a

7    significant relevance, but I think given my finding that the

8    clawback was appropriate and that it is a privileged document,

9    I think the relevance of it to the issues in the litigation

10    becomes irrelevant to a decision on the motion.  So that is

11    going to be the -- it was styled as an objection to the

12    clawback.  I'm construing it as a motion, in effect, to

13    overrule the clawback.  So this is document 241, and I'm

14    denying that motion for the reasons stated on the record.

15          So that gets us to the star of the show, right?  I

16    think we've covered everything except the request for the

17    additional time.  Ms. Rosen, am I right, or is there something

18    else I'm missing?

19          MS. ROSEN:  I think that was all you had on your

20    agenda.  There's a couple motions that you were holding back,

21    the ones that -- there's the one that aren't fully briefed.

22          THE COURT:  Yes, the one, the Foxx motion by the

23    state's attorney's office.  They were in communication with

24    court staff yesterday.  They wanted to know if they needed to

25    be here.  We told them they didn't.  That's not fully briefed.

1    We don't need to spend time on it.

2            The other one was I think a motion to compel subpoena

3    compliance.  The third party witness was somebody named Byrne

4    who was some type of film maker.  There's an objection by a

5    media attorney in that one and, as you saw, we wanted to give

6    that media attorney notice of our willingness to tee that up

7    for hearing or even briefing if he wants a briefing, and I

8    expect that to be decided promptly.

9            Can you tell me, Ms. Rosen, or anybody who -- who

10   filed that motion?

11           MS. GONZALEZ:  I did, Your Honor.

12           THE COURT:  Ms. Gonzalez.

13           MS. GONZALEZ:  Yes.

14           THE COURT:  Have you had a chance to send my order of

15   yesterday to Brendan Healey and find what out he wants to do?

16           MS. GONZALEZ:  I did, Your Honor.  He notified us

17   this morning -- well, late last night, but we reviewed the

18   email this morning -- that he'd like to propose a briefing

19   schedule.  So we're in communication about dates for a

20   briefing schedule.

21           THE COURT:  Great.  So today is already Thursday, but

22   do you think by -- I don't know -- Monday, Tuesday, Wednesday,

23   you could file a quick status report and tell us what the

24   proposal is as between you and Mr. Healey?

25           MS. GONZALEZ:  Absolutely.

1          THE COURT:  Okay.  That would be wonderful.  So, yes,

2     that one is just entered and continued.  So that just leaves

3     us with the additional time, and I had some questions about

4     that.  There's a lot that is resolved here.  There's a lot of

5     agreement here.

6          State's Attorney Foxx, we already know that I told

7     you to get dates for her in October because I anticipated we

8     would need to go into October to do that one if that

9     deposition goes forward.  So that one I don't think we need to

10    talk about.

11         Let's see.  The motion seeks 45 days to November

12    11th.  Who is kind of speaking on that motion for the

13    defendants?

14         MR. GROSSICH:  I will, Your Honor.

15         THE COURT:  Okay.

16         MR. GROSSICH:  Jeff Grossich.

17         THE COURT:  Mr. Grossich, another hard question for

18    you.  Is it true that you didn't really reach out to

19    plaintiff's counsel on this motion till 4:13 p.m. the day

20    before its filing?

21         MR. GROSSICH:  That's true, Your Honor.

22         THE COURT:  Why not earlier?  I know we're busy and I

23    understand that, but if we're going to have a consolidated,

24    you know, filing and the thing is due on the 25th, it kind of

25    puts them in a little bit of a spot to react that soon.  But

1    maybe you'll tell me the way I structured it was unfair.  I

2    mean, whatever, why wait that long?

3           MR. GROSSICH:  I don't think it's unfair, Your Honor,

4    and I understand why you're asking me this question.  You

5    know, as far as the extension itself, that's something, as

6    Your Honor knows, that's been discussed for quite awhile, and

7    we actually put it in our status report that was filed, I

8    think, a week ago.

9           As Your Honor knows, there's been a flurry of

10   activity in this case, taking Mr. Swygert's dep, plaintiff's

11   dep, preparing to go to Florida, which I was expecting to do,

12   and then also these motions that have been filed recently.  So

13   there's been a lot that we've been trying to get done in a

14   very short period of time.

15          So we had communicated to plaintiff's counsel that we

16   were intending to seek an extension.  We just didn't say

17   exactly how long it was going to be.  I told them the day

18   before it was going to be 45 days, and then I wasn't able to

19   get them a draft after having circulated it amongst all

20   defense counsel until the following morning.

21          You know, I apologize for that, but as Your Honor

22   knows, you know, and as I said to plaintiff's counsel, we're

23   all really busy attorneys and we're trying to do things as

24   quickly as we can, and that's why it happened the way it did.

25          THE COURT:  Okay.  You've heard me before try not to

1   be too hard on counsel.  Your jobs are difficult, and I

2   appreciate that.  I think the next time, if there's a next

3   time when I do something like this, I may just prescribe, you

4   know:  Here's a date for conferral.  Here's a date for filing

5   something consolidated.

6           Here, as it happens, we're so close to the end of

7   discovery that there was very little time, and I think I

8   wanted the plaintiff's deposition completed by the time I had

9   you do that.  So we were -- we all were sort of pressed.  So

10  your answer, I appreciate it, and I don't think you need to

11  apologize.  It is what it is.

12          The one thing we would need to be careful about, as

13  the Court is, have we inflicted any prejudice on the plaintiff

14  by giving them such a short time to respond?  I have that in

15  the back of my mind, but maybe by the time we end this

16  discussion plaintiff will or will not feel that way, and

17  they'll have an ability to tell me.

18          So on your motion, Mr. Grossich, I want to go through

19  what you're asking to do over the next 45 days, which is going

20  to take us to November 11, and I want to make sure I've got

21  everything and that I haven't left anything out because, as

22  you saw from Mr. Chanen's response, he listed quite a few

23  things that were not really mentioned in your motion.

24          So I want it -- I don't want it to be -- I wouldn't

25  want to assume that your leaving those things out represented

1    an agreement by you or by defendant Guevara, who's a person

2    behind a number of those items, you know, that state they

3    can't be done, I'd like to kind of confront that today.  So

4    let's go through them.

5          The deposition of Officer K. Fleming, he had an issue

6    with his schedule in September.  So what's going on with him?

7    Is he giving you dates, Mr. Grossich?  When can he sit?

8          MR. GROSSICH:  That's something that the city

9    defendants are arranging, Your Honor, and I think Ms. Rosen

10    can speak better to that.

11          THE COURT:  Okay.  So what's going on with him,

12    Ms. Rosen.

13          MS. ROSEN:  So, Judge, his dep was scheduled for a

14    date in August.  I don't have it in front of me.

15          THE COURT:  The 22nd, I've got it.

16          MS. ROSEN:  Then the Court set a hearing, and we

17    proposed doing the dep after the hearing.  Plaintiff's counsel

18    didn't want to do that.  So we rescheduled it for this

19    September date, and then Mr. Fleming got his new work schedule

20    and couldn't comply with that date.  So I believe we had

21    offered October 4th or 5th, but now I've lost the thread on

22    that.  But, yes, we can get -- I can look and find the precise

23    dates.

24          THE COURT:  So you would expect October for him, is

25    that fair?

1          MS. ROSEN:  Oh, for sure.

2          THE COURT:  Okay.  Mr. Olstein or Mr. Chanen, if the

3     discovery fact cutoff were extended for limited purposes,

4     including doing the Fleming deposition in the month of

5     October, what's your reaction to that?

6          MR. CHANEN:  We're fine with that, Your Honor.  We

7     said from the very beginning when he had a work conflict that

8     we were happy to take him on October 4th.  We did say we think

9     that they should grant one extension on a very narrow issue

10    we'll get to at the end of this discussion to us as well, but

11    we said October 4th is fine for Mr. Fleming and I'll be

12    prepared to take the dep on that date.

13         THE COURT:  Okay.  So that's going to be granted as

14    to Fleming through October.  I said granted.  It's

15    probably that there may be a partial grant, partial deny, but

16    whatever is granted it would be for the limited purposes we

17    articulate here today, right?  Not for all purposes, not

18    blanket.

19         So let's go to Rios.  Rios I think we have agreement

20    on that you were going to depose him, I guess, today, and this

21    horrible hurricane has kind of delayed things.  It's closed

22    courthouses.  It has people sandbagging.  It's pretty scary

23    down there in Florida right now.

24         But we have agreement on that, don't we, Mr. Chanen,

25    that you will do Rios?  I don't know if you've agreed on

 1   October, but it will happen after the cutoff, right?

 2          MR. CHANEN:  Correct, Your Honor.

 3          THE COURT:  Okay.  Let's talk about Luis Rodriguez.

 4   It's interesting.  So he gets on the phone or defense counsel

 5   gets on the phone with him and agrees to a deposition date,

 6   and then he kind of vanishes, stops responding to calls.

 7   There's no subpoena on him.

 8          I think it's been the city defendants who've been

 9   chasing him down, right, Ms. Rosen?

10          MR. GROSSICH:  It's been us actually, Your Honor.

11   Jeff Grossich.

12          THE COURT:  Oh, it's you, Mr. Grossich.  Do you have

13   service of a subpoena on him yet?

14          MR. GROSSICH:  No, we don't.  We have our

15   investigators out trying to get service on him, but they have

16   been unsuccessful as of yet.

17          THE COURT:  Okay.  So here's the problem with this.

18   I don't know how long it might take to serve him, if you ever

19   do serve him.  Honestly I think, you know, this can be a

20   function of I don't know how long you waited to serve.  I

21   think it was in your motion that you've been looking for him

22   for a few months.

23          MR. GROSSICH:  Uh-huh.

24          THE COURT:  I don't think you have been diligent, but

25   I don't have an assurance that he isn't just completely in the

1 wind.  I've probably said before in this case that this

2 surprises me a little because usually city defendants, officer

3 defendants are really good at finding people.  But if you do

4 find him, I'll grant you leave to serve the subpoena.

5    But then we'll have to take up whether that

6 deposition, whether that subpoena is going to be enforced.

7 It's going to depend on when, at what point in time we are,

8 where we are process-wise.  I mean, what if summary judgment

9 is already going on?  I mean, I don't know.  So allowing you

10 to serve the subpoena doesn't mean that I'm saying that you

11 can take his deposition after the cutoff.  So I'm allowing you

12 to serve the subpoena after the cutoff, and that's it.

13    But Mr. Olstein and Mr. Chanen haven't been heard on

14 that.  What do either of you make of my suggestion as to how

15 we would deal with Rios?  Not Rios, Rodriguez.

16    MR. CHANEN:  Judge, I'm absolutely fine with the

17 order you just issued as to Rodriguez, but I do want to say

18 one thing about it.  Mr. Rodriguez's name appeared on our Rule

19 26 disclosure in August of 2023.  September went by, as did

20 October, November, December, January, February, March, and so

21 on, and we're going to have this with virtually every subpoena

22 that was issued in mid-September, many of which --

23    THE COURT:  Well, but that's not fair, though, is it?

24 They've been trying to serve the guy.  They talked to him on

25 the phone.  He even said he was going to appear and then,

1    bingo, he's ducking service.  I mean, I wish they'd have done

2    it earlier, too, Mr. Chanen, but the fact is he's a little

3    different because he doesn't want to sit.  He's avoiding

4    service.  Doesn't that make it a little different?

5           MR. CHANEN:  He's also -- he's also avoiding my

6    telephone calls, and I represent his cousin.  So, yeah, he's

7    clearly a problem witness, and I don't have any problem with

8    Your Honor's ruling.  I just wanted to make a broader point.

9    When we get to other people who were served in mid -- or they

10   were attempting to serve in mid-September, part of the problem

11   is that they waited 13 months to start this process and now

12   want to get it all done in two weeks.

13          Rodriguez is probably the worst example because he's

14   ducking them as he is ducking us.  However, I just wanted to

15   make the broader point that these are the kinds of problems

16   you run into when you wait till September 20th, which is when

17   the subpoena to (inaudible) first came out.

18          THE COURT:  Yes, I'm concerned about that, too, but

19   as you've probably seen, I've tried to be -- while strict

20   about enforcing deadlines, I've also erred a little bit on the

21   permissive side to make sure people get their discovery.  But

22   now we're kind of reaching a point where I'm feeling a little

23   less permissive about that.

24          So I'm not presaging how I'm going to rule if a month

25   from now, two months from now, six months from now, after

1  discovery has already closed but I've allowed the subpoena to

2  be served on Rodriguez, what we do then.  I'm not giving you a

3  forecast.  I want everybody to be heard at that time as to the

4  equities of that and the propriety of that at that point, and

5  the utility of it.  So that's what we're doing on Rodriguez.

6          Jose Mejias, this was set for today, but the

7  plaintiff couldn't make it.  Mr. Chanen, Mr. Olstein, as

8  plaintiff, are you agreed to doing Mejias sometime in October

9  or even November if we allowed that, given that this appears

10  to be a scheduling problem, otherwise, he would have been done

11  today, if I have that right?

12          MR. CHANEN:  Judge, we got a notice of deposition for

13  Mr. Mejias basically a week out.  I mean, I don't know the

14  precise date, but it was about, it was about the 19th through

15  the 26th, maybe a day or two before that.

16          THE COURT:  Okay.

17          MR. CHANEN:  And we then go to them and say that

18  Mr. Olstein and I are not available on that date.  So when you

19  say it was scheduled for today and that we somehow backed out,

20  we didn't back out.

21          THE COURT:  Okay.

22          MR. CHANEN:  We told them the minute, within a minute

23  of getting their notification that the 26th was not an

24  available date for us.

25          THE COURT:  All right.  Let me just stop you.

1         Mr. Grossich, when does Mejias get disclosed either

2    through a 26(a)(1) or otherwise as among your witnesses you

3    thought would have information?  When does he get disclosed?

4         MR. GROSSICH:  I believe he was disclosed in our

5    first supplemental which was probably in June or somewhere

6    thereabouts.

7         THE COURT:  Of this year?

8         MR. GROSSICH:  Yes.

9         THE COURT:  Okay.

10        MR. CHANEN:  It was August.  It was August.

11        THE COURT:  Well, hold on.  Hold on, Mr. Chanen.

12        Mr. Grossich, why doesn't he get served?  Why does

13    the notice take so long to go out?

14        MR. GROSSICH:  I will say, Your Honor, he is under

15    subpoena, so he has accepted service of the subpoena.  The

16    reason why we want Mr. Mejias's deposition is because of

17    certain things plaintiff said in his deposition about a prior

18    shooting.  So I alluded to this in one of my filings, but the

19    plaintiff pleaded guilty to a separate shooting that caused

20    him to be in prison for 15 -- or caused him to be sentenced to

21    15 years in IDOC custody.  So that would obviously overlap

22    with the time he's claiming he was wrongfully imprisoned in

23    this case.

24        And now, after pleading guilty, Mr. Cruz is saying

25    that what he pled guilty to didn't really happened, and this

1    gentleman, Mr. Mejias, is going to say:  No, I was the victim

2    of this shooting, and Mr. Cruz absolutely pointed a gun at me

3    and started pulling the trigger.

4            So, you know, we had our investigators go find

5    Mr. Mejias.  He confirmed that what's in the police reports is

6    true, and we want to depose him so we can get him on record

7    about that.

8            THE COURT:  All right.  Do you have any sense of

9    whether he's being difficult about appearing or whether you

10   would expect if you got agreement from the plaintiff on a date

11   to do this he would sit?  What can you tell me?

12           MR. GROSSICH:  He's been very amenable.  He doesn't

13   want to tell us his home address because I think he's kind of

14   afraid of the gang nature of this case and doesn't want people

15   to know where he lives, but he says he's perfectly willing to

16   sit for a Zoom deposition.  Actually, I spoke to him just a

17   few days ago and said that the deposition would not be going

18   forward on the 26th, and he just said:  Just let me know

19   another date and I'll make myself available.

20           THE COURT:  Okay.  This is a closer call for me

21   because, you know, you start to get to a point when, you know,

22   the scheduling of depositions and the service of subpoenas,

23   when they get backloaded, you know, even if it's because,

24   well, you didn't depose plaintiff until whatever, September

25   19th.

1     You know, I did say earlier that I didn't expect or I

2     didn't anticipate being very patient with last-minute

3     discovery requiring further extensions, and so that's kind of

4     Mr. Chanen's point:  It was all sort of too late.  We couldn't

5     even appear for that one because it was so late.

6     He's 404(b), Mr. Grossich, then?  It's some unrelated

7     other shooting, is that right?

8     MR. GROSSICH:  Well, I don't know.  I don't know if

9     that's exactly correct, Your Honor, because it has to do with

10    like mitigation of damages for one because plaintiff is

11    saying:  Well, I spent 28-and-three-quarter years wrongfully

12    imprisoned.

13    But he pleaded guilty to a different crime that would

14    have led him to spend 15 years in prison regardless, and this

15    guy is saying -- now Mr. Cruz is disavowing that plea of

16    guilty, saying:  Well, it never really happened.  I just did

17    it because of the circumstances I was in or what have you.

18    This guy, Mr. Mejias, is going to say:  No, it

19    absolutely happened.  He tried to shoot at me.

20    And I know also that in the criminal trial the judge

21    sentenced Mr. Cruz to 28 years or whatever -- I'm sorry -- 90

22    years because he said:  Mr. Cruz is a shooter.  This is not

23    the first time that he has shot at somebody, and I think in

24    order to protect society from this shooter, I've got to put

25    him in prison for 90 years.

1          And the reason he said he was a shooter is because of

2     this other incident involving Mr. Mejias.  So there's multiple

3     reasons why this is relevant to this case.  It goes to

4     damages.

5          THE COURT:  Okay.

6          MR. GROSSICH:  It goes to Cruz's credibility.  It

7     goes to other things as well.

8          THE COURT:  Maybe even his character.  You don't have

9     to answer that because it's not before me.

10         MR. GROSSICH:  Right.

11         THE COURT:  The whole admissibility thing I'm not

12    ruling on, and I view admissibility and discovery as two very

13    different things.  Even I think based on what you've told me,

14    there's not really now a motion to quash that deposition for

15    that reason, but it would face a really uphill climb, right?

16    Because I generally like people to be able to find out things

17    that they can use to say it's admissible or not, but that's

18    not before me.  So I really think with him it's a close call

19    for me, but I'm going to let you do it.  I'm going to say no

20    later than November 11.  Okay?  So that one I'm going to let

21    you do.

22         Let's go on to Maite Amborebrieta.  Who is she?

23    Who's seeking that deposition?  Ms. Gonzalez, is it you?

24         MS. GONZALEZ:  Yes, Your Honor.

25         THE COURT:  Okay.  So who is she?

```
 1              MS. GONZALEZ:  So Ms. Amborebrieta is a reporter whom
 2   Mr. Cruz was in communications with while he was incarcerated.
 3              THE COURT:  Mr. Cruz?  I'm sorry.  Maybe pull that
 4   mike a little closer.
 5              MS. GONZALEZ:  Sorry about that.
 6              THE COURT:  That's okay.
 7              MS. GONZALEZ:  She's a reporter whom Mr. Cruz was in
 8   communications with while he was incarcerated.
 9              THE COURT:  Okay.  This is one of the seven subpoenas
10   I let you serve late, right?
11              MS. GONZALEZ:  It's actually six subpoenas --
12              THE COURT:  Six, okay.
13              MS. GONZALEZ:  -- but yes, Your Honor.
14              THE COURT:  All right.  You know, the propriety of
15   those subpoenas wasn't before me.  It was only a motion to
16   quash based on the timing of the service.  I denied that
17   motion.  I let you go ahead and at least serve them after
18   August 31st or whatever it is, so I didn't look at the
19   subpoenas very closely.  What do you want from this reporter?
20   What kind of materials are you looking for?
21              MS. GONZALEZ:  So we are specifically looking for any
22   communications or documents related to Mr. Cruz.  We're
23   actually in contact with an attorney for Ms. Amborebrieta.  We
24   just spoke to her yesterday, and we're in the process of
25   scheduling a 37.2 related to the subpoena for documents.
```

```
 1              THE COURT:  Okay.  Who is it, by the way, the

 2    attorney, if you know?

 3              MS. GONZALEZ:  I can't remember off the top of my

 4    head, Your Honor. `

 5              MS. CHECKAI:  Her name is Amanda Leith (inaudible)

 6    from NBC legal, Your Honor.

 7              THE COURT:  Okay.  So my thought on this one is, you

 8    know, you saw what we're doing with Margaret Byrne.  What I'm

 9    going to do with regard to this is I'm going to -- I'm not

10    going to include Amborebrieta in -- well, no.  You know what?

11    To be consistent we're including Margaret Byrne in that.  We

12    just don't know if that discovery is going to be allowed or

13    not.  I'll include Amborebrieta in that, but it doesn't mean

14    that that's going to be granted and we need to resolve that.

15              So what I think I will need you to do is the same

16    thing I was having you do concerning Mr. Healey, which is to

17    let Amborebrieta's attorney know that, you know, I want to

18    give an opportunity for a hearing and/or agreed briefing.  So

19    can you incorporate that into what you tell me next week?  I

20    would like all that to be the same.  I would like any

21    response, reply, the briefing, that sort of thing, I would

22    like all of that to be on the same dates so we're all on the

23    same page.  Then if there's a hearing date you want to

24    propose, make it a date everybody can be there for.  Okay?

25              MS. GONZALEZ:  Okay.
```

1        THE COURT:  All right.  So in a way the grant as to

2    Amborebrieta is just not conclusive to whether the discovery

3    will happen.  But if it were happen, we would allow it to

4    happen before November 11.  Are you with me?

5        MS. GONZALEZ:  Yes.

6        THE COURT:  Okay.  Mr. Chanen, we haven't heard from

7    you on that, though.  You may have something to say about it,

8    so don't let me cut you out.  Anything you want to add?

9        MR. CHANEN:  Yeah, Judge.  Just for the record,

10   they've known about all of Cruz's communications for a very --

11   with a reporter in prison who's writing a story about wrongful

12   convictions for a very, very, very long time.

13       THE COURT:  Yes.

14       MR. CHANEN:  And the first -- literally it was

15   September, the 14th month of discovery, that they alerted us

16   that they're going after five reporters or producers of news

17   coverage.  Now they knew that the NBC legal counsel office

18   would assert the reporter's privilege, they knew Ms. Byrne

19   would assert the reporter's privilege, and Your Honor had

20   warned them two months ago:  If you're going to get this done,

21   you better take into account as well any motion practice that

22   might occur.

23       So from our perspective, Judge, given that they

24   started this process, it's not just six subpoenas, Judge, it's

25   11 subpoenas.  It's six document subpoenas and five deposition

1  subpoenas, some of which have been served, some have not been

2  served, some they're accusing the person of ducking service,

3  all these different things.  Now as far as I'm aware, there's

4  four lawyers involved representing four different -- three

5  different reporters and one woman who's not a reporter and

6  who's the mother of two other Guevara victims.  They're going

7  after her for the first time in September, even though

8  whatever it is they're trying to get from her they've known

9  about her for 14 months.

10         There just comes a point, Judge, where given that you

11  said September 27th was the close of fact discovery four

12  different times, once in May, once in August, twice in

13  September you've said September 27th is the cutoff, and

14  frankly, Judge, our position is -- and I want to be really

15  clear about it -- is anything that was noticed for the first

16  time in September that could not be completed by September

17  27th or maybe October 4th, there is no good cause that they've

18  established for waiting that long to start this whole process.

19         THE COURT:  Okay.

20         MR. CHANEN:  Now, it sounds like Your Honor rejected

21  that argument, and I can accept that Your Honor has rejected

22  that argument.  I wanted to put it on the record.  But this is

23  insane, the idea of looking in the face of the September 27th

24  cutoff and filing 11 subpoenas, the vast majority of which are

25  directed at reporters.  That to me is just -- if I were a

1   magistrate judge, I would not allow that.

2           THE COURT:  But you're not.

3           MR. CHANEN:  That is too --

4           THE COURT:  I'm the magistrate judge.  I hear you,

5   Mr. Chanen.  I hear you, but let me give you some reaction

6   just to cut this -- to keep this efficient.  So I thought a

7   lot about this since denying your motion to quash, and I've

8   kind of a little bit questioned myself about whether I should

9   have granted your motion to quash.  But that ship has sailed.

10  I granted it -- I denied it, rather, and I allowed the

11  subpoenas to be served.  I did not, though, in allowing them

12  to be served, I did not rule that the depositions could be

13  taken after September 27.  I didn't.  That ruling wasn't a

14  part of our order.

15          So I think the door is still open on that issue for

16  you to oppose those, but more importantly we know that

17  Mr. Healey is involved, somebody from NBC Universal is

18  involved, and there may be a couple of other lawyers involved.

19  There's going to be some substance brought to the Court's

20  attention about the whole idea of subpoenaing reporters for

21  their notes, for their outtakes, for their sources and means,

22  and I think it presents a real question about whether those or

23  that kind of discovery can even occur.

24          So I guess I'm looking back to when I was a law clerk

25  and I worked for John F. Grady.  Do you remember him, Mr.

1    Chanen?

2         MR. CHANEN:  I do remember Judge Grady very, very

3    well.

4         THE COURT:  Mr. Chanen was also a law clerk for Judge

5    Grady before me, I guess, or after.  I don't remember.

6         Anyway, I'm clerking for Judge Grady in 1994.  John

7    Wayne Gacy is on death row.  He's about to be executed.  He

8    files a last-minute petition with the Seventh Circuit and

9    Judge Grady to stop the execution because the manner and

10   method was cruel and unusual, that it was derived from the

11   Nazis, so on and so forth.  That's actually an argument made

12   more frequently in recent years.

13        But Judge Grady thought it was probably procedurally

14   defaulted because it was brought too late, and he made a

15   decision that said:  You know, it's life or death.  I'm not

16   going to deny this because it's procedurally defaulted.  I'll

17   get to the substance of it because it's important, and I'll

18   decide it based on the substance.

19        I'm kind of thinking the same thing here.  I think

20   it's an important substantive issue of what you can get from

21   reporters, how proper it is to have in defendant's playbook:

22   We're going to slap a bunch of subpoenas on reporters.  We're

23   going to make them hire lawyers.  We're going to have them

24   incur expense.

25        How much does that burden the exercise of the right

1    of access to documents and the exercise to the First

2    Amendment?  Does it?  Does it?  So I think it's a really

3    interesting question and an important one, so I'm going to get

4    to that question.  If I get to that question and the answer is

5    you don't get the discovery, we don't even need to worry about

6    when it takes place in that the procedural question of timing

7    becomes very secondary.  I think the substantive question is

8    more important.

9            What happens in the Gacy case?  Judge Grady reaches

10   the merits and denies Gacy's petition, not because it was a

11   successive petition but on its merits, and it goes to the

12   Seventh Circuit where 17 boxes of documents are presented to

13   the Seventh Circuit.  The opinion that was entered then was:

14   Judge Grady, you were wrong.  This was procedurally defaulted,

15   and you should never have reached the merits.  And if you

16   think we're going to stay this execution because we have to

17   take time to read your 17 boxes, think again.

18           Gacy got the needle that night.  Anyway, long

19   background story, but I want to give you the sense a little

20   bit of where I'm coming from because as, you know, I guess

21   Benton has written and Frank has written and Posner has

22   written, sometimes judicial decisions become a product of

23   experience, a product of the judge's experience.

24           So I think we should reach this issue because I think

25   it's important, and it seems like it's teed up based on the

```
 1   Healey objections that you filed in your motion to compel
 2   Margaret Byrne, Ms. Gonzalez.
 3           So Amborebrieta, that one is granted, but it's a
 4   provisional grant, right?  We're leaving open whether or not
 5   that dep even goes forward.  So we're really, we're really not
 6   ruling on that, and I guess that's the same ruling as to
 7   Byrne.  If I said otherwise earlier, I take it back.  We're
 8   withholding what we're going to do after the cutoff on Byrne
 9   and Amborebrieta until these other issues can get raised.  So
10   as to Byrne, same ruling, we're waiting.
11           Robert Fischer.  Ms. Gonzalez, he doesn't go by
12   Bobby, does he?
13           MS. GONZALEZ:  Not that I am aware of, Your Honor.
14           THE COURT:  It would be darned interesting getting
15   him in a chess game.
16     (Laughter.)
17           THE COURT:  So he's an attorney apparently, right?
18           MS. GONZALEZ:  That's correct.
19           THE COURT:  So what's going on with him?  He was on
20   noticed before September 27, but schedules posed an issue.  It
21   sounds like we're a little bit into Jose Mejias's territory.
22           MS. GONZALEZ:  Yes, Your Honor.  So we have been in
23   communication with Mr. Fischer.  He recently retained an
24   attorney.  We originally scheduled his deposition to take
25   place on September 23rd, and due to a conflict in his schedule
```

1    he wasn't able to appear on that date.  So we asked him for

2    his October availability.  His attorney let us know that they

3    are both very limited in October.

4           They've only provided us -- they originally provided

5    us with two days, October 4th and October 24th, and since then

6    they are now indicating that they're only available on October

7    4th, which we understand poses a conflict with Officer

8    Fleming's deposition.

9           THE COURT:  All right.  Well, it's very much like

10   Mejias.  I mean, we're here because we're so late in the

11   process and there's scheduling issues.  I said I'd let you do

12   Mejias.  I could either say I'll let you do Mejias and

13   Fletcher to be consistent, or I could say you have to pick one

14   of those to keep a lid on this.  That strikes me as a little

15   arbitrary, so I'll let you do Fischer by November 11.

16          Mr. Chanen, tell me.  React to that.  I gather your

17   reaction is the same as it was with respect to Mr. Mejias and

18   maybe telling me a little bit of, you know:  Here we go.  You

19   know, when you open the door to Mejias, you're opening the

20   floodgates.

21          What do you say?

22          MR. CHANEN:  Well, Judge, I mean, Mr. Fischer, Rob

23   Fischer is a lawyer for one of the material witnesses, Pedro

24   Jaramillo.  He was Mr. Jaramillo's lawyer in 1993.  Then when

25   we flew down to Miami and took -- they took -- well, when both

 1 | sides took Mr. Jaramillo's deposition, Mr. Fischer, 31 years
 2 | later, ended up representing Mr. Jaramillo again.  Anything he
 3 | said to Mr. Jaramillo in the last 31 years is privileged, and
 4 | while maybe on the margin they might ask him one or two
 5 | questions about did he speak to Mr. Jaramillo's employer or
 6 | did he speak to Guevara, you know, maybe at the margins there
 7 | might be something relevant, but 99 percent of the deposition
 8 | is going to have objections on privilege grounds.  Then where
 9 | are we going to go?  Then are they going to file a motion to
10 | compel and ask can that November 11th become January 11th?
11 |        MR. GROSSICH:  May I respond to that, Your Honor?
12 | I'm sorry.
13 |        THE COURT:  You may.  So hearing that there's a
14 | little more to it because Fischer was Jaramillo's lawyer, can
15 | either of you, Mr. Grossich or Ms. Gonzalez, tell me why
16 | wouldn't the information that would come up in a Fischer
17 | deposition be heavily either subject to privilege or subject
18 | to an argument that it is.  Why wouldn't that be the case?
19 |        MR. GROSSICH:  Well, it's my understanding that Pedro
20 | Jaramillo never actually spoke with Mr. Fischer because
21 | Mr. Fischer doesn't speak Spanish, but the things we want to
22 | ask about are not the communications.  It's really factual.
23 | So there's a Brady claim in this case that the police officers
24 | did not disclose that Mr. Jaramillo had said certain things to
25 | them, and we asked ask questions at Mr. Jaramillo's deposition

1    which I attended in person like, well, he said he went to

2    court.  Mr. Jaramillo said he went to court in this case.  We

3    asked him:  Did you speak with the state's attorney, or did

4    you speak with the defense attorney or any attorney in court?

5           Then he kind of -- I can't remember his exact

6    testimony.  It wasn't very clear, but I do remember

7    Mr. Fischer sitting there next to me and like shaking his head

8    or making comments about Mr. Jaramillo's testimony like:  Oh,

9    that's not what happened -- or kind of indicating that

10   Mr. Jaramillo was misremembering things.

11          Obviously it's important if Mr. Jaramillo was in

12   court and spoke to the defense attorney or spoke to the

13   state's attorney or if Mr. Fischer spoke to either of those

14   attorneys on Mr. Jaramillo's behalf because then there would

15   be no Brady claim.  Then the parties would know -- then

16   counsel would know that Mr. Jaramillo was a witness and what

17   he would say, and the claim would go away.  So that's what

18   we're going to ask about, and that's why we want Mr. Fischer.

19          THE COURT:  Boy, you know, Mejias was a close call.

20   Fletcher is a similarly a close call.  You persuaded me on

21   Mejias, but you didn't persuade me on Fletcher.  I think it's

22   pretty marginal.  It's too marginal, and there's too great a

23   risk that privilege issues will get involved, will have to be

24   litigated, and I'm actually going to say no, that one can't be

25   done after September 27.  So that one I'm going to not let you

1      do.

2              MR. GROSSICH:  And, Your Honor, you're referring to

3      Fischer, correct?

4              THE COURT:  Did I say Fletcher?

5              MR. GROSSICH:  Yes, Your Honor.

6              THE COURT:  It's because I circled his name in my

7      notes in ink, and it was the same pen, by the way, that I used

8      that went through the middle of Fisher's name and made it look

9      like an L.  I'm sorry, so Fischer, yes, Fischer, if he's not

10     done by tomorrow, you're not doing him.

11             MR. GROSSICH:  So just to be clear, Your Honor, I

12     understand your ruling, but if we were to ask Mr. Fischer, you

13     know, did he speak with a state's attorney on behalf of Pedro

14     Jaramillo without going into the substance of what was said, I

15     mean, there's no privilege issue there, so we would not be

16     able to ask him those questions?

17             THE COURT:  Well, I'm saying I don't know how many

18     privilege issues would arise.  I'd find it hard to believe

19     that there would be somehow very, very few.  And even if you

20     limited it to the conversation you're having, I'm seeing that

21     as very, very, very marginal as compared to everything else,

22     not as persuasive as that Jose Cruz shot this other guy,

23     Mejias.  So it's, it's too far at the penumbra for me to say

24     I'm going to let you do that now.

25             I also think with that one if he were that important

1   and you've known about him for that long, he was Jaramillo's

2   lawyer, he's another guy that I know we've been doing a lot of

3   things for 15 months, but we shouldn't be up against the wall

4   like we are now.  The fact that we're up against the wall made

5   Mejias a close case.  He fell to the left side of the line.

6   Fischer fell to the right.  So that's the ruling.

7          Foxx, we've said that we'll let that take place if it

8   is allowed to take place.  So it's the same thing with Foxx.

9          Carola Rogala, who's doing this?  Mr. Grossich, are

10  you the one looking for Rogala, or is it Ms. Gonzalez or

11  Ms. Rosen?

12         MR. GROSSICH:  I believe it's Guevara's witness, is

13  that correct?

14         MS. GONZALEZ:  Yes, Your Honor, we issued that

15  subpoena.

16         THE COURT:  Okay.  So let me ask you this.  Do you

17  expect similar arguments to be made on Rogala's behalf as are

18  being made on Foxx's behalf?  I've not seen a motion to quash

19  that subpoena.  What's going on?

20         MS. GONZALEZ:  No, Your Honor.  So I believe

21  Ms. Rogala was the state's attorney assigned to the

22  post-conviction proceedings.  We originally noticed that

23  deposition up for early August.  We just had several

24  scheduling conflicts from August until September.  We now have

25  dates for her October availability.  We asked all of the

1  attorneys if they were available for certain dates, and

2  Mr. Chanen indicated that he would be objecting.

3          THE COURT:  Okay.  What do we want from Rogala?

4          MR. GROSSICH:  What we want from Rogala, she has

5  knowledge as to why the state's attorney dropped their

6  opposition to Mr. Cruz's successive post-conviction petition.

7  So I think the way that this process went is Ms. Foxx met with

8  Jose Cruz and told him:  Don't worry.  You're coming home

9  soon.

10          Mr. Swygert wrote a letter to the state's attorneys

11  who were opposing the post-conviction petition and said:  Hey,

12  your boss just said that Mr. Cruz is coming home soon, so why

13  are you guys still going to court and opposing my petition?

14          Then those state's attorneys said:  Okay.  We won't

15  oppose it anymore.

16          And we want to figure out --

17          THE COURT:  Rogala said that --

18          MR. GROSSICH:  Yeah.

19          THE COURT:  -- upon being told that Foxx had made a

20  decision.

21          MR. GROSSICH:  That is my understanding.  I don't

22  know if I have the entire --

23          THE COURT:  Isn't Rogala then kind of following

24  marching orders that get issued by Foxx?

25          MR. GROSSICH:  That's what we believe, but we don't

1    have any testimony to really get that in the record.

2              THE COURT:  Because you haven't deposed Foxx yet.

3              MR. GROSSICH:  We haven't deposed Foxx, and we

4    haven't deposed Rogala.  So we don't really know.  That's our

5    supposition, but we don't know.

6              THE COURT:  Rogala, a member of the same agency, just

7    a line assistant -- well, I didn't mean to say that

8    derisively, "just a line assistant," an important member of

9    the office, but the same agency and same kind of deliberative

10   process issues if they're raised are going to come up, aren't

11   they?

12             MR. GROSSICH:  I believe so, Your Honor, yes.

13             THE COURT:  Okay.  So this is pretty easy for me.

14   Since you want to depose the sitting state's attorney about

15   these issues, and we have to make a determination still about

16   whether you'll be allowed to do that, I'm really seeing Rogala

17   as farther, even farther out on the penumbra than Fischer is

18   because I can't imagine -- I appreciate sometimes we depose

19   multiple witnesses on a particular issue, but if Foxx is going

20   to tell you why the state dropped its opposition to that if

21   she's allowed to testify, Rogala becomes extraneous.  She

22   becomes cumulative.  To the extent she's not, it's potentially

23   minimally to the extent she's not, and we're too late.  She's

24   a close call, falling on the right side of the line with

25   Fischer.

 1          Ms. Rosen, you want to say something.  Please go

 2     ahead.

 3          MS. ROSEN:  Yes, Judge.  So with respect to your

 4     rationale that you just articulated, if the Court decides that

 5     Foxx does not have to sit for a deposition, and the issues

 6     related to Foxx are different than the issues related to

 7     Rogala, I assume that the analysis with respect to a sitting

 8     state's attorney -- in fact, I know the analysis with respect

 9     to whether or not a court will compel the deposition of a

10     sitting state's attorney is different than a line assistant,

11     right?

12          THE COURT:  Okay.

13          MS. ROSEN:  So the apex doctrine doesn't even come

14     into play, and all these other issues do not come into play.

15          THE COURT:  Yes, I'm not even worried about the apex

16     doctrine.

17          MS. ROSEN:  Okay.

18          THE COURT:  If somebody at the top of an organization

19     has relevant information, generally my application of the apex

20     doctrine usually has been to allow that deposition to take

21     place.  There's other issues that are going on here that we're

22     going to rule on.  I don't know how I'm going to rule on them,

23     but I think I'm hearing what you're saying; that is, if after

24     litigation of the Foxx motion to compel is completed any

25     defendant feels like Rogala is somehow important, if there's

1    some different issue that doesn't get addressed and you want

2    to file a motion on it, I'll let you do that if that's what

3    you're looking for.

4           MR. GROSSICH:  I will say --

5           THE COURT:  But right now the ruling is you can't do

6    her unless you can do her before tomorrow.

7           MR. GROSSICH:  I will just say one other thing, Your

8    Honor, just to make a record if I may.

9           THE COURT:  Yes, yes.

10          MR. GROSSICH:  With regard to Rogala, the way this is

11   going to play out -- and I just did a trial on a case like

12   this -- we're going to get to trial, and the plaintiff is

13   going to stand up and say:  Mr. Cruz was exonerated.  His

14   post-conviction petition was granted and the state's attorney

15   decided not to retry him, and now he has a certificate of

16   innocence so he is an innocent man.

17         But the reason we want Rogala's deposition is because

18   that's not really how these things happened.  Not to get

19   political, but there was some behind-the-scenes machinations

20   that caused this all to happen, that caused the state's

21   attorney to not oppose the post-conviction petition, that

22   caused Mr. Cruz to get a certificate of innocence, and it

23   really doesn't have to do with Cruz's innocence.  It has to do

24   with these things that happened behind the scenes at the

25   state's attorney's office.

1         And frankly, Your Honor, that's why it's important

2   for us to get Ms. Rogala's deposition, so we could find out,

3   well, why was he really -- why did this really happen as

4   opposed to, you know, plaintiff's counsel getting up at trial

5   and saying:  Well, obviously Mr. Cruz is innocent because the

6   state's attorneys dropped all this.

7         Well, that's not what happened, and we want to get to

8   the heart of that.

9         THE COURT:  So that's an interesting issue, but I

10  think it needs to wait until after we rule on the Foxx motion

11  to compel because I think I sense where you're going with that

12  is something similar to stuff that's happening in state's

13  attorney's offices all over the country.  Somebody gets

14  elected state's attorney and wants to do a bunch of things, a

15  bunch of line assistants don't like it and might hold a very

16  different opinion, might hold a very different view of the

17  facts than what the state's attorney said, and that's -- you

18  mentioned it's tied up in politics.  You bet it is, but I

19  don't know what these people's stories are.

20        I think my ruling is a good ruling.  You don't get to

21  do her now.  If you think you've got a basis to do her later,

22  you come in on a motion and we'll figure it out, and then I'm

23  going to want to hear specifics.  You didn't really say it was

24  a conspiracy theory, but it kind of sounds a lot like one, and

25  it's one I've heard in reading stories in the media now for

1    several years about the wrongful conviction movement.  If you

2    want to put that in a motion and back it up, you be my guest.

3    So that's what we're doing on Rogala.

4            Plaintiff, we'll wait for you to file a motion on

5    whether you get to depose him again.  So his deposition

6    happened already, and extension of the cutoff as to him is not

7    really before us.

8            Responding to the second set of interrogatories,

9    who's responding to that?  Is it Cruz responding, or it's the

10   plaintiff responding to Cruz's second set?

11           MS. ROSEN:  I believe it's the requests to admit.

12           MR. OLSTEIN:  Yeah, requests to admit.

13           THE COURT:  Yes, requests to admit.  I thought there

14   was agreement on this.  Is there not?

15           MS. ROSEN:  There is not.

16           THE COURT:  Okay.

17           MS. ROSEN:  So, Judge, there were -- plaintiff issued

18   a first set of requests to admit directed at the City of

19   Chicago long ago.

20           THE COURT:  Okay.

21           MS. ROSEN:  They objected to an extension of time for

22   the city to answer those RTAs which the Court granted -- which

23   the Court overruled his objection.  So we got the extra two

24   weeks.  We answered those.  At the time that we needed to --

25   that we needed to reschedule Officer Fleming's deposition

1  because of the work conflict that came up September 11th,

2  Mr. Chanen agreed to the October 4th date but only if we

3  agreed to allow him to issue new requests to admit against the

4  City of Chicago.

5         We did not think that that was a fair trade based on

6  the scenario.  He's issued -- plaintiff's counsel has issued

7  those requests to admit despite the fact that they could not

8  have been answered within the discovery cutoff period.

9         THE COURT:  Yes.  When could you answer them now if

10  you had to?

11         MS. ROSEN:  Judge, they are mostly duplicative of and

12  follow up to the first set of requests to admit --

13         THE COURT:  Okay.

14         MS. ROSEN:  -- that were particularly onerous and

15  difficult.

16         THE COURT:  May the court reporter read back the

17  question?

18         MS. ROSEN:  Sure, Judge, I will answer your question.

19  Judge, they are complicated.  They reference events without

20  citation to any documents or exhibits related to Mayor Daley

21  and the Burge era, and for us to dig through records to try

22  and answer these would take a lot.  It took the other -- it

23  took us six weeks to answer the other ones with plaintiff

24  identifying exhibits.  I don't believe plaintiff has

25  identified any exhibits with respect to this set.

 1          THE COURT:  Yes.

 2          MS. ROSEN:  So we would need exhibits because he's

 3     pulling -- Mr. Chanen, I assume, is the author of these, and

 4     he's pulling information from, obviously, documents that he

 5     has or from the Internet.  It's referencing in ways summaries

 6     of statements made by Mayor Daley back, you know, 30 years

 7     ago, things like that.  So --

 8          THE COURT:  Not to cut you short, but I actually have

 9     to go to an event that begins in 15 minutes in a place called

10     Oak Forest.  I'm being asked to swear someone in, and they

11     know I might be a little late but I have to go there.  But I

12     also have a belief about this one, Ms. Rosen.  I think if I'm

13     going to allow Guevara to subpoena five or six reporters

14     because it's a little bit late and if I'm going to really push

15     the envelope on whether we can get all that done on the

16     procedural side, I don't know why I wouldn't let plaintiff get

17     his responses to these RFAs from you.

18          That said -- and I'm not trying to tell anyone how to

19     practice law -- that said, you didn't file a protective order

20     motion on that.  If you did that now, the optics obviously are

21     not great.  It's awfully late to be doing that.  It's going to

22     impose further delay.

23          But my preference would be, you know, I will allow

24     this to take place before November 11.  So I'm ruling the same

25     way I did as to Mejias on this one and allowing the Guevara

1    subpoenas on the reporters a little bit out of reciprocity.

2    But you had more.

3              MS. ROSEN:  I do.  I just want to make one point

4    about a motion for protective order.

5              THE COURT:  Yes.

6              MS. ROSEN:  They weren't proper.  From our point of

7    view, they weren't properly issued because they were too late.

8    They were issued too late to be complied with within the time

9    period of this discovery cutoff when plaintiff was saying all

10   along he was never agreeing to a discovery cutoff.  He was

11   simply going to agree to Officer Fleming if we agreed to this.

12             THE COURT:  Yes.

13             MS. ROSEN:  So that's why we didn't already file a

14   motion for protective order.  I understand the Court's ruling.

15             THE COURT:  Okay.

16             MS. ROSEN:  I would like to raise one additional

17   point.

18             THE COURT:  Sure.

19             MS. ROSEN:  Plaintiff has taken the position that he

20   would not answer contention interrogatories from any -- from

21   the city and from, I believe, some of the defendant officers

22   until discovery was closed based on a ruling the Court made

23   earlier with respect to --

24             THE COURT:  Yes, I don't like them before discovery

25   is closed.  Is there a dispute as to whether or not he would

1  do that?

2          MS. ROSEN:  Well, what he has told us now is that --

3  what he told us when the discovery cutoff was September 27th

4  was that he would answer them October 4th.  We would like them

5  answered on October 4th because we don't view what the Court

6  is doing here as a global extension of the discovery cutoff.

7  It is simply to allow certain things to go forward.  So we

8  would like the answer October 4th.

9          THE COURT:  November 11, does that really put you in

10  a terrible position?  That's the date you all were looking for

11  for the extension.  What if I said he does it November 11.  So

12  by then, is that okay?

13          MS. ROSEN:  Provided that the defendants then have an

14  opportunity post-November 11th to challenge.

15          THE COURT:  You'll have that.  You'll have that.

16          MS. ROSEN:  Fine.

17          THE COURT:  That's fair, you know.  And remember,

18  they're requests for admission, you know, so usually those are

19  yes or no or they're whatever the objection is.

20          MS. ROSEN:  Right.  That's the -- I'm talking about

21  plaintiff's contention interrogatories, right?

22          THE COURT:  Oh, I'm sorry.  I'm mixed up.  You're

23  right.

24          MS. ROSEN:  Yeah.

25          THE COURT:  There's so much going on.  So, right,

1    they're not just yes or no.  They're interrogatories.  So

2    anyway, they're going to be required to respond by November

3    11.  Is there any issue with that, Mr. Olstein or Mr. Chanen?

4          MR. CHANEN:  No, no, Your Honor.  November 11th is an

5    appropriate date.

6          THE COURT:  Okay.

7          MR. CHANEN:  And I assume -- well, that's assuming

8    that all discovery is over on November 11th.

9          THE COURT:  That is the assumption, and that was my

10   assumption about September 27, but I knew there'd be some

11   issues and I wanted to be fair about working through them.

12   Hopefully, not everybody got everything they wanted, and some

13   probably got less than what they wanted.  That's just how

14   things are.

15         So I've got to go to Oak Forest, but I guess the

16   final note would be, Ms. Gonzalez, we talked about third party

17   Byrne.  We talked about third party Maite, and her last name

18   now escapes me.  But it came up when Mr. Chanen was talking

19   that there's additional reporters.  I didn't really see them

20   on the list.  There's some film maker?  In other words,

21   there's additional people, but they weren't, it appears to me,

22   a part of this motion to have those done after tomorrow.  What

23   am I missing?

24         MS. GONZALEZ:  So we issued six subpoenas for

25   documents in total.  Only two of those individuals received

1    notices of deposition, but we issued notices of deposition for

2    two, which were Margaret Byrne and Maite Amborebrieta.  The

3    others are simply seeking communications and documents related

4    to Mr. Cruz.

5           THE COURT:  Okay.  It's raising just serious issues

6    in terms of what reporters have to turn over, so I think what

7    we ought to do is this.  If you're in touch with lawyers for

8    any of these other people who got subpoenas served on them,

9    coordinate and see if they want to brief it, see if they want

10   to appear, then same day, same briefing schedule.  All

11   reporters who wish to oppose any of this, they're going to be

12   free to join briefs filed by others if they wish to save

13   money.  That's fine.

14          MS. GONZALEZ:  Okay.

15          THE COURT:  But I'd like all that in front of the

16   Court really as soon as possible.  But confer with Mr. Healey

17   and with other attorneys and see what you work out there, and

18   let me know next week what we're doing because the ruling is

19   similar as to that.  We'll figure out what, if any,

20   depositions happen once we figured out that as a matter of law

21   they can happen, and that includes production of documents.

22          Anything else on any of that or anything from

23   defendants?

24          MS. GONZALEZ:  No, nothing from me, Your Honor.

25          THE COURT:  Okay.  Plaintiff?

```
 1              MR. OLSTEIN:  Nothing further from me.

 2              MR. CHANEN:  Your Honor?

 3              MR. OLSTEIN:  Oh.

 4              MR. CHANEN:  Your Honor?

 5              THE COURT:  Yes.

 6              MR. CHANEN:  Yeah.  I'm very sorry.  I was too quick

 7     to say November 11 for everything is all fine.  I forgot about

 8     the trial --

 9              THE COURT:  The trial.

10              MR. CHANEN:  -- (inaudible) the next day.  So what

11     I'd like, Judge, is to say October 30.  So not give them 45

12     days, give them 34 days or 36 days.

13              THE COURT:  Well, I'm not going to give them fewer

14     days because one of the plaintiff's counsel has a trial.  How

15     long will the trial last, Mr. Olstein?

16              MR. OLSTEIN:  We're both trying a case, and it's

17     for --

18              THE COURT:  How long?

19              MR. OLSTEIN:  -- a full week.

20              THE COURT:  A full week.

21              MR. CHANEN:  November 12th, November 12th through

22     November 20th.

23              THE COURT:  I don't like this at all because I don't

24     like people having to do things when they're on trial, but I

25     want to make it -- I think it's still plenty of time,
```

1    Mr. Chanen.  Certainly you think if we made it October 30th or

2    31st it would be enough time.  So November 30, November 30 is

3    the date now for this limited cutoff, and I'm just doing that

4    in my own discretion to manage things.  I understand how

5    difficult trial schedules can be, and I'm not comfortable

6    cutting it shorter before November 11.  So that's what we'll

7    do there.  I appreciate you reminding me of that, Mr. Chanen,

8    because I did see the filing that came in on that issue.

9            So anything else that you wanted to add, Mr. Chanen?

10           MR. CHANEN:  No, but thank you.  Thank you very much,

11   Your Honor.

12           THE COURT:  Okay.  Thanks, everybody.  Have a nice

13   weekend.

14           MS. ROSEN:  Thank you, Your Honor.

15           MR. GROSSICH:  Thank you, Your Honor.

16     (Proceedings concluded.)

17                  C E R T I F I C A T E

18      I, Patrick J. Mullen, do hereby certify the foregoing
     is an accurate transcript produced from an audio recording of
19   the proceedings had in the above-entitled case before the
     Honorable GABRIEL A. FUENTES, one of the magistrate judges of
20   said court, at Chicago, Illinois, on September 26, 2024

21                          /s/ Patrick J. Mullen
                            Official Court Reporter
22                          United States District Court
                            Northern District of Illinois
23                          Eastern Division

24

25