UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE CRUZ,                                        )
                                                  )   Case No. 23 C 4268
        Plaintiff,                                )
                                                  )   District Judge Georgia N. Alexakis
        v.                                        )
                                                  )   Magistrate Judge Gabriel A. Fuentes
REYNALDO GUEVARA, et al.,                          )
                                                  )
        Defendants.                               )

## MEMORANDUM OPINION AND ORDER

In this matter before the magistrate judge on a referral including discovery supervision (D.E. 49), Defendant Reynaldo Guevara has moved to compel ("Motion to Compel"; D.E. 246) third-party journalist and filmmaker Margaret Byrne ("Byrne") to comply with a document subpoena for materials including her notes, communications, memoranda, audio and video "outtakes," and metadata apparently showing her modification and/or "syncing" of audio and video recordings related to Plaintiff Jose Cruz and an as-yet-unreleased and unpublished documentary film Byrne is producing about Cook County wrongful convictions involving Defendant Guevara. The Court has considered Byrne's written response ("Resp." D.E. 282), as well as Guevara's reply in support of his Motion to Compel ("Reply"; D.E. 292). The Court decides the Motion to Compel within the broad discretion afforded to magistrate judges to manage discovery and to promote a just, speedy and inexpensive determination of the matter. *Jones v. City of Elkhorn, Ind.*, 737 F.3d 1107, 1115 (7th Cir. 2013); Fed. R. Civ. P. 1.

### BACKGROUND

Plaintiff's lawsuit asserts that Defendant Guevara, a former Chicago Police Department detective, and seven other former police detectives (including one who is deceased), a police

sergeant, a now former assistant state's attorney, and the City of Chicago ("the City") caused Plaintiff to be convicted wrongfully of murder and attempted murder in 1996 in connection with an October 1993 shooting in which Plaintiff says he was not involved.  First Amended Complaint ("First Am. Cmplt."; D.E. 44), passim.[1]  Plaintiff's claims stem from his arrest, prosecution and convictions in that case and assert that various of the Defendants including Guevara fabricated evidence (including by causing a witness to implicate Plaintiff falsely as one of the shooters in the October 1993 incident), suppressed exculpatory evidence, fabricated police reports, and deliberately failed to investigate the shooting so that the actual shooters could be identified.  *Id.* ¶ 3.  Plaintiff alleges that as a result of his wrongful conviction, he spent more than 28 years in prison as an innocent person.  *Id.* ¶¶ 1-3.  Plaintiff alleges that Defendants conspired to deprive him of his federal constitutional rights and failed to intervene to protect those rights; he asserts counts for malicious prosecution, intentional infliction of emotional distress, willful and wanton conduct, and civil conspiracy against Guevara and the seven other former police officer defendants.  He also has made a claim of unconstitutional policies and practices against the City under *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658 (1978).

In many respects, Defendant Guevara is at the center of Plaintiff's allegations.  First Am. Complt. ¶ 3.  Plaintiff alleges that "Guevara, together with other Area 5 officers and supervisors, including the Defendant Officers in this case, framed dozens of innocent men and women for crimes they did not commit, over the span of at least two decades." *Id.* ¶ 134.  Plaintiff has alleged that at least 38 persons "have had their convictions dismissed (or were acquitted) because of

---

[1] The district court dismissed certain, but not all, of Plaintiff's claims against the former prosecutor, Defendant Edward Maloney, on November 12, 2024. (D.E. 309.)

Defendant Guevara's misconduct." *Id.* ¶ 135.[2]  As of a year ago, Cruz was one of at least 20 plaintiffs who had filed federal civil rights lawsuits in this district against Guevara.[3]  Defendant City of Chicago's Motion to Bifurcate *Monell* Claim and Stay *Monell* Discovery ("Bifurcation Motion"; D.E. 72) at 5 & n.1.  In the past year, according to the Court's review of public dockets in this district, Guevara was named as a defendant in six more federal civil rights lawsuits alleging wrongful convictions.[4]  The wrongful conviction plaintiffs' bar currently is alleging that the number of persons exonerated as a result of Guevara's alleged misconduct now stands at 46.[5]

The extent of wrongful conviction allegations involving Guevara has generated a fair degree of public interest in the cases and their outcomes.  *See, e.g.,* A.D. Quig, "Cook County commissioners advance settlements tied to disgraced Chicago Detective Reynaldo Guevara,"

---

[2] Defendant Guevara's pleaded answer to this allegation in the First Amended Complaint was to assert his Fifth Amendment right against self-incrimination.  Defendant Reynaldo Guevara's Answer to Plaintiff's First Amended Complaint (D.E. 58) at 33.

[3] The lawsuits listed by Defendants on October 11, 2023 in a filing in this case are, in addition to the instant case:  *Rodriguez v. Guevara*, No. 22 C 6141; *Gonzalez v. Guevara*, No. 22 C 6496; *Flores v. Guevara*, No. 23 C 1736; *Hernandez et al. v. Guevara*, No. 23 C 1737; *Lugo v. Guevara*, No. 23 C 1738; *Davilla v. Guevara*, No. 23 C 1739; *Abrego v. Guevara*, No. 23 C 1740; *Martinez v. Guevara*, 23 C 1741; *Gecht v. Guevara*, 23 C 1742; *Rivera v. Guevara*, No. 23 C 1743; *Mendoza v. City of Chicago*, No. 23 C 2441; *Diaz v. Guevara*, No. 23 C 2575; *Munoz v. Guevara*, 23 C 3210; *Kwil v. Guevara*, No. 23 C 4279; *Mulero v. Guevara*, No. 23 C 4795; *Nelson Gonzalez v. Guevara*, No. 23 C 14281; *Cain v. Guevara*, No. 23 C 14282; *Andino v. Guevara*, No. 23 C 14283; and *Santiago v. Guevara*, No 23 C 14284.  Bifurcation Motion at 5 n.1.

[4] The six Guevara lawsuits noted by the Court on its review of public dockets since October 11, 2023, are: *Ruben Hernandez v. Guevara*, No. 23 C 15375; *Tinajero v. City of Chicago*, No. 24 C 1598; *Kelly v. Guevara*, No. 24 C 5354; *Robinson v. Guevara*, No. 24 C 5954; *Soto v. Foster*, No. 24 C 10869; and *Ortiz v. Guevara*, No. 24 C 11057.

[5] *See Ortiz v. Guevara*, No. 24 C 11057, Complaint (D.E. 1) ¶ 125 (N.D. Ill. Oct. 28, 2024) ("They are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Arturo DeLeon-Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, Robert Bouto, Thomas Sierra, Geraldo Iglesias, Demetrius Johnson, David Gecht, Richard Kwil, Ruben Hernandez, Juan Hernandez, Rosendo Hernandez, Ray Munoz, David Lugo, Carlos Andino, Daniel Rodriguez, Jaime Rios, Jose Cruz, Marilyn Mulero, Nelson Gonzalez, Johnny Flores, Adolfo Rosario, Ruby Abrego, Jeremiah Cain, Edwin Davila, Alfredo Gonzalez, Gamalier Rivera, Madeline Mendoza, John Martinez, Jose Tinajero, Thomas Kelly, Louis Robinson, Oscar Soto, and Plaintiff Edwin Ortiz.").

*Chicago Tribune* (Oct. 24, 2024) (https://www.chicagotribune.com/2024/10/23/cook-county-commissioners-advance-settlements-tied-to-disgraced-chicago-detective-guevara/). Journalists with an interest in the allegations involving Guevara include the third-party subpoena respondent on the instant Motion to Compel, an independent filmmaker named Margaret Byrne. Byrne is the founder, director, producer, and cinematographer at Beti Films, and she is its only full-time employee. Declaration of Margaret Byrne ("Byrne Decl."; D.E. 282-1) ¶ 5. Byrne is currently directing a film entitled *To Catch a Case* (apparently also known as "Corruption Capital"), a six-year project she describes as "a documentary feature focused on the post-conviction process in Cook County." *Id.* ¶¶ 2, 6. Byrne states that the film is not about Plaintiff's case exclusively, and that Plaintiff's case "may or may not be discussed at all in the [f]ilm." *Id.* ¶ 3. Byrne says the film "follow[s] retired detective Bill Dorsch's quest to uncover wrongful murder convictions connected to" Guevara. *Id.* ¶ 3; Motion to Compel at 3. With the film now in "post-production," Byrne says she continues to engage in interviews, other reporting activities, and ongoing editing. Byrne Decl. ¶¶ 2, 3. So far, Byrne says, she has conducted about 100 interviews and has recorded about 1,000 hours of video footage and 1,000 hours of audio. *Id.* ¶ 7. The film apparently has not been published or released, as it has not been completed, and the record on Guevara's Motion to Compel contains nothing further about its contents.

Guevara argues that Byrne possesses information critically important to his defense of this civil litigation:

> Under Plaintiff's present version of the alleged facts rendered at his deposition, his theory is that officers generally fabricated evidence, and/or threatened witnesses to make false identifications in the Antwane Douglas homicide investigation. To this end, conversations that Plaintiff had with a third party about his case obviously provides fodder for potential inconsistent statements and admissions. This is especially so given that Plaintiff appears to have concealed or conveniently "forgot" during written discovery that he had dozens and dozens of communications with Ms. Byrne both during and after his release from prison. The critically important

4

> information possessed by Ms. Byrne is not limited to contradictory statements made by Plaintiff. Defendants sought to obtain discovery from Plaintiff at his deposition regarding Plaintiff's criminal attorney's efforts to locate witnesses and Plaintiff invoked attorney client privilege to refuse to answer such questions. Plaintiff is the "holder" of this evidentiary privilege, and Plaintiff's former criminal defense attorney, Fredrick Cohn, is deceased. Given Plaintiff's refusal to address this issue, defendants need Ms. Byrne to verify these statements. And, of course, it appears to be undisputed that [Plaintiff] … provided [extensive] documentary materials to Ms. Byrne relating to his case which have never been explained or accounted for in this case. Simply stated, Ms. Byrne cannot be permitted to conceal highly probative evidence from Defendant in this case.

Motion to Compel at 6. Defendants "vehemently deny" Cruz's allegations of misconduct and seek to establish that Cruz's version of events leading to his conviction is a "fabrication." Motion to Compel at 2. To Defendants, Cruz's credibility, therefore, is "crucial evidence in this case," and "*the most* important issue in the case." *Id.* at 2; Reply at 5. The primary significance of Byrne's "information," then, lies in its containing "potential inconsistent statements and admissions," as Guevara put it. Motion to Compel at 6.

Guevara has issued a Rule 45 subpoena to Byrne, demanding that she produce the following information:

1. Any and all video and audio related to IDOC video visits with Jose Cruz.

2. Any and all video and audio related to Jose Cruz.

3. Any and all documents, transcriptions, notes, correspondence, and/or communications related to Jose Cruz, and/or his family.

4. Any and all documents, notes, articles, and/or communications related to Jose Cruz, and/or his family.

5. Any and all documents, notes, articles, internet/social media postings and/or communications related to "Corruption Capital," a documentary in post-production and Jose Cruz.

6. Any and all video and/or audio outtakes related to IDOC video visits with Jose Cruz.

7. Any and all video and/or audio outtakes related to "Corruption Capital," a documentary in post-production and Jose Cruz.

8. Any and all video and/or audio outtakes related to any film and/or media production and Jose Cruz.

9. Any and all data, metadata, modifications, edits, documents, copies, memorandums, emails, etc. related to the syncing of audio and video related to Jose Cruz.

10. Any and all data, metadata, modifications, edits, documents, copies, memorandums, emails, etc. related to the syncing of audio and video related to "Corruption Capital," a documentary in post-production and Jose Cruz.

Byrne Subpoena (D.E. 246-4).

As for the content of those "potential" inconsistent statements or admissions sought by the subpoena, and as for why Guevara believes he will find them in the subpoenaed documents, Guevara argues:

- *Byrne communicated with Cruz.* Since first reaching out to Cruz in March 2020 about his criminal case, Byrne communicated with Cruz frequently by e-mail, telephone, and video visits, as shown by IDOC records of communications with Cruz while he was in custody. Motion to Compel at 3, Exhs. 2 (D.E. 246-2) and 3 (D.E. 246-3).

- *Byrne communicated with Cruz about his criminal case and matters relating to Guevara.* Guevara establishes this fact (that the general nature of Byrne's communications with Cruz included discussion about his case and matters involving Guevara) by obtaining an Illinois Department of Corrections report of communications between Byrne and Cruz. (D.E. 246-2.) Guevara notes that the IDOC materials show that Cruz communicated with Byrne about his case, including developments in his state post-conviction litigation, and that he shared with Byrne various written documents abouts his case, but none of those communications contains any specific statement that Guevara claims to be impeaching or contradictory to Cruz's "version" of events surrounding his conviction or his dealings with Guevara. Motion to Compel at 3-4.

- *Byrne interviewed other persons besides Cruz about his case.* The communications Guevara obtained from IDOC establish or at least indicate that Byrne interviewed others about Cruz's case, including members of his extended family. *Id.* at 5. Guevara establishes the fact that such communications occurred, but his information from IDOC contains nothing about the content of what might have been disclosed to Byrne in any of those interviews.

- *Byrne "monitored" Cruz's efforts to exonerate himself through state-post conviction proceedings, about which she "updated" him.* The IDOC information cited IDOC communications indicating that the progress of the post-conviction proceedings was one of the matters about which Byrne and Cruz communicated while Cruz was in custody, *id.*,

but Guevara cites no specific statement Cruz made to Byrne with respect to his dealings with Guevara or the events leading to Cruz's conviction, i.e., the events that Cruz related in his lawsuit and that Guevara calls "a fabrication."

- *Byrne continued to communicate with Cruz after his release from custody.* Guevara points to three videos, posted online, in which Byrne interviewed Cruz after his release from custody. *Id.* Guevara does not cite the content of any of these video interviews with respect to the events leading to Cruz's conviction or his dealings with Guevara; Guevara states only that "Byrne makes repeated reference to other communications and interactions she has had with Plaintiff since his release including attending an 'innocence conference' with him in Arizona and visiting his home (of which a small snippet of such footage is displayed)." *Id.* at 5-6. In other words, Guevara does not state that any of these three video interviews posted to social media contain any further indication of precisely what Cruz told Byrne about Guevara at any time – only that Byrne and Cruz had many communications about his case. *Id.* at 6.

In opposition to the Motion to Compel, Byrne argues that the subpoena should not be enforced because it imposes an undue burden upon her as a working journalist, and that the Court's assessment of the Rule 45 burden should include what Byrne calls the questionable relevance of her information. Resp. at 6-8. "The relevance is questionable when Mr. Guevara seeks to impose this burden solely in the hope that he might dredge up something that might be used for impeachment." *Id.* at 8. Discussing the burden of the subpoena more specifically, Byrne estimates that reviewing her materials for responsiveness would take as many as 40 hours. Byrne Decl. ¶ 8. She also argues that her reporting and newsgathering activities would be burdened by enforcement, in that:

> My relationships with sources are built on trust, and I believe those relationships would be damaged if sources knew that information they provided me, whether in the form of documents or interviews, would be disclosed to parties in litigation. I realize that nonconfidential sources understand that portions of their interviews may be incorporated into publicly distributed documentaries, but that does not mean that they would be comfortable with my being used as a conduit for a law firm to collect information. I believe that would materially detract from my ability to report both for the Film and for future films. If my relationships with sources and subjects are damaged, that may also affect their willingness to participate in social impact campaigns for the Film and other Beti Films documentaries.

*Id.* ¶¶ 12-13.

Byrne makes a passing reference to a state law reporter's privilege that might be recognized or somehow credited in federal court as a matter of comity, Resp. at 8, but the Court begins the analysis with the proposition that no federal reporter's privilege exists in the Seventh Circuit, and that the Illinois statutory reporter's privilege does not apply in federal court. *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003); *U.S. Dep't of Educ. v. National Collegiate Athletic Ass'n*, 481 F.3d 936, 938 (7th Cir. 2007). Other courts in this circuit have confronted arguments that their discretion permits them to apply the state law privilege to bar or limit subpoenas on journalists, but this Court agrees with those that have rejected Byrne's "comity" argument as a means of extending the Illinois reporter's privilege to matters under federal jurisdiction. *See Gaines v. Board of Educ.*, No. 19 C 775, 2022 WL 1292248, at *4 (N.D. Ill. Apr. 29, 2022) (declining media organization's invitation to consider state law privilege as a "factor" in the burden analysis per *Davis v. City of Springfield*, No. 04-3168, 2009 WL 1161619, at *3 n.1 (C.D. Ill. Apr. 28, 2009), and following *McKevitt*'s prescription that subpoenas directed at the media are evaluated for reasonableness "the same way as any other subpoena"); *Tate v. City of Chicago*, No. 18 C 7439, 2020 WL 4437853, at *2 (N.D. Ill. Aug. 3, 2020) ("The Seventh Circuit has clearly established that state-law privileges – specifically, Illinois' statutory version of the reporter's privilege, 735 ILCS 5/8-901 – are not 'legally applicable' in federal question cases such as this.").

## ANALYSIS

In view of *McKevitt*, the reporter's privilege is not in play in this case. The Court's analysis of Byrne's undue burden argument must consider the length of *McKevitt*'s shadow, as in what courts mean when they say they are treating subpoenas upon media members in "the same way as any other subpoena" per *McKevitt*. *McKevitt* involved a request for compelled production of U.S journalists' tape recordings of a witness for use in a foreign proceeding under 28 U.S.C. § 1782,

and the opinion rejected the journalists' argument for a federal reporter's privilege. 339 F.3d at 531-35. A party issuing a subpoena in a federal civil matter "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Under Rule 45, the balancing of the benefits and burdens in an analysis of a subpoena's enforceability is a matter committed to the district court's discretion. *Northwestern Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 928 (7th Cir. 2004). As the Seventh Circuit explained in *Ashcroft*, the required balancing boils down to whether the burden of the proposed discovery outweighs its likely benefit. *Id.* at 927. *McKevitt* made a passing reference to Federal Rule of Criminal Procedure 17(c) and did not discuss its civil counterpart, coming closest to discussing the Rule 45 balancing of benefit and burden in the following passage:

> It seems to us that rather than speaking of privilege, courts should simply make sure that a subpoena duces tecum, like any other subpoena duces tecum, is reasonable under the circumstances, which is the general criterion for judicial review of subpoenas. We do not see why there need to be special criteria merely because the possessor of the documents or other evidence sought is a journalist.

339 F.3d at 533, citing Fed. R. Crim. P. 17(c) (other citations omitted).[6] *McKevitt* also commented briefly on individualized challenges to a subpoena's reasonableness under the circumstances based on the burden that subpoena enforcement might place on journalists. Considering only the issue of whether subpoena enforcement would deter completion of the journalistic project, a biography in that case (a burden claim akin to but narrower than the burden Byrne asserts in this matter), *McKevitt* added that the deterrent to completing the biography "is a consideration that a district court might properly consider in deciding on a challenge to a subpoena, but it would add nothing to the court's consideration to analyze it in legal categories drawn from the First Amendment." *Id.* at 535. A fair reading of the above snippets from *McKevitt* about the impact of subpoena

---

[6] "On motion made promptly, the court may quash or modify the [criminal] subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).

enforcement upon journalists is that the decision left open a path toward arguing that such burdens are considered as part of the Rule 45 analysis, even as they "do not establish a freestanding privilege." *Beverly v. Watson*, No. 14 C 4970, 2016 WL 3633316, at *6 (N.D. Ill. July 7, 2016). The Court has reviewed the Northern District of Illinois precedent in that vein, mindful that "none of these cases is particularly helpful since each turned on the peculiar facts that were presented[,]" *Taylor v. City of Chi.*, No. 14 C 737, 2015 WL 6561437, at *10 (N.D. Ill. Oct. 29, 2015), and that no district court decision is binding on another district court. *Calhoun v. Colvin,* 959 F. Supp. 2d 1069, 1077 n.6 (N.D. Ill. 2013). The questions before the Court on the Byrne subpoena involve (1) the degree to which reporters like Byrne may make cognizable undue burden arguments, as reporters, under Rule 45 after *McKevitt*, and (2) the outcome of the case-specific balancing of the benefits and burdens presented by the Byrne subpoena.

I. **Journalists May Make Rule 45 Undue Burden Arguments Based on Reasonableness Under the Circumstances.**

In dismissing Byrne's Rule 45 undue burden arguments as "boilerplate," Guevara relies on *McKevitt* for the propositions that Byrne "is entitled to no additional protections than anyone else responding to a subpoena issued under Rule 45," that the subpoenaed materials are "ordinarily discoverable" under Rule 45, and that not enforcing the Byrne subpoena "would effectively be applying a privilege that does not exist."   Motion to Compel at 9, 14.   Yet Guevara also acknowledged that he "agrees" that several post-*McKevitt* Northern District of Illinois decisions "recognize special concerns that factor into a determination of what is reasonable when a party subpoenas a reporter, which is consistent with the *McKevitt* court's direction to consider specific circumstances when determining whether discovery is reasonable."   Reply at 9-10.   To clear up any confusion about whether reporters may argue after *McKevitt* that subpoena enforcement will affect them, as reporters, in a way that represents an undue burden under Rule 45, this Court will

address whether, as Guevara suggests, *McKevitt* snuffed out virtually any reporter's undue burden argument based on that person's status as a reporter engaged in newsgathering activities protected by the First Amendment. The Court sees the answer to that question as no.

In *McKevitt*, the Seventh Circuit refused to recognize the existence of a reporter's privilege, despite several other courts of appeal having done so in various circumstances. 339 F.3d at 532-33. *McKevitt* reasoned that applying a federal reporter's privilege to protect confidential sources would be contrary to what *McKevitt* saw as the majority opinion in *Branzburg v. Hayes*, 408 U.S. 665 (1972), and that extending such a privilege to protect against disclosure of non-confidential sources based on "concerns with harassment [of reporters], burden, using the press as an investigative arm of government, and so forth . . . may be skating on thin ice" because, according to *McKevitt*, *Branzburg* rejected those considerations in rejecting a privilege protecting reporters' confidential sources from grand jury subpoenas in federal criminal investigations. *McKevitt*, 339 F.3d at 532-33. But *McKevitt* did not say that such concerns are not cognizable where reporters argue that a subpoena is not reasonable under the circumstances; instead, by referring to burdens including harassment of the press, and making the press an investigative arm, as among the considerations "that a district court might properly consider in deciding on a challenge to a subpoena," *id.* at 533, 535, the Seventh Circuit indicated that those concerns ought to be cognizable under Rule 45. Byrne therefore may make arguments that the subpoena upon her is not reasonable under the circumstances without relying on a nonexistent reporter's privilege.

That said, the language of several post-*McKevitt* decisions of district courts in the Northern District of Illinois has suggested that reporters' undue burden arguments based on First Amendment concerns may be an attempt to find an "alternate route" to recognizing a reporter's privilege in derogation of *McKevitt*. But those courts' use of such language was in the context of

11

balancing, under Rule 45, the burden on the media against the benefit of enforcing the subpoenas directed at the media. *See Gaines*, 2022 WL 1292248, at *4 ("CBS2's articulated burden is simply an alternate route to a reporter's privilege, one that relies upon the same rationales that courts in this circuit have rejected"); *Taylor*, 2015 WL 6561437, at *10 (allowing broad discovery from Chicago Tribune journalists whose "articulated burden appears to be an alternate route to a reporters' privilege, one that relies upon the same rationales that courts in this circuit have rejected"); *Thayer v. Conlisk*, 257 F.R.D. 466, 470 (N.D. Ill. 2009) ("Absent a showing of actual burden, the Court is not inclined to allow Mr. Conlisk to avoid enforcement of the subpoena with a backdoor attempt to impose a privilege."); *Wilson v. O'Brien*, No. 07 C 3994, 2009 WL 763785, at *10 (N.D. Ill. Mar. 20, 2009) ("To find, in this case, that the Subpoena is not reasonable under the circumstances, or that it imposes an undue burden on [journalist] Possley, would be tantamount to promulgating a First Amendment federal reporter's privilege with respect to non-confidential information."). The Court does not read these cases as indicating that journalists are altogether precluded from raising Rule 45 undue burden arguments. That would represent a significant extension of the holding of *McKevitt*. The "circumstances" of a subpoena upon a reporter include the fact that the subpoena respondent is a reporter. Otherwise, courts would be treating subpoenas upon reporters in a manner distinctly *unlike* "any other subpoena," by *not* considering the reporters' individual circumstances and what is reasonable in those circumstances.

As for the First Amendment, the Seventh Circuit only a year ago made crystal clear that newsgathering is a protected activity under the First Amendment. *See Brown v. Kemp*, 86 F.4th 745, 763-64 (7th Cir. 2023) ("First Amendment protection extends to activities necessary to produce and disseminate speech within a protected medium for the communication of ideas …. We have held the act of *making* an audio or audiovisual recording is necessarily included

within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording …. The First Amendment covers …. plaintiff Weisberg's newsgathering activities.") (internal quotations and citations omitted). *Brown*'s holding was that a Wisconsin statute criminalizing the recording of hunters in the field unconstitutionally chilled the expressive activities of a newspaper opposed to hunting. *Id.* at 784. Extending *McKevitt* to preclude journalists from arguing a First Amendment burden in the Rule 45 context of opposition to a subpoena, or to apply some sort of presumption against that type of argument based on a fear that courts are creating an "alternative" avenue to a reporter's privilege, would place a remarkably low value on the constitutional dimension of newsgathering as recognized recently by *Brown*. This Court does not extend *McKevitt* in that fashion, and to the extent other courts have done so, this Court is not bound to follow those cases and does not follow them.

In any event, decisions like *Gaines*, *Taylor*, *Thayer* and *Wilson* analyzed entertained journalists' burden arguments under Rule 45, although those courts rejected the arguments. These cases adhered to Rule 45 in evaluating the relevance of the discovery sought as well as the persuasiveness of the reporters' undue burden arguments. These decisions qualitatively balanced the benefit of the subpoenaed information against burden and found the journalists' burden arguments unpersuasive in the individual circumstances of those cases. Consequently, this Court must undertake its own qualitative balancing of Byrne's undue burden arguments against the value Guevara says he will gain from the requested unpublished information.

## II. The Court's Balancing of Benefits and Burdens Weighs Against Enforcing the Byrne Subpoena.

The balancing of the benefits and burdens in this matter does not justify compelling Byrne to disgorge the information Cruz provided to her over a period of years, including her notes, her

13

video and audio recordings, metadata that would reveal her editing of video and audio recordings, or anything else on the list of requested documents in the Byrne subpoena.

### A. The "Potential" Relevance of Byrne's Information Is More Speculative Than Dispositive.

Guevara's assertion that there is "no dispute whatsoever" that Byrne "has relevant documents pertaining to this case" (Motion to Compel at 2) vastly overstates the benefit of the information to Guevara. Guevara devotes nearly three pages of his opening brief to reciting the extent of the communications that occurred between Byrne and Plaintiff, yet in all that ink, Guevara does not point to a single Cruz statement that is inconsistent with any assertion he made in the pleadings or discovery, including his deposition. *Id.* at 3-6. On the one hand, Guevara speculates that the body of communications between Cruz and Byrne is "fodder for *potential* inconsistent statements and admissions," and on the other hand, he insists that it contains "contradictory statements by Plaintiff," again without pointing to a single such statement or a single piece of evidence beyond Guevara's suspicion that because Cruz did not disclose Byrne in discovery, he must be hiding something.[7] *Id.* at 6 (emphasis added). The Court agrees that Plaintiff's credibility is an important issue in the case or even "the" important issue, but that does not make his unknown statements to Byrne, included or not in a yet-to-be-published documentary film, any more relevant or likely to contain impeachment material or admissions.

---

[7] Guevara expresses a concern that Cruz's interrogatory responses failed to disclose Byrne as someone with whom he had communicated about his case, notwithstanding the interrogatory's request for disclosure of his communications with journalists. Motion to Compel at 2, citing Plaintiff Cruz's Response to Defendant Boris's Interrogatories (D.E. 246-1). Guevara argues that his case for compelling Byrne to produce under the subpoena is supported by Cruz having "concealed or conveniently 'forgot' during written discovery" that he had communicated extensively with Byrne. Motion to Compel at 6. The Court does not see Cruz's forgetfulness (whether "convenient," deliberate, or otherwise) as adding to the relevancy of any statements he made to Byrne without more about what those statements actually contained. The Court views Cruz's nondisclosure (apparently not yet seasonably supplemented, at least to the Court's knowledge) as anything more than an unresolved discovery issue. Cruz's non-disclosure of his communications with Byrne adds nothing to Guevara's argument that those communications contain critically important information in the form of "potential" impeachment material.

Guevara argues that this case is "akin to *Taylor*" because the *Taylor* court compelled production of the information gathered from the wrongful conviction plaintiff, Daniel Taylor, by the Chicago Tribune journalists. *Id.* at 10. Guevara contends that the *Taylor* court compelled production because Taylor "was going to testify about the very same topics he described to the reporter during multiple interviews" that had taken place closer in time to the relevant events than Taylor's deposition, so the Tribune's unpublished information "could provide Defendants with information useful for attacking witness credibility, impeachment, and/or otherwise admissible evidence." *Id.* at 10. But that gloss on *Taylor* is only a part of the *Taylor* court found. If impeachment evidence would follow so surely from earlier statements *about* the same subject matter as the trial or even deposition testimony, then the mere fact that a plaintiff spoke to a journalist *about* a case would mean that a court need inquire no further into the relevancy of the communications. And that is not what happened in *Taylor*. The rest of the story in *Taylor* is that the magistrate judge had the benefit of previously published Tribune news stories about Taylor's case, including many related statements Taylor made to the reporters. 2015 WL 6561437, at *4. The magistrate judge carefully examined those news stories and Taylor's prior statements, assembling a lengthy chart of eight quoted or paraphrased statements Taylor made (gleaned from seven separate Tribune news stories) about him being in a police lockup at the time of the murder, along with several other statements he made to the reporters about the alleged confession of another person and his allegations of having been beaten by police. *Id.* at *6-9. From all this, the magistrate judge in *Taylor* concluded that the defense in his wrongful conviction lawsuit had a substantial need for the discovery of his prior statements to the Tribune, and that this need outweighed the burdens that the Tribune or its reporters had asserted in opposition to the subpoena. *Id.* at *10-11.

The record on the Motion to Compel in the instant case, though, contains no information at all about Cruz's specific statements (let alone inconsistent statements) to Byrne about his case, either in the subpoenaed recordings, notes or memoranda, or in the 72-page, single-spaced IDOC electronic message report that is in the record (D.E. 246-2); the Court presumes that if any of those statements indicated the existence of impeaching or inconsistent statements in the materials not produced, Guevara would have called that to the Court's attention. He did not.[8] In short, the instant case is hardly "akin" to *Taylor*. Guevara's analogy to *Taylor* is overstated and breaks down because the subpoena proponents in *Taylor* easily established relevance, impeachment value, and substantial need based on the prior, published statements the magistrate judge carefully and thoroughly analyzed, whereas in this case, Guevara has nothing or next to nothing published to go on, and the result is that unlike the *Taylor* proponents, he points to not a single piece of hard evidence suggesting "critical" relevance of Byrne's unpublished materials. *See also Wilson*, 2009 WL 763785, at *2, 9 (finding that subpoenaed information from reporter was "more than merely

---

[8] The parties including Guevara have taken substantial discovery in this case, and Guevara is in possession of a substantial amount of electronic communications between Cruz and Byrne by virtue of IDOC's preservation of electronic records, as the Court has noted. Byrne has argued that the substantiality of Guevara's discovery of Cruz's communications with Byrne is a reason to deny compelled production of the subpoenaed information from Byrne as unnecessary, Resp. at 6-7, but the Court is not deciding the Motion to Compel on that ground. The Court notes for the record, though, that the docket indicates that Guevara and the other defendants deposed Cruz on September 18, 2024, and as for Cruz's communications with Byrne, Cruz at his deposition was asked questions only about the fact that he communicated with her about his case (and specifically "about [his] being innocent," as he put it), that he could not remember statements he made to his former criminal lawyer, and that he had not listed Byrne in his response to the Boris interrogatory asking for disclosure of reporters to whom he had spoken. 9/18/24 Cruz Dep. Tr. (D.E. 288-1) at 370-72, 445-50, passim. Guevara and the other defendants did not ask Cruz about any more specific information he provided to Byrne during her research, despite having had the opportunity to explore those issues at the deposition. Not questioning Cruz in any specific detail about the information he provided to Byrne is tantamount to not having asked him at all, a factor that at least one court in this district has found to cut against enforcement of this type of subpoena upon the journalist. *Patterson*, 2005 WL 43240, at *2; *see also Cooper v. Rezutko*, No. 3:17-CV-834-PPS-MGG, 2019 WL 927095, at *8 (N.D. Ind. Feb. 26, 2019) (quashing litigant's subpoena and finding an undue burden on respondent newspaper where litigant city sought unpublished information "without exhausting its options for securing the same information from Plaintiff and his attorney.")

relevant" after reporter published three news stories based on interviews with a crime victim who, when told of plaintiff's exoneration, recanted her earlier accusatory statements about plaintiff). Several other district court decisions relied upon here by Guevara, and discussed below, also enforced subpoenas on journalists after finding their information highly relevant based on what the journalists already had published.

In *Gaines*, CBS2 had aired a news story featuring portions of recordings of a minor (whose mother sued the Chicago school system over alleged beatings the minor suffered at the hands of school staff) and of one of the school staff members accused of involvement in the beatings. 2022 WL 1292248, at *1. The plaintiff seeking disclosure of the reporter's unaired "outtakes" was able to establish that the school staffer had made previously recorded statements directly contradicting her statements to police and other investigators, and that the minor victim's recorded statements had significant value as prior consistent statements made without a motive to fabricate. *Id.* at *2-3. Those factors make *Gaines* unlike this case, for the same reasons this case is not "akin" to *Taylor*. But in addition, CBS2 in *Gaines* did not dispute the relevancy of the outtakes, instead leaning heavily on the Illinois statutory reporter's privilege, which the district court correctly saw as inapplicable in the *Gaines* federal case and thus wholly ineffective as a counterweight in the balancing of benefits and burdens. *Id.* at 3-4. By contrast, in the instant case, Byrne disputes the relevancy and criticality of the unpublished information Guevara seeks from her. Resp. at 7-8.

*Mosely v. City of Chicago*, 252 F.R.D. 421 (N.D. Ill. 2008), like the other cases in Guevara's array of Northern District of Illinois matters in which the balancing of benefit and burden came out in favor of enforcing subpoenas on reporters, involved a published journalistic work that triggered the subpoena. But *Mosely* is less clear about whether the Court's ability to review the published statements (in that case by the *Mosely* plaintiff) established that the

17

journalists' unpublished tapes of the plaintiff's statements were of sufficient relevance to overcome the journalists' arguments that the subpoena placed an undue burden on them. Instead, the court in *Mosely* appeared to assume that because the article established that the plaintiff spoke to the journalist about his case in detail, and because those events were "at the epicenter" of the lawsuit, the "criticality" of his statements to the journalist was "beyond debate," so that "there is every reason to conclude that the subpoenaed information is likely to contain critical information that could constitute or lead to admissible evidence." 252 F.R.D. at 430-31. This Court reasonably and within its discretion does not make the same inference in this case, in which the core journalistic product of plaintiff's statements to Byrne has not been published, and Guevara's emphasis on the importance of those statements to his case are based only on their "potential" for impeachment value. *See Ashcroft*, 362 F.3d at 926-29 (affirming district court's finding that the balance of benefit and burden favored quashing a subpoena for sensitive health information, where the asserted relevancy of the information lay in "the *possibility*" that the subpoena proponent might find information that had "potential value" in impeaching a witness's credibility).

In *Tate*, CBS aired news reports about improper Chicago police searches of homes, including three reports about the search of the home of the plaintiff who brought a federal rights suit in connection with that search; the search of the plaintiff's home also was part of a 28-minute documentary aired by CBS. 2020 WL 4437853, at *1. The *Tate* court limited the subpoenaed CBS production to "outtakes" of statements by the plaintiff only, under a relevancy theory that, like *Mosely*, turned on the court's inference that plaintiff's interviews were central to the case's key event, *id.* at *3, which was a much more discrete – and *concrete* – event (a police raid gone wrong) than the far more complex and inter-related series of events Cruz in the instant case says gave rise to his vacated murder prosecution. In *Tate* and *Mosely*, the courts saw relevancy in the

18

subpoenaed information, but enforcement turned more on those courts' dismissal of the journalists' arguments about why the subpoena placed an undue burden on them. 2020 WL 4437853, at *3; *Mosely*, 252 F.R.D. at 431-32. The Court will address those aspects of *Tate* and *Mosely* below in the discussion of Byrne's undue burden arguments. But for purposes of this discussion, the benefit analyses in *Tate* and *Mosely* do not carry the day on the Guevara Motion to Compel, which presents very different circumstances, in that Byrne's journalistic work has not been published (except for three brief video snippets that Guevara has not described as containing or even suggesting inconsistent statements or admissions) and yields no basis for Guevara's sweeping conclusion that Byrne's unpublished information is (potentially) rich with impeachment material.

Finally, Guevara's discussion of *Patterson v. Burge*, No. 03 C 4433, 2005 WL 43240 (N.D. Ill. Jan. 6, 2005), illustrates why Guevara falls short of establishing the kind of critical relevance that he sees as warranting enforcement of the Byrne subpoena. Reply at 9. *Patterson* observed that no one in that case was arguing that the subpoenaed documents contained no relevant statements by the exonerated plaintiff, and the court understood that "it is possible that Patterson said something during those interviews that could be used to cross-examine him in the civil suit or be used as an admission." 2005 WL 43240, at *2. But "possible relevance," or "relevance in its broadest and weakest sense," is not the standard for enforcing subpoenas. *Id.* In *Patterson*, the court reasoned that as a result, the subpoena proponents were "simply speculating" that the journalists possessed unpublished materials containing impeachment information or admissions. *Id.* The Court finds Guevara's relevance arguments just as speculative. Although Guevara has reason to know that Cruz discussed his prosecution extensively with Byrne, and thus that his statements to Byrne may contain some relevant information, Guevara has pointed to nothing to indicate that Cruz's discussions with Byrne contained impeachment material or admissions – there

is only the "potential" for such content. All Guevara can say is that this case is different from *Patterson* because "Defendants have provided numerous specific pieces of information retained by [Byrne]." Reply at 9, citing Motion to Compel at 2-6. But the fact that Byrne appears to have retained a significant amount of the information she received from Cruz is not the same as her possessing impeaching or inculpatory content in any of that information. Motion to Compel at 2-6.

### B. The Subpoena's Burdens Upon Byrne Are Substantial.

Against Guevara's weak showing of relevance of the information, the Court weighs Byrne's argument that the subpoena is unduly burdensome as part of the Rule 45 balancing. First, Byrne argues that she is the sole employee of her filmmaking company and will have to devote 20-40 hours to collecting the subpoenaed material, all while her film is still in production, if the subpoena is enforced. Resp. at 7; Byrne Decl. at ¶¶ 8-11. Second, Byrne argues that enforcement will burden substantially her ability to complete her *To Catch a Case* reporting and her ability to operate as a reporter in the future, as her sources, she believes, will be less cooperative with her once they know that all the information they provide to her may be turned over to litigants such as Guevara. Byrne Decl. ¶ 12.

#### 1. The Subpoena Would Impose a Substantial Administrative Burden on Byrne.

Even accepting Guevara's representation that he only seeks "portions [of Byrne's reporting materials] that relate to Plaintiff," as opposed to all she has concerning Guevara, Motion to Compel at 13, Plaintiff has averred that collection of those materials would take about 20 hours of her time. Byrne Decl. ¶ 9. This burden is substantial, given Byrne's status as the sole employee of Beti Films, with no staff to help her complete the subpoena compliance project or the post-production

stages of *To Catch a Case*, including further reporting and editing. The greater burden on Byrne, though, is on her newsgathering activities, as discussed below.

### 2. The Subpoena Burdens Byrne's Constitutionally Protected Newsgathering Activity.

Byrne's non-administrative burden argument, concerning the impact on her constitutionally protected newsgathering activities, is substantial. "Burden in this context [of whether a Rule 45 subpoena is reasonable under the circumstances] means more than mere administrative hardship. It encompasses the interests that enforced production would compromise or injure." *Patterson*, 2005 WL 43240, at *1, citing *Ashcroft,* 362 F.3d at 928-29. Specifically, the burden Byrne describes is the loss of trust from her sources "if sources knew that information they provided me, whether in the form of documents or interviews, would be disclosed to parties in litigation." Byrne Decl. ⁋ 12. Guevara dismisses these arguments as "boilerplate" and "nearly uniformly … rejected" by courts. Motion to Compel at 2, 10, citing *Gaines*, 2022 WL 1292248, at *1; *Taylor*, 2015 WL 6561437, at *14; *Tate*, 2020 WL 4437853, at *3; *Mosely*, 252 F.R.D. at 436; and *Wilson*, 2009 WL 763785, at *9. Guevara relies most heavily on *Mosely*, and in particular a passage of *Mosely* in which that court found that the journalist's assertion of future burden on newsgathering activity from being forced to comply with a litigation subpoena was "unconvincing," "illogical," and "unpersuasive." Motion to Compel at 14, citing *Mosely*, 252 F.R.D. at 431-32. Yet *Mosely* recognized, as a concern that "could not be more valid," judicial caution in *Patterson* about how "too many" civil litigants' "insatiab[le]" desire to engage in "endless discovery" could lead to "indiscriminate enforcement of subpoenas to news organizations, based solely on a finding of 'mere relevance,' [and] could have an undue burden on journalists and the media." 252 F.R.D. at 434, citing *Patterson*, 2005 WL 43240, at *3. That concern did not prevail in *Mosely* because the court determined that the subpoenaed documents in

that case "have substantial, identifiable 'probative value,'" in that the court thought the absence of prior inconsistent statements in what that plaintiff had said to the journalist was "improbable." *Id.* *Mosely* is therefore distinguishable from this case for the reasons stated above in Part II(A), but *Mosley* also discussed at length, and dismissed, the burden on the journalist's newsgathering activities:

> Publication of interviews with *non-confidential* sources is consistent with the expectation – if not the desire – of the interviewee that there be public dissemination. Anyone reading the interview intuitively understands that. The possibility that at some point in the future a journalist *might* have to make a further disclosure of that which either was already publically disclosed or could have been had the journalist decided to do so, does not change the essential nature of the understanding the interviewee and the journalist had or impose a risk meaningfully different from that which inhered in the interview. . . . Journalists alone determine the contours and content of their interviews, unaided and uninfluenced by lawyers in cases still in the womb of time and that may never be born.

252 F.R.D. at 431-32, quoted in Reply at 7.

The *Mosely* court's "intuitive[] understand[ing]" about how reporters interacted with their sources 16 years ago does not apply in this case. *Mosely*'s reference to the "womb of time" and litigation matters "that may never be born," appeared to suggest that compelling reporters to turn over, under subpoena, their sources' unpublished information to civil litigants would not hamper newsgathering that is remote in time from the subpoena. Byrne, though, is continuing to complete her film project concerning Guevara and wrongful convictions in Cook County, and Guevara seeks to enforce his subpoena upon her before her reporting on the project is completed. In this case, then, there is no "womb of time" separating her reporting activities from the unborn prospect of her being compelled to provide Guevara and his attorneys all of her notes, video and audio recordings (and metadata showing how she may have edited the recordings). But even if the subpoenaing of Byrne's unpublished information from Plaintiff were some far-off prospect or future event, as it arguably was when Byrne began her reporting on this project in March 2020,

the outcome should be no different.  In the milieu of criminal justice reporting, journalists speaking to sources today about alleged wrongful convictions in Cook County could well anticipate future litigation and subpoenas directed at that reporting, particularly in high-profile matters such as this one, in which Guevara is a person facing some 26 wrongful conviction lawsuits and is said to be involved in about 46 murder exonerations.  In this case alone, Guevara initiated or pursued some seven subpoenas on journalists or their news organizations. (D.E. 209.)

In addition, several of *Mosely*'s "intuitive[] understand[ings]" are based on assumptions not supported in the record here.  One such assumption is that everything Cruz told Byrne was "on the record" (a term of journalistic art meaning for full use, with attribution to the source, by the reporter in the published work) and thus approved by Cruz for publication.  The Court has no way of knowing whether this is so, and nothing in the record establishes it.  But even assuming everything the source tells the reporter was "on the record," *Mosely* contains another assumption: that a so-called "non-confidential source," that is, one who knows the reporter will fashion a published journalistic work from the source's information provided "on the record," must also know that all of source's information – including information that the journalist may choose not to publish – is essentially fair game for disclosure *not only in the published work*, but separately and additionally to anyone else who might ask for it or subpoena it, possibly including the persons about whom the source is providing the information. Under this assumption, the reporter is gathering information not just for the news story, but for full consumption by anyone and everyone and for use in litigation.  Based on these assumptions, *Mosely* dismisses the argument that journalists' sources would be less willing in the future to share information with reporters after enforcement of subpoenas for the sources' information that the reporter did not publish.  Nothing in the record in the instant case supports any of these assumptions, and particularly the latter one.

23

Byrne has said that her relationship with present and future sources "would be damaged *if sources knew* that information they provided me, whether in the form of documents or interviews, would be disclosed to parties in litigation." Byrne Decl. ¶ 12 (emphasis added).[9]  In other words, Byrne is saying her sources ordinarily *do not know* that their *unpublished* information would be disseminated to third parties at all, let alone to the lawyers for one of the primary subjects of the reporter's investigation.  Guevara has offered no firsthand information to the contrary.  The most that the Court could infer from the record in this case is that the source consented to Byrne publishing the information she chose to publish, in her exercise of editorial judgment.  Therefore, the Court sees Byrne's concerns about the impact of subpoena enforcement on her present and future newsgathering activities as not so speculative that the Court could or should discount or dismiss those concerns in the Rule 45 balancing, when Guevara's arguments about the "potential" relevancy of her unpublished information are as speculative as they are in this case.

---

[9] Guevara has called this point a "journalistic street cred" argument.  Reply at 5.  As summarized above, the Court prefers more neutral language, fairly construing Byrne's argument as stating that when sources share information with her within her relationship of trust with them, the sources also trust that Byrne will not disclose information about them other than what she attributes to them in her published work.  In the years since *McKevitt*, courts in this district occasionally have used the term "street cred" to describe this argument.  *See Gaines*, 2022 WL 1292248, at *4; *Taylor*, 2015 WL 6561437, at *10; *Thayer*, 257 F.R.D. at 470 n. 5; *Bond v. Utreras*, 04 C 2617, 2006 WL 1806387, at *5 (N.D. Ill. June 27, 2006).  No federal court outside the Northern District of Illinois, and no state court, has used this term to refer to a reporter's constitutionally protected newsgathering activities.  Courts ordinarily have used the term "street cred" or "street credibility" to refer to criminal conduct, usually by gangs, and the term has been described by federal agents and gang members as instilling "a sense of fear in victims and witnesses and in people who hear about the reputation of the gang." *Wright v. McDowell*, No. 2:18-cv-03227 TLN GGH P, 2019 WL 5420209, at *2 (E.D. Cal. Oct. 23, 2019); *see also United States v. Chester*, No. 13 CR 0774, 2017 WL 3394746, at *11 (N.D. Ill. Aug. 8, 2017) (noting how gang member "described how the Hobos were 'one of the hottest gangs right now.' . . . 'We living up to our street creds.'").  This district's first use of this term to characterize newsgathering came in *Bond*, a 2006 decision involving a journalist who had embedded himself in Chicago's former Stateway Gardens public housing project and who had "fancie[d] himself as being a voice of the people in the projects." 2006 WL 1806387, at *2, 5.

24

In short, the differences between this case and *Mosely* are many, including the less well-established relevance of the subpoenaed information. In addition, this Court agrees with *Patterson* that ordering journalists to produce unpublished information on a mere showing of possible usefulness in the litigation (as Guevara proposes here), would create substantial burdens for journalists because:

> [I]f there is no standard higher than mere relevance which civil lawyers must satisfy to help themselves to reporters' records, news organizations will be very busy responding to civil subpoenas. Similarly, the news organizations' efforts *to maintain their independence and gain the trust of sources is an interest that will be severely impaired* if mere relevance, meaning as it does here a mere relationship to the subject matter of a civil suit, makes their non-public records available on request. Further, the journalistic and editorial judgments involved in deciding what to ask an interview subject, and in deciding what to use from the material gathered, are the commercial and intellectual stock in trade of the news organizations; surely some good justification should be advanced before these journalistic and editorial judgments can be examined by outsiders and made public in the context of a civil lawsuit.

2005 WL 43240, at *3 (emphasis added); *see also Hobley v., Burge*, 223 F.R.D. 499, 505 (N.D. Ill. 2004) ("If the parties to any lawsuit were free to subpoena the press at will …. [t]he resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties").

After balancing the subpoenaed information's "potential" relevance against the burdens on Byrne's newsgathering activities in conjunction with what this Court has described as a substantial administrative burden on Byrne (a one-person journalism shop responding to this subpoena in an era in which media companies are struggling financially), the Court finds that the burdens of the subpoena on Byrne, a third party, outweigh Guevara's showing of mere potential relevance of the information sought under Rule 45 and should not be enforced. Finally, the Court sees a number of aspects of the subpoena as overbroad or unduly burdensome, such as the request for metadata that would reveal Byrne's editing of audio and video recordings. The Court does not reach those

issues in greater detail, having found that the subpoena's mere potential relevancy does not outweigh the burdens on Byrne for the reasons stated above.

## CONCLUSION

For the foregoing reasons, Guevara's Motion to Compel (D.E. 246) is denied.

**SO ORDERED.**

**ENTER:**

**GABRIEL A. FUENTES**
**U.S. Magistrate Judge**

**Dated: November 22, 2024**