**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Jose Cruz, | ) | |
| | ) | |
| *Plaintiff,* | ) | No. 23 cv 4268 |
| | ) | |
| v. | ) | Honorable Judge Alexakis |
| | ) | |
| Former Detective Reynaldo Guevara, et al. | ) | Magistrate Judge Fuentes |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF CRUZ' JOINT RESPONSE IN OPPOSITION TO
DEFENDANTS' SUMMARY JUDGMENT MEMORANDA**

Dated: February 11, 2026

Stuart J. Chanen, (ARDC # 6191744)
Ariel Olstein, (ARDC # 6324440)
CHANEN & OLSTEIN, LLP
8822 Niles Center Rd., Ste 100
Skokie, IL 60077
847-469-4669
stuart@chanenolstein.com
ariel@chanenolstein.com

**CRUZ OPPOSITION**
**TABLE OF CONTENTS**

LEGAL STANDARD…………………………………………………………………………………1

I.      DEFENDANTS ARE WRONG ABOUT THE LEGAL IMPACT OF
        MEADORS' STATIONHOUSE AND TRIAL IDENTIFICATIONS……………………..2

II.     THE COURT SHOULD REJECT DEFENDANTS' ARGUMENT THAT MEADORS'
        MAY 8 AND MAY 9 IDENTIFICATIONS OF CRUZ PROVIDED SUFFICIENT
        PROBABLE CAUSE AND DEFEAT CRUZ'S MALICIOUS PROSECUTION AND
        UNLAWFUL DETENTION CLAIMS (COUNTS 1B, III, VII)…………………………...5

        A.      Defendants Provide This Court With An Incomplete Legal Standard………………......6

        B.      Defendants Omit The Key Element of the Probable Cause Definition……………………..6

        C.      The Court Should Reject Defendants' "Grand Jury" Argument …………………...................9

        D.      The Court Should Reject Defendants' "Single Identification" Argument …………………...10

        E.      The Court Should Reject the Defendants' "Inherently Reliable" Argument………………11

        F.      The Court Should Reject Defendants' Reliance on Post-Oct.-1993 Evidence…..................14

        G.      The Court Should Reject Defendants' Reliance on Inadmissible Evidence……………….16

        H.      The Court Should Reject Defendants' Qualified Immunity Argument……………………17

        I.      The Court Should Reject Guevara's "Commence and Continue" Argument……………...18

III.    THE COURT SHOULD DENY DEFENDANTS' MOTIONS FOR
        SUMMARY JUDGMENT ON CRUZ'S FABRICATION-OF-EVIDENCE CLAIMS
        (COUNT IA, IB) ………………………………………………………………………………………..19

        A.      Defendants Fabricated That "Cruz Was The Shooter"……………………………….21

                1.      The Court Should Reject Defendants' Factual Argument………………...21
                2.      The Court Should Reject Defendants' *Blackmon* Legal Argument………..23
                3.      The Court Should Reject Defendants' Qualified Immunity Argument……26

        B.      Defendants Fabricated the Altered GOCR in Furtherance of the "Cruz-Was-The-
                Shooter" Fabrication………………………………………………………………….27

        C.      Defendants Fabricated That They Removed A Latin King Constitution
                And A Latin King Photograph From Cruz's Person……………………………….32

[i]

IV.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO
REASONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT III *BRADY*
CLAIMS…………………………………………………………………………..39

V.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO
REAONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT IV AND IX
CONSPIRACY CLAIMS…………………………………………………………46

VI.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO
REAONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT IV
1985(3) RACIAL CONSPIRACY CLAIM…………………………………………..51

VII.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO
REAONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT V
FAILURE-TO-INTERVENE CLAIM …………………………………………………52

VIII.      DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO
REAONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT VIII
EMOTIONAL DISTRESS ("IIED") CLAIM…………………………………………..52

IX.      THE COURT SHOULD REJECT DEFENDANTS' ARGUMENT THAT
IT SHOULD GRANT JUDGMENT TO INDIVIDUDAL DEFENDANTS
BASED ON A LACK OF PERSONAL INVOLVEMENT………………………………53

X.      THE COURT SHOULD DENY THE CITY'S MOTION ON CRUZ'S
COUNT VI *MONELL* CLAIM………………………………………………………57

      A.      The City Has Not Met (Nor Tried to Meet) Any of Its Three Summary
Judgment Burdens…………………………………………………………63

      B.      Cruz Has Presented More Than Sufficient Evidence To Prove the Single
*Monell* Claim He Has Pled……………………………………………………65

         1.    Cruz Has Established The Defendants' Underlying Constitutional Violations……66

         2.    Cruz Has Established That The City Had A Widespread Code of Silence
And A Widespread Failure to Train, Supervise, and Discipline……………………67

         3.    Cruz Has Established That The City Was On Notice of
Its Detectives' and Officers' Unconstitutional Practices……………………………74

         4.    Cruz Has Established That The City Was Deliberately Indifferent
To The Risk of Continuing Constitutional Injuries…………………………….74

         5.    Cruz Has Established That The City's *De Facto* Policies Were The Moving
Force Behind Cruz's Constitutional Injuries…………………………………...76

[ii]

**CRUZ OPPOSITION**
**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706 (7th Cir. 2013). ………………………..17,27

*Alexander v. South Bend*, 433 F.3d 550 (7th Cir. 2006)………………………………. 24

*Alford v. Deffendoll*, No. 25-5149, 2026 WL 183860 (6th Cir. Jan. 23, 2026) ………. 7n2

*Arrington v. City of Chicago*, 17 C 5345, 2018 WL 620036 (N.D. Ill. Jan. 30, 2018)…58, 65n17

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)………………………………Passim

*Beck v. Ohio*, 379 U.S. 89 (1964)…………………………………………………………..16

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984)………………………………….50n12

*Beuchamp v. City of Noblesville*, 320 F.3d 733 (7th Cir. 2003)………………………….10

*Blackmon v. Jones*, 132 F.4th 522 (7th Cir. 2025)…………………………………………..23-26, 38

*Bolden v. Pesavento*, 623 F. Supp. 3d 897 (N.D. Ill. 2022)………………………………19

*Boss v. Pierce*, 263 F.3d 734 (7th Cir. 2001) …………………………………………..45-46

*Briscoe v. Lahue*, 460 U.S. 325 (1983)……………………………………………………..34-35

*Brady v. Maryland*, 373 U.S. 83 (1963)………………………………………………….Passim

*Brown v. Chicago Transit Auth.*, 777 F. Supp. 3d 855 (N.D. Ill. 2025)……………………1

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022)………………………….36n8

*Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)………………………………….31

*Byrd v. Brishke* (7th Cir.1972)………………………………………………………...52n13

*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016)………………………………………..7, 10

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005)………………………………………69

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019)…………………………………………42-43, 55

*Carmichael v. Village of Palatine,* 605 F.3d 451 (7th Cir. 2010) …………….…………..7

*Chatham v. Davis*, 839 F.3d 679 (7th Cir. 2016)……………………………………………….70

*Chicago Title Ins. Co. v. Sinikovic*, 125 F. Supp. 3d 769 (N.D. Ill. 2015) …………………..47

*CCP Golden/7470 LLC v. Breslin*, 161 F.4th 461 (7th Cir. 2025)……………………………1, 64

*Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017)……………………………………….18

*Coones v. Bd. of Cnty. Commissioners of Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, No. 24-3147, 2026 WL 158115, at *19 (10th Cir. Jan. 21, 2026) ……………………7n2

*Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988) …………………………………………………..69

*Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016)………………………………………..64-65

*Doe v. Oberweis Dairy*, No. 03 C 4774, 2004 WL 1146712 (N.D. Ill. May 21, 2004)…………12

*Donohoe v. Consolidated Operating & Production Corp.*, 736 F. Supp. 845 (N.D. Ill. 1990)….12

*Engel v. Buchan*, 710 F.3d 698 (7th Cir. 2013)…………………………………………………..41

*Estate of Chlopek by Fahrforth v. Jarmusz*, 877 F. Supp. 1189 (N.D. Ill. 1995)………………..12

*Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829 (N.D. Ill. Jan. 24, 2024)……………42

*Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sept. 11, 2017)…………………...71-72, n19

*Fields v. City of Chicago*, 981 F.3d 534 (7th Cir. 2020)…………………………………………41,72n19

*Fields v. Wharrie*, 672 F.3d 505 (7th Cir. 2012) …………………………………………..40n9

*Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014)………………………………………………..40n9

*First Midwest Bank v. City of Chicago*, 988 F.3d 978 (7th Cir. 2021)…………………………75

*Fulton v. Bartik*, 547 F. Supp. 3d 799 (N.D. Ill. 2021) …………………………………………49

*Galvan v. City of Chicago*, No. 24 CV 3854, 2025 WL 1807984 (N.D. Ill. July 1, 2025)………...66

*Garcia v. Rix*, No. 24 C 9611, 2025 WL 2624741 (N.D. Ill. Sept. 10, 2025) …………………...17

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003) ……………………………………………..42-43,& n10

*Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012) ………………………………………50n12

*Giglio v. United States*, 405 U.S. 150 (1972) ……………………………………………………39-46

*Gray v. City of Chicago,* No. 18 C 2624, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) …………50n12

*Haliw v. City of S. Elgin*, No. 19 C 01515, 2020 WL 1304697 (N.D. Ill. Mar. 18, 2020)………49

*Hall v. City of Chicago,* 953 F.3d 945, 950 (7th Cir. 2020) …………………………………..66

*Harris v. City of Chicago*, 2020 WL 7059445 (N.D. Ill. Dec. 2, 2020)………………………..49,50,50n12

*Horton v. City of Rockford*, No. 18 C 6829, 2019 WL 3573566 (N.D. Ill. Aug. 6, 2019)…………………..36n8

*Iglesias v. Guevara*, No. 19-CV-06508, 2025 WL 3171611 (N.D. Ill. Nov. 13, 2025)…………..50n12

*In Estate of McIntosh by Lane v. City of Chicago*, No. 15-CV-01920, 2022 WL 4448737
(N.D. Ill. Sept. 23, 2022)…………………………………………………………………..65n17

*Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995)……………………………………….58

*Jimenez v. City of Chicago*, 830 F. Supp. 2d 432 (N.D. Ill. 2011)……………………………..45-46

*Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025) …………49,50n12,53,54

*Johnson v. Winstead*, 447 F. Supp. 3d 715, 720 (N.D. Ill. 2019)……………………………..…...36n8

*Jones v. City of Chicago*, No. 23 CV 4975, 2024 WL 4753687 (N.D. Ill. Nov. 12, 2024)………..68

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)…………………………………….18,43,50n12,71

*Jones v. York,* 34 F.4th 550 (7th Cir. 2022)…………………………………………………… 34

*Kluppelberg v. Burge*, 276 F.Supp.3d 773 (N.D. Ill. 2017)…………………………………………72n,73

*Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill) …………………………………………………….60

*Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447 (N.D. Ill. 2006) …………………..12

*Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467 (7th Cir. 1997)……………………………………56

*LaPorta v. City of Chicago*, 2017 WL 4340094 (N.D. Ill. Sept. 29, 2017)………………………..65n17

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) …………………………………………41

*Lovelace v. Gibson*, No. 17-CV-1201, 2020 WL 6049901 (C.D. Ill. Oct. 13, 2020),
*rev'd in part and remanded on unrelated grounds*, 21 F.4th 481 (7th Cir. 2021)……………………..36n8

*Madero v. McGuinness*, 97 F.4th 516 (7th Cir. 2024)……………………………………………7

*Malley v. Briggs*, 475 U.S. 335 (1986)………………………………………………………18,26

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993)……………………………………..6

*Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450 (N.D. Ill. Apr. 8, 2024)……….31

*Minix v. Canarecci*, 597 F.3d 824 (7th Cir. 2010) …………………………………………53-54,57n15

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022)…………………………………………10,20,30,31

*Napue v. Illinois*, 360 U.S. 264 (1959) …………………………………………………………19

*Neil v. Biggers*, 409 U.S. 188 (1972)……………………………………………………………13

*Neita v. City of Chicago*, 148 F.4th 916 (7th Cir. 2025) …………………………………………..14-15

*Newsome v. James*, No. 96 C 7680, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) …………………49

*Newsome* v. McCabe, 256 F.3d 747 (7th Cir. 2001) ………………………………………………18,40n9

*Obrycka v. City of Chicago*, 07 C 2372, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012)………………61

*Obrycka v. City of Chicago*, 913 F. Supp. 2d 598 (N.D. Ill. 2012). ………………………………..61

*Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426 (N.D. Ill. Sept. 28, 2021)………………..50n2

*Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983)……………………………………71,&n18

*Palmer v. City of Decatur*, No. 17-CV-3268, 20S1 WL 7707939 (C.D. Ill. Sept. 20, 2021)………50n12

*Panizzi v. City of Chicago Bd. of Educ.*, No. 07 C 846, 2007 WL 4233755………………………16
(N.D. Ill. Nov. 19, 2007)

*Patrick v. City of Chicago*, No. 14 C 3658, Dkt.263-1 (N.D. Ill. April 3, 2017)…………………..39

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020)……………………………………..20-30

*Patrick v. Fuelling,*No. 14 C 5414, 2021 WL843426 (N.D. Ill. Mar. 5, 2021)……………………53n14

*People* v. *Holt*, 2022 IL App (1st) 220400 ……………………………………………………12

*People v. Turner*, 240 Ill. App. 3d 340 (1st Dist. 1992) …………………………………………12-13

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014)……………………………………………19

*Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959 (N.D. Ill. Apr. 25, 2017) …………………15n2

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002)………………………………………………56

*Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012) …………………………………………..48

*Reyes/Solache v. City of Chicago*, Nos. 18 CV 1028 (N.D. Ill. July 24, 2025)…………………….6,8,49

*Reynolds v. Jamison*, 488 F.3d 756 (7th Cir. 2007)………………………………………………………10

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018) ……….………………………………………36n8

*Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018)…………….56,72n20

*Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015)…………………………………………..69

*Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648 (1st Dist. 2006)……………………………12-13

*Saunders-El v. Rhode*, 778 F.3d 556 (7th Cir. 2015)…………………………………………………41-42

*Scott v. Harris,* 550 U.S. 372 (2007). ………………………………………………………………………1

*Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284 (N.D. Ill. June 4, 2020)…………………47

*Simmons v. City of Chicago*, 2017 WL 3704844 (N.D. Ill. Aug. 28, 2017)…………………………..65

*Smith v. Burge*, 222 F. Supp. 3d 669 (N.D. Ill. 2016). …………………………………………………..42

*Smith v. City of Chicago*, 785 F. Supp. 3d 356 (N.D. Ill. 2025)………………………………36n8,50n12

*Spalding v. City of Chicago*, 186 F. Supp. 3d 884 (N.D. Ill. 2016)…………………………………..61

*Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999), *as amended* (Jan. 7, 2000) …………………17-18

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2017)…………………………………………………..41

*Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617 (7th Cir. 2010)……………………...7

*Stoltey v. Brown*, 283 F. App'x 402 (7th Cir. 2008) …………………………………………………10

*Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293 (7th Cir. 2010)………………………………

69-70

*Tabor v. City of Chicago*, 10 F.Supp.2d 988 (N.D. Ill. 1998)……………………………………..48

*United States v. Bagley*, 473 U.S. 667 (1985)…………………………………………………..41,46

*United States v. Campuzano*, No. 22-CR-119, 2025 WL 2076661 (N.D. Ill. July 23, 2025)……….. 8-9

*United States v. Diaz*, 876 F.2d 1344 (7th Cir. 1989). …………………………………………….46-47

*United States v. Saelee*, 162 F. Supp. 2d 1097 (D. Alaska 2001). ………………………………….. 28-29

*United States v. Sheth*, 924 F.3d 425 (7th Cir. 2019) ………………………………………………8

*United States v. Shields*, 789 F.3d 733 (7th Cir. 2015)……………………………………………..7

*United States v. Starzecpyzel*, 880 F. Supp. 1027 (S.D.N.Y. 1995)……………………………..28-29

*Wade v. Collier*, 783 F.3d 1081 (7th Cir. 2015)……………………………………………..5,9

*Walker v. City of Chicago*, No. 21 CV 2648, 2025 WL 343471 (N.D. Ill. Jan. 30, 2025)………36n8,53n14

*Walker v. White*, No. 16 CV 7024, 2021 WL 1058096 (N.D. Ill. Mar. 19, 2021)…………………34,50n12

*Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022)……….34-35

*Wearry v. Cain*, 577 U.S. 385 (2016)………………………………………………………..39

*Weston v. City of Chicago*, No. 20 C 6189, 2021 WL 2156459 (N.D. Ill. May 27, 2021)…………...50n12

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)……………………………………19,30,31,35

*Williams v. City of Chicago*, No. 17 C 5186, 2020 WL 1182753 (N.D. Ill. Mar. 12, 2020)…………10

*Williams v. Martinez*, No. 22-CV-06602, 2023 WL 6141494 (N.D. Ill. Sept. 20, 2023) ……………15

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994)……………………………………………….52

**Rules and Statutes**

28 U.S.C § 1983…………………………………………………………………………Passim

28 U.S.C. § 1985(3)……………………………………………………………………..51-52

Federal Rule of Civil Procedure 56 ……………………………………………………………Passim

Federal Rule of Civil Procedure 56(a) …………………………………………………………….63

Federal Rule of Evidence 801……………………………………………………………………17

Federal Rule of Evidence 801(d)(2)(A)-(D)………………………………………………….65

Federal Rule of Evidence 802……………………………………………………………………17

Federal Rule of Evidence 901…… ………………………………………………………...29

Federal Rules of Evidence 901(b)(3)……………………………………………………..28

Defendants Wojcik, Rutherford, Riccio, Boris, Gawrys, Mingey, and Halvorsen's Estate (collectively, the "Individual Defendants") have moved for summary judgment in dockets 459-462 (hereafter, "Individual Defendants' Motion" or "[460]").  Defendant Guevara has moved for summary judgment in dockets 461-464 and 464-1 ("Guevara's Motion" or "[464]").  Cruz refers to the Individual Defendants and Guevara collectively as "Defendants."  Defendant City of Chicago (referred to as "the City") has moved for summary judgment on Cruz's Count VI *Monell* claim ("City's Motion" or "[466]").  Defendant Maloney has settled his case with Cruz, and by agreement, Maloney has withdrawn his summary judgment motion [Dkts.445, 450-52] or will shortly.

This is not a proper case for summary judgment; the three remaining Motions should be denied.

## THE CONTROLLING SUMMARY JUDGMENT STANDARDS

Your Honor most recently set forth the controlling summary judgment standards in *Brown v. Chicago Transit Auth.*, 777 F. Supp. 3d 855, 859 (N.D. Ill. 2025).  *See also* December 11, 2025 Transcript [474] at  (Alexakis, J.) ("The burden of proof is on them. They're the moving party.").  In response to the three Motions, Cruz may not "rest upon mere allegations in the pleadings" or on unsupported or inadmissible evidence. *CCP Golden/7470 LLC v. Breslin*, 161 F.4th 461, 470 (7th Cir. 2025).  Rather, he must "marshal and present the court with the evidence he contends will prove his case." *Id*.  For its part, the Court views all facts that are supported by (a) direct, (b) circumstantial, or (c) expert evidence – as well as any reasonable inferences to be drawn from such facts – "in the light most favorable" to the non-Movant Cruz.  *Scott v. Harris,* 550 U.S. 372, 378 (2007).

These controlling legal standards are vitally important, especially in a case where Defendants repeatedly inform the Court that there is not one shred of evidence to support the non-Movant's claims.  Defendant Guevara refers to this moment as the "put up or shut up" phase of the case [464] at 3.  Here, Cruz has "put up" extensive, detailed, and powerful evidence in support of each of his claims, and therefore, Defendants' and the City's Motions should be denied.

I.   **DEFENDANTS ARE WRONG ABOUT THE LEGAL IMPACT OF MEADORS'
     STATIONHOUSE AND TRIAL IDENTIFICATIONS**

Defendants repeatedly assert that there is "no evidence" that Defendants coerced Meadors to identify Cruz as the shooter or that Meadors' testimony was fabricated in any way. [460] at 2 ("Initially, and critically, there is no evidence that Movants, or anyone, coerced Meadors to identify Cruz"); [464] at 23 ("no evidence Guevara was involved in any way in manipulating or coercing Meadors to identify Plaintiff or fabricating any evidence"). Indeed, in their joint DSOF and their two Motions, Defendants use the phrase "no evidence" 65 times. [461] (DSOF), at ¶¶ 153-154, 157-175; [460] at 5, 6, 6-7, 9, 10, 11, 15, 17 n.3; [464] at 1, 3, 4, 5, 6, 7, 8, 9, 10, 24.

Each of Defendants' legal arguments is based on the false assertion of "no evidence." For example, with respect to Defendants' "probable cause" arguments, Defendants ignore all of the impeachment and exculpatory evidence that favors Cruz, even though caselaw requires unequivocally that at the time Defendants made their probable-cause assessment, they were required to consider _all of the evidence_ known to them related to Douglas's murder and the shooting of Meadors (hereafter, collectively, the "shooting"). *See infra* § II, at 5-19. Similarly, this Court, in evaluating Defendants' summary judgment motion, also must consider the exculpatory and impeachment evidence related to the shooting, and not just Meadors' in-court identification of Cruz. *See infra* § III, at 19-39. The following evidence supports Cruz's claims.

(a)   At the murder scene, Meadors told Officers Odegard and Fleming that both the primary assailant and the other assailants who exited the vehicle, were Black. Plaintiff's LR56.1(b)(2) Statement-of-Fact Response ("PR-DSOF"), [488] at ¶¶ 41(a); and Plaintiff's LR56.1(b)(3) Statement of Additional Facts ("PSOAF"), [487] at ¶¶ 30-36.

(b)   At the murder scene, Jaramillo told Defendants Rutherford and Boris that the first shooter was a 6'0" tall black male in black clothing. PR-DSOF [488] at ¶¶ 41(b), 22, 24(1); PSOAF [487] at ¶¶ 6(b).

(c)   At the murder scene, Rios told Defendants Rutherford and Boris that the getaway car passed "right by" him and that the car contained three Black males, one of whom took a shot at him. PR-DSOF [488] at ¶¶ 41(c), 23, 24(2), 55; PSOAF [487] at ¶¶ 27-29, 37.

2

(d) Defendants Rutherford and Boris intentionally omitted from their reports that one of the assailants took a shot at Rios because it was not consistent with Defendants' theory. PR-DSOF [488] at ¶¶ 41(d), 23, 24, 55; PSOAF [487] at ¶¶ 6(c), 16, 22-26, 27-29,.

(e) Odegard's GOCR originally stated that the primary shooter was an M1 (Black Male) and that the other two shooters were also M1 (Black Male), and one or more Defendants caused the first entry to be altered to M4 (Hispanic Male) and the other entry to be obliterated. PR-DSOF [488] at ¶¶ 41(e), 19; PSOAF [487] at ¶¶ 30-36.

(f) The fair inference that Defendants Guevara, Halvorsen, and Mingey went to Meadors' home to try to influence his identification, which is supported by both 404(b) evidence, Guevara's efforts to influence Jaramillo's testimony, and the fact that none of the three Detectives contemporaneously memorialized the visit to Meadors' home. PR-DSOF [488] at ¶¶ 41(f), 41(v), 26; PSOAF [487] at ¶¶ 1-2, 55-78.

(g) Meadors looked directly at Cruz's photo and told Defendants Guevara, Halvorsen, and Mingey that Cruz was not the shooter ("Meadors' October 6 Non-Identification"). PR-DSOF [488] at ¶¶ 41(g), 28; PSOAF [487] at ¶¶ 46-48.

(h) Sergeant Capitelli – and by reasonable inference one or more Defendants – caused Meadors' name and street address to be placed into *The Chicago Tribune* on the morning of October 7, in violation of all CPD protocols designed to protect crime victims and witnesses. PR-DSOF [488] at ¶¶ 41(h), 29, 105, 135, 161; PSOAF [487] at ¶¶48-49, 51.

(i) Defendant Guevara repeatedly tried to coerce and frighten Jaramillo into identifying Cruz as the first shooter, or at a minimum, to state that the first shooter was an "olive-complected Hispanic" or "light-skinned black." PR-DSOF [488] at ¶¶ 41(i), 67, 79, 80, 153, 154-158, 169; PSOAF [487]  at ¶¶ 6(b), 14(g), 80-81.

(j) Defendant Guevara pressured Jaramillo to sign a "One-Page Document," but then later, fearful that the document would hurt the case Guevara was building against Cruz, destroyed the One-Page Document.  PR-DSOF [488] at ¶¶ 41(j), 90-91, 168-170; PSOAF [487] at ¶¶ 14(h).

(k) Defendants Wojcik and Maloney fabricated the Jaramillo Statement at the behest of Guevara in order to impeach Jaramillo's testimony that the shooters were black. PR-DSOF [488] at ¶¶ 41(k), 79-81, 153, 157-158, 169.

(l) Defendants Riccio and Maloney fabricated the Rodriguez Statement in order to "break" or "block" Cruz's alibi.  PR-DSOF [488] at ¶¶ 41(l), 82-83, 148, ; PSOAF [487] at ¶¶ 42-44.

(m) Defendant Wojcik and Riccio fabricated an interview of Santiago McClaren in order to further break or block Cruz's alibi.  PR-DSOF [488] at ¶¶ 41(m), 57, 59, 82, 86; PSOAF [487] at ¶¶ 42-44.

(n) Defendants Mingey, Riccio, and Maloney never interviewed Cruz's actual alibi witness, Ada Pacheco, and although they interviewed Cruz's second alibi witness, Tito Tartabu, they never memorialized his purported statement in a signed written statement.

3

PR-DSOF [488] at ¶¶ 41(n), 56-58, 82, 148; PSOAF [487] at ¶¶ 42-43.

(o) Defendants Wojcik, Riccio, Gawrys, and perhaps Guevara (who was present) caused Cruz to sit on a yellow phonebook during the live lineup, both bringing extra attention to him and increasing his perceived height, both greatly increasing the chance of a false identification. PR-DSOF [488] at ¶¶ 41(o), 71-74; PSOAF [487] at ¶¶ 17, 54.

(p) Wojcik and Riccio fabricated evidence that Cruz was carrying two Latin King Documents on his person, which documents were admitted at trial along with Wojcik's lies about them. PR-DSOF [488] at ¶¶ 41(p), 48-50, 101, 115-118, 137, 140-142, ; PSOAF [487] at ¶¶ 38-39.

(q) Each Defendant, at one time or another, and many of them, *every time*, failed to contemporaneously memorialize either their investigative activity or the evidence they were uncovering (including impeachment and exculpatory evidence), in violation of CPD rules and Cruz's constitutional rights. PR-DSOF [488] at ¶¶ 41(q), 23-24, 26, 28, 30, 32, 36-37, 43, 169; PSOAF [487] at ¶¶ 14, 46, 50.[1]

(r) Defendant Wojcik never investigated (or asked anyone else to investigate) the purported murder-for-hire plot that Meadors purportedly outlined to Wojcik on October 8; PR-DSOF [488] at ¶¶ 33, 41(r); PSOAF [487] at ¶ 18.

(s) The State's own gang expert testified at Cruz's trial that in 1993 there were approximately 10,000 Latin King gang members in Chicago, and as many as 50,000 gang members adverse to the Disciples. [488] at ¶ 41(s).

(t) Defendants' own gang expert testified at his deposition in this case that in Chicago in 1993 there were 35,000-50,000 gang members adverse to the Disciples. PR-DSOF [488] at ¶ 41(t).

(u) Jaramillo testified in this case (and his testimony is unrebutted) that the State subpoenaed him to appear at the State's Attorney's Office for Cruz's trial, but when he got to that office, he was instructed to wait by the CCSAO entryway and <u>not go to the courtroom</u>. PR-DSOF [488] at ¶¶ 41(u), 143, 145.

(v) Cruz's 404(b) witnesses will testify at the trial of this case that one or more of the Individual Defendants used the same coercive *modus operandi* to convince them to identify a defendant who did not, in fact, commit the crime charged. PR-DSOF [488] at ¶¶ 41(v); PSOAF [487] at ¶¶ 1-2, 55-78.

---

[1] Defendants did not contemporaneously memorialize: (i) Guevara's October 6 interview of Jaramillo at the gas station; (ii) Rutherford and McDonald's purported October 6 interview of Meadors at the hospital; (iii) Guevara, Halvorsen, and Mingey's October 6 interview of Meadors in his home; (iv) Guevara, Halvorsen, & Mingey's October 6 photo array presented to Meadors in his home; (v) Guevara's October 7, 8, and 9 interviews of Jaramillo at Area 5; (vi) Wojcik's first October 8 interview of Meadors in his home; and (vii) Wojcik's second October 8 interview of Meadors in his home; (viii) Wojcik's and Riccio's search of Pacheco's home, which included a search of Cruz's basement bedroom. *See* PR-DSOF [490], 18 n.2 (explaining that evidence cannot be provided to support the complete absence of evidence). *See also* Exhibit A (Attorney Decl.)

4

(w) Cruz's police-practices expert, Police Chief Thomas Tiderington, will testify that Defendants violated numerous CPD rules and regulations related to investigations and memorializing investigations (and Cruz will argue from that testimony that they did so in order to both coerce Meadors to identify Cruz as the shooter and to create evidence used to block or impeach the testimony of Jaramillo, Rios, Pacheco, Tartabu and others). PR-DSOF [488] at ¶¶ 24-26, 29-30, 33, 36-37, 41(w), 43, 57-58, 161; PSOAF [487] at ¶¶ 14, 17-19, 43-44, 46, 49-50.

(x) Defendants Guevara, Halvorsen, and Mingey showed Cruz's photo to Meadors *a first time* Oct. 6 in an improperly-administered photo array. [488] at ¶¶ 26-28, 41(x); [487] at ¶¶ 14, 45-47.

(y) Defendants Wojcik, Mingey, and Gawrys showed Cruz's photo to Meadors *a second and third time* on Oct. 8 in an improperly-administered photo array. PR-DSOF [488] at ¶¶ 35-40, 41(y); PSOAF at ¶¶ 50-53.

(z) Defendants Wojcik, Mingey, Gawrys, and Guevara presented Cruz to Meadors *a fourth time* on October 9, in an improperly-administered live lineup. PR-DSOF [488] at ¶¶ 41(z), 71-73, 74-76; PSOAF at ¶¶ 20-21, 54, 59, 80.

(aa) Cruz's eyewitness identification expert, Dr. Brian Cutler, will testify at trial that Defendants violated numerous CPD rules and regulations related to eyewitnesses, photo arrays, and live lineups (and Cruz will argue to the jury that they did so in order to increase the likelihood of Meadors' false eyewitness identification). PR-DSOF [488] at ¶¶ 41(aa), 27-28, 37, 40, 71, 74-76, 134; PSOAF [487] at ¶¶ 17, 21, 45, 47, 52-54.

(hereafter, "Cruz's Exculpatory/Impeachment Evidence"). Defendants' legal arguments are each premised on the false assumption that Cruz's Exculpatory/Impeachment Evidence: (a) does not exist; (b) is legally irrelevant; or (c) is factually insufficient to defeat Meadors' trial testimony. Such assertions are just wrong as a matter of law.

**II. THE COURT SHOULD REJECT DEFENDANTS' ARGUMENT THAT MEADORS' MAY 8 AND 9 IDENTIFICATIONS OF CRUZ PROVIDED SUFFICIENT "PROBABLE CAUSE" AND DEFEATS CRUZ'S MALICIOUS PROSECUTION AND UNLAWFUL DETENTION CLAIMS (COUNTS 1B, III, VII)**

Cruz does not dispute that the existence of probable cause to arrest and charge is an absolute bar to liability for federal seizure/detention claims and federal and state malicious prosecution claims. *See* [460] at 2, *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015). Cruz does dispute, however, that Defendants have met their burden to establish that no reasonable jury could find that Defendants <u>did not</u> have probable cause. In both Motions, Defendants assert that

5

they have established the existence of probable cause based solely on Meadors' October 8 identification of Cruz in two photo arrays and Meadors' October 9 identification of Cruz in a lineup (collectively, the "Meadors' Oct. 8 and 9 Identifications"). [460] at 4-5; [464] at 11. Defendants are wrong for the following nine reasons.

### A. Defendants Provide This Court With an Incomplete Legal Standard.

Defendants first assert that as long they can show that a single witness, Meadors, identified Cruz as the shooter, then they have established sufficient "probable cause," and further, that such proof defeats Cruz's Counts IB, III, and VII. [460] at 5; [464] at 11. Defendants, however, completely mis-state their actual legal burden. In Judge Steven Seeger's detailed oral ruling in *Reyes/Solache v. City of Chicago*, Nos. 18 CV 1028, 2312 (N.D. Ill. July 24, 2025), he held unequivocally that the "probable cause" question a court faces on summary judgment is not whether the Movants have pointed to sufficient evidence to establish "probable cause;" rather, the proper question is whether there is "enough evidence in the record to support a finding by a reasonable jury that there was *not* probable cause." *See* Guevara Exhibit A [464-1] at 116:8-11 and City Exhibit D, [469-4] at 116:8-11. Defendants Guevara and the City must view Judge Seeger's opinion as important, as each has attached it to their legal memorandum as an Exhibit. *Id*.

Put another way, when a Detective's probable cause inquiry is based on highly-disputed evidence, the question whether Defendants had probable cause must be left to the jury. *See Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) ("Probable cause can be found as a matter of law, however, only when the facts permit but one conclusion—that is, "only when no reasonable jury could find that the officers did not have probable cause").

### B. Defendants Omit the Key Element of the Probable Cause Definition.

In addition to misidentifying their probable-cause *burden*, Defendants also omit the most important element in the definition of "probable cause." The parties agree that probable cause is

6

defined as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged," *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016), and that the standard is "an objective one focusing on the facts known to the officer[s] at the time of arrest." *Carmichael v. Village of Palatine,* 605 F.3d 451, 457 (7th Cir. 2010). Probable cause is a "fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of defendant's arrest." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015).

Most importantly – and this is the part the City omits – because the inquiry looks at "the totality of the circumstances . . . an officer may not close his or her eyes to clearly exculpatory facts." *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 625 (7th Cir. 2010). In *Madero v. McGuinness*, 97 F.4th 516, 523 (7th Cir. 2024), the Seventh Circuit held:

> [A]n arresting officer, in assessing the existence of probable cause, cannot fail to acknowledge and to take into consideration obvious exculpatory evidence that casts a dark cloud on the reliability of other evidence suggesting guilt.

*Id*. at 523. An arresting officer may not "take an ostrich-like approach to exculpatory evidence that is obvious in nature and weakens substantially the relevance and probative value of the evidence suggesting guilt." *Id*. The court cited a long line of Seventh Circuit cases that so held, *Id*. (collecting cases), as well as several from its sister Circuits. *Id*. (collecting cases).[2]

Here, the Detective Defendants ignore ALL of the exculpatory evidence. They repeatedly

---

[2] Two other Circuits literally emphasized this rule while we were writing this brief. *See Coones v. Bd. of Cnty. Commissioners of Unified Gov't of Wyandotte Cnty./Kansas City, Kansas*, No. 24-3147, 2026 WL 158115, at \*19 (10th Cir. Jan. 21, 2026) ("Officers must consider the totality of the evidence known to them when considering probable cause, and in cases where they have both inculpatory and exculpatory evidence they must not ignore the exculpatory evidence in order to find probable cause"); *Alford v. Deffendoll*, No. 25-5149, 2026 WL 183860, at \*4 (6th Cir. Jan. 23, 2026) ("Because probable cause is an objective, totality-of-the-circumstances standard, we . . . center our analysis on the inculpatory and exculpatory evidence available at the time of the arrest").

7

tell this Court that as long as they possessed the Meadors Oct. 8 and 9 Identifications, that was enough for them to cause Cruz to be charged. The controlling law, however, actually requires this Court to evaluate not only the Meadors Oct. 8 and 9 Identifications, which *inculpated* Cruz, but also all the evidence that *impeaches* the Meadors Oct. 8 and 9 Identifications and all the additional evidence that *exculpates* Cruz. *See supra* at 2-5. In making their October 9 probable-cause determination, Defendants were required to include all of Cruz's Exculpatory/Impeachment Evidence. They are not permitted to point solely to the evidence that favors them and then ignore the extensive evidence that undermines their purported probable-cause determination.

Equally importantly, this is not an issue that should be taken from the jury, as Judge Seeger also explained in *Reyes/Solache* (Exhibit 1 to Guevara's memorandum [464-1] at 110:8-117:1):

> [P]robable cause "necessarily" entails a "fact-intensive inquiry." . . . Probable cause is based on the totality of circumstances. . . . The existence of probable cause is often a question that district courts cannot answer at the summary judgment stage. . . . [D]efendants, as the movants, face a high bar to show that there is not any dispute of material fact such that defendants have established the existence of probable cause *as a matter of law*. . . . The [real] question is whether there is a genuine issue of material fact about whether the officers had probable cause. [Here,] I don't think the record dispositively demonstrates that the officers had probable cause. The evidence is either undisputed but uncompelling or the evidence is disputed. . . . [N]one of [the evidence on which Movants rely] is enough, in my view, to show that there's probable cause, and certainly not enough to show that there's probable cause as a matter of law such that a reasonable jury couldn't reach the opposite conclusion. *As I look at this, there is a question of fact about whether there's probable cause. There's enough on both sides of the ledger, so the jury has got to sort it out.* (emphasis added) (cleaned up) (internal citations omitted).

Here, Defendants have failed to consider the facts "on both sides of the ledger." By repeatedly ignoring all of Cruz's Exculpatory/Impeachment Evidence, Defendants have forfeited their probable-cause argument altogether. *United States v. Sheth*, 924 F.3d 425, 435 (7th Cir. 2019) ("A party forfeits an argument . . . by raising it in a perfunctory or general manner"); *United States v. Camp-uzano*, No. 22-CR-119, 2025 WL 2076661, at *3 (N.D. Ill. July 23, 2025) ("Arguments that are not adequately developed or supported are waived"). Cruz respectfully requests this Court to so hold.

The Court, however, should reach the same result even if it considers Defendants' argument on its merits. Because Defendants have not considered the exculpatory and impeaching facts at all in its analysis, Defendants have fundamentally failed to establish that no reasonable jury could conclude that Defendants did not have probable cause.[3]

**C. The Court Should Reject Defendants' "Grand Jury" Argument.**

Defendants assert that a grand jury indictment is *prima facie* evidence of probable cause and then assert that Cruz's indictment by a grand jury is therefore sufficient to establish that Defendants had probable cause. [460] at 4, citing *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015); [464] at 20. This argument fails, however, because in the very next phrase, Defendants concede that prima facie proof of a fact is not sufficient to obtain summary judgment, and that the grand-jury "presumption" on which they rely *may be rebutted* by evidence that "police secured [the indictment] through improper or fraudulent means." [460] at 4, *citing Wade,* 783 F.3d at 1085.

Here, Cruz has fully supported the proposition that Defendants obtained Cruz's indictment through improper and fraudulent means. *See supra* at 2-5. Cruz submits that the admissible, improper-and-fraudulent-means evidence he has presented is overwhelming, but it does not have to be overwhelming to defeat these Motions. It is enough that the evidence presents a genuine issue of disputed material fact that must be presented to – and decided by – a jury. Defendants have not

---

[3] A good, but rare, example of a case where the facts permitted "only one conclusion," and the court was able to find probable cause "as a matter of law" is Your Honor's opinion in *Trakselis v. Village of Justice*, 758 F. Supp. 3d 842 (N.D. Ill. 2024), *aff'd*, No. 24-3282, 2025 WL 2505761 (7th Cir. Sept. 2, 2025). As both Your Honor and the Seventh Circuit held, the officers' reasonable belief that Trakselis's Illinois license had been revoked was all that was required to establish that it was illegal for him to be driving on Illinois roads. *Id*. at 847-48. Put another way, there was no genuine disputed issue left for the jury to resolve given that every disputed factual issue Trakselis proposed was not a *material* or *genuine* dispute because even if true (such as his claim that he possessed an Indiana driver's license), such fact would not have changed the officers' reasonable (and ultimately correct) belief that Traskselis was still violating the Illinois driving laws. *Id*. As the Court will see in this Opposition, this case is not *Trakselis*.

seriously argued to the contrary, all but conceding (in the part where they acknowledge that their grand-jury presumption is *rebuttable*) that this issue must go to a jury.

### D. The Court Should Reject Defendants' "Single Identification" Argument.

Defendants also assert that a single witness's identification of a suspect is sufficient to establish probable cause. [460] at 4, *citing Moran*; [464] at 19-20, citing *Hart, Woods, Moran, Coleman, Cairel, Johnson, Velez, and Moorer* (collectively, "Defendants' Single Identification Cases"). There are, however, two reasons that Defendants' Single Identification Cases do not support Defendants' position, and a third reason why they do not support summary judgment.

First, Defendants mischaracterize what the cases actually hold, asserting that "[p]robable cause is conclusively established based on a single eyewitness even if inconsistent, equivocal, or questionable." [460] at 6; *see also* [464] at 10. This purported summary of what the Single Identification Case hold is wildly overblown. While there are probable-cause cases in which a single eyewitness was *sufficient* to establish probable cause, that fact is a far cry from asserting that "probable cause is conclusively established" whenever a single eyewitness makes an identification – regardless of the strength and weakness of his or her testimony and regardless of the strength of the competing impeaching and exculpatory evidence. The Seventh Circuit holdings in *Beuchamp v. City of Noblesville*, 320 F.3d 733, 765 (7th Cir. 2003); *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) (collecting cases); and *Stoltey v. Brown*, 283 F. App'x 402, 406 (7th Cir. 2008) – that "a single witness is <u>generally sufficient</u> to establish probable cause, *unless the officer has a reason to question the witness' account,*" (emphasis added) – far more accurately describes the Seventh Circuit's actual standard. *See also Williams v. City of Chicago*, No. 17 C 5186, 2020 WL 1182753, at *6–7 (N.D. Ill. Mar. 12, 2020) (adopting this formulation). This formulation is important because any rule that states a "single witness is enough no matter what" fails to accommodate for the fact that impeaching and exculpatory evidence must also be considered. *See supra* at 7-9 and n.2.

10

Defendants' breezy formulation – "[p]robable cause is conclusively established based on a single eyewitness even if inconsistent, equivocal, or questionable" – is simply not the controlling standard in this Circuit.

Second, Defendants' Single Identification Cases are also factually distinguishable. None of the Single Identification Cases involved a situation, as here, where there was overwhelming exculpatory evidence establishing that the person being charged <u>did not do it</u>. None involved:

- the only eyewitness officers relied upon made an initial "non-Identification" of the person charged;
- a second eyewitness insisted that the perpetrators were of a different race than the person charged;
- a third eyewitness also stated that the perpetrators were of a different race than the person charged;
- Defendants never interviewed the charged person's first alibi witness;
- Defendants purportedly interviewed the charged person's second alibi witness, but inexplicably (and highly suspiciously) never committed that witness to a signed statement.
- Defendants purportedly interviewed a 13-year-old non-alibi witness, fabricated a statement for that witness, and then used that fabricated statement to block the charged person's alibi.

These extensive impeaching and exculpatory facts (and additional ones we don't even include here) establish that Defendants' Single Identification Cases are highly distinguishable.

Finally, Defendants' Single Identification Cases do not hold that the probable-cause question is to be taken from the jury. The Court should leave that question to the jury.

**E. The Court Should Reject Defendants' "Inherently Reliable" Argument.**

Defendants next assert that in assessing probable cause they reasonably gave greater weight to Meadors' May 8 and 9 Identifications than to Jaramillo's and Rios's identifications because, as a victim of the crime, "there is a presumption under Illinois law that the information [Meadors] provided is *inherently reliable*." [460] at 4 (emphasis added). Defendants then assert that this Court must also apply such a victim-reliability principle in its probable cause analysis. *Id*. This Court, however, should reject Defendants' victim-reliability principle on four grounds.

First, Illinois law does not apply to evidentiary presumptions on Defendants' two Motions. Under the *Erie* doctrine, this Court applies federal procedural rules, including evidentiary

11

presumptions, not only as to Cruz's two federal counts at issue (Counts IB and III), but also to the count where state law applies the rule of decision (Count VII). *See Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 450 (N.D. Ill. 2006) ("in cases where the principal claim in federal court arises under federal law, with pendent jurisdiction over a state claim, the federal common law of privileges apply"); *Doe v. Oberweis Dairy*, No. 03 C 4774, 2004 WL 1146712, at *2 (N.D. Ill. May 21, 2004) (same); *Estate of Chlopek by Fahrforth v. Jarmusz*, 877 F. Supp. 1189, 1193 (N.D. Ill. 1995) (court applied federal evidentiary rule to all claims, even those where state law provided the rule of decision), *citing Donohoe v. Consolidated Operating & Production Corp.*, 736 F. Supp. 845, 860–61 (N.D. Ill. 1990) (same). Because Defendants have not cited any *federal law* in support of their "victim-reliability principle," Defendants have again forfeited their argument. *See s*upra at 8-9. If, however, this Court forgives the forfeiture, then it should reject the argument on the merits because there is simply no federal law that supports the victim-reliability principle that Defendants are asserting.

Second, even if Illinois law applied, Illinois' victim-reliability principle does not apply *to Meadors*. The principle has never been applied in Illinois to an *eyewitness's identification of a complete stranger*. Every victim-reliability case Cruz's counsel could find (including *Turner*, the lone Illinois citation Defendants provide) turns on the fact that the victim either (a) personally knew the perpetrator prior to the crime taking place; or (b) had a direct, personal, and prolonged interaction with the perpetrator while the crime (usually sexual assault) was taking place. It is such facts – which are not present here *at all* – on which Illinois's victim-reliability principle is based. *See, e.g., People* v. *Holt*, 2022 IL App (1st) 220400, ¶¶ 68-69 (victim-reliability principle applied to a woman who told police that the accused had battered her, sexually assaulted her, threatened her at gunpoint, and repeatedly prevented her from leaving his apartment); *Sang Ken Kim v. City of Chicago*, 368 Ill. App. 3d 648, 650–52, 655 (1st Dist. 2006)(victim-reliability principle applied to

12

a woman who informed Detectives that her boyfriend (who was also the father of her 21-22-week fetus) had pushed her to the floor and then proceeded to kick her in the vagina numerous times, causing extensive uterine bleeding and killing the fetus).

In other words, these "inherently-reliable" identifications were not simply reliable because they came from a victim of any crime, but rather because they came from victims who had detailed prior knowledge of the perpetrator or close and sustained proximity to the perpetrator during an assault. *See also Neil v. Biggers*, 409 U.S. 188, 200 (1972) (victim-reliability principle applied under Tennessee law where victim faced her rapist directly, spent up to half an hour with him both under adequate artificial light indoors and a full moon outdoors, and provided the police with the rapist's approxi-mate age, height, weight, complexion, skin texture, build, and voice); *Turner*, 240 Ill. App. 3d at 357–58 (police reasonably relied on robbery victim's lineup identification of Turner). Cruz cannot find a single case in which any court has applied the victim-reliability principle to the identification of a complete stranger, let alone based on a 3-second observation, and here it is undisputed that Meadors and the perpetrators were complete strangers. PSOAF [487] at ¶ 21(c).

Third, the irony of Defendants' argument, of course, is that, in fact, the exact opposite of "inherently reliable" is true under the facts of *this case*. The evidence that Meadors' October 8 and 9 Identifications were *not* reliable is overwhelming. Meadors testified at Cruz's criminal trial that he viewed the lead shooter for three seconds, and that as soon as the shooting began he dove to the ground and shielded his head. PR-DSOF [488] at ¶¶ 12, 14, 15; [487] at ¶ 21(h). In contrast, Jaramillo was behind floor-to-ceiling, bullet-proof glass the entire time he witnessed the perpetrators, even when he was crouched down. PR-DSOF [488] at ¶¶ 22, 63, 64, 66. Moreover, because Meadors did not become a victim (*i.e.*, did not get shot in the arm) until after he was *already lying on the ground and shielding himself*, he was in a far *worse* position to see the perpetrators than were Jaramillo or later, Rios, who said the perpetrators drove right by him. PR-DSOF [488] at

13

¶¶ 12, 14, 15; [487] at ¶ 21(h). In addition, the social science literature teaches us that the highly stressful nature of being a shooting victim actually make such victims less reliable witnesses, not more reliable. Cutler Expert Report, PX-19, at 9 ("Extreme stress is known to enhance the risk of mistaken eyewitness identification"), *citing* Deffenbacher et al., 2004; Morgan et al., 2004. Indeed, *as the Individual Defendants' own counsel proclaimed during Dr. Cutler's deposition*,

> I don't think there's any doubt, the shootings were highly – were likely a highly stressful event. As you say here, Mr. Meadors himself was [a] victim, he was shot in the arm, so stress can be a factor in a witness' ability to encode the offender's face, is that correct?

Cutler Dep., PX-20 [478-20] at 182:9-16. To which Dr. Cutler responded, "Well said." *Id.*

Fourth and finally, even if Illinois law applied (it doesn't) and even if this Court were inclined to apply the "victim-reliability principle" to Defendants' 1993 probable-cause assessment (it shouldn't be), the victim-reliability principle still does not help Defendants because Rios has testified that one of the perpetrators shot at him as they were fleeing the scene, PSAOF [487] ¶ 29; PR-DSOF, [488] at ¶¶ 23, 55, which also makes *Rios* an *attempt-murder victim*. (That Defendants intentionally omitted this fact from their reports does not mean it did not happen, nor does the fact that Meadors was struck by a bullet, while Rios was not, make Rios any less of an attempt-murder victim than Meadors.) Therefore, even if the Court were to apply the victim-reliability principle, it must apply it equally to both Meadors' and Rios's identifications of the shooters.

In sum, the victim-reliability principle does not help Defendants at all. It does not apply as a matter of law; it does not apply on these facts; neither social science nor common sense support its application here; and the Court should resoundingly reject its use in this instance.

**F. The Court Should Reject Defendants' Reliance on Post-October 1993 Evidence.**

It is blackletter law that the probable cause inquiry is measured at the time of arrest (if the arrest is being challenged) or at the time police cause a suspect to be charged (if the charging decision is being challenged). *Neita v. City of Chicago*, 148 F.4th 916, 928 (7th Cir. 2025) (at time

14

of arrest); *Williams v. Martinez*, No. 22-CV-06602, 2023 WL 6141494, at \*4 (N.D. Ill. Sept. 20, 2023) (at time of charging decision).  Under either scenario, a party's probable cause arguments must be drawn only from information known to the Defendants at that time.  Defendants may not "later supplement their probable cause arguments based on information *not* known to them." *Nieta*, 148 F.4th at 928 (emphasis in original).  Nevertheless, Defendants try to bolster their October 9, 1993 "probable cause" analysis by repeatedly pointing to:

(a) Meadors' **December 1995** trial testimony (DSOF [461] at ¶¶ 10-12, 14-15, 24, 28-30, 32, 34, 36-38, 40-41, 75-76, 103, 104, 107-109);

(b) the fact that Meadors identified Cruz at Cruz's **December 1995** trial (*Id*. at ¶ 103);

(c) the weight that ASA Kevin Byrne placed on Meadors' testimony in **December 1995** (*Id*. at ¶ 107);

(d) arguments Cruz made (or didn't make) in his post-trial motion **(in 1996)** or direct appeal **(in 1997)** in relation to Meadors (*Id*. at ¶¶ 123-126);

(e) statements Meadors made to Cruz's post-conviction counsel Greg Swygert in **2017** when Swygert undertook a postconviction investigation (*Id*. at ¶ 129);

(h) post-conviction arguments that Cruz and Swygert made (or didn't make) in **August 2018** in relation to Meadors and his testimony (*Id*. at 130); and

(f) answers Cruz gave (or didn't give) in response to contention interrogatories in **October 2024** (*Id*. at 151, 152).

Defendants then argue that this additional evidence supports their Oct. 9, 1993 probable-cause analysis. *See, e.g.* [460] at 6, *citing* DSOF 24, 28, 29, 33, 34, and 108 (arguing that "Meadors' own trial testimony" rebuts any evidence that Meadors' October 9 identification was coerced); *Id*. at 7, *citing* DSOF-103-04, 107-09 (arguing that Meadors' in-court identifications bolster Defendants' belief that they had probable-cause, entitling them to summary judgment).  The Court should  reject these arguments as a matter of controlling law.  Even Defendants' own cited cases prohibit this Court from considering post-October 9, 1993 evidence.  *See, e.g.*, [460] at 3-4, citing *Beck*, 379 U.S. at 91; *Williams*, 2023 WL 6141494, at \*4.  Because Defendants did not

15

know any of the facts cited above until well after October 1993, those facts may not be considered in support of Defendants' argument or the Court's probable-cause analysis.

### G. The Court Should Reject Defendants' Reliance on Inadmissible Evidence.

It is also blackletter law that a party may not rely upon inadmissible evidence to support or oppose a motion for summary judgment. *Panizzi v. City of Chicago Bd. of Educ.*, No. 07 C 846, 2007 WL 4233755, at *5 (N.D. Ill. Nov. 19, 2007). Here, Defendants rely extensively on evidence that will not be admissible at trial and therefore is also not amissible on summary judgment. As one example, Defendants assert that while Meadors was at the Hospital, he told Defendant Rutherford and former Defendant McDonald that the shooter was "a mustachioed Hispanic male, about 26, 5'4", 150 pounds, chubby, wearing a black zippered leather jacket and a flat hunter's hat." [460] at 4, *citing* DSOF ¶ 24. Defendants then add (almost comically if it were not so tragic), "This description resembled Cruz." *Id.* Defendants, however, may not rely on this purported "Meadors Hospital Description" in support of their probable cause analysis.

First the purported Meadors Hospital Description lacks authenticity and foundation. Rutherford and McDonald's Supplemental Report makes no mention of Rutherford or McDonald going to, or being at, the Hospital, let alone interviewing Meadors there, let alone Meadors providing this purported description while there. In fact, the Hospital is only mentioned two times in their Supp. Report: "TAKEN TO: Meadors-St. Elizabeth Hospital," [461-6] at 2; and

> Victim #2 [Meadors] had already been removed from the scene and taken to [S]t. Elizabeth's Hosp. where he was treated for his wounds. He was released from the hospital with surgery recommended to remove the bullet lodged in his arm to be scheduled for a later date."

*Id.* at 4. There is no mention of Rutherford or McDonald or anyone else taking a statement from Meadors at the Hospital, and it is undisputed that neither took a single contemporaneous note that reflects they met Meadors at the Hospital or that he gave a statement. Therefore, with literally zero foundation for any such description being provided by Meadors while at the Hospital, the only

16

reasonable inference is that the Hospital interview never took place and that the purported Meadors Hospital Description never occurred at all.

Even if Defendants could prove this conversation happened, it is still wholly inadmissible hearsay. Defendants' Oct. 10 Supp. Report [461-14] is an inadmissible, out-of-court statement on which Defendants rely for its purported truth. Then, embedded within the report is Meadors' equally-inadmissible, double hearsay, a second out-of-court statement also proffered for its truth. *See* FRE 801, 802. Because a jury may not consider either statement, *Id*., so too this Court may not consider them on summary judgment. The bottom line is that both the Federal Rules of Evidence and Federal Rule of Civil Procedure 56 simply do not permit Defendants to rely upon evidence that they cannot also get in front of a jury. The Court should disregard the Meadors Hospital Description and any other inadmissible evidence from its analysis.

**H. The Court Should Reject Defendants' Qualified Immunity Argument.**

Defendants also declare that the probable-cause standard inherently allows room for "reasonable mistakes." [460] at 7, *quoting Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). They then assert that if they "reasonably but mistakenly concluded" that they had probable cause, then they are entitled to qualified immunity. *See* [464] at 12 and 21-22, *citing Garcia v. Rix*, No. 24 C 9611, 2025 WL 2624741, at *3 (N.D. Ill. Sept. 10, 2025); see [460] at 7-8.

This, however, is clearly not a mistake case. In order for it to be a mistake case, that is, in order for this Court to bar Cruz's suit for damages on immunity grounds, there must be a pertinent area of the law that was so murky or unresolved (which, by the way, Defendants never identify) that defendants are entitled to immunity because of that murkiness. Here, it does not exist because the Seventh Circuit held unequivocally in *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999), *as amended* (Jan. 7, 2000) that "[i]t is undisputed that the constitutional right to be free from arrest without probable cause was clearly established at the time Spiegel was arrested in 1993").

17

As the Supreme Court first described in *Malley v. Briggs*, 475 U.S. 335 (1986), and the Seventh Circuit quickly followed in *Spiegel*, a law enforcement officer will not have qualified immunity to malicious prosecution or wrongful detention claims when it is "obvious that no reasonably competent officer would have believed" that the person they are arresting deserved to be arrested or the person they are causing to be charged had, in fact, committed the crime. *Malley,* 475 U.S. at 341; *Spiegel*, 196 F.3d at 723. This case is simply not about a murky area of the law or allowing room for reasonable mistakes, and Defendants' assertion of "arguable probable cause" is inapplicable.

## I.  The Court Should Reject Guevara's "Commence or Continue" Argument.

Guevara adds one more argument, asserting that he cannot be found liable on these counts because "Plaintiff's prosecution was not commenced or caused by Guevara but, rather, by prosecutors who decided [that Meadors'] identification was a viable basis to proceed." [464] at 20. Guevara is wrong (in fact, so wrong that the Individual Defendants did not join this argument.) As early as *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988), the Seventh Circuit has held that "[a] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision." *Id*. at *994*. *See also Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001) (rejecting an argument that it was the prosecutor, not the defendant officers who withheld the *Brady* material). Even Guevara's own cited case, *Colbert* [644] at X, makes clear that the chain of causation is <u>not</u> broken by an indictment where police officers make "knowing misstatements . . . to the prosecutor," or "exert pressure or influence over the charging decision," as Defendants did here with former Defendant Maloney. [464] at 20-21, *quoting Colbert*, 851 F.3d at 655. It appears that it was again Judge Seeger who said it best:

18

[T]he rule that a prosecutor's independent decision to commence or continue a criminal action "breaks the causal chain" only applies in the absence of a police officer's conduct that satisfies the significant-role assessment. The assumption is "that the prosecutor has received a full and fair report detailing a complete good-faith investigation intended to ascertain the identity of the person responsible for the crime." But if "an investigative team conducts a bad-faith and incomplete investigation – designed to implicate a particular individual regardless of the evidence – the prosecutor is effectively prevented from fully exercising that independent judgment. "A prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."

*Bolden v. Pesavento*, 623 F. Supp. 3d 897, 925–26 (N.D. Ill. 2022), *quoting Jones.* These words could not be more directly on point, and the Court should reject this argument.

For all nine reasons identified in this Section, the Court should reject Defendants' probable cause argument in its entirety and deny their motion for judgment on Counts IB, III, and VII.

## III. THE COURT SHOULD DENY DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON CRUZ'S FABRICATION-OF-EVIDENCE CLAIMS (COUNT IA, IB).

It has been long-established that police officers "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[A] police officer who manufactures false evidence against a criminal defendant violates that defendant's right to due process if that false evidence "is later used to deprive the defendant of [his] liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). The "hallmark of a fabrication case" is that the defendants "created evidence that they knew to be false." *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). To prove that one or more Defendants unconstitutionally fabricated evidence against Cruz, Cruz must prove:

(1) the Defendant knowingly fabricated evidence against him;
(2) the fabricated evidence was material to Cruz's conviction; and
(3) the fabricated evidence was used to deprive Cruz of a fair trial (or other liberty).

Cruz's Count IA fabrication-of-evidence claim has five parts, three of which survive Defendants' request for summary judgment. In fact, in order to deny Defendants' Motion on Count IA, this

19

Court need hold only that one of these three sub-theories is supported.

A. Defendants fabricated that Cruz was the shooter and coerced Meadors to so testify, which Meadors did at Cruz's criminal trial (**the "Cruz-Was-The-Shooter Fabrication"**).

B. Defendants altered the General Offense Case Report ("GOCR") in order to change the identification Meadors gave to the first responders, and that GOCR alteration was "used" (within the meaning of the case law) at Cruz's trial because Cruz's counsel was not able to cross-examine Meadors with the fabricated GOCR (**the "GOCR Fabrication"**).

C. Defendants fabricated that upon his arrest, Cruz had the Latin Kings' Constitution and a photograph of Cruz holding up a Latin Kings' gang sign (hereafter, the "Latin King Documents"); Wojcik testified at Cruz's criminal trial (**the "Latin-King-Documents-On-His-Person Fabrication"**).

Cruz's fourth and fifth fabrication claims are:

D. that Defendant Wojcik, in conspiracy with Defendant Maloney and other Defendants, fabricated and falsely attributed to Jaramillo the words "olive-complexed Hispanic" or light-skinned black" in Jaramillo's October 9 written statement (**the "Jaramillo Fabrication"**); and

E. that Defendant Riccio, in conspiracy with Defendant Maloney and other co-defendants, fabricated (and falsely attributed to Cruz's then 13-year old cousin, Danny Rodriguez) a handwritten statement, in order to "block" Cruz's alibi (**the "Rodriguez Fabrication"**).

Cruz is not pressing fabrication claims D and E because this Court has already twice held that fabrication-of-evidence claims may only be brought with respect to evidence that was "used" at Cruz's trial and/or "admitted into evidence" at Cruz's trial. *See* [309] at 12, *citing in part Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020); *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022). *See also* [395] at 3 (dismissing Cruz's claim against Maloney with prejudice).[4]

---

[4] While Cruz respectfully disagrees with the Court's holding for reasons previously stated, [372], at 4-13, Cruz nevertheless accepts, as he must, that the Court's ruling [395] is law of the case, which requires him to stand down from pressing the Jaramillo and Rodriguez Fabrications as violations of due process in Count IA. Nevertheless, Cruz has inserted this footnote for two reasons: (1) to unambiguously preserve his appellate claim that the Jaramillo and Rodriguez Fabrications should also be considered in furtherance of Cruz's fabrication-of-evidence due process claim against Defendants; and (2) to emphasize that even though the Court has barred the use of the Jaramillo and Rodriguez Fabrications in furtherance of Cruz's Count IA due-process claim, they nevertheless continue to be relevant evidence in furtherance of other Cruz claims, such as his Count IB Fourth Amendment fabrication-of-evidence seizure and detention claim (which does not require prior use at trial) and his Count III and VII federal and state malicious prosecution claims (which also do not require prior use at trial).

20

### A.    Defendants Fabricated That Cruz Was The Shooter.

After Defendants learned that the shooters of Douglas and Meadors were black, they fabricated that the shooter was *Cruz*, which is his first of three due-process fabrication "buckets." Guevara's and his detectives' *modus operandi* throughout this period was to put fake cases on Hispanic men and boys who Guevara wanted off the street. They fabricated their case against Cruz using the same basic formula that they have used against at least 53 other wrongfully-convicted Defendants, and Guevara picked Cruz in this instance because Cruz had been implicated in a Humboldt Park "blue boy" shooting (in which no one was hit or hurt). Guevara did not like that Cruz was already out on bond; Guevara wanted charges on Cruz that would not only come without bond, but which would also come with a potential sentence of 90 years or more. In Cruz's Complaint, he asserted, and throughout discovery, he developed, extensive evidence that Defendants created the "fabricated fact" that Cruz was the shooter and then coerced witness Vernon Meadors to testify to that fabricated fact. Defendants now move for summary judgment on that claim, which the Court should reject.

### 1.    The Court Should Reject Defendants' Factual Argument.

Defendants repeatedly insist that there is "no evidence" that Guevara or any other Defendant coerced Meadors into identifying Cruz as the shooter.[5]

In fact, however, the evidence that contradicts Defendants' assertions is overwhelming, including the facts identified on pages 2-5 above. In considering Defendants' Cruz-Was-The-Shooter Fabrication, this Court is required to construe the facts in the light most favorable to Cruz

---

[5]    [460], at 2 ("no evidence that Movants, or anyone, coerced Meadors to identify Cruz"); *Id*. ("no evidence that any identifications were suggestive or unreliable"); *Id*. at 5 (no evidence that "Rutherford and McDonald fabricated Meadors' [purported Oct. 6 Hospital Statement]"); *Id*. at 6 and 10 ("no evidence that any Movant coached [or] manipulated . . . Meadors"); *Id*. at 10 ("no evidence that "Meadors's identification of Cruz as the shooter resulted from pressure, coercion, or fabrication by any officer"). *See also* [464], at 3, 5, 6, 23 (same).

21

and draw all reasonable inferences in his favor.  As one example only, the Court is aware that on October 6, Meadors told Guevara, Halvorsen, and Mingey that "the guy that was the shooter wasn't in that pile of [21] photos."  PR-DSOF [488] at ⁋ 28, *citing* Mingey Dep. [461-3] at 224:17-226:3. Defendants insist that the sole reasonable inference to draw from that statement is that Meadors did not identify Cruz because he was too afraid to do so, while Cruz asserts that the only reasonable inference (especially when the other two eyewitnesses said the shooter was black) is that Meadors did not identify Cruz in that photo array because *Cruz was not, in fact, the shooter*, and Meadors did not see a picture of the true shooter – an approximately 6'0", 170 lbs., black male.

Two days later, Meadors picked Cruz's picture out of two photo arrays – one the Gang Book, the other, the All-Hispanic, 21-Photo Array.  Defendants insist that the only reasonable inference to draw from that fact is Meadors was not afraid for his family any more; he was now prepared to tell the truth, while Cruz asserts that it was not until Guevara and his crew had really scared Meadors (first with the unrecorded Oct. 6 meeting, then with the Oct. 7 *Tribune* article, then with Wojcik's two Oct. 8 visits, including the murder-for-hire threat) and even then not until Defendants had offered Meadors and his family protection if he would identify Cruz as the perpetrator, only then was Meadors willing to go along with the scheme and identify Cruz.

Under the controlling law, the Court must of course credit all reasonable inferences that favor Cruz.  As long as a reasonable jury could conclude from the evidence to be admitted that the inference Cruz is asking the jury to draw is correct, this Court must deny summary judgment with respect to Defendants' Cruz-as-the Shooter Fabrication.  Moreover, numerous judges have already held that Guevara had a *modus operandi* of simply assigning murders to individual gang members and then, along with the Detectives under his command, fabricating evidence and coercing witnesses in order to charge that individual, PSOAF [487] ¶ 2, all, by the way, while completely ignoring the actual murderers.  The Cook County Criminal Court has already

22

exonerated 54 such convicted murderers, 44 of whom have received Certificates of Innocence.

PSOAF [487] ¶ 1; *see also id*. at ¶¶ 55-78.  It is therefore simply wrong for Defendants to assert

that Cruz has not met his "put up or shut up" burden on fabrication of Meadors' testimony, and

the Court should deny Defendants' request for judgment on Count IA.

### 2.  The Court Should Reject Defendants' *Blackmon* Legal Argument.

Defendants next argue that the "Cruz-Was-The-Shooter Fabrication" claim is foreclosed by

*Blackmon v. Jones*, 132 F.4th 522, 524–25 (7th Cir. 2025).  *See* [460] at 15-17; [464] at 4.  The

Court should reject Defendants' *Blackmon* argument.  First, the Seventh Circuit's opinion in

*Blackmon* is simply not applicable to Cruz's due process fabrication-of-evidence claim in this case.

The panel in *Blackmon* was focused solely on Blackmon's narrow claim that "the other people in the

lineup did not look enough like him." *Id*. at 525.  The Court in *Blackmon* concluded that the

negligent preparation of a lineup does not rise to the level of a constitutional violation.  The court

held that the "appropriate remedy" for a detective error that takes place in a stationhouse and not in a

courtroom (such as police showing witnesses a suggestive photo array, conducting a suggestive

lineup, or failing to give a suspect *Miranda* warnings) is "exclusion of the evidence from that

criminal defendant's criminal trial." *Blackmon*, 132 F.4th at 525–26.  It is "not damages [in that

defendant's later civil rights suit]." *Id*.  The court emphasized that the negligent, deficient, or tainted

lineup did not implicate Blackmon's due process rights because the error remained in the station-

house, and never made it to the courthouse. *Id*.  Because the defective lineup was never presented to

Blackmon's jury, there was no violation of Blackmon's constitutional rights. *Id*.  In order to make

this point unambiguous, the court expressly stated that had the defective lineup procedure at issue

made it into the criminal trial against Blackmon, then he *would have had* a 14th Amendment due

process claim for violation of "a right to a trial untainted by evidence obtained through unduly

23

suggestive methods." *Id., citing Alexander v. South Bend*, 433 F.3d 550, 555 (7th Cir. 2006). Therefore, even if applicable, the Court's *holding* in *Blackmon* favors Cruz, not Defendants.

Unlike *Blackmon*, the fabricated testimony that "Cruz was the shooter" not only made it into the courthouse and courtroom, but in fact, it was truly the only substantive evidence admitted against Cruz at his trial. Unlike Cruz, the panel in *Blackmon* never addressed officers who cause evidence to be fabricated from whole cloth and then support their own fabrication *with accompanying suggestive photo or lineup procedures.* The panel in *Blackmon* never cited or discussed the legal standard for fabrication-of-evidence claims and never undertook a fabrication-of-evidence analysis *at all.* Rather, the panel simply held that a suggestive lineup, standing alone, does not lead to money damages against the officers who created a negligent lineup. *Id*.

Defendants treat Cruz's fabrication claim as nothing more than a "suggestive identification claim" or "tainted-identification-procedure claim." [460] at 5, 6-7, 15-17; [464] at 2- 4, 7. Cruz's Count IA fabrication claim, however, is pled far more broadly than Defendants are willing to acknowledge. While Cruz does not dispute that Defendants used tainted identification procedures to support their Cruz-Was-The-Shooter Fabrication, Cruz's actual Cruz-Was-The-Shooter-Fabrication claim asserts that Defendants violated his "constitutional right to due process and a fair trial by fabricating false incriminating evidence against him and using that evidence to deprive him of [a fair trial]." [327] at ¶ 191. Cruz's claim is extremely different than Blackmon's, and the Court should reject Defendants' *Blackmon* argument on that ground alone.

There is one final reason this Court should reject Defendants' reliance on *Blackmon*. To emphasize how narrow its holding was, the panel in *Blackmon* also created a specific exception to its holding. The Court in *Blackmon* held that while generally stationhouse lineups do not create cognizable due process claims, that holding did not apply to situations in which Defendants coerce a witness to identify a suspect and then conceal from prosecutors the tactics they used to coerce a

24

specific identification. *See Blackmon*, 132 F.4th at 525-26. Defendants specifically acknowledge that this *Blackmon* exception exists, [460] at 15; [464] at 7, but they then just dismissively swat the exception away by rejecting even the possibility that any such coercion could have happened in this instance. Without citation or support, Defendants simply declare that no such coercion ever happened to Meadors. *See* [460] at 7 ("While the [*Blackmon*] Court commented that . . . coercion, misrepresentation of identification to prosecutors [would open the door to liability] there is no evidence of anything like that here."); *see also* [464] at 6, 10-11. The fact is that this is precisely what happened to Meadors. *See supra* at 2-5. The paragraph in *Blackmon* emphasizing this exception applies precisely to a case such as this, and this is yet another reason *Blackmon* favors Cruz, and not Defendants.

Finally, whether Defendants coerced Meadors is one of the many genuine issues of disputed material fact that must be decided by a jury, not as a matter of law by this Court.[6]

---

[6]     Another example of attempting to take disputed, material, factual issues away from the jury is Defendants' argument that the phonebook placed under Cruz during the lineup actually "brought Cruz closer in height to the fillers," and therefore, the lineup was "*less*, not more, suggestive" and Defendants are entitled to summary judgment on that ground. Motion at 38 (emphasis Defendants'). This argument is farcical. Jaramillo described the shooter as 6'0." Cruz was (and remains) 5'7". Defendants therefore improperly had Cruz sit on a phonebook for two reasons. First, the phonebook was used to intentionally make Cruz look taller than he actually was. He was far shorter than the actual shooter and far shorter than every other person in the lineup, all of whom more closely reflected the true height of the true shooter. Therefore, the notion that increasing Cruz's height to equal that of the fillers renders the lineup *less suggestive* is patently absurd. Second, the phonebook was intentionally used to bring attention to Cruz. Defendants assert that "Cruz's claim that the phonebook made him stand out . . . is belied by the photograph: the phonebook is barely visible." *Id*. at 38. This is nonsense. Defendants' use of the words, "barely visible" is simply a concession that the phonebook was, in fact, <u>visible</u>. In addition, Cruz will present the expert testimony of Dr. Brian Cutler that the placement of the phonebook to bring attention to Cruz was highly improper and substantially increases the risk of a false identification. PR-DSOF [488], at ¶ 41(o).

Do Defendants really expect to obtain summary judgment based on an argument that the phonebook Defendants improperly placed under Cruz was "*barely visible*," and therefore its existence should be ignored in its entirety as immaterial? And, in any event, shouldn't it be up to the jury to decide what weight to give to the fact that Defendants intentionally tainted the lineup procedure with a phonebook? Maybe the jurors will think the phonebook is a big nothing, or

25

In sum, Defendants incorrectly request this Court to apply *Blackmon* to a wholly inapposite factual scenario. *Blackmon* is simply not a basis to grant summary judgment to Defendants.

### 3. The Court Should Reject Defendants' Qualified Immunity Argument.

We have briefly touched upon qualified immunity above in Section II.H., and we won't belabor it here. The Court should reject Defendants' qualified immunity argument based on *Blackmon*. Defendants assert that it was not "clearly established even as of 2022 that a police officer could be liable for conducting suggestive identification procedures." [464] at 7, *citing Blackmon*; *see also* [460] at 17 (same). As Cruz just stated, however, this is a due process fabrication-of-evidence claim; it is not a "suggestive identification" or "tainted-identification-procedure" claim. *Blackmon* is simply inapplicable because Cruz has alleged (and supported) that Defendants fabricated the false fact that Cruz was the shooter; Meadors was the means by which they put that fabricated fact into evidence; and threats, coercion, intimidation – and also suggestive lineup procedures – were the means by which they got Meadors to agree to be the conduit for their fabricated fact, while *Blackmon*'s only claim was that defendants negligently composed his lineup. Therefore, whatever open question existed in 2022 about liability for negligently-performed line-ups has nothing to do with the scheme that Defendants executed against Cruz.

The proper immunity question is was it well-established in 1993 that coercing Meadors to change his identification from the black man he saw with his own eyes to the Hispanic man they repeatedly pressured him to identify violated Cruz's "clearly-established constitutional rights of which a reasonable person would have known." As Defendants concede, qualified immunity does not protect "those who knowingly violate the law," [460] at 7; [464] at 12, 18, 21, *quoting Malley*,

---

maybe they will think it is one of twenty different ways Defendants coerced Meadors to change his testimony. This is why we have trials, so jurors can decide not only who to believe, but also what weight to give evidence. This Court should reject Defendants' "don't-pay-attention-to-that-man-behind-the-curtain" argument and allow this claim to go to the jury.

475 U.S. at 341, nor is this a case of "mistaken judgments about open legal questions." *Id.*, *quoting Abbott*, 705 F.3d at 713. It is a case in which "no reasonable officer could have thought [Defendants were] acting lawfully" when they coerced Meadors to identify Cruz as the perpetrator of a murder actually perpetrated by three black men.

### B. Defendants Altered The GOCR In Furtherance of Their "Cruz-Was-The-Shooter" Fabrication.

Cruz's second fabrication "bucket" is that one of the Defendants altered the General Offense Case Report ("GOCR"). More specifically, one of the co-conspirators altered the GOCR to change the description of the shooter from M1 (Male Black) to M4 (Male Hispanic), and also to obliterate the description of the other two offenders, who were also listed on the original GOCR as M1 (Male Blacks). Patrolman Charles Odegard was a first responder, and in that capacity, he was charged with preparing the GOCR. After preparing it, the normal procedure would have been to send a copy to Area 5 and the original to CPD's main repository for police reports. PR-DSOF [488] at ¶¶ 41(a), 41(e), 19; PSOAF [487] at ¶¶ 30-36. As just stated above, however, one of the Defendants altered the original, and it was the altered copy that got produced to both the gprosecutor and defense counsel. *Id.* As the Seventh Circuit made clear in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017), Defendants are legally responsible for the "foreseeable consequences" of that action. Id. at 441. Here, the original GOCR could have been used at trial to impeach Meadors' testimony that Cruz was the shooter (because it memorialized that Meadors' told the first responding officers the shooters were Black). By altering the GOCR (to now state that Meadors told Odegard that the shooter was Hispanic), Defendants have engaged in both an unconstitutional suppression of the original GOCR under *Brady* and an unconstitutional fabrication of evidence under *Avery*.

The Individual Defendants make two arguments as to why this Court should ignore the altered GOCR and reject Cruz's fabrication claim. First, they assert that there is "no evidence" that the GOCR was altered. [460] at 9-10. Second, they assert that even if it was altered, because it was not "admitted into evidence" at Cruz's trial, it cannot form the basis of a fabrication-of-evidence claim.

First, the evidence that Defendants altered Odegard's GOCR is extensive. PR-DSOF [488] at ¶¶ 19-20, 41(a), 41(e); PSOAF [487] at ¶¶ 8, 24, 30-36. Defendants oddly appear to assert that without calling an expert document examiner to educate the jury, Cruz is barred from arguing directly to the jury that they can see the alterations in the document with their own two eyes (or perhaps, more appropriately, their own 12 or 24 eyes). *See* [460] at 5. Defendants' argument has been resoundingly rejected, and this Court should do as well. In *United States v. Starzecpyzel*, 880 F. Supp. 1027 (S.D.N.Y. 1995), Judge Lawrence McKenna wrote the leading opinion holding that handwriting comparison and document alteration are not beyond the ken of the average juror. While Judge McKenna *permitted* expert testimony in that case, his opinion also made clear that such testimony is not a prerequisite to a jury's own consideration of altered documents or of handwriting comparisons. To the contrary, the court recognized that jurors may independently compare known and questioned writings and reach their own conclusions regarding authenticity and alteration. *Id*. at 1044 (jurors can perform the task of visual comparisons between handwriting).

In fact, the same principle is now embedded directly in the Federal Rules of Evidence. Rule 901(b)(3) expressly authorizes authentication by "comparison by the trier of fact," confirming that expert testimony is permissive, not mandatory. Thus, the Rules contemplate that jurors themselves may assess documentary discrepancies, inconsistencies, and indicia of alteration based on the evidence presented. Courts applying *Starzecpyzel* have repeatedly underscored this point. In *United States v. Saelee*, 162 F. Supp. 2d 1097 (D. Alaska 2001), the

28

district judge actually *barred* experts from testifying in part because of the jury's ability to perform the comparison unaided, making expert testimony wholly unnecessary. *Id*. at 1104-05.

Here, Cruz made a decision mid-expert discovery (in large part after reading *Starzecpyzel*) that there was no need to offer scientific opinions and specialized forensic conclusions. Cruz will seek only to present the GOCR itself and let the jury decide whether the documents' several indicia of alteration support Cruz's hypothesis that Defendants altered the document to hide what Meadors actually said to the first responders at the murder scene. That will be classic jury work. Defendants remain free to challenge those inferences through cross-examination and competing evidence, but they may not bar the jury from performing a task that the Federal Rules of Evidence expressly assign to the jury in Rule 901. Accordingly, Defendants' attempt to impose an expert-testimony requirement is directly contradicted by *Starzecpyzel*, the Federal Rules of Evidence, and plain old, common sense (see 7th Cir. P. J. Instruction 2.02 ("It would be a violation of your oath as jurors to decide this case on anything other than the evidence presented at trial and your common sense"). Therefore, Defendants first argument related to the GOCR must be rejected.

Second, Defendants assert that even if Cruz could prove to a jury that Defendants altered the GOCR, that fact "is immaterial" for purposes of Cruz's fabrication claim because "[t]he GOCR [itself] was not introduced into evidence in Cruz's criminal trial." [460] at 10. Cruz disagrees, perhaps re-opening the debate about whether evidence must be "admitted into evidence" in order to lead to an unfair trial, or whether a fabricated police document that is *produced to the defense and represented to be part of the police department's investigatory file* may still be considered "used" in relation to a trial and still create an unfair trial and violate due process. Cruz respectfully submits that when police or prosecutors produce fabricated evidence to a defendant, which in turn blocks a criminal defendant from presenting probative exculpatory evidence to the jury, such a fabrication is the mirror image of (and just as central to an unfair trial) as *admitting into evidence* false and

29

fabricated testimony or documents to prove a fact against Defendant. Both are *used* against the Defendant in relation to the trial; both can have an effect on the jury.

On these particular facts, the alteration of the GOCR, even though not "admitted" into evidence was still "used" against Cruz at his trial. The panel in *Patrick* purposefully chose the word "use" at trial instead of "admit" at trial. It was not until *Moran* that a panel held that fabricated evidence "must be admitted" in order to impact the jury. That rule – which has not been expressly adopted by the whole Court under the Court's internal procedures, and which would overrule numerous earlier cases beginning with at least *Whitlock*, takes away the civil jury's opportunity to determine if there was a causal connection between the Officer Defendants' fabrication and the criminal jury's decision to convict. Once Meadors testified, the GOCR Fabrication prohibited Cruz's counsel from undertaking a very straightforward cross-examination of Meadors:

> Mr. Meadors, didn't you tell the first police officer who came to you at the murder scene that the shooter you saw was black?

> And Mr. Meadors, didn't you also tell that Patrolman that the other perpetrators who got out of the car with guns drawn were also black?

> And while he was questioning you, the patrolman was taking detailed notes, correct?

> And, in fact, Patrolman Odegard explained that the notes he was taking would become the murder's initial case report, correct?

> Mr. Meadors, I am handing you Patrolman's Odegard's initial case report [the original].
> In top half of Box 43, a code is marked there as M-1, correct?
> And under the heading Race Codes, it states that M-1 means Black Male, correct.

> Then, in bottom half of Box 43, it indicates that the other two shooters were also black males.

> And this is what you said to the man on the scene who first interviewed you, correct?

Obviously, if Defendants gave the prosecutor (and the prosecutor gave defense counsel) only a fabricated GOCR [461-4] defense counsel was deprived of that effective cross-examination.

Cruz submits that the GOCR Fabrication was "used" by Defendants in relation to Cruz's

30

trial and it caused an infringement of his liberty interest. The altered document was not put in the proverbial "drawer":

> [I]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest.

*Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012), *citing Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994). Here, the GOCR was not put in a drawer. Defendants *did* make further use of it. It was given to the prosecutor, who gave it to defense counsel, and when the defense counsel reviewed it, he was tricked into believing that Meadors had identified a Hispanic male at the scene. The GOCR was not admitted into evidence (nor would it be, given that it is hearsay), but it certainly contributed to creating an unfair trial.

If the full Seventh Circuit were to embrace *Moran* and make a rule that only fabricated evidence "admitted into evidence" constitutes a violation of due process (which it hasn't done yet), then it is going to improperly exclude from the definition of "unfair trials" and "due process" other ways that police officers can effectively *use* "fabricated evidence" to achieve the same ends.

Interestingly, in this Court's November 12, 2024 opinion granting Maloney's Motion to Dismiss with respect to Cruz's fabrication claim, [309] the Court acknowledged that some courts have concluded that "a criminal defendant's due process rights are violated when fabricated evidence is used to convince a criminal defendant to enter a guilty plea." *Id*. at 13 n.5, *quoting Mendoza v. City of Chicago*, No. 23-CV-2441, 2024 WL 1521450, at *2 (N.D. Ill. Apr. 8, 2024). From Cruz's perspective, this was an acknowledgement that there may be situations in which a fabricated document, even if not "admitted into evidence," might still have a "causal connection" to a deprivation of a defendant's liberty interest. Somewhere between "placed in a drawer" and "admitted into evidence" there should still be room for other ways in which fabricated evidence may be "used" (*see Patrick*) to create an unfair trial in violation of the 14th Amendment.

31

Should the Court permit this "bucket" of fabricated evidence to proceed, Cruz of course will be required to convince his civil jury that the fabricated GOCR was material to his criminal defense and causally-connected to the unfairness of Cruz's criminal trial. But the Seventh Circuit Pattern Jury Instruction on fabrication of evidence, No. 7.14, specifically accommodates for that requirement. *Id*. ("2. The evidence was material"). Respectfully, the court should leave to the jury whether the fabricated document effectively blocked Cruz's cross-examination of Meadors and whether the fabricated document caused an "unfair trial" and violated Cruz's due process rights.

## C. Defendants Fabricated That They Removed A Latin King Constitution and A Latin King Photograph From Cruz's Person.

Cruz's final fabrication claim relates to two pieces of evidence that were admitted into evidence as State Exhibits 34 and 35 at Cruz's trial. The first was a photograph of Cruz making a Latin Kings gang sign ("the Photograph"); the second was a copy of the Latin Kings' Constitution ("the Constitution"), and together, we will refer to them as "the Latin King Documents." *See* PR-DSOF [488] at ¶¶ 41(p), 48-50, 101, 115-118, 137, 140-142; PSOAF [487] at ¶¶ 38-39.

At the time the State moved the Latin King Documents into evidence, Wojcik falsely testified that they were recovered from a search of "[Cruz's] person" in the Detective interview room at Area 5. PR-DSOF [488] at ¶ 48. Indeed, the Individual Defendants themselves basically concede that the focus of Cruz's fabrication allegation is on the fact that Wojcik lied at trial about finding the Latin King documents on Cruz's person. *See* [460] at 10-11 ("Cruz alleges that Wojcik and Riccio fabricated the claim that they found [the Latin King Documents] *on his person at the time of his arrest*") (emphasis added), *citing* SAC ¶¶ 192(e) & (f) and 199 (e) & (f).

Cruz also testified at his deposition that Wojcik was lying. First, Cruz knows for a fact that at the time of his arrest on the street, during his transport to Area 5, and after he was brought to the

32

interrogation room, he was not in possession of either document. Second, Cruz also knows that at the time of his arrest he had never possessed or seen a copy of the Latin Kings Constitution and never did so until years later when he was in prison. Third, Cruz knows for a fact that he kept the Photograph among a group of photographs he kept in his bedroom. Fourth, Cruz also knows for a fact that he was searched when he was arrested on the street; he was searched again before he entered the transport vehicle; he was searched again when he entered Area Five. *See generally* PR-DSOF [488] at ¶¶ 41(p), 48-50, 101, 115-118, 137, 140-142; PSOAF [487] at ¶¶ 38-39.

The purported search by Detectives Wojcik and Riccio in an Area 5 Detective interrogation room is completely concocted and is an extremely bad lie because it is so contrary to every reasonable precaution that police take to search suspects and remove belongings *well before* they get to an Area 5 Interrogation Room. (Or, put another way, asserting that these documents were found when Cruz was arrested and first searched on the street would have been a much better lie.)

Wojcik's false testimony and the admission into evidence of these two documents will be referred to as the "Latin-King-Documents-From-Cruz's-Person Fabrication." The fact that the documents were recovered "on his person" was presented to Cruz's criminal jury multiple times. *See* [641-2] at 163 ("Upon searching the defendant, did you find anything *on his person*?"); *Id*. at 164 ("[People's 34] is the photograph that was recovered representing the Latin Kings. And [People's 35] is a chapter constitution of the Almighty Latin King Nation, *both on his person*"); *Id*. ("[are these] in the same condition as when you recovered them *from the defendant's person*?).

Defendants make four different arguments about their Latin-King-Documents-On-Cruz's-Person Fabrication, one of which may simply be ignored and three of which should be rejected.[7]

---

[7] Defendants appear to argue that Wojcik and Riccio cannot be held liable for writing the fabricated fact into their October 10 Supplemental Report, Defendants' Exhibit 13 [461-14], that they took the Latin King Document from Cruz's person – because the Supplemental Report itself was not admitted into evidence at Cruz's trial. *See* [460], at 12; *Id*. at 14-15. Cruz, however,

Defendants assert that neither of the two Latin King Documents were themselves fabricated, that the Detectives only fabricated that they found the documents on Cruz's person. [460] at 12-14. But the Court may easily dispose of this argument. In *Walker v. White*, No. 16 CV 7024, 2021 WL 1058096 (N.D. Ill. Mar. 19, 2021), Judge Shah held, *"*a [civil] jury could also find that the photos [used against plaintiff during his criminal trial] though not [themselves] altered, were taken and presented in such a misleading way as to be fabricated," *Id*. at *8, which is exactly what happened here. While it is true that Defendants' "fabrication" in this instance did not involve altering the words of the Constitution or photo-shopping the Photograph Wojcik and Riccio found in Cruz's bedroom, it is sufficient that Defendant created the false fact that Defendants found these objects on Cruz when they searched him at Area 5.

Defendants' second argument is that under *Briscoe v. Lahue*, 460 U.S. 325, 345-46 (1983) and *Jones v. York,* 34 F.4th 550, 563 (7th Cir. 2022), Wojcik is absolutely immune from liability for his fabricated trial testimony that he and Riccio found the Latin King Documents on Cruz's person when they searched him at Area 5. [460] at 12. The court in *Walker* also rejected this argument, holding:

> [W]itnesses at a criminal trial are immune from suit for their testimony alone. *Avery*, 847 F.3d at 441. But "virtually any item of evidence introduced at trial must be authenticated by oral testimony." *Id*. The due-process violation is not complete until the officer authenticates and introduces the fabricated evidence at trial. *Id.* So although an officer is immune from liability for his testimony alone, he is not immune from [liability for] testimony that repeats or authenticates the content of the fabricated evidence. *Id.*

2021 WL 1058096, at *8. Then, in *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022), the court reached the same result, rejecting Defendants' immunity argument, although the Court phrased the point a slightly different way: "Officer Defendants are not absolutely immune from [liability for] fabricating inculpatory evidence *in advance of Plaintiffs'*

---

is not asserting that they are liable on that basis, so the Court may disregard the argument.

34

*trials.*" *Id*. at *21. In *Boudreau*, the judge acknowledged that the fabrication would also have to be used in relation to the trial, but held that what distinguished *Boudreau* from purely fabricated testimony under *Briscoe* was that the witness testified to a specific fabrication that Defendants had concocted in advance of the trial. *Id*.

Both *Walker* and *Boudreau* cited *Avery* on this point. In *Avery*, plaintiff proved at trial that the defendant officers had fabricated his confession and coerced him into signing it. *Id*. at 435. The court held:

> We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way. . . . **Falsified evidence will never help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the defendant's right to due process.** What's relevant is not the label on the claim, but whether the officers "created evidence that they knew to be false."

*Id*. at 439-440 (emphasis added). This proposition clearly applies to the false fact about finding the Latin King Documents on Cruz's person. The defendants in *Avery* made the same absolute immunity argument that Wojcik makes here, but the Seventh Circuit rejected the argument, explaining:

> When the detectives falsified their reports of a nonexistent confession, it was entirely foreseeable that this fabricated 'evidence' would be used to convict Avery at trial . . .. That was, of course, the whole point of concocting the confession. As we explained in *Fields II*, however, under common-law causation principles, "[h]e who creates the defect is responsible for the injury that the defect foreseeably causes later."] An unbroken causal chain connects the acts of [defendants'] evidence fabrication to Avery's wrongful conviction and imprisonment. The detectives are liable under § 1983 for this due-process violation even though their trial testimony, standing alone, would not subject them to damages liability.

*Id*. at 443 (emphasis added) (cleaned up) (internal citations omitted). The Court in *Avery* also explained *why* it was required to reject Defendants' absolute immunity argument:

> If an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false "facts" in his trial testimony, wrongful-conviction claims premised on evidence fabrication would be a dead letter. That would squarely conflict with our caselaw—most notably *Whitlock*—and would put us at odds with every other circuit to consider the viability of due-process claims premised on fabricated evidence.

*Avery*, 847 F.3d at 441. Cruz requests the Court to reject Defendants' immunity argument based on *Avery*.[8]

---

[8]     Since *Avery*, judges in the Northern District are equally divided on how to interpret it. At least

Finally, Wojcik and Riccio assert that even if they are not immune from liability for their fabrication, the fabrication was nevertheless "immaterial" because the sole basis on which the State used the Latin-King-Documents-On-Cruz's-Person Fabrication was "to demonstrate that on October 6, 1993 Cruz was a Latin King gang member." [460] at 12, 13-14. Therefore, Defendants assert, it simply does not matter *where* they found the Latin King Documents because the Latin King Documents proved Cruz to be a Latin King "either way." *Id*. at 12.

From these assertions, Defendants simply declare, "Cruz cannot begin to show that 'there is a reasonable likelihood [that the admission of Wojcik's testimony that he found these on Cruz's person] affected the judgment of the jury.'" [460] at 13 (citation omitted). They don't explain why that is so – they simply declare it. The Court, however, should reject Defendants' immateriality argument because Defendants are not being straight with the Court. Defendants themselves admit in DSOF-101 that the Latin-King-Documents-On-Cruz's-Person Fabrication was used to make a point far greater than just that Cruz was a Latin King. They admit – and the trial transcript bears this out – that the Fabrication was used to establish that "[Cruz's] sole motive for the murder was his love of the Latin Kings" and as the State told the jury during the trial, Cruz's love for his gang "would be supported [during his trial] by a photo of Cruz flashing a Latin King gang sign

---

four district judges have rejected Defendants' absolute immunity argument on the grounds set forth in *Avery* and have distinguished between false testimony simply given at trial and false testimony being given in furtherance of facts or evidence that Defendants specifically fabricated *before trial* to use against the criminal defendant *at trial*. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1043 (N.D. Ill. 2018), *opinion clarified on unrelated issue,* No. 12-CV-04428, 2018 WL 11469072 (N.D. Ill. May 17, 2018); *Horton v. City of Rockford*, No. 18 C 6829, 2019 WL 3573566, at *5 (N.D. Ill. Aug. 6, 2019); *Johnson v. Winstead*, 447 F. Supp. 3d 715, 720 (N.D. Ill. 2019); *Lovelace v. Gibson*, No. 17-CV-1201, 2020 WL 6049901, at *22 (C.D. Ill. Oct. 13, 2020), *rev'd in part and remanded on unrelated grounds*, 21 F.4th 481 (7th Cir. 2021).

Other judges have reached a contrary conclusion, *see Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1159–60 (N.D. Ill. 2022); *Walker v. City of Chicago*, No. 21 CV 2648, 2025 WL 343471, at *3-4 (N.D. Ill. Jan. 30, 2025); *Smith v. City of Chicago*, 785 F. Supp. 3d 356, 406–07 (N.D. Ill. 2025), but respectfully, we believe that these courts have misapplied *Avery*.

and by the Latin King Constitution *found on his person*." DSOF [461] at ¶ 101 (emphasis added). In other words Defendants' own DSOF-101 expressly contradicts their assertion that Cruz's membership in the gang was the "sole purpose" for admitting the Latin King Documents.

As Defendants have also unwittingly conceded, the criminal trial evidence further establishes that Defendants did not need the Latin King Documents to prove Cruz was a Latin King. The State had that under control from the very start. As Defendants state in their Motions:

1. "Cruz admitted he was a Latin King when he was arrested."
2. "Cruz was arrested wearing a jacket emblazoned with the word 'Kings."
3. The State's expert testified that wearing a Kings hockey jacket meant that the wearer was a Latin King.
4. "Gang evidence permeated the trial, from openings to closings."
5. "Cruz's own counsel acknowledged Cruz's gang membership multiple times, in opening statements and closing arguments."
6. "Cruz's gang membership was never disputed by his criminal defense attorney."
7. "Cruz's counsel admitted he was a Latin King in his opening statement."
8. "Cruz admitted to being a Latin King" during the trial.
9. "Cruz never disputed that the Photograph and Constitution were his."
10. "During closing arguments, Cohn stated three times that Cruz was a 'gang member.'"
11. "Cruz's counsel admitted he was a Latin King in . . . closing argument."
12. "Extensive evidence [was] presented about Cruz's gang membership."

[460], at 12-14; DSOF [461], at ¶ 117, 118, 121. *See also* 443-1 (since stricken), at 34-35.

Second, as noted above, Wojcik and the Prosecutor's repeated references to "on his person" was not asked and answered gratuitously. Just as Defendants indicate in DSOF-101, the State always intended to use the on-his-person Fabrication to convince the jury of Cruz's deep love of the Kings. *See, e.g.,* Cruz Criminal Trial Testimony and Argument [461-39] at 59 ("He's proud to be a Latin King; he has the constitution on him."); [641-2] at 14 ("he did this for no other reason than the love of his gang and the hatred for the Disciples"); *Id*. at 80 (prosecutor arguing that the gang evidence "provides the jury with the explanation and understanding as to why this particular victim was shot"). The "motive" was not revenge of the death of another gang member or a drug dispute, but rather Cruz's love of his very own gang – as evidenced by the documents he carried on his

37

person – that that was the motive for this murder. So the Latin-King-Documents-on-Cruz's-Person Fabrication was definitely material. The Court should reject Defendants' materiality argument.

Defendants, however, also have a second materiality argument, arguing this time that *where* Wojcik and Riccio recovered the Latin King Documents cannot be material because according to Defendants, had it been material, Cruz would have moved prior to trial to suppress the documents, but they never did so. In fact, Defendants go much further than a claim that failing to move to suppress renders the evidence immaterial; Defendants actually assert that because Cruz "did not assert his rights *then*," [460] at 13-14 (emphasis added), he has forfeited the argument altogether:

> Because Cruz necessarily knew at the time of his trial that the report of the photo's seizure was fabricated, he was obligated to assert his rights *then*, not remain silent through decades of litigation and resurrect the claim now.

*Id*. at 13. This argument – that if a criminal defendant does not move to exclude fabricated evidence from his criminal trial, he is barred from ever bringing a claim for evidence fabrication in a later civil trial -- is completely concocted. It does not exist in the law; it lacks any support of any kind. Defendants have not identified (and Cruz cannot find) any case that stands for the proposition that a plaintiff is estopped from asserting a fabrication-of-evidence claim on the ground that he failed (as a criminal defendant) to move to exclude such evidence from his criminal trial. While it is true that some violations – such as a negligently-prepared and arguably suggestive lineup – may only result in evidence exclusion and do not generate a stand-alone cause of action for compensatory damages, see *Blackmon*, discussed *supra*, that principle does not apply to *fabricated evidence*. *See Avery*, 847 F.3d at 439-40 ("Falsified evidence will never help a jury satisfy its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate a defendant's right to due process").

If the Court agrees that as a matter of law that no such estoppel exists, then no further consideration of this issue is required. But Defendants are also wrong *as a matter of fact* that the only conclusion a court (or a jury) can reach from the failure to move to suppress evidence is that

38

the evidence was immaterial to the underlying conviction.  As this Court is aware, there could be a myriad of reasons Cruz's criminal defense counsel did not move to suppress the Latin King Documents, everything from: (a) Cruz and his counsel did not learn about Defendants' search of his home *until after he was convicted* (which is in fact true, Cruz Dep., PR-DSOF [488] at ¶¶ 139-141) *or* (b) defense counsel believed that even if they could prove that Wojcik was lying about where the Documents came from (which likely could only occur if Cruz took the witness stand), the judge was still likely to admit those documents regardless, and (c) every possible form of potential negligence, malpractice, or ineffective assistance in between.  But the "reasons" Cruz and his lawyer did what they did or did not do what they did not do are:  (a) strategy decisions that are not of record in this case (because when Defendants asked about them Judge Fuentes barred them from discovery on attorney-client-privilege and attorney-work-product grounds), and (b) even if there was a record with respect to Cruz and Cohn's decisions, courts repeatedly criticize parties' attempts to use criminal-trial strategy decisions as a basis for cross-examination in a civil rights suit.  *See, e.g.*, *Patrick v. City of Chicago*, No. 14 C 3658, April 3, 2017 Tr. Tr., Dkt.263-1, at 3128-29, 3130.

The Court should reject Defendants' Motions on Cruz's Fabrication-of-Evidence claims.

## IV.     DEFENDANTS HAVE NOT MET THEIR BURDERN TO PROVE THAT NO REASONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT III *BRADY* CLAIMS.

In Count II, Cruz asserts that Defendants violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).  To establish his *Brady/Giglio* claim, Cruz must show that Defendants suppressed exculpatory or impeaching evidence that had a reasonable probability of impacting the criminal case.  [460] at 17; *Wearry v. Cain*, 577 U.S. 385, 392 (2016).  The Supreme Court and Seventh Circuit have repeatedly held that any evidence *that could be used to impeach a key eyewitness* is material.  *Giglio*, 405 U.S. at 153-54.[9]

---

[9]     See *also Smith*, 565 U.S. at 75 (impeachment evidence regarding eyewitness was

39

Here, Defendants suppressed from both prosecutors and Cruz's criminal defense attorney,

(a) evidence that one or more of the Defendants, in conspiracy with the others, altered the GOCR prepared by Patrolman Odegard. PR-DSOF [488] at ¶¶ 19, 41(a), 41(e); PSOAF [487] at ¶¶ 30-36.

(b) evidence that the Defendants had coerced and pressured Meadors' false identification of Cruz, including police reports and/or notes relating to Defendants' interactions with Meadors, which the Defendants destroyed or concealed (*See supra* at 2-5);

(c) evidence that Detectives Wojick and Riccio did not recover the Constitution or the Photograph on Cruz's person, at Area 5, as they falsely reported. PR-DSOF [488] at ¶¶ 41(p), 48-50, 101, 115-118, 137, 140-142; PSOAF [487] at ¶¶ 38-39);

(d) evidence that Defendants had attempted to coerce Jaramillo into falsely identifying Cruz, including police reports and/or notes relating to Guevara and other officers interactions with Jaramillo, which the Defendants also destroyed or concealed. PSOAF [487] at ¶¶ 6(b), 14(g), 14(h), 80-81; PR-DSOF [488] at ¶¶ 41(i), 41(j), 41(k), 67, 79-81, 90-91, 153, 154-158, 168-170.

(e) evidence that as the perpetrators' car was speeding from the murder scene, the front seat passenger shot at Rios. [467-2] at ¶ 205. *See also* PR-DSOF [488] at ¶¶ 41(c), 23, 24(2), 55; PSOAF [487] at ¶¶ 27-29, 37; and

(f) evidence that Guevara caused Jaramillo to sign a "One-page Document," which Guevara later destroyed and which was never produced in the criminal case or in this case. PR-DSOF [488] at ¶¶ 41(j), 90-91, 168-170; PSOAF [487] at ¶¶ 14(h).

Had the first two pieces of evidence been disclosed, they could have been used to cross-examine

Meadors (the only substantive witness), had the third piece been disclosed, Wojcik could have

---

material when eyewitness was the only evidence connecting defendant to the crime); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred"); *Fields v. Wharrie*, 672 F.3d 505, 517 (7th Cir. 2012) (*Fields I*) ("The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial – or when other information that impeach the testimony's reliability are not shared with the defense."); *Fields v. Wharrie,* 740 F.3d 1107, 1117 (7th Cir. 2014) (*Fields II*) ("failing to disclose the false statement's corrupt origins at trial violates [Fields'] due-process right to a fair trial under . . . *Brady*"); *Fields II*, 740 F.3d at 1123 (Sykes, J., concurring in part and dissenting in part) (if "police officers . . . withhold exculpatory information about coerced or fabricated evidence, the aggrieved [criminal] defendant will have a good § 1983 claim against the officers for violation of *Brady*"); *Avery*, 847 F.3d at 439 ("Armed with the *Brady* disclosure, the accused can impeach the coerced testimony by pointing to the tactics the officers used to extract it, and the jury has a fair opportunity to find the truth").

40

been cross-examined with it.  See *Smith*, 565 U.S. at 75; *Fields I*, 672 F.3d at 517; *Newsome*, 319 F.3d at 302-05.  Indeed, this is the sort of impeachment evidence that is material as a matter of law. See *Giglio*, 405 U.S. at 154-55; *United States v. Bagley*, 473 U.S. 667, 676 (1985).

Defendants incorrectly assert that facts giving rise to a due process fabrication claim can never also give rise to a due process suppression claim.  [460] at 18; [464] at 13-14 ("Plaintiff's *Brady* theories are identical to his fabrication theories [and therefore] barred").  This is simply incorrect; the Seventh Circuit has recognized in many cases that the same facts may give rise to both a fabrication claim and a suppression claim.  For example, in *Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2017, the Seventh Circuit held *en banc* that Defendants had violated due process by *both* "(1) fabricating the principal evidence of [plaintiff]'s guilt . . . and (2) failing to disclose, as required by *Brady*, the defendants' agreement to fabricate this evidence."  *Id*. at 524-25.  *See also Avery*, 847 F.3d at 443-44 (although plaintiff knew that the informants' statements were false, . . . he did not know about the pressure tactics and inducements the detectives used to obtain them. . . .   In other words, he did not have the evidence that could help him *prove* that the informants' statements were false"); *Engel v. Buchan*, 710 F.3d 698, 699 (7th Cir. 2013) (plaintiff both "claim[ed defendant] framed him by fabricating evidence and manipulating witnesses, then suppressed this evidence in violation of *Brady*"); *Lewis v. City of Chicago*, 914 F.3d 472, 480 (7th Cir. 2019) (fabricating evidence that results in a conviction "might also violate the accused's right to due process under the rubric of *Brady* . . . , if government officials suppressed evidence of the fabrication").

In the face of this controlling law, Individual Defendants cite just one case, *Saunders-El v. Rhode*, 778 F.3d 556, 562 (7th Cir. 2015), for the proposition that *Brady* does not "compel police officers to accurately disclose the circumstances of their investigations to prosecutors" and that in *Saunders-El*, the Seventh Circuit rejected "the notion that a plaintiff can successfully 'charge the officers with a *Brady* violation for keeping quiet about their [alleged] wrongdoing."  [460] at 18,

41

quoting *Saunders-El* ("alleged" inserted by Defendants). As an initial matter, *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), which relied on *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (and is often referred to as "the *Gauger/Saunders* line of cases") holds that police are not required under *Brady* to disclose the true circumstances of an interrogation of a criminal defendant *that results in a false confession* because, according to these cases, the criminal defendant was present for and knows the true circumstances of the interrogation and false confession. The logic of these decisions is that police are not required to turn over evidence already known to the criminal defendant because that evidence has not been "suppressed" within the meaning of *Brady*. *See* [464] at 14 (Guevara citing all the coerced confession cases in the *Gauger/Sanders-El* line of cases). But this is not a false confession case. The Seventh Circuit has emphasized that the logic of the *Gauger/Sanders-El* line of cases does not extend to the type of evidence suppression claims presented here. In *Avery*, where police fabricated third-party witness statements to implicate a plaintiff at his criminal trial, the Court held that that rule does not apply where police are aware of exculpatory or impeachment evidence that the criminal defendant/civil plaintiff does not possess. 847 F.3d at 443-44. The Court reasoned that even though the plaintiff knew that the third-party's statements about him were false, the police still had an obligation to disclose and could not remain silent about how they had manufactured the false witness statements and the tactics they had used to get the witnesses to adopt them. *Id*. Numerous judges in this district have limited *Saunders-El* to cases where police coerce a confession from a criminal defendant, and then later as a civil rights plaintiff, that individual contends that the police should have disclosed the circumstances of the interrogation and false confession. *See, e.g., Ezell v. City of Chicago*, No. 18 C 1049, 2024 WL 278829, at \*22 (N.D. Ill. Jan. 24, 2024); *Smith v. Burge*, 222 F. Supp. 3d 669, 680 (N.D. Ill. 2016). *See also especially Camm v. Faith*, 937 F.3d 1096, 1110 (7th Cir. 2019), which held that a police officer's lie about evidence during an investigation is itself

42

actionable under *Brady*, regardless of the exculpatory value of the evidence being lied about, because "exposing the lie . . . would have eroded the jury's trust in both the prosecutor and the lead case investigator," and "it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case," both of which "can help create reasonable doubt."[10]

Defendants next assert that Cruz's claim that Defendants failed to record (or recorded and destroyed) certain exculpatory and impeaching evidence related to Meadors – including their own coercion of Meadors and the fact that Meadors made an October 6 "non- identification" of Cruz. Defendants do not argue that such evidence is not exculpatory or impeaching; they argue that there is no requirement that police "keep written records of all their investigatory activities," [460] at 18, *citing Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988). This argument is of course 180° contrary to what its co-defendant, the City, asserts, which is that by 1992, all Detectives had been trained, and all Detectives knew, that they were required to keep written records of their investigatory activities and that the City's deeply-engrained suppression problem had been solved. See City's Brief [466] at 22-24; CPSOF [467] at ¶¶ 21-29.

Defendants also assert that they cured the Guevara/Halvorsen/Mingey *Brady* violation in their Oct. 10 Supp. Report when Defendants finally disclosed the Guevara/Halvorsen/Mingey visit to Meadors, as well as his non-identification. This is actually correct as far as it goes, but it does not cover anything else that happened or was said at the October 6 meeting at Meadors' home or any of the numerous other events for which Defendants did not take any contemporaneous notes.

---

[10] If the Court is interested in a more fulsome discussion of why the *Gauger/ Sanders-El* line of cases does not apply here, *see Sierra v. Guevara*, 18-cv-3029, Dkt.520, at 37-48 and n.9.

See *supra* at 4 n.1 (collecting all events that remained undocumented by GPRs).[11]

Defendants Riccio, Gawrys, and Wojcik obtained the Photograph from Cruz's home and the Constitution (we believe from another defendant's criminal file). Instead of writing those facts into their reports, they instead fabricated a story that they had taken the two documents off of Cruz's person. That lie – that they had taken the two documents from Cruz –is *both* an unconstitutional fabrication and a classic unconstitutional *Brady* violation. By suppressing the true source of the two documents, Defendants withheld vital information Cruz and his lawyer needed to counter the prosecutor's assertion that it was Cruz's love for his gang that was the motive for the murder.

Defendants' four arguments to the contrary should be rejected. First, Defendants argue that Cruz's knowledge of the home search is based on inadmissible hearsay, a statement from Cruz's aunt years after his conviction. But this is a complete non-sequitur. As long as he did not learn the truth before or at his criminal trial, it is completely irrelevant how or when Cruz came into the knowledge of Defendants' search – it still constitutes material, suppressed information.

Second, Defendants argue that prior to the trial, Cruz already knew that Defendants had not taken the two documents off his person, and therefore the actual locations at which they had seized

---

[11] Guevara adds his own twist to this "no obligation" argument. He basically asserts that (a) he had no obligation to record exculpatory evidence, and (b) the exculpatory evidence he chose not to include in a report cannot support a *Brady* claim because a *Brady* violation can only occur when a document exists corroborating it. [464], at 14-15. If this argument seems circular to the Court, it's because it is. This is simply not the law. The easiest way to prove that point is to consider Guevara's October 6 interview of Meadors and even more specifically, the fact that Meadors provided a "non-identification" that night that Cruz was NOT the shooter. Neither Guevara, Wojcik, nor Mingey made any record of that exculpatory evidence, ever. Under Defendants' "no document" theory, Defendants simply had no obligation to disclose to Cruz that Meadors gave a non-identification, on the sole ground that if there is no document that says Meadors gave a non-identification, there can be no *Brady* violation. This is not and cannot be the law. While it is true, as pointed out above, that Wojcik later cured this violation, that does not change the fact that Guevara's "no document" theory must be rejected. Nor are Guevara's string-cite of quotations on page 15, which are taken completely out of context, to the contrary. Cruz's long string-cite of his own on page 39-40 n.9 covers a party's *Brady/Giglio* obligations and are controlling.

the two documents was not "suppressed." Again wrong. It is not enough that Cruz knew Wojcik was lying, he needed *the impeaching evidence* of how the documents were truly seized in order to conduct an impeachment of Wojcik's testimony. His counsel cannot just stand up and say, "When you assert that Cruz was carrying these two documents, you were lying, weren't you? Cruz told me you were lying about that." Moreover, Defendants cannot deflect their own *Brady* violation by forcing Cruz to take the witness stand at his criminal trial, in order to prove Defendants were lying.

Defendants next argue that Cruz could have discovered the actual places police recovered the two objects through "reasonable diligence" and then moved to suppress their admission, but Cruz failed to do so. [460] at 12. Guevara chimes in that had Cruz's attorney only worked harder, he likely would have uncovered all material evidence that Guevara had suppressed. [464] at 16. This is also wrong. With respect to the Constitution, Defendants do not propose any method whatsoever as to how Cruz and his attorney could have learned its true source. With respect to the Photograph, they suggest that Cruz's counsel should have foreseen that Detectives took the picture out of Cruz's bedroom, interviewed the people who were present at the house on the day that occurred, and then moved to suppress the Photo as the fruits of an illegal search. This concocted solution is well outside the Seventh Circuit definition of reasonable diligence and should be rejected. *See Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (Defendants' "argument rests on far too expansive an understanding of what sort of evidence should be considered available to a defendant through the exercise of reasonable diligence"). Reasonable diligence does not require defense attorneys to seek evidence they "had no reason to believe existed," and the Seventh Circuit regards as "untenable" any rule that just presumes that defense counsel is able to uncover all evidence wrongfully suppressed by police. *Id.* at 740, 743. The Seventh Circuit has also held that the limitations on what can be achieved through due diligence applies with even greater force to "interviewing witnesses" than it does to "obtaining documents." *Boss* and its progeny (*see, e.g.*,

45

*Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 443-44 (N.D. Ill. 2011)) make clear that the diligence exception applies primarily to *documents* defense counsel could have obtained through a reasonable search for documents, but courts should be highly reluctant to apply such a test to "*Brady* material contained in a witness's head," *Id*. at 741, as Guevara demands in this case.[464] at 16-17. Finally, a victim's diligence is an issue for a jury, not summary judgment.

Guevara again adds one *Brady* argument that the Individual Defendants do not make, that he has qualified immunity from his *Brady* violations. This argument is both undeveloped and fails on its merits. First, Guevara spends a full page giving the elements of qualified immunity, but when it comes to identifying the legal doctrine that Guevara is asserting was unknown to him, he asserts only, "As set forth above, courts routinely hold that Plaintiff's theories of *Brady* violations are not legally sufficient." [463] at 19. This sentence does not assert a proper claim for qualified immunity. It does not identify with specificity the law Guevara claims was unresolved or unknown, and the claim is therefore forfeited. *Supra* at 8-9. In addition, on the merits, *Brady* in 1963, *Giglio* in 1972, and *Bagley* in 1985 fully put Guevara on notice of his obligations to produce the exculpatory facts and information he learned during the 1993 Douglas murder investigation.

## V.     DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO REASONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT IV AND IX CONSPIRACY CLAIMS.

The parties are in agreement that if all the substantive federal claims fail, then the conspiracy count also fails. *See* [460] at 22-23; [464] at 23-25. If, however, just one federal substantive claim survives against just one Defendant (and a Defendant engaged in one predicate act in furtherance of the conspiracy), then the conspiracy claim remains against all Defendants.

Defendants next concede that a conspiracy may be established through circumstantial evidence, and numerous cases hold that "[b]ecause conspiracies are carried out in secret, direct proof of agreement is rare. . . . Circumstantial evidence may appropriately be utilized to demonstrate both

a conspiracy and the defendant's participation in the conspiracy." *United States v. Diaz*, 876 F.2d

1344, 1352 (7th Cir. 1989). Under the heading, "Sufficiency of the Evidence," *Diaz* held:

> Not only is the use of circumstantial evidence permissible, but "circumstantial evidence may be the sole support for [proof of a conspiracy]." [Indeed,] circumstantial evidence may be stronger and more convincing than direct evidence." In weighing both direct and circumstantial evidence, "[j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict." While "[c]ommon sense is no substitute for evidence, . . . common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence." Not only do we recognize the jury's common sense, we also acknowledge the jury's role as the arbiter of credibility; we defer to the jury's determination of witnesses' credibility.

Id. at 1351–53 (cleaned up). *See also Serrano v. Guevara*, No. 17 CV 2869, 2020 WL 3000284, at

*22 (N.D. Ill. June 4, 2020) (holding that the circumstantial evidence permitted a reasonable

inference that Defendants joined the conspiracy and knew of its scope).

Defendants next assert that the evidence of a conspiracy "must be clear and convincing,"

but this is only half right. Defendants cite a federal case, *Chicago Title Ins. Co. v. Sinikovic*, 125

F. Supp. 3d 769, 781–82 (N.D. Ill. 2015) for this proposition, hoping to make it appear that clear

and convincing applies to both Cruz's federal and state conspiracy claims. *Simikovic*, however,

was a diversity case *that applied only Illinois law*. There is no "clear and convincing" requirement

for Cruz's *federal* conspiracy claim, and Defendants have not cited any federal case holding that

the clear and convincing standard applies to Cruz's federal conspiracy claim.

Defendants then assert that Cruz has "no evidence—circumstantial or otherwise—of a

conspiratorial agreement amongst the Officer Defendants." [460] at 22; *see also* [464] at 24.

That's it. No discussion of the evidence. Just a declaration that no such evidence exists.

The 404(b) evidence in this case, standing alone, supports the strong inference of a conspiracy.

In addition, numerous aspects of the evidence in this case summarized above further support the

inference of a conspiracy. Defendants' burden on this motion is to establish that no reasonable

jury could possibly conclude that Defendants "reached an agreement to deprive Cruz of his

47

constitutional rights" and that no Defendant who joined engaged in "an overt act in furtherance of the conspiracy." The agreement between them that is required is inferred from their *modus operandi* over at least 54 cases, and the multiple different roles that different Defendants played in relation to the scheme to get Meadors to change his testimony. That level of sustained coordination is not possible without . . . coordination. Common sense (which jurors are not only permitted to use, but required to use) supports the inference that an agreement existed.

Defendants' overt acts in furtherance of the conspiracy are covered on pages 2-5 above.

Guevara adds two more conspiracy arguments, [464] at 24-25, which the Individual Defendants do not join. Guevara argues that because all *police defendants* in this case were working *f*or the same government entity and within the scope of their employment, Defendants were not capable of conspiring with themselves, and therefore the Court should grant them judgment on Cruz's conspiracy claim under "the intra-corporate conspiracy doctrine." *Id*. Guevara then argues that whether he is right or wrong about that doctrine, he is nevertheless entitled to qualified immunity on the conspiracy claim because it was undecided in 1993 whether that doctrine applied to Section 1983 claims. There are five reasons to reject these two arguments.

First, Guevara's argument is fatally underdeveloped and therefore forfeited or waived. Guevara never even bothers to explain what the doctrine actually holds or how it applies to the police officers in this case. He simply cites to a 1998 case, *Tabor*, which was neither a police misconduct nor Section 1983 case and to Judge Seeger's 2025 transcript, which he attaches as [464-1] at 129:3-136:4. Under *Puffer v. Allstate Ins. Co.*, 675 F.3d 709 (7th Cir. 2012), "arguments raised in a conclusory or underdeveloped manner" are waived. *Id*. at 719.

Second, the doctrine does not apply on these facts because Defendant ASA Maloney was also named as a member of the conspiracy, and Maloney did not work for the same government entity as the "police defendants." The whole point of the doctrine is that a corporation or

48

government entity (and its actors) cannot be accused of conspiring among themselves because the very definition of their jobs is to come to agreed decisions on behalf of the corporation or government. Therefore, while government entities (and its actors) can make poor decisions, including ones resulting in personal liability, they cannot be alleged to have "conspired" if they are a single government entity. On that ground alone, the doctrine is wholly inapplicable. *See Fulton v. Bartik*, 547 F. Supp. 3d 799, 818 (N.D. Ill. 2021) (because plaintiff has alleged an "*inter-entity*" conspiracy, "there is no need to decide whether [the doctrine or] qualified immunity" apply).

Third, the judges of this district have overwhelmingly held that the doctrine does not apply to Section 1983 conspiracy claims asserting police misconduct and a deprivation of constitutional rights. As *District Judge* St. Eve held in *Harris v. City of Chicago*, 2020 WL 7059445, *11 (N.D. Ill. Dec. 2, 2020), "[t]he doctrine applies only when the agents of a corporation or government entity act within the scope of their employment in joint pursuit of the entity's *lawful business*." Id. at *5. "In police misconduct cases, *the doctrine is inapplicable if the alleged misconduct is not the product of routine police department decision-making.*" *Id*. (emphasis added). By definition, Defendants' rogue conduct in this case was not "routine department decision-making." *See especially Newsome v. James*, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000) (holding that the decision to frame someone for murder "is not the product of routine police department decision-making"). Or, as Judge Ellis recently stated in *Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813 (N.D. Ill. Mar. 24, 2025), "CPD could not have lawfully planned to violate individuals' rights." *Id*. at *33. While two judges in this District disagree, *Haliw v. City of S. Elgin*, No. 19 C 01515, 2020 WL 1304697, at *4–5 (N.D. Ill. Mar. 18, 2020) (Chang, J.) and *Reyes/Solache* [461-1] (Seeger, J.), every other judge in this district has held that the doctrine

49

does not apply to Section 1983 police misconduct cases on this ground.[12]

Fourth, all of the judges in footnote 11 rely on the "unlawful conduct" component to reach their conclusion, but several then gild the lily (as we are doing now) by also pointing to two "exceptions" to the doctrine, rendering it further inapplicable. The doctrine does not apply when (1) "the conspiracy is part of a broader unlawful pattern of conduct by the entity's employees, as alleged in the *Monell* claims;" or (2) defendants acted "outside the scope of [an] entity's interests, which is the case when law enforcement subverts the law." Both exceptions apply here.

Finally, qualified immunity does not apply *at all*. As Judge St. Eve explained in *Harris*:

> Recent uncertainty over the intra-corporate conspiracy doctrine's application to § 1983 cases *does not create an opening for qualified immunity on behalf the defendant officers*. . . . In a Section 1983 case, "the function of conspiracy doctrine is merely to yoke particular individuals to the specific [constitutional] torts charged in the complaint." . . . Like failure-to-intervene, a conspiracy among state actors is simply a means of proving that a defendant is legally responsible for the [substantive] violation [proven]."
>
> Intra-corporate immunity is therefore nothing more than a "distraction." It does not undermine the validity of the conspiratorial theory of liability under § 1983 because that "road to liability is well-paved—clearly established—in several cases."

---

[12] See *Iglesias v. Guevara*, No. 19-CV-06508, 2025 WL 3171611, at *17 (N.D. Ill. Nov. 13, 2025) (Valderrama, J.); *Johnson v. Guevara*, 2025 WL 903813, at *33 (N.D. Ill. Mar. 24, 2025) (Ellis, J.); *Smith v. City of Chicago*, 785 F. Supp. 3d 356, 397–98 (N.D. Ill. 2025) (Cummings, J.); *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *27 n.28 (N.D. Ill. Sept. 30, 2022) (Kness, J.); *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *14 (N.D. Ill. Mar. 29, 2022) (Lee, J.); *Ochoa v. Lopez*, No. 20-CV-02977, 2021 WL 4439426, at *9 (N.D. Ill. Sept. 28, 2021)(Rowland, J.); *Weston v. City of Chicago*, No. 20 C 6189, 2021 WL 2156459, at *10 (N.D. Ill. May 27, 2021) (Alonso, J.); *Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *16 & n.16 (N.D. Ill. Mar. 19, 2021) (Shah, J.); *Piercy v. Warkins*, No. 14 CV 7398, 2017 WL 1477959, at *19–20 (N.D. Ill. Apr. 25, 2017) (Pallmeyer, J.).

As the Court pointed out in *Palmer v. City of Decatur*, No. 17-CV-3268, 20S1 WL 7707939, at *44 (C.D. Ill. Sept. 20, 2021), an additional reason qualified immunity does not apply is that "the Seventh Circuit has long recognized that conspiracy to violate constitutional rights provides a pathway to recovery under § 1983." *Id*. at 44, *citing Harris. See also Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reinstating conspiracy claim against "several members of the same police unit") *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (affirming jury determination of conspiracy among Chicago police officers); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253–61 (7th Cir. 1984) (upholding damage award for conspiracy among Milwaukee police officers).

2020 WL 7059445, at *5 (emphasis added). Shortly after, in *Walker*, Judge Shah distinguished Section 1985(3) claims (where the doctrine applies) to Section 1983 claims (where it does not):

> Section 1985(3) creates *substantive liability* for a conspiracy, whereas conspiracy under § 1983 is a *theory of responsibility for an underlying constitutional violation*. It would make little sense to preclude liability for conspiracy when conspiracy itself is not a standalone violation for which a defendant can be liable in the first place. In other words, the § 1983 conspiracy is not unlawful, the constitutional tort is the unlawful act. So long as it is properly understood that conspiratorial responsibility is simply a method of proof for an officer's personal involvement in a constitutional tort under § 1983 and so long as the underlying constitutional right is clearly established, *qualified immunity does not apply*.

2021 WL 1058096, at *16 (emphasis added). In sum, none of the current debate about intra-corporate conspiracies opens the door to even a facially-plausible qualified immunity argument in this case.

## VI.     DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO REASONABLE JURY COULD FOIND FOR CRUZ ON HIS COUNT IV 1985(3) RACIAL CONSPIRACY CLAIM.

In Count IV, Cruz adds the allegation that Defendants' conspiracy and their actions taken in furtherance of it included "some racial, or otherwise class-based, invidiously discriminatory animus." 28 U.S.C. § 1985(3); [467-2] at ¶ 221 ("The conspiracy was racially motivated. The Individual Defendants willfully conspired with racial animus toward Cruz and the many other Hispanic Area 5 victims identified above"). Defendants now assert that there could be no racial animus because they "*indisputably* had evidence of a gang-related shooting involving a largely Hispanic gang and investigated accordingly," [460] at 3 (emphasis added), which is complete and utter nonsense. Cruz's theory of the case is that Defendants had *indisputable* evidence of three black men shooting Douglas to death, but instead of investigating *that gang*, Defendants chose instead to put the case on Cruz, just as in the other 53 cases where instead of going after the real murderers, Defendants picked a *Hispanic* member of a *Hispanic* gang. Defendants may not like this description of what happened, but it is certainly a description that includes invidious racial discriminatory animus in that Guevara always fabricated cases against Hispanics because those

51

were the ones he wanted off the streets and out of his Area. Here, Guevara picked Cruz because he had been implicated in a Humboldt Park "blue boy" shooting, but was already out on bond; Guevara wanted to stick him with charges that would not only come without bond, but which would also come with an extremely lengthy sentence. Where the evidence overwhelmingly points to three black shooters, and Defendants instead go after only one Hispanic, there is more than enough evidence to support a Section 1985 "racial animus" conspiracy claim.

VII. **DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO REASONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT V FAILURE-TO-INTERVENE CLAIM.**

In Count V, Cruz alleges that each Defendant also "had a realistic opportunity to intervene to prevent the harm [that befell Cruz] from occurring." [467-2] at ¶ 229; *see also Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Defendants' sole argument on Count V is that if the Court grants Defendants judgment on Counts I-IV, it should also grant them judgment on Count V. Cruz concurs that if Counts I-IV are all dismissed, Count V should be as well, but if the Court holds that any of those counts survive (even against just one defendant), then Cruz's Count-V-failure-to-intervene claim survives against all Defendants.[13]

VIII. **DEFENDANTS HAVE NOT MET THEIR BURDEN TO PROVE THAT NO RESONABLE JURY COULD FIND FOR CRUZ ON HIS COUNT VIII EMOTIONAL DISTRESS ("IIED") CLAIM**

Defendants have moved for summary judgment on Count VIII. [460] at 25; [464] at 22-23. Defendants first assert that Cruz's IIED claim fails because his arrest and prosecution were supported by probable cause. [464] at 23; [460] at 25. The Court should reject this argument for the substantive reasons already stated above and because probable cause is a fact-specific inquiry

---

[13] Although Guevara presses Judge Easterbrook's 2022 words about vicarious liability (which were dicta in a concurring opinion in an unrelated case) [464], at 25 n.2, the Individual Defendants concede that *Byrd v. Brishke* (7th Cir. 1972) continues to control the viability of failure-to-intervene claims in this Circuit. [460], at 21.

that must be decided by a jury. Second, Defendants assert that if all of Cruz's constitutional claims fail, then his IIED claim should fail as well. [460] at 25; [464] at 22-23. Cruz does not agree. A reasonable jury could reject all of Cruz's federal constitutional claims on any number of complicated grounds and still conclude that Defendants went after Cruz for the sole purpose of causing him emotional distress. Third, the Individual Defendants simply declare that Cruz cannot demonstrate that their conduct was sufficiently "extreme and outrageous" to establish an IIED violation. [460] at 25. Defendants, however, don't develop this argument in any way, and it is therefore forfeited, and, in any event, the degree of Defendants' extreme and outrageous conduct must be decided by a jury.[14]

In sum, the Court should reject Defendants' request for summary judgment on the IIED claim.

## IX. THE COURT SHOULD REJECT DEFENDANTS' ARGUMENT THAT IT SHOULD GRANT JUDGMENT TO INDIVIDUAL DEFENDANTS ABSED O A LACK OF "PERSONAL INVOLVEMENT."

Cruz does not (nor could he) dispute that individual liability for a substantive Section 1983 claim requires a Defendant's "personal involvement in the alleged constitutional deprivation." *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010); Johnson v. Guevara, No. 20 C 4156, 2025 WL 903813, at *17 (N.D. Ill. Mar. 24, 2025) (Ellis, J.).

> This does not mean that the defendant must have personally participated in the violation of the plaintiff's constitutional rights. . . . Rather, the plaintiff "must demonstrate a causal

---

[14] Guevara asserts a fourth argument (which the Ind. Defs. do not join), that Cruz's IIED claim is untimely. [464], at 22-23. While Guevara is correct that an IIED claim initially accrues on the date the prosecution commences, *Id.*, he intentionally omits that under *Heck v. Humphrey*, 512 U.S. 477, 484-87 (1994), the law did not permit Cruz to bring his IIED claim – and the statute of limitations was tolled – until his conviction was overturned. *Walker v. City of Chicago*, 559 F. Supp. 3d 747, 753 (N.D. Ill. 2021)("the IIED claim was tolled under Heck"); *Gonzalez v. City of Waukegan*, 220 F. Supp. 3d 876, 888 (N.D. Ill. 2016) (same); *Patrick v. Fuelling*, No. 14 C 5414, 2021 WL 843426, at *7 (N.D. Ill. Mar. 5, 2021) ("Illinois courts embrace the *Heck* rule for claims arising under Illinois law"). Guevara's timeliness claim is therefore frivolous and forfeited. Because Cruz's conviction was vacated on July 11, 2022, and he filed his IIED claim on July 4, 2023, which is *more than a year before* Illinois' two-year IIED statute of limitations expired, there is nothing even remotely untimely about Cruz's IIED claim.

connection between (1) the sued officials and (2) the alleged misconduct." . . . It is sufficient "if the conduct causing the constitutional deprivation occurs at [the defendant's] direction or with [the defendant's] knowledge and consent.' " . . . Put differently, the defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see" such that their actions are either knowing or done with reckless indifference.

*Johnson*, 2025 WL 90813, at \*17, *citing Minix*, 597 F. at 833–34 (additional citations omitted).

Here, each Defendant asserts that he did not have direct "personal involvement" in various narrow aspects of Defendants' overall scheme, which have variously been called "sub-theories" or "baskets of evidence."  The Individual Defendants assert that Cruz has "no evidence" that:

- Rutherford, Boris, Wojcik, Riccio, Gawrys, Mingey, or Halvorsen **had any personal involvement in the creation of the GOCR;**
- Rutherford or Boris **were personally involved in the photo arrays or live lineup viewed by Meadors;**
- Rutherford, Boris, Mingey, or Halvorsen **were present when Jaramillo and Rodriguez were at Area 5, or that they had any involvement in either witness's handwritten statement;**
- Rutherford, Boris, Gawrys, Mingey, or Halvorsen **had anything to do with the Latin King Documents;**
- Rutherford or Boris **had any involvement in the investigation after October 6, 1993, or in Cruz's arrest or detention.**

[460] at 24.  Meanwhile, Defendant Guevara asserts that he had no "direct personal involvement" in anything related to Cruz, in any way. [464] at 23 (Guevara "had no contact  with" Cruz); *Id*. (Cruz "has no evidence Guevara was involved in any way in manipulating or coercing Meadors to identify Plaintiff"); *Id*. ("no evidence Guevara fabricated any evidence").

Defendants' basic argument is that "Cruz's inability to provide evidence of personal involvement of these Defendants entitles them to summary judgment *on the specified claims*." [460] at 24 (emphasis added).  But Defendants are wrong for two reasons.  First, Defendants have not *specified any claims*.  They identify very narrow aspects of the scheme and assert that they had no personal involvement in those aspects of Cruz's allegations (such as six of the eight Defendants were not part of the Latin-King-Documents-on-Cruz's-Person Fabrication).  Defendants, however,

54

never finish the thought; they never explain to the Court exactly what that fact gets them; they are afraid to come right out say, "Since Defendant X did not have personal involvement in the Latin-King-Documents-on-Cruz's-Person Fabrication, then . . .," because the "then" does not lead to judgment in their favor. Defendants cannot obtain judgment on Cruz's fabrication-of-evidence claim by proving that they did not have involvement in **Fabrication A, B,** *or* **C**. They can only obtain summary judgment on Cruz's fabrication claim if the only conclusion a reasonable jury could reach is that Defendant did not have any involvement in **Fabrication A, B,** *and* **C**. The Seventh Circuit has made this clear: "[W]hile the parties sometimes refer to three 'Brady claims,' it's more accurate to say that the plaintiff has a single *Brady* claim alleging the suppression of three baskets of evidence." *Camm v. Faith*, 937 F.3d 1096, 1108-09 (7th Cir. 2019) (cleaned up). Although *Camm* involved suppression, the same principle applies to Cruz-Was-The-Shooter Fabrication here. That Fabrication proves that no individual Defendant can obtain summary judgment on "no personal involvement" grounds. It took a lot of effort from each individual Defendant to move from October 6 when Meadors "indicated to [Mingey, Halvorsen, and Guevara] that the guy that was the shooter wasn't in that pile of [21] photos," [487] at ¶ 46 (citing Mingey Dep.), to Meadors picking Cruz out of the October 9 lineup.

- On Oct. 6, **Rutherford and Boris** fabricate Meadors' "Hospital" identification, which coincidentally is a perfect description of Cruz (and there is no contemporaneous evidence that a Hospital interview even occurred);

- On Oct. 6, **Guevara, Halvorsen, and Mingey** show up at Meadors' home to begin asserting the pressure (and there is no contemporaneous record of the meeting);

- On Oct. 7, un-named co-conspirator **Capitelli** leaked Meadors' name and address, significantly ratcheting up the pressure;

- On Oct. 8, **Wojcik** went twice to Meadors' home and increased the pressure (including a fair inference that he simply concocted the murder-for-hire plot) (and there is no contemporaneous record of the two meetings);

- On Oct. 8, **Wojcik and Mingey** continue with suggestive photo-arrays, showing Cruz's

55

photo to Meadors a second and third time;

- On Oct. 9, **Riccio, Gawrys, Guevara, and Wojcik** conduct a highly suggestive lineup (including 3 fillers instead of 4; the exact opposite of cautionary instructions, telling Meadors that the Detectives have "arrested a suspect"; a phonebook to increase Cruz's height, a phonebook to draw attention to Cruz; and additional problems identified by Dr. Cutler).

Therefore, because *all of the Defendants* had personal involvement in the Cruz-Was-The-Shooter Fabrication, it would not matter if, in fact, only Wojcik and Riccio had personal involvement in the Latin-King-Documents-on-Cruz's-Person Fabrication or that Cruz is unable to identify which of the eight Defendants was the one to alter an M-1 in the GOCR and to obliterate the other two M-1s. As long as Cruz can present evidence of a Defendant's personal involvement in *any of the alleged Fabrications*, that Defendant's summary judgment request on that ground must be denied.

Finally, Cruz's federal conspiracy, failure-to-intervene, and state conspiracy claims (Count IV, V, and X) do not have a personal-involvement requirement. That requirement applies only to the underlying constitutional torts. As Judge Gottschall explained in *Rivera v. Guevara*, No. 12-CV-04428, 2018 WL 11469072, at *1 (N.D. Ill. May 17, 2018), when a defendant obtains summary judgment on a substantive § 1983 claim because plaintiff could not establish that that particular defendant "participat[ed] directly in the alleged constitutional violation[]" that defendant "can nevertheless be held liable for another defendant's acts taken in the scope of and in furtherance of the conspiracy or for failing to intervene to prevent a constitutional violation." *Id.* at *1, *citing Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) and *Lanigan v. Vill. of E. Hazel Crest*, 110 F.3d 467, 477–78 (7th Cir. 1997). Therefore, the only way for the Court to grant summary judgment on Cruz's federal conspiracy and failure-to-intervene counts is if grants ALL Defendants judgment on ALL of Cruz's Counts IA, IB,, II, and III. Or, put the other way, if just <u>one</u> of Cruz's substantive allegations in Counts I, II, and III survive against just <u>one</u> Defendant, then Counts IV and V survive

against ALL Defendants.  The same principle applies to the state conspiracy claim.[15]

## X.  THE COURT SHOULD DENY THE CITY'S MOTION  ON CRUZ'S COUNT VI *MONELL* CLAIM.

In Count VI, Cruz asserts that throughout the 80's, 90's, and continuing into this century, the City maintained a broken and dysfunctional police accountability and disciplinary system that failed to identify, track, and discipline officers who repeatedly engaged in malicious misconduct, including the very specific act of intentionally framing innocent people for crimes they did not commit.  This is Cruz's *one Monell* claim and one *Monell* theory.  Cruz will prove that the City enabled and condoned corrupt officers to repeatedly engage in misconduct that caused the wrongful convictions of hundreds of innocent defendants and was also the moving force behind Cruz's wrongful conviction.

The evidence that Cruz will present to support his *Monell* claim falls into two groups. The first group is the actual misconduct of officers that the City enabled and condoned.  These include:

(A)  fabricating false evidence;

(B)  coercing, abusing, and sometimes torturing suspects into false confessions;

(C)  threatening, abusing, and coercing witnesses into false witness identifications;

(D)  suppressing exculpatory and impeaching evidence;

(E) maliciously prosecuting defendants;

(F)  providing perjured testimony at suppression hearings, criminal trials, and in response to disciplinary complaints against these officers, all for the purpose of covering up the misconduct in (a)-(e);

(G) conspiring to do (a)-(f) to build wrongful convictions; and

(H) failing to intervene to stop fellow officers from building wrongful convictions.

These are the means and methos in which individual Officers, including Defendants in this case, effectuated their fake and fabricated cases against criminal defendants.  We will refer to this

---

[15]     Nor would it matter if Gawrys testified that Riccio placed the phonebook, Riccio testified that Wojcik did, and Wojcik testified that Gawrys did.  Personal involvement does not mean that the defendant must have personally participated in the violation of the plaintiff's constitutional rights.  It is sufficient that he knew about the conduct and facilitated, approved, condoned, or turned a blind eye to it. *Minix*, 597 F. at 833–34. All three did that as to the phonebook.

misconduct collectively as "Officer Misconduct" or "Misconduct A-H."

The second group is a separate set of ways in which the City and the CPD managed their officers, which had the effect of enabling and condoning Officer Misconduct:

       (1) Failing to train;
       (2) Failing to supervise (which includes both issuing and enforcing appropriate rules);
       (3) Failing to discipline; and
       (4) Failing to stop the CPD Code of Silence (or put another way, allowing, endorsing and condoning the City's well-entrenched Code of Silence).

These failings, which Cruz will refer to as "City Misconduct" are the source of the City's separate and distinct municipal liability under Section 1983 and the basis for Cruz's Motion.

In its Motion, the City intentionally confuses and conflates these two groups. When the City asserts on page 1 that Cruz "lists 12 theories of *Monell* liability," this is clearly an attempt to conflate Officer Misconduct and City Misconduct. Of course there is going to be overlap between the two lists. More than 30 years ago, in *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995), the Seventh Circuit explained,

> The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.

*Id*. at 152; *Arrington v. City of Chicago*, 17 C 5345, 2018 WL 620036, at *2 (N.D. Ill. Jan. 30, 2018).

Therefore, for Cruz to prove City Misconduct to a jury, Cruz must, by definition, bring out significant past incidents of Officer Misconduct as a way to introduce the City's failures to stop Officer Misconduct, including its failures to (1) train, (2) supervise, (3) discipline, and (4) eradicate the Code of Silence. In this Opposition, as well as Cruz's PR-CSOF-1-80 [489] and PSOAF-C1-C40 [487] Cruz has no choice but to emphasize the following outrageous Officer Misconduct:

58

- Between approximately 1971 and 1993, CPD Commander Jon Burge – and the corrupt Area 2 and Area 3 officers he led – tortured and abused more than 120 African-American men in their custody and caused the improper prosecutions of at least 54 innocent men and boys. PSOAF [487] ¶¶ 1-10.

- From approximately 1982 and 2005, CPD Detective Reynaldo Guevara – and the corrupt Area officers he led at Area 5 – repeatedly used physical and psychological coercion, abuse, threats, and inducements of suspects and witnesses in order to obtain fabricated confessions or eyewitness statements, which in turn led to the wrongful convictions of at least 54 Hispanic men and boys. PSOAF [487] ¶¶ 11-19.

- Between approximately 1988 and 2001, CPD Detectives Kenneth Boudreau, James Halloran, and Michael Kill and other corrupt officers at Area 1 caused at least 24 known and documented wrongful convictions. PSOAF [487] ¶¶ 26.

- From approximately 2002 to 2009, Sergeant Ronald Watts and the corrupt officers under his command (including Watt's partner Kallatt Mohammed) put at least 212 fabricated drug cases on innocent men and women at the Ida B. Wells Homes. (PSOAF-25).

For decades, the City denied that any such misconduct occurred, when in fact the City was either ignoring the misconduct completely or, even worse, actively working to cover it up. What it should have been doing instead is creating and enforcing a disciplinary system that set forth clear expectations of proper conduct and that included severe consequences for any officer who would dare to fabricate, conceal, or suppress evidence in order to intentionally convict someone of a murder or other crime that he or she did not commit. Why did the City of Chicago and its Police Department's senior leadership believe that it was okay to allow officers charged with protecting us from criminal behavior to show up at work every day *and engage in criminal behavior*? Why did they think it was okay to allow well-known and well-documented torture to continue at Area 2 for well over a decade?

It actually gets much worse because the City did more than just enable and condone a well-established pattern of Officer Misconduct; the City also enabled and condoned – indeed, nurtured – something far more pervasive and pernicious: the Department's Code of Silence. This Code was never written down anywhere, but it was nevertheless extremely well-engrained

59

in every Chicago Police Officer's psyche and behavior: The core principle behind the Code was a simple one: "No matter what the circumstances, no matter what the consequences, no matter what unlawful conduct I encounter, blue does not rat on blue, ever. Period."

The evidence Cruz has set forth in his Response to the City's Statement of Facts 1-80 [489] and it Cruz's own Statement of Additional Facts 1-40 [487] proves that the Code of Silence was not limited to the rank and file, but reached all the way to the very top of the CPD Command structure. When the City did nothing from 1980 to 1991 to stop Burge from torturing suspects at Area 2 (and subsequently promoted him to an Area 3 command in 1988), the message was loud and clear. Cruz's expert witness has testified (and will testify) that it was the message that the Department sent about Burge that birthed Guevara; and the message it sent about Burge and Guevara that birthed Boudreau/Halloran/ Kill, and the message it sent out about Burge, Guevara, and Boudreau/Halloran/Kill birthed Watts. In October 1993, the Defendants in this case had ample reason to believe – because of the Code of Silence and because the City was not training, enforcing, supervising, or disciplining any of the unconstitutional conduct in which they were engaging – that they would not be held accountable for their actions, even in the face of their most egregious misconduct. Even a partial history of the Code proves this to be true:

- At an October 11, 1989 City Council Hearing, Police Superintendent Leroy Martin was asked whether a Code of Silence exists within CPD, and he answered that to "some extent" it did. (PX-130, at 369).

- On February 22, 2007, in *Klipfel v. Bentsen*, No. 94-cv-6415 (N.D. Ill), a federal jury in Chicago returned a *Monell* verdict against the City, finding that the City was responsible for maintaining a code of silence and a deeply flawed disciplinary system that was the moving force behind Klipfel's constitutional injury. *See* Dkt. 445 (the jury's verdict is a restricted document that Cruz cannot retrieve from PACER, but the Court should be able to do so).

- On July 24, 2007, Alderman Anthony Beale acknowledged that a code of silence exists within the CPD. During discovery in this case, Judge Fuentes deemed the issuance of this mayoral statement, admitted. [322] at ¶32.

60

- On February 19, 2007, at a bar where Karolina Obrycka was working, off-duty police officer Anthony Abbate Jr. viciously beat, kicked, and punched Obrycka within an inch of her life because she refused to serve him additional alcoholic beverages. Pursuant to the Code of Silence, several of Abbate's fellow-officers attempted to cover up Abbate's assault of Obrycka by undertaking a sham investigation into the incident in order to protect Abbate. Obrycka, however, filed suit against Abbate, the City of Chicago, and other Defendants.

  On February 23, 2012, Judge Amy St. Eve denied summary judgment on the City's *Monell* liability claim (but granted it on Obrycka's indemnification claim, but which is not pertinent to this motion). See *Obrycka v. City of Chicago*, 07 C 2372, 2012 WL 601810, at *1–12 (N.D. Ill. Feb. 23, 2012). The City chose to let the *Monell* claim go to the jury, which "heard evidence concerning both a code of silence within the CPD and a widespread custom or practice of failing to adequately investigate and/or discipline officers." *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 603 (N.D. Ill. 2012). The jury held for Obryka on her *Monell* claim against the City and against Abbate for the conspiracy he and others entered to interfere with her First Amendment rights to speak about what Abbate had done to her.

  Judge St. Eve entered judgment on the verdict, but the City – perhaps having decided that it was not a good idea to have let that claim go to a jury – reached a settlement with Obrycka, which included her agreement to jointly move the Court to vacate the judgment. Judge St. Eve denied that motion, holding that vacatur would not serve the public interest, thereby holding that "[t]he verdict and the judgment both stand." *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 601-06 (N.D. Ill. 2012).

- In 2007 and 2008, in cooperation with the FBI, CPD Narcotics Officers Shannon Spalding and Daniel Echeverria went undercover to investigate a rogue Sergeant named Ronald Watts and several additional officers under his command. In 2012, the FBI and Chicago U.S. Attorney's Office charged Watts, who pled guilty to corruption near the end of 2012. The Department and many of its supervisors and officers, however, took Watt's side and began imposing severe retaliation against Spalding and Echeverria, including intentionally withholding backup from Officer Spalding when she called for backup from a dangerous situation and also numerous explicit threats of physical harm to both Spalding and Echeverria. Spalding and Echeverria sued in 2012, the court denied summary judgment in May 2016, *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 919–20 (N.D. Ill. 2016), and the City promptly settled the lawsuit for $2 million.

- On November 24, 2015, the City of Chicago – pursuant to a Court Order that it do so – released a video of Jason Van Dyke murdering Laquan McDonald. Two weeks later, Rahm Emanuel stood on the floor of the Chicago City Council to acknowledge that "nothing can excuse what happened to Laquan McDonald" and that the City needed "a painful but honest reckoning of what went wrong, not just in this one instance but over decades."

  To do so, Emanuel stated, required an honest appraisal of the police culture that allows and enables certain misconduct to go unchecked. Referring to a problem "at the very heart of the policing profession," Mayor Emanuel stated,

  > The problem is sometimes referred to as the "Thin Blue Line." The problem is other

61

times referred to as the "Code of Silence." It is this tendency to ignore; it is the tendency to deny; it is the tendency in some cases to cover-up the bad actions of a colleague or colleagues. No officer should be allowed to behave as if they are above the law just because they are responsible for upholding the law. Permitting and protecting even the smallest acts of abuse by a tiny fraction of our officers leads to a culture where extreme acts of abuse are more likely, just like what happened to Laquan McDonald. During discovery in this case, Judge Fuentes deemed the issuance of this mayoral statement, admitted. [322] at ¶ XX.

- On March 20, 2016, Mayoral spokesperson Adam Collins was asked by reporters about Mayor Emanuel's December 9 admission that there was a code of silence within the police department, and Collins responded that the Mayor had "finally put a voice to something everyone knew to be true." During discovery in this case, Judge Fuentes deemed this fact admitted. [322] at ¶ 28.

- In December 2015, the U.S. Department of Justice and U.S. Attorneys' Office for the Northern District of Illinois embarked on a joint investigation "to determine whether the Chicago Police Department is engaging in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices within CPD, IPRA [the Independent Police Review Authority] and the City might be facilitating or causing this pattern or practice." In January 2017, DOJ issued a report of the Investigation's findings, concluding, among other things, that there was a widespread code of silence endemic to the CPD and that the "CPD's failure to meaningfully and routinely review or investigate officer use of force is a significant factor in perpetuating practices that result in a pattern of unlawful conduct." PX78 [479-48] at 5; see also PR-CSOF [489] ¶ 7. During discovery in this case, Judge Fuentes deemed this fact admitted. [322] at ¶ 29.

The DOJ Report also stated that "[t]he City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to conceal evidence." PX78 [479-47] at 8.

- In April 2016, the City of Chicago's Police Accountability Task Force (which had been appointed by Mayor Emanuel and was chaired by a future Mayor, Lori Lightfoot) (hereafter, "PATF") issued a report that stated, "From 1972 to 1991, CPD detective and commander Jon Burge and others he supervised tortured and abused at least 100 African Americans on the South and West sides in attempts to coerce confessions" and "For years, Burge and the City denied allegations of torture, reinforcing community beliefs in a police 'code of silence.'" PATF Report, PX-56, at 34; *see also* PR-CSOF-7. During discovery in this case, Judge Fuentes deemed this fact admitted. [322] at ¶ 28.

The PATF Report further states that certain "statistics give real credibility to the widespread perception that there is a deeply entrenched code of silence supported not just by individual officers, but by the very institution itself," and "collective bargaining agreements between the police unions and the City have essentially turned the code of silence *into official policy*." PX56 [479-26] at 12, 14 (emphasis added).[16] **This is literally a City-of-Chicago**

---

[16] Other members of the Task Force included former AUSA and then-City Inspector

**document that states the Code of Silence has become official policy.**

- Cruz's *Monell* Expert, former Police Chief Timothy Longo (and currently, VP of Security at the University of Virginia) has stated in his report and will testify at trial that CPD's intentionally ineffective, internal disciplinary system and the CPD Code of Silence – in relation to "the Burge era of unchecked torture" – "led logically to the misconduct of Reynaldo Guevara and the Detectives with whom he worked." Longo Report [467-7] at 10.

In other words, the Code of Silence existed in 1993 – and has continued to this day.

### A. The City Has Not Met (Nor Tried to Meet) Any of its Three Summary Judgment Burdens.

In bringing its *Monell* summary judgment Motion before this Court, the City must establish:

1. there is *no genuine dispute as to any material fact* with respect to Cruz's *Monell* claim

2. the City is entitled to judgment on Cruz's *Monell* claim *as a matter of law*

3. no reasonable jury could conclude that
   (a)     the City's *de facto* policy or policies, and
   (b)     the City's deliberate indifference to the risk that those policies would continue to cause constitutional harm,
   (c)     were the moving forces behind Mr. Cruz's constitutional injury.

Fed. R. C. P. 56(a); *Monell*, 436 U.S. at 694; *Jones,* 2024 WL 4753687, at *6.

Here, the City has not come close to meeting any of these burdens, nor have they made any particular effort to do so. They never once assert that there "is no genuine dispute as to any material fact." They never once assert that they are "entitled to judgment as a matter of law." They never once assert that "no reasonable jury could find in Cruz's favor at a trial on his *Monell* claim." This argument is not just a quibble over the precise words the City has chosen to use; rather, it is to point out that the City has not made any attempt to meet its Rule 56 burden or to explain how it has done so. Had the City established these three requirements in their Motion, then the burden would have shifted

---

General Joe Ferguson; former AUSA and later acting U.S. Attorney Sergio Acosta; University of Chicago law professor and former Cook County Public Defender Randolph Stone; and retired Chicago Police Superintendent Hiram Grau. Former Chief of the DOJ Civil Rights Division Deval Patrick (who was also a Chicago native and former Governor of Massachusetts) served as a senior advisor to the Task Force.

– temporarily – to Cruz "to marshal and present the court with the evidence he contends will prove his case." *CCP Golden/7470 LLC v. Breslin*, 161 F.4th 461, 470 (7th Cir. 2025). Now that Cruz has done just that, in this Opposition and its PSOAF [487] and its PR-CSOF [489] the burden then shifts back again to the City to meet the Rule 56 conditions identified. It has not done so.

In addition to not meeting its Rule 56 burdens, the City has not asserted that any of the evidence Cruz gathered during discovery is inadmissible. With the exception of the Longo Report (whose admissibility Cruz will address separately in his Opposition to the City's *Daubert* Motion), nowhere in the City's 25-Page Motion [466] nor its 80-Statement CSOF [467] does the City actually challenge the admissibility of a single piece of evidence that Cruz has brought forward to prove his *Monell* claim. While the City does take "pot shots" at its own Goldston Report [467-30] Sanders Report [467-29] and Police Accountability Task Force Report (the "PATF Report") [479-26] (as well as numerous admissions from CPD Police Superintendents, City of Chicago Mayors, and the Chicago City Council), the City does not (nor can it) assert that such evidence is inadmissible because all of the conclusions reached in these reports were commissioned and produced *by the City of Chicago* itself. In *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016), the Seventh Circuit held that the factual findings in a DOJ Report were admissible because they emanated from a legally-authorized investigation. Therefore, its factual findings, opinions, and conclusions were admissible under Federal Rule of Evidence 803(8)(A)(iii). The court especially noted that factual findings from a report of this type can "go a long way toward meeting a plaintiff's burden of proving an unconstitutional custom, policy or practice under *Monell*." *Id*. at 731. *See also Id*. at 740-41 (collecting cases). And the Court's conclusion in *Daniel* gets magnified 10-fold where, as here, the factual findings, admissions, and other statements of opinion all come from the City of Chicago or its authorized representatives.

Numerous cases have followed *Daniel* and have specifically applied their holdings to the

64

very same evidence on which Cruz relies. As just one example, in *Simmons v. City of Chicago*, 2017 WL 3704844 (N.D. Ill. Aug. 28, 2017), Judge Kennelly relied heavily on the Seventh Circuit's holdings in *Daniel* in admitting the Mayor-Emanuel-commissioned PATF Report. The court held that the PATF Report was an evaluative report of a legally authorized investigation, that it properly contained factual findings, and that such findings may include both opinions and conclusions. Like the DOJ Report in *Daniel*, the PATF report was admissible under Federal Rule of Evidence 803(8)(A)(iii). *Id*. at 7-8. *Id*. at 8. (The Court also could have ruled that the Report was not hearsay on a second ground: since the City commissioned the report, it was also an admission of a party opponent under Federal Rule of Evidence 801(d)(2)(A)-(D).)

The court also overruled the City's Rule 403 objection on the ground that the Report had significant probative value (citing the "goes a long way" quote from *Daniel*) and that the City (and its fellow-defendants) had failed to show any

> *unfair* prejudice with regard to points that are directly at issue in this case, including plaintiffs' *Monell*-based contentions regarding failure to supervise, investigate, and discipline allegations of excessive force and their allegations regarding the comparative treatment of complaints where the alleged victim of excessive force is African-American.

*Id*. at 8.[17]

### B. Cruz Has Presented More Than Sufficient Evidence to Prove the Single *Monell* Claim He Has Pled.

If the Court agrees that the City has not made a sufficient showing that (a) there is no

---

[17] Other Northern District cases in which the courts have admitted the evidence on which Cruz relies include: *In Estate of McIntosh by Lane v. City of Chicago*, No. 15-CV-01920, 2022 WL 4448737, at *11–13 & nn.16-18 (N.D. Ill. Sept. 23, 2022) (finding Emanuel Speech, PATF Report, DOJ Report all admissible and denying summary judgment on code-of-silence claim); *Arrington v. City of Chicago*, No. 17 C 5345, 2018 WL 620036, at *4 (N.D. Ill. Jan. 30, 2018) ("the Seventh Circuit has held that government reports such as the DOJ Report at issue here can be admissible evidence of municipal notice relevant to a *Monell* claim"); *LaPorta v. City of Chicago*, 2017 WL 4340094, at *13 (N.D. Ill. Sept. 29, 2017) (the PATF Report's finding that a CPD "code of silence" exists is both admissible and a basis to deny the City summary judgment on LaPorta's *Monell* claim).

disputed issue of fact; (b) no plausible argument that it is entitled to judgment as a matter of law; and (c) failed to establish that no reasonable jury could rule for Cruz on his *Monell* claim, then the Court may summarily deny the City's Motion, and no further consideration is required. In an abundance of caution, however, Cruz briefly addresses the three elements Cruz must meet to prove his *Monell* claim at trial and the five arguments the City makes, asserting that Cruz can neither prove any of these three *Monell* elements, nor establish the preliminary hurdle of proving any of the individual claims against the Individual Defendants and Defendant Guevara.

As Your Honor stated in *Galvan v. City of Chicago*, No. 24 CV 3854, 2025 WL 1807984 (N.D. Ill. July 1, 2025), to succeed on a *Monell* claim, a plaintiff:

> must ultimately prove three elements: (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury.

*Id*., *quoting Hall v. City of Chicago,* 953 F.3d 945, 950 (7th Cir. 2020).

With these requirements in mind, the City asserts that "Cruz has not proven" that (1) any individual defendant violated Cruz's constitutional rights [466] at 5; (2) the City engaged in "any citywide practice" violating *Monell* [466] at 1, 5, 6, 10; (3) the City was on "notice" of the improper citywide practices of which Cruz complains [466] at 14, 17 & n.4, 21, 23; (4) the City was 'deliberately indifferent" to Defendants' unlawful practices. [466] at 4, 16, 17, 22-23; and (5) the City's policies were the moving force behind Cruz's constitutional injuries. [466] at 4, 16. Cruz disagrees, as stated in detail, as follows:

**1. Cruz Has Established the Defendants' Underlying Constitutional Violations.**

The City asserts that "Plaintiff failed to develop evidence of any constitutional violation." [466] at 5. Cruz disagrees. If the Court agrees with Cruz that he has presented sufficient evidence of either a constitutional violation or a genuine issue of disputed material fact regarding a

66

constitutional violation – by any one Defendant on any one constitutional claim – then the Court should reject the City's first preliminary argument that Cruz has not proved an underlying violation, and the Court need not consider that argument further.

> **2. Cruz Has Established That The City Had A Widespread Code of Silence and A Widespread Failure to Train, Supervise, and Discipline.**

According to the City, Cruz has not "even attempted to demonstrate . . . a citywide practice that constitutes a City custom and practice with the 'force of law.'" [466] at 5. "Instead," the City asserts, "Plaintiff relies on the opinion of his retained expert, Timothy Longo, that such practice existed" and then further argues that the Court should simply reject Longo's "inadmissible" opinions because he "employed no discernible methodology;" his opinions "lack a reliable basis;" and his opinions "are not premised on sufficient facts and data" to establish a municipal policy. *Id*. at 5-6. The City then spends the remainder of its memorandum attacking Longo's opinions (except pages 18 and 25).

There are two reasons that Cruz does not respond <u>here</u> to Defendants' "Longo arguments." The first is that the these arguments are identical or virtually identical to the arguments that the City makes in its *Daubert* Motion, so Cruz will respond these arguments in his Daubert Opposition. The second reason is that the City attempts to create a false narrative that in opposing summary judgment, the only evidence Cruz is permitted to rely upon are the opinions of his expert, Tim Longo. It does not cite any precedent for that proposition; Cruz rejects it; and Cruz hopes this Court does as well.

There are other problems with the City's argument in this Section. On pages 1, 5, 6, and twice on page 10, the City asserts that Cruz has failed to "adduce evidence of ***any citywide practice***." *See* [466] at 1 ("Plaintiff's failure to adduce evidence of ***any citywide practice*** dooms his *Monell* claim") (emphasis added); at 5 ("Plaintiff has not established—nor has he even attempted to demonstrate—***a***

67

*citywide practice* that constitutes a City custom and practice with the 'force of law'") (emphasis added); *Id*. at 6 ("Because Longo's conclusions are based on a limited set of allegations only, his opinion is insufficient to establish *a citywide policy*") (emphasis added); *Id*. at 10 ("Ultimately, neither Plaintiff, nor Longo, provide evidence to establish how these various statements about allegations of police brutality or comments on Guevara's credibility are probative of *CPD's citywide disciplinary practices* in 1993") (emphasis added); *Id*. at 10 ("Even assuming discipline should have been imposed in those cases but was not (evidence Plaintiff failed to develop), such a limited number is insufficient to establish *a citywide widespread* [sic] *practice*") (emphasis added).

First, the City does not support the proposition that Cruz must establish a citywide practice with any citation to any case.

Second, it happens that in very first *Monell* case, which of course was *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), "the plaintiffs alleged that New York had a _citywide_ policy of forcing women to take maternity leave after the fifth month of pregnancy," Id. at 661 n.2, but to the best of Cruz's knowledge, no court – including the Supreme Court in many re-visits of the Monell doctrine – has ever held that a *Monell* plaintiff must plead and prove a _citywide_ policy. A plaintiff's burden has always been to establish that a City's custom, practice, and/or *de facto* policy was "widespread," not "citywide."

We did locate one case that did use the word "citywide," but from the context of its use, we believe the court used it in error. It was this Court's November 2024 opinion in *Jones v. City of Chicago*, No. 23 CV 4975, 2024 WL 4753687 (N.D. Ill. Nov. 12, 2024). The Court's full paragraph states,

> Here, plaintiff alleges that the City's *widespread* custom of a "code of silence" encouraged officers to fabricate evidence, leading to the deprivation of his Fourth and Fourteenth Amendment rights. [1] ¶ 41. To determine whether plaintiff sufficiently pleaded a *widespread* custom theory of *Monell* liability, the Court looks to "the instances of misconduct alleged, the circumstances surrounding the alleged constitutional injury,

68

> and additional facts probative of a ***widespread*** practice or custom." *Williams*, 315 F. Supp. 3d at 1079. Generally speaking, a plaintiff must plead more than a single incident of wrongdoing to allege *Monell* liability; the ***widespread*** custom alleged must "permeate[ ] a critical mass of [the] institutional body." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005); *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). This requirement aims to ensure that the plaintiff has identified a true ***citywide*** custom, rather than just one isolated event. *Walker*, 596 F. Supp. 3d at 1074.

*Id*. at *6 (emphasis added). The City does not cite this paragraph to support their "citywide" argument; indeed, they don't cite to *Jones* at all (which tempted us not to raise this issue at all). Nevertheless, fearful that it surface in a reply brief as support for the City's unsupported "citywide" argument, Cruz thought it best to address it here. Respectfully, given the paragraph's full structure and wording, Cruz does not believe this Court intended to change the longstanding "widespread" standard. And most importantly, regardless which word is used, Cruz is clearly not seeking to build his *Monell* claim around "one isolated event." He has produced substantial evidence "over multiple events" to support his Code of Silence and failure to train-supervise-discipline allegations and the City's repeated failures prior to 1993 to take any significant corrective action.

In addition to meeting the requirement of "breadth," Cruz also meets the requirement of "depth." In 1988, in *Cosby v. Ward*, 843 F.2d 967 (7th Cir. 1988), the Seventh Circuit held that "there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, *except that it must be more than one instance*." *Id*. at 983 (7th Cir.1988) (emphasis added). Seventeen years later, in *Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005), the Seventh Circuit repeated that position, holding that a custom or practice claim "requires more evidence than a single incident to establish liability." *Id*. at 380. Five years later, still nothing had changed, when the Court held in *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293 (7th Cir. 2010):

> We do not adopt any bright-line rules defining a "widespread custom or practice." As we stated in *Cosby v. Ward,* there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, "except that it must be more than one instance," . . .

69

> or even three. . . . But the plaintiff must demonstrate that there is a policy at issue rather than a random event. This may take the form of an implicit policy or a gap in expressed policies, . . . or "a series of violations to lay the premise of deliberate indifference." . . . Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the [municipality] had a widespread practice that [caused] the alleged constitutional harm.

*Id*. at 303 (internal citations omitted); *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (same). In short, Cruz has established that he is focused on a City "policy" and not "a random event."

Cruz also meets these same standards with respect to the City's failure to train, supervise, and discipline CPD officers. Let's take one example because it is a classic *Monell* issue and because the City spends a lot of time in their Statements of Fact attempting to justify its actions. In its Statements of Fact 21-29 [467] the City admits that prior to 1982, CPD and its officers maintained what were commonly referred to as "working files," "running files," or "street files," which contained investigatory evidence, CSOF [467] at ¶ 29, and which, for ease of reference, we will refer to collectively as "Suppressed Files." Once defense lawyers, defendants, and judges learned about these "Suppressed Files," they instantly and repeatedly criticized and complained (and sued) that the practice was being used to suppress exculpatory evidence from Defendants in violation of *Brady* and *Giglio*. Numerous suppression motions were filed on these grounds, and lawyers filed impact litigation against the City in federal court as well.

In its Statement of Facts, the City insists that beginning in approximately April 1982 and continuing until 1992, the City took steps to put an end to CPD's practice of Suppressed Files and purportedly informed all CPD Detectives and other police officers that they must (1) stop the practice of Suppressed Files, (2) memorialize all material evidence and information during an investigation, and (3) turn all such evidence over to prosecutors prosecuting the case. In support of this, the City insists that it issued six sets of new rules between 1982 and 1992, including: (1) DDN 82-2 in April 1982; (2) S.O. 83-1 in January 1983; (3) S.O. 83-2 in May 1983; (4) S.O.

70

86-3 in May 1986; (5) 1988 SOPs; and (6) 1992 SOPs. *See* [467] at ¶¶ 21-28. The City insists that these Orders "reinforced CPD's long standing, though unwritten, policy that everyone has an obligation to pass on information." *Id.* ¶ 25. And then they end this section of their Statements by asserting that the 1992 CPD Detective Division Standard Operating Procedures

> required detectives to "preserve and record information and materials obtained, including that which might aid in the defense of the accused," and that detectives were trained to thoroughly and accurately document their investigation steps in a homicide investigation.

Id. ¶ 29. The problem with the City's argument is that the actual evidence that Cruz is bringing forward right now on summary judgment disproves that "everyone" understood what "everyone's" obligation was and further disproves that the City's written orders were effective in any way. We hope it is not lost on the Court that the City's position that "[homicide] detectives were trained to thoroughly and accurately document their investigation steps" is directly contrary to Guevara's position that he and his fellow officers had "no *Brady* obligation to create evidence by documentation or creating police reports," Guevara Motion [464] at 14. Apparently, Guevara (along with hundreds of other CPD Detectives in the 80's and 90's) simply did not get the memo.

As demonstrated by Judge Shadur's 1983 injunction in *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983)[18]; the Seventh Circuit's 1988 holding in *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988), in *Fields,*[19]

---

[18]    In *Palmer*, a class action brought on behalf of persons charged and convicted asserting that the City was suppressing exculpatory material, the court issued an injunction requiring changes to the City's police department documentation policies and requiring the City to preserve exculpatory material held in its hands. *Id.* at 1080-83 (Order setting forth Injunction).

[19]    In *Fields*, the Court instructed the jury that to find against the City on plaintiff's *Monell* claim, it had to determine that "at the time of [Officers'] concealment [of evidence], it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence," and the jury returned a verdict against the City on that policy claim. *See* PR-CSOF [489], ¶ 29, *citing* PX-150 [481-15], at 14-15; PX-151 [481-16]; and PX-137 [481-2]. The district court denied the City's post-trial motion, and the Seventh Circuit affirmed, holding that the City had been on notice from *Palmer* and *Jones* that the use of street files and the failure to ensure the production of exculpatory evidence in the underlying criminal cases presented a constitutional

and *Rivera*,[20] as well as additional verdicts and court rulings identified in Cruz's PR-CSOF [489]

at ¶¶ 21-29, and especially given the facts in this case, that in 1993 Area 5 Detectives were

continuing to suppress exculpatory and impeachment evidence that they were required to produce

under all the CPD Orders and cases identified above, and also under the due process clause of the

U.S. Constitution.  Cruz has presented more than a sufficient case that the City of Chicago was

not enforcing the Orders it relies upon in its Statements of Fact 21-29 [461].

The problem continued to exist at two levels.  First, churning out wholly-ineffective written

policies was like putting a band-aid on a cancerous growth.  For example, although the City is

apparently proud S.O. 83-2, the Standing Order actually failed to properly address the City's

evidence suppression problem that had been exposed in *Palmer*.  Among other deficiencies, S.O.

83-2 did not require a single repository for investigative information; applied only to detectives

and excluded other officers; provided no guidance on required content of supplementary reports;

provided no procedures for inter-detective communication; relied on inventory sheets instead of

---

problem and that the jury was permitted to conclude that the City failed to take necessary
corrective action. See generally *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sept. 11,
2017); *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020).

Subsequently, in *Kluppelberg v. Burge*, 276 F.Supp.3d 773, 776-79 (N.D. Ill. 2017), Judge
Lefkow held that based on *Fields*, the City was estopped from relitigating the issue of whether it had a
policy or practice of suppressing exculpatory and/or impeachment evidence.

[20]  In *Rivera*, Rivera's expert established that CPD policymakers were aware of the
evidence-suppression problem since at least the early 1980s, that CPD policies were deficient and
perpetuated decentralized parallel files, and that investigative materials were routinely withheld from
prosecutors and defense counsel across decades, including in more than 90% of reviewed defense
files.  PR-DSOF [490], at ¶ 29, *citing* PX-90 [480-10]; at 2182-2184, 2186-2193, 2210-15, 2218-20,
2226 and PX-93 [480-10], at 3912-3919.  As in *Fields*, the court instructed the jury that it could find
against the City if it determined that "the City of Chicago had a policy of concealing material
exculpatory and/or impeachment evidence" that caused the violation of the plaintiff's constitutional
rights.  The *Rivera* jury also returned a verdict against the City.  *Id.* (citations omitted).  Following the
verdict, as in *Fields*, the *Rivera* court denied the City's post-trial motion.  *Rivera v. Guevara*, No. 12-
CV-4428, 2019 WL 13249674, at *4 (N.D. Ill. Sept. 20, 2019).

actual disclosure; and lacked audit or oversight mechanisms. *See generally* [467-16] (S.O. 83-2); Hickey Dep. in *Kluppelberg* [467-12 in this case] at 236-38. In addition, in his Response to the City's Statements, Cruz identifies similar deficiencies with respect to other Orders the City issued.

In addition, the Orders the City relies upon – deficient or not – are only as good as the Department's willingness to enforce them, which the facts of this case prove is "none." In 1993, more than a decade after the suppression problems had surfaced in *Jones* and *Palmer*, Guevara was a one-man suppression machine. It appears he never wrote down what *he* did on an investigation, nor what the witnesses actually said to him. If a piece of evidence was wholly exculpatory and Guevara just didn't feel like writing it down, the evidence certainly suggests he simply did not do so, with perhaps the best example being Meadors' non-identification of Cruz.

Now Guevara's position is that there was no obligation to write anything down, which of course flies in the face of numerous requirements embedded in the S.O.s and SOPs. The bottom line is that the evidence fully supports that the City did not enforce the S.O.s or SOPs, and therefore they do not form a basis for the City to obtain summary judgment.

Finally, all of this discussion involves disputed issues of material fact. The City of course is not entitled to judgment on a claim simply by pointing to some SOPs and announcing, "suppression problem solved." It will be up to the jury to determine whether by 1993, when the individual Defendants engaged in extensive Brady violations, whether the City's failure to train, supervise, and discipline Officers around this issue was the moving force behind the violation of Cruz's rights. At the very most, the City has established nothing more than there is evidence "on both sides of the ledger," also commonly referred to as "genuine disputed issues of material fact." That is not enough to obtain summary judgment.

**3. Cruz Has Established That the City Was On Notice of its Detectives' and Officers' Unconstitutional Practices.**

**4. Cruz Has Established That The City Was Deliberately Indifferent To The Risk Of Continuing Constitutional Injuries.**

The City asserts that it was neither on "notice" of certain illegal practices, [466] at 14, 17 & n.4, 21, 23, and even if it was on notice, it was never 'deliberately indifferent" to those unlawful practices. *Id*. at 4, 16, 17, 22-23. As set forth in this Opposition and in [487] and [489] the evidence to the contrary is overwhelming.

Defendants assert that Cruz is unable to establish that the City's high-ranking policymakers knew in the early 80's that Burge was torturing arrestees at Area 2. [466] at 9-10. The actual evidence, however, supports that the CPD Superintendent, the Mayor of Chicago, and the Cook County State's Attorney all knew about the torture. In February 1982, Dr. John Raba, the Director of Medical Services at Cermak Health Services associated with Cook County Jail, wrote to CPD Superintendent Richard Brzeczek that a medical examination of Andrew Wilson revealed unmistakable evidence that while Wilson was in police custody, he has been tortured. In Dr. Raba's letter to Brzeczek, he explained that the evidence supported Wilson's allegation that the officers who interrogated him had tortured him by both electric shock and by pressing his back against a radiator. See [322] at ¶ 3 (Judge Fuentes deemed admitted that Raba sent his Feb. 17 letter to Brzeczek, which stated that Wilson had injuries consistent with torture). "Dr. Raba's letter to Brzeczek demanded an investigation." *Id*. Brzeczek, however, did not initiate any investigation. Rather, he told the Mayor orally, *Id*. at ¶ 5, and also wrote to then-Cook County State's Attorney Richard Daley, *Id*. at ¶ 7, that, in light of the pending prosecution of the Wilson brothers for the murder of two Chicago Police Officers, CPD would not investigate or otherwise pursue Andrew Wilson's allegations of torture, allegations which Dr. Raba had corroborated. Years later, Brzeczek himself admitted that he completely failed in not having the Office of Professional Standards

74

("OPS") investigate the torture that had been alleged. *See Id*. at 3-16 (Judge Fuentes deemed admitted in whole or in part Cruz's Requests to Admit numbered 3, 7, 9, 10, 11, 12, 15, and 16)

This is not complicated. The time for the Superintendent of Police to have stopped torture at one of CPD stationhouse's was *right then*. Brzeczek knew his Detectives were torturing citizens, and he chose to do nothing about it, at all. In response, the City insists that because the City terminated Burge just shy of 12 years later, Cruz is incapable of proving deliberate indifference. Or put another way, the City asserts that the action that it finally took against Burge in 1993 outweighs all the inaction it took from 1982 to 1993. The City is welcome to argue that to the jury, but it is not a basis on which it is entitled to summary judgment.

**5. Cruz Has Established That the City's *De Facto* Policies Were The Moving Force Behind Cruz's Constitutional Injuries.**

Finally, the City's policy failures to train, supervise, and discipline Officer Misconduct and the City's Code of Silence were the "moving forces" behind Cruz's wrongful conviction. As the Supreme Court has made clear, the primary purpose of the "moving force" element is to "guard against backsliding into respondeat superior liability." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). To satisfy the moving force standard, a plaintiff need only show a "direct causal link" between the challenged municipal action or inaction and the violation of plaintiff's constitutional rights. *Id*. Here, the City has not asserted that Cruz is incapable of establishing that causal link at trial, nor has it established that no reasonable jury could find that the City was the moving force behind Cruz's wrongful conviction.

For these reasons, Cruz respectfully requests this Court to deny the City's Motion for summary judgment, [465], and for all the reasons set forth on pages 2-56 above, Cruz respectfully requests this Court to deny the Individual Defendants' and Guevara's Motions. [459] [463].

Dated: February 11, 2026

Respectfully Submitted
*Plaintiff, Jose Cruz*

By: */s/ Stuart J. Chanen & Ariel Olstein*

Stuart J. Chanen
Ariel Olstein
Rivka Reichman
CHANEN & OLSTEIN, LLP
8822 Niles Center Rd., Ste. 100
Skokie, IL 60077
847-469-4669
stuart@chanenolstein.com
ariel@chanenolstein.com
rivka@chanenolstein.com

76