**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOSE CRUZ,

        Plaintiff,

        v.

REYNALDO GUEVARA, et al.

        Defendants.

No. 23 CV 4268

Judge Georgia N. Alexakis

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jose Cruz was convicted of the October 6, 1993 murder of Antwane Douglas and the attempted murder of Vernon Meadors. After serving 21 years for these crimes, Cruz had his conviction vacated and received a Certificate of Innocence as part of a string of exonerations granted by Illinois state courts after police misconduct within the Chicago Police Department came to light. Cruz now sues eight former Chicago police officers: Reynaldo Guevara, Anthony Riccio, Anthony Wojcik, Robert Rutherford, Robert Boris, Edward Mingey, Stephen Gawrys, and Ernest Halvorsen (now deceased and whose estate is represented by Geri Lynn Yanow). The Court will refer to these defendants collectively as "the Individual Officers."

Cruz alleges that the Individual Officers framed him for Douglas' murder and Meadors' attempted murder and secured wrongful convictions by fabricating false evidence, coercing and intimidating Meadors, and withholding exculpatory evidence, all in violation of constitutional and common law rights. Cruz also sues the City of Chicago ("the City"), primarily under a *Monell* theory of liability.

All defendants have moved for summary judgment on all of Cruz's claims. [459], [463], [465]. The City has also moved to bar Cruz's expert, Timothy Longo, [468], and the Individual Officers have moved to strike Cruz's Local Rule 56.1 statement of additional material facts and response to the Individual Officers' statement of facts, [494]. For the reasons that follow, the Court grants the motions for summary judgment in part and denies them in part. It denies the City's motion to bar Longo, subject to other limitations set forth in this opinion, and the Individual Officers' motion to strike Cruz's Local Rule 56.1 filings.

## I.    Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If they meet that burden, the onus shifts to the nonmoving party to set forth evidence creating a genuine dispute as to any material fact, which exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When assessing the defendants' motions for summary judgment, the Court views the facts and draws reasonable inferences in the light most favorable to Cruz. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But Cruz "is only entitled to the benefit of

2

inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quoting *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)). When considering what facts to credit, the court may not weigh conflicting evidence or make credibility determinations, *see Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and it must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

## II. Background

### A. Motion to Strike Cruz's Local Rule 56.1 Filings

The Court first addresses the Individual Officers' motion to strike Cruz's Local Rule 56.1(b)(2) response to the Individual Officers' joint statement of facts [490] and his Local Rule 56.1(b)(3) statement of additional facts [487]. [494]. The City requests similar relief. [510] at 1–9 (asking the Court to disregard those portions of Cruz's Local Rule 56.1 filings that are, in the City's estimation, noncompliant).

This Court previously admonished the parties that it would strictly enforce Local Rule 56.1 and that it expected all parties to adhere closely to the strictures of that rule. [474] at 15:8–14. The Court struck noncompliant Local Rule 56.1 statements filed by the defendants (while giving them leave to refile compliant versions) and made explicit that it would hold Cruz to the same standard of adherence to Local Rule 56.1. *Id.*; [456]. Despite these admonitions, Cruz's statement of additional facts and his responses to the Individual Officers' and the City's statements of facts are noncompliant in multiple respects.

3

First, Local Rule 56.1(d)(1) requires that the "LR 56.1(a)(2) statement of material facts and LR 56.1(b)(3) statement of additional facts … consist of *concise* numbered paragraphs." (Emphasis added.) The Local Rules do not prohibit a party from asserting multiple facts within each paragraph, but conciseness—i.e., brevity— is still required, and the multiple facts asserted must still be "logically grouped." *See Jackson v. City of Chicago*, No. 20 C 5886, 2024 WL 1142015, at \*2 n.1 (N.D. Ill. March 15, 2024) (although "there is no categorical prohibition of paragraphs containing multiple sentences or multiple facts," paragraphs must still be "concise, numbered, and logically grouped"); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("[T]he numbered paragraphs should be short; they should contain only one or two individual allegations, thereby allowing easy response."). Cruz's Local Rule 56.1(b)(3) statement does not comply with this rule. It often includes multiple distinct facts shoehorned into a single paragraph. *See, e.g.*, [487] ¶¶ 14(a)–(k), 17(a)–(g), 18(a)–(g), 21(a)–(o), 23, 30, 44–46, 48, 50, 59, 67–70, 72–77, 78(a)–(n), 84 (in portion of statement relevant to Individual Officers); [487] ¶¶ 6(a)–(d), 8, 9(a)–(e), 12(a)–(e), 27(a)–(g), 33 (in portion of statement relevant to City). Some of these paragraphs go on for at least one page if not more. They are far from concise.

Cruz's Local Rule 56.1(b)(2) response to the Individual Officers' statement of facts is problematic in the same way. The Individual Officers point in particular— and rightly so—to Cruz's response to Paragraph 41 of their statement of facts. [494] at 5. In response to the Individual Officers' assertion that "[n]o officer directed Meadors to pick any particular picture" when Meadors viewed the 21-photo stack for

the second time on October 8, which the Individual Officers properly support with Meadors' testimony from Cruz's criminal trial making that precise point, Cruz responds by describing every fact and allegation that he believes cuts in his favor. [490] ¶ 41. The response that results consists of 27 subparagraphs (many of which contain additional subparagraphs) and spans 16 pages. *Id.* at 34–50, ¶ 41(a)–(aa). Cruz goes on to reference his Paragraph 41 response throughout his Local Rule 56.1 filings and cites it several times in his response brief as well, effectively re-incorporating by reference the same voluminous material several times over. *See*, [490] ¶¶ 103, 108, 109, 134, 149, 159–64, 166–69, 171–76; [491] at 2–5, 25, 27–28, 32–33, 40.

Another local rule is implicated by Cruz's filings. Local Rule 56.1(e)(2) bars a non-moving party's response to a Local Rule 56.1(d) statement of facts from setting forth "any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." L.R. N.D. Ill. 56.1(e)(2). The same rule prohibits the responding party from "assert[ing] legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." *Id.*; *see also* L.R. N.D. Ill. 56.1(d)(4) (statements of material facts and statements of additional facts "should not contain legal argument"). Cruz's response to the Individual Officers' statement of facts contains legal argument and attempts to counter facts properly asserted and supported by the defendants with unresponsive facts that Cruz believes are favorable to his case. *See*, *e.g.*, [490] ¶¶ 19, 22–24, 29, 41, 90, 101, 103–104, 148, 152, 161.

For example, Cruz admits the Individual Officers' proffered fact that on October 7, 1993, the *Chicago Tribune* published an article about the shooting that identified Meadors as a victim and included the block of his residence, which upset Meadors. *Id.* ¶ 29. Despite admitting this fact, Cruz's response includes four paragraphs of legal argument and additional facts about how Meadors responded to the article, Mingey's deposition testimony about the potential dangers arising from the publication of Meadors' home address, and the fact that Guevara invoked his Fifth Amendment right against self-incrimination when questioned about the article. *Id.* Cruz also included these facts in his own statement of additional facts. [487] ¶¶ 48–49. Thus, the only function they serve in Cruz's response to the Individual Officers' statement of facts is to advance a legal argument about what inferences could or should be drawn from an undisputed fact.

As another example of such non-compliance: Cruz admits to the Individual Officers' proffered fact that Meadors identified Cruz as the shooter in open court during Cruz's criminal trial. [490] ¶ 103. But he goes on to dispute that "the identification was reliable and uncoerced" and spends nearly three pages rehashing all of the facts that he believes indicate that Meadors' various identifications of Cruz were all coerced. *Id.* Responses to Local Rule 56.1 statements are an opportunity for nonmoving parties to identify disputed facts, not to advocate for conclusions they wish the Court to draw from the record as a whole. *See Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018).

Cruz's noncompliance notwithstanding, at this stage in the litigation, the Court will not exercise its discretion to order Cruz to submit amended Local Rule 56.1 filings. Such a directive would create untenable delay—in a matter that is already scheduled for an October trial—and squander the Court's resources, which have already been expended making sense of these voluminous and repetitive filings. *See Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 717 (N.D. Ill. 2016) ("The court declines to [strike a noncompliant statement of facts] only because a significant amount of judicial resources have already been devoted to sifting through the parties' Local Rule 56.1 statements to ascertain those facts which are, in fact, material and disputed."). To some degree, the Court is also sympathetic to Cruz's point, made in response to the Individual Officers' motion to strike, that it can be difficult to dispute an assertion by defendants that "no evidence" exists to establish a particular fact without describing the countervailing evidence, at some length, along with providing the required record citations. [497] at 5–6. This problem is particularly acute for Cruz, whose case hinges on largely circumstantial evidence and inferences that he asks the Court to draw from that evidence. As a result, the Court denies the Individual Officers' motion to strike Cruz's Local Rule 56.1(b)(2) response to the Individual Officers' joint statement of facts [490] and his Local Rule 56.1(b)(3) statement of additional facts [487].[1]

---

[1] Shortly after the Individual Officers filed their motion to strike, the Court provided the Individual Officers some of the relief they sought as an alternative to the Court striking Cruz's Local Rule 56.1 filings altogether. [494] at 6–8. It permitted the Individual Officers to file a reply brief that is 15 pages longer than what it typically permits. [498].

Still, the Court sternly admonishes Cruz for failing to comply with Local Rule 56.1, particularly after he called the defendants to task for their own earlier noncompliance. [444]. The Court also will disregard all legal arguments Cruz has advanced solely in his Local Rule 56.1 filings, consistent with the aforementioned rules. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[A] district court is entitled to expect strict compliance with Rule 56.1" and may strike Local Rule 56.1 statements and responses, in whole or in part, when parties fail to comply); *Brown v. Chicago Transit Auth.*, No. 25-1750, 2026 WL 1815909, at *4 (7th Cir. June 24, 2026) (affirming district court's decision not to accept plaintiff's disputes of defendants' factual assertions where plaintiff failed to comply with local rules governing summary judgment practice). And going forward in this litigation, the Court expects Cruz (indeed, all parties) to more scrupulously adhere to all applicable requirements.

### B.      Facts

The following facts are undisputed unless otherwise noted.

In the early morning hours of October 6, 1993, Vernon Meadors was waiting for the bus near a gas station at the corner of North and Kedzie Avenues in Chicago's Humboldt Park neighborhood. [490] ¶ 5. Around 3:30 am, 16-year-old Antwane Douglas pulled into the gas station parking lot, where his car stalled. *Id.* ¶ 6. Douglas exited the car and asked the overnight gas station attendant, Pedro Jaramillo, for assistance, but Jaramillo was unable to help. *Id.* ¶¶ 6–7. Douglas then approached Meadors for help, and Meadors suggested Douglas ask the attendant if he could leave the car overnight. *Id.* ¶ 8.

As Douglas turned back towards the gas station, another vehicle pulled into the gas station. *Id.* ¶ 9. Meadors heard the car's passenger ask Douglas: "What gang are you in? Are you a Disciple?" *Id.* ¶ 11. Douglas replied: "I'm a Vice Lord." *Id.* ¶ 12.[2] Three to four men immediately exited the car, drew handguns, and began shooting. *Id.* Douglas tried to flee but was gunned down and died at the scene. *Id.* ¶ 13.

Meadors dove to the ground when the gunfire began. *Id.* ¶ 14. When it abated momentarily, he heard someone shout "Witness!," and more gunfire followed. *Id.* Meadors was shot in the right arm. *Id.* The assailants reentered their car and fled. *Id.* ¶ 15. As they drove away, they shot at another bystander, Ivan Rios, [506] ¶ 29, who was a member of the Latin Kings gang, [490] ¶ 23.[3] Shortly after, Meadors was transported to nearby St. Elizabeth Hospital for treatment. *Id.* ¶ 17.

Chicago Police Department ("CPD") Officers Chuck Odegard and Keith Fleming arrived at the scene shortly after the shooting, with Officers Boris, Rutherford, and Kevin McDonald arriving soon after, at around 4 a.m. [506] ¶ 30;

---

[2] Cruz disputes this fact as well as the assertion in the sentence that immediately follows because, he argues, it is based on inadmissible hearsay. [490] ¶¶ 12–13. For the reasons set forth later in this opinion, the Court finds both assertions properly supported by testimony from Meadors at Cruz's criminal trial and therefore deems them admitted. *See infra* at 22–23, n.14.

[3] Although the Individual Officers dispute Paragraph 29 of Cruz's statement of additional material facts, their objections do not undercut the fact the Court treats as undisputed: that Rios was shot at by the same group of assailants who shot Douglas and Meadors. [506] ¶ 29. For his part, Cruz objects in part, admits in part, and disputes in part Paragraph 23 of the Individual Officers' statement of material facts. [490] ¶ 23. Although he does not specify which portions of that paragraph he admits, his objections do not undercut the fact the Court treats as undisputed: that Rios was a member of the Latin Kings gang. *Id.*

[490] ¶ 21. Odegard prepared a General Offense Case Report (GOCR), documenting his and Fleming's activities at the scene. [490] ¶ 19.[4]

In support of their motions for summary judgment, the Individual Officers submit what they maintain is a copy of the GOCR that Odegard prepared on October 6. [461-4]. The supplied GOCR indicates the race and sex of the shooter with the notation "M4," which is CPD shorthand for a Hispanic male. *Id.*; [461-7] at 44:16–21. Cruz maintains that the GOCR that the Individual Officers have submitted was altered after Odegard prepared it. [490] ¶ 19. According to Cruz, the original GOCR denoted the race of the shooter with "M1," which is CPD shorthand for a Black male, and the change from "M1" to "M4" was made later in order to implicate him. *Id.*; [461-7] at 41:8–12. Cruz also asserts that the original GOCR listed two other offenders and described them as "M1s," but that these descriptions were "obliterated." [490] ¶ 19; *see also* [461-4] (in the GOCR upon which the Individual Officers rely, two black squares appear in the portion of the form reserved for information about the offender); *infra* at Opinion's Appendix. The Court addresses Cruz's argument regarding the allegedly altered GOCR later in its analysis. *See infra* at 26–28.[5]

---

[4] The Individual Officers state that Odegard jointly prepared a GOCR along with Fleming. [490] ¶ 19. Cruz disputes that Fleming assisted in preparing a GOCR but admits that Odegard did prepare one. *Id.*

[5] Cruz objects to the admissibility of the proffered GOCR on authenticity, foundation, and hearsay grounds. [490] ¶ 19. But he also relies on the same document to advance his fabrication-of-evidence claim. *See, e.g.*, [491] at 27–29, 32. In so doing, Cruz has waived his objections to the admissibility of the proffered GOCR on foundation and authenticity grounds. *See Walker v. Groot*, 867 F.3d 799, 805 (7th Cir. 2017) (litigant waived argument that a piece of evidence should not have been admitted when he used the evidence to support his own theory of the case). The Court also sets aside Cruz's objections to the admissibility of the proffered GOCR for the following reasons. With respect to authenticity, the Court understands Cruz's objection to be that the proffered GOCR is not what the Individual

At the crime scene, Officers Rutherford, Boris, and McDonald interviewed Jaramillo and Rios, both of whom provided a description of all the shooters as Black men. [490] ¶¶ 21–23. Officers Rutherford and McDonald then visited Meadors in the hospital, where Meadors provided a conflicting description: of a shooter who was a white Hispanic male, roughly 26 years old, about five feet five inches tall and 150 pounds with a thin mustache. *Id.* ¶ 24; [461-3] at 42:10–43:13 (Meadors' testimony at Cruz's criminal trial regarding the description of the shooter that he provided police at the hospital).[6]

---

Officers purport it to be: the GOCR that Odegard actually prepared. As stated above, the Court addresses this argument later in its opinion. *See infra* at 26–28. With respect to foundation, Cruz argues that the document "lacks foundation under Rule 602" because Fleming, who testified about the nature of the GOCR, did not personally write it. [490] ¶ 19. But the lack of foundation is not generally a bar to considering evidence at summary judgment. *See Erickson v. Baxter Healthcare, Inc.*, 151 F. Supp. 2d 952, 960 (N.D. Ill. 2001); *Isbell v. Baxter Healthcare, Corp.*, 273 F. Supp. 3d 965, 977–78 (N.D. Ill. 2017). Finally, with respect to his hearsay objection, Cruz writes that the document is "as to the Defendants, inadmissible hearsay not subject to any exception under Fed. R. Evid. 804." [490] ¶ 19; *see also* [491] at 31 (arguing in passing that the GOCR "is hearsay"). Cruz does not explain why the Court is limited to assessing admissibility under Rule 804 when other avenues for the document's admissibility, from the vantage point of the Individual Officers, are apparent. *See, e.g.*, Fed. R. Evid. 803(6) (concerning records of regularly conducted activity); Fed. R. Evid. 803(16) (concerning statements contained in documents prepared before January 1, 1998); *see also Woods v. City of Chicago*, 234 F.3d 979, 986 (7th Cir. 2000); *Valdez v. Lowry*, No. 18 CV 5434, 2021 WL 5769533, at *12 (N.D. Ill. Dec. 5, 2021). Moreover, given the Individual Officers' arguments related to the existence of probable cause, *see, e.g.* [460] at 3– 5, 7–8, the Court understands that the key statements in the proffered GOCR are not being used by the Individual Officers for the truth of the matter asserted (that the shooter was a Hispanic male) but rather as evidence of their state of mind (that the Individual Officers believed the shooter was a Hispanic male). *See Woods*, 234 F.3d at 986–87.

[6] Although Cruz disputes that Meadors provided this description of the shooter to Officers Rutherford and McDonald, the evidentiary material he cites to contradict this assertion does not, in fact, contradict it. Cruz points to the evidence that Jaramillo and Rios provided different physical descriptions of the shooter to the police and that officers memorialized those descriptions in the October 6, 1993 Supplementary Report. [490] ¶ 24; [461-6]. But the fact that other witnesses provided a different description does not contradict admissible evidence that Meadors described the shooter as he did on October 6, 1993. Cruz also points to the alleged alteration of the GOCR, *see* [490] ¶ 24, and the Court addresses this argument

Meadors was discharged from the hospital later the same day, October 6. [490] ¶ 17. Also on that day, Guevara, Halvorsen, and Mingey visited Meadors at his home. *Id.* ¶ 26. There, they showed Meadors a stack of 21 photos depicting Hispanic

later in this opinion. *See infra* at 26–28. Cruz also objects to the admissibility of the October 6, 1993 Supplementary Report memorializing the hospital interview of Meadors on authenticity, foundation, and hearsay grounds. [491] at 16–17. The Court sets aside the foundation and hearsay objections for the same reasons it set aside Cruz's objections on those grounds to the proffered GOCR. *See supra* at 11 n.5; *see also* [508] at 10–11 (articulating basis for admitting the October 6, 1993 Supplementary Report for reasons unrelated to the truth of the statements contained therein). As for his objection to the authenticity of the October 6, 1993 Supplementary Report, Cruz waived this objection for purposes of the instant motion where he affirmatively relied on the same document himself. [506] ¶ 48.

Cruz further contends that Meadors was never actually interviewed in the hospital on October 6, 1993, because CPD investigative files "do not include any contemporaneous notes or reports" documenting any such interview, despite CPD rules and regulations requiring that such contemporaneous notes be made and maintained. [490] ¶ 24; [491] at 16–17. Although courts may not weigh conflicting evidence or make credibility determinations when considering what facts to credit, *see Omnicare*, 629 F.3d at 704, Cruz's argument that the October 6, 1993 interview never happened because notes are missing from an old investigative file amounts to speculation or conjecture. *See Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) ("[A]n inference that veers too far into speculation fails to survive summary judgment.") (cleaned up). The Court separately concludes that the October 6 hospital interview took place because significant, admissible evidence exists to establish that the hospital interview, in fact, occurred: Meadors' live, sworn testimony at Cruz's criminal trial, *see* [461-3] at 42:10–43:14; live, sworn testimony from Officer McDonald, who is now deceased, at Cruz's criminal trial, *see id.* at 85:21–87:4; and the existence of an admissible report memorializing the interview's occurrence, [461-6]. *See Anderson*, 477 U.S. at 252 (a genuine dispute requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position").

Further, Cruz's reliance on the absence of a record to show that an event never happened is itself hearsay. Federal Rule of Evidence 803(7) allows the admission of evidence that a matter is not included in a regularly-kept record to show that the matter did not occur *if* "a record was regularly kept for a matter of that kind." Fed. R. Evid. 803(7). Here, Cruz has developed a record that the officers on his investigation often failed to record contemporaneous interview notes. [491] at 4 n.1; *see also* [478-17] at 9–10 (Cruz's expert identifies other instances of missing notes in the investigative file in this case and others). For that reason as well, the Court will not consider the absence of notes for the premise that the hospital interview never occurred. "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

members of local gangs in the area, including Cruz. *Id.* ¶ 27. Meadors did not identify any of them as the shooter. [506] ¶ 46.

The following day, October 7, 1993, the *Chicago Tribune* published a short article on the shooting. [490] ¶ 29; [461-16]. The article included the following details: "Vernon Meadors, 40, of the 1330 block of North Kedzie Avenue [was] shot about 3:30 am … said Grand Central Violent Crimes Sgt. Frank Capitelli." *Id.* Capitelli was one of the Individual Officers' supervisors. [506] ¶ 48. Meadors was very upset and frightened that his address had been "leaked" to the newspaper. *Id.*; [490] ¶ 29.

The next day, on October 8, 1993, Wojcik went to Meadors' home and left his card. [490] ¶ 30. Later that day, at around 4:30 p.m., Wojcik returned to Meadors' home. *Id.* ¶ 32; [461-8] at 134:5–9. After Wojcik arrived, Meadors told Wojcik that Meadors' friend, a member of the Latin Kings, had told Meadors that the Latin Kings were offering "an 8-ball of cocaine and some cash for his death." [490] ¶ 33. Wojcik arranged for Meadors and his family to be relocated and placed under protective services. [490] ¶ 35.[7] Wojcik then took Meadors to CPD's Area 5 Detectives Division,

---

[7] The parties dispute why Meadors and his family were placed under protective services at this time. Cruz objects to the Individual Officers' version of events—that Wojcik arranged for protective services for Meadors after learning of the alleged reward from the Latin Kings for Meadors' death—as based on inadmissible hearsay and lacking foundation. [490] ¶¶ 33, 35. Wojcik's deposition testimony relaying this fact, however, is not offered for the truth of the matter asserted (that the Latin Kings had offered a reward for Meadors' death), but for the effect this information had on Wojcik: It prompted Wojcik to arrange protective services for Meadors. *See* [461-8] at 134:19–135:11. The testimony also has adequate foundation because Wojcik's recollection of what Meadors told him and how he reacted to that information is based on Wojcik's personal knowledge. *Id.*; Fed. R. Evid. 602. The Court therefore credits it. In contrast, Cruz asserts that Meadors was frightened by the leak to the *Chicago Tribune* and that officers placed him under protective services "only after Meadors told Wojcik that he could make an identification." [487] ¶ 51. Although Cruz cites evidentiary material to support this theory of causation, *id.*, the Court has examined the cited material (Wojcik's deposition testimony, Wojcik's testimony at Cruz's criminal trial, and an October 10, 1993

13

where Meadors viewed an album containing hundreds of photos of Hispanic Latin King gang members, including a photo of Cruz. *Id.* ¶ 36;[8] [506] ¶ 52. Meadors identified Cruz's photo as one of the attackers. [461-3] at 47:22–50:10; [461-8] at 154:16–155:19.

Wojcik then contacted Mingey, who brought over the same stack of 21 photos that Meadors had viewed at his home on October 6. [490] ¶ 39. This time, Meadors identified Cruz as the shooter. *Id.* ¶ 40. Cruz disputes that the Individual Officers provide any evidence supporting this fact, *id.*, but the Court disagrees. Meadors testified on this precise point at Cruz's criminal trial. The transcript reads:

> Q: When the detectives showed you that group of photographs, after you had already picked out the defendant's photograph [from the] photo album, did you thumb through them and pick the defendant's picture out again?
>
> A: Yes, I did.

[461-3] at 52:10–15.

Meadors' trial testimony is admissible hearsay for reasons explained *infra* at 22–23 n.14. Cruz contends that, even if admissible, Meadors' trial testimony still does not support the fact that Meadors identified Cruz's photo from the stack of 21

---

police report) and has determined that none provide evidence that the Individual Officers conditioned protective services on Meadors' willingness to identify a suspect. *Id.*

[8] Cruz objects on hearsay grounds to the Individual Officers' reliance on an October 10, 1993 supplemental report in support of this fact. [490] ¶ 36. The Court does not resolve this evidentiary objection because (1) Cruz admits to the fact, his objection notwithstanding, and (2) the fact is separately supported by citations to other evidence in the record. *Id.* The Court therefore accepts it as undisputed. Cruz's other assertions in response to this statement of fact are unresponsive argument, or are based on inadmissible evidence. *See id.*; *see also supra* at 11–12, n.6.

14

photographs after viewing that stack a second time. [490] ¶ 40. According to Cruz, "[a]ll [Meadors] testified to is that the photo he picked out (first on October 8 at the stationhouse and then in front of the jury during his trial testimony) was the same photograph that Meadors saw in the stack of photos on October 6," not that he identified Cruz as the shooter. *Id.* Having reviewed the entirety of Meadors' trial testimony, the Court disagrees with Cruz's hyper-technical characterization of it. Question after question, the prosecutor conducting Meadors' direct examination asks Meadors about every instance in which he was asked to identify the person who shot him. *See* [461-3] at 46:14–19, 48:6–11, 52:10–15, 53:9–14. Meadors also makes clear that he understands that throughout his interactions with the police, officers were asking him to identify the individual who shot him. *See, e.g., id.* at 48:9–11 ("Q. And did you tell the detectives at that point that you saw the picture of the shooter? A. Yes, I did."). Given this context, Meadors' above-cited testimony can only sensibly be understood as testimony identifying Cruz as the shooter. Cruz cannot manufacture a factual dispute by unreasonably denying what the evidence demonstrably supports.[9] *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

---

[9] Cruz also disputes that Meadors was being truthful when he told Wojcik and Mingey that Cruz was the shooter. [490] ¶ 40. He cites no evidence to support this point. *Id. See Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) ("[T]he prospect of challenging a witness' credibility is not alone enough to avoid summary judgment.").

15

Based on Meadors' identification, police arrested Cruz outside his home at about 1:30 am on October 9, 1993. [490] ¶ 45. At the time of his arrest, Cruz matched Meadors' description of the shooter and was a member of the Latin Kings gang; he was also wearing a "Kings" sports team jacket, which reflected his membership. *Id.* ¶¶ 46, 51; [461-2] at 243:19–22. Cruz was taken to the Area 5 Detectives Division, where he was read his *Miranda* rights, interviewed by Riccio and Wojcik, and searched. [490] ¶¶ 47–48. Wojcik claims that during this search, he found a partial document entitled "Latin King Constitution" and a photo of Cruz displaying a Latin King hand sign while holding a child. *Id.* ¶¶ 47–50. Cruz disputes that these documents were on his person at the time of his arrest, *id.* ¶ 49, although he admits the photo at issue does depict him showing a Latin Kings gang sign, *id.* ¶ 50. He further admits that the photo was his own and that he kept it in bedroom. *Id.* ¶ 140.

At the time of his arrest, Cruz was living with his aunt, Ada Pacheco; his uncle, Santiago McClaren; and his cousins, Luis "Tito" Tartabu, Marisol Torres, and Luis "Danny" Rodriguez. *Id.* ¶ 44. Cruz presented an alibi to the police that he was home with his family when Douglas and Meadors were shot. [506] ¶ 42. It is disputed whether the police interviewed Tartabu, McClaren, and Rodriguez about the events of October 6; the police claim they did, but McClaren did not speak English, and Rodriguez testified that the police asked him about his age and school, but never asked him about the events of that day. [490] ¶¶ 57–60, 83. The police claim that 13-year-old Rodriguez provided a written statement undermining Cruz's alibi, but Rodriguez testified that he did not make the statement. *Id.* ¶¶ 83–85.

16

Still on October 9, Wojcik and Riccio interviewed Jaramillo with assistance from a translator. *Id.* ¶ 61. Following the interview, Wojcik and Riccio recorded in a report that Jaramillo described the shooter as "male non-white, either an olive-complected hispanic or light skinned black [sic]." *Id.* ¶ 67.[10] It is undisputed that a police officer wrote down this description and attributed it to Jaramillo, but the parties dispute whether Jaramillo ever actually gave that description. *Id.* Jaramillo denies that he gave this description, maintaining that he consistently described Douglas' shooter as Black. *Id.* ¶ 81.

Later on October 9, the police organized a seated lineup featuring Cruz and three other individuals—referred to by the parties as "fillers"—of similar complexion. *Id.* ¶¶ 71–73. The fillers ranged from 5'8" to 6'0," and Riccio instructed Cruz to sit on a phonebook, which was visible during the lineup and raised Cruz above his normal seated height. *Id.* ¶ 72–73; [506] ¶ 54; *see also* Opinion's Appendix.[11] Meadors and Jaramillo viewed the lineup separately. [490] ¶ 77. Meadors identified Cruz as his

---

[10] Cruz objects to the admissibility of this report on hearsay grounds, *see* [490] ¶ 67, but the Court does not use it for the truth of the matter asserted (that the shooter was a male non-white, either olive-skinned or light-skinned Black). Instead, it uses the report to compare the officers' record of Jaramillo's description with Jaramillo's testimony in the instant case regarding the description that he provided officers.

[11] The Individual Officers argue that the phonebook brought Cruz to a more similar height to the fillers, while Cruz argues that the phonebook made him stand out in the lineup. [506] ¶ 54. The Court draws all reasonable inferences from the undisputed fact that Cruz sat on a phonebook in Cruz's favor. A reasonable jury could find that the phonebook attracted undue attention to Cruz during the lineup. *See* [478-19] at 7 ("[I]n the lineup, Cruz is the only live lineup member sitting on … a yellow phonebook, potentially making him stand out. When people or photos stand out from the others, they are more likely to be falsely idenified.").

17

shooter, and Jaramillo did not make an identification. *Id.* ¶¶ 76–77; [461-3] at 53:4–54:10.[12]

On October 10, 1993, with permission from his supervisor, Assistant State's Attorney Edward Maloney approved charges against Cruz for first degree murder and aggravated battery with a firearm. [490] ¶ 86. On November 10, a grand jury indicted Cruz, charging him with murder, attempted murder, and aggravated battery with a firearm. *Id.* ¶ 88. Cruz was tried in December 1995, with Meadors testifying against him. *Id.* ¶¶ 99–100. In court, Meadors identified Cruz as the shooter and also testified that he previously described the shooter to the police as approximately 5'4" and 150 pounds, male, Hispanic, "kind of chubby," and with "a thin mustache." *Id.* ¶¶ 103–104. Cruz argues that this testimony—like all of Meadors' identifications of Cruz—were the byproduct of intimidation and coercion. *Id.*; [491] at 2–5, 21–23. The Court discusses these contentions *infra* at 21–32.

On December 14, 1995, the jury found Cruz guilty on all three counts: first-degree murder of Douglas, attempted first-degree murder of Meadors, and aggravated battery with a firearm of Meadors. [490] ¶ 122. Cruz spent 21 years incarcerated for these crimes before being released.[13] [506] ¶ 7. On August 9, 2023,

---

[12] Cruz objects to these asserted facts because, he maintains, the Individual Officers cite inadmissible hearsay to support them. [490] ¶¶ 76–77. The Court need not resolve this evidentiary objection because the Individual Officers also permissibly and accurately cite Meadors' trial testimony (*see supra* at 15 and *infra* at 22–23 n.14), and Jaramillo's deposition testimony in the instant case. Cruz further objects to the veracity and reliability of Meadors' identification given the suggestive nature of the lineup. [490] ¶ 76. The Court discusses this contention *infra* at 33–35.

[13] The first seven and a half years of Cruz's incarceration were served concurrently with a sentence for an unrelated offense, which is not at issue here. [506] ¶ 7.

the Chief Judge of the Cook County Criminal Court granted Cruz a Certificate of Innocence, vacating his convictions in connection with the October 6, 1993 shootings. [506] ¶ 5.

In the instant lawsuit, Cruz has alleged that the Individual Officers fabricated evidence in violation of the Fourteenth Amendment's Due Process Clause and the Fourth Amendment (Count I); withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Count II); and maliciously prosecuted him, in violation of federal and state law, and unlawfully detained him (Counts III and VII). [327] ¶¶ 190–214, 246–249. He also brings claims against the Individual Officers for conspiring against him, in violation of both federal and state law (Counts IV and IX); failure to intervene (Count V); and intentional infliction of emotional distress (Count VIII). *Id.* ¶¶ 215–229, 246–257. Finally, Cruz brings a *Monell* claim against the City, alleging that the City maintained a policy that led to his constitutional injuries (Count VI), *id.* ¶¶ 230–245, and brings *respondeat superior* and indemnification claims against the City based on his claims against the Individual Officers (Counts XI and XII), *id.* ¶¶ 258–261.

## III.   Analysis

### A.     Meadors' Identifications of Cruz

Resolving the Individual Officers' motions for summary judgment hinges a great deal on whether a triable issue of fact exists over whether Meadors' identifications of Cruz were fabricated. The Court therefore starts its analysis on this point.

Cruz contends that the Individual Officers fabricated Meadors' eyewitness identifications of him as the individual who killed Douglas and shot Meadors by engineering threats to his and his family's safety and through an unduly suggestive live lineup. *See, e.g.*, [491] at 3–4, 22–25. These purportedly false identifications played multiple roles in the investigation, prosecution, and eventual conviction of Cruz. They supported probable cause, which then served as the basis for arresting Cruz, holding him in pretrial detention, and prosecuting him for Douglas' murder and the attempted murder of Meadors himself. Meadors went on to be a key witness at Cruz's criminal trial, and his in-court identification of Cruz was bolstered by his prior identifications of Cruz from a gang book, a stack of 21 photographs, and a live lineup.

The fabrication of Meadors' identifications, Cruz argues, was a constitutional violation in its own right, under the Fourteenth and Fourth Amendments, and also violated his right under *Brady v. Maryland*, 373 U.S. 83 (1963), to receive exculpatory evidence. [491] at 20, 40. The allegedly fabricated identifications from Meadors also inform Cruz's federal and state claims of malicious prosecution, neither of which can survive if the Individual Officers had probable cause to arrest and prosecute Cruz. *See Thompson v. Clark*, 596 U.S. 36, 43 (2022) ("[T]he gravamen of the Fourth Amendment claim for malicious prosecution … is the wrongful initiation of charges without probable cause."); *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018) ("To state a claim for malicious prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause."). Probable cause is also a complete bar to a claim for unlawful

detention in violation of the Fourth Amendment. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006).

The Seventh Circuit has held that "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Whitlock v. Bruggeman*, 682 F.3d 567, 580 (7th Cir. 2012)) (alteration in original). "To prevail on this claim, a plaintiff must show that the officers (1) knowingly fabricated (2) false evidence (physical or testimonial), (3) the false evidence was used against him in his criminal trial, and (4) it was material to his conviction." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022) (citing *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019); *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020)). "Succeeding on such a claim requires clearing a 'high bar': Plaintiffs must establish not only that a statement was false but also that the Officer Defendants 'manufactured' it." *Washington v. Boudreau*, No. 16-CV-01893, 2022 WL 4599708, at *20 (N.D. Ill. Sept. 30, 2022) (citing *Coleman*, 925 F.3d at 344).

"On the other hand, a claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights." *Avery*, 847 F.3d at 439. To prevail on his due process claim, Cruz therefore must show that he has evidence not just that the officers *coerced* Meadors' identification, but that they *fabricated* it out of whole cloth. "Fabricated testimony is testimony that is made up; it is invariably false." *Fields v.*

21

*Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). In contrast, evidence collected from coercively interrogating witnesses may turn out to be true. *Id.* at 1112; *see also Avery*, 847 F.3d at 439. And while coercing witnesses to speak is a constitutional wrong, the rights violated when a witness is coerced are only those of the witness himself. *Fields*, 740 F.3d at 1112; *see also Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014).

As already explained earlier, *see supra* at 11–15, 17–18, the Court treats the following facts as undisputed. On October 6, 1993, while at the hospital, Meadors provided Rutherford and McDonald with a description of a chubby, 5'5" Hispanic shooter. Although Meadors did not identify Cruz from a stack of 21 photos that the police showed him at his home later that same day, Meadors identified Cruz in a gang book containing hundreds of photos of Latin Kings members on October 8. He also identified Cruz when he reviewed the stack of 21 photos for a second time on October 8 and picked him out of an in-person lineup on October 9. The Individual Officers assert that Meadors' October 8 and 9 identifications were not coerced, [460] at 6, and Meadors' testimony from Cruz's criminal trial supports that assertion.

Meadors testified at Cruz's criminal trial on December 13, 1995. [461-3] at 1, 24.[14] Meadors told the jury that he did recognize Cruz when officers initially showed

---

[14] Cruz argues that Meadors' testimony is inadmissible hearsay, despite the fact that Meadors is deceased and thus currently unavailable as a witness, because Cruz did not have sufficient opportunity to cross-examine Meadors at his trial. *See*, *e.g.*, [490] at 2, n.1; Fed. R. Evid. 804(b)(1). The Court disagrees. Cruz had the opportunity and substantial motivation to impeach Meadors' testimony at trial, and through counsel, he attempted to do so. *See* [461-3] at 58:13–76:6, 77:16–19 (cross-examining Meadors on his opportunity and ability to identify Cruz given, among other factors, how quickly the relevant events transpired and Meadors' distance from the shooter). Although Cruz "now contends that the cross-examination that occurred was inadequate because his attorney [at his criminal trial] did not have the evidence 'now known' regarding police misconduct, this argument fails because 'the

22

him the stack of 21 photos at his home on October 6 and explained why he nonetheless did not make an identification at the time: "I was still afraid and nervous at the time, not wanting to jeopardize my family, at that time. I was worried about my family and the location I was at … which I knew was a Latin King neighborhood." *Id.* at 44:22–45:4. Meadors then described his reaction to seeing his name and address in the *Chicago Tribune* the next day. *Id.* at 45:7–15 ("I really got upset and frightened then."). According to Meadors' testimony, he reached back out to Wojcik after discussing the decision to "come forward" with his wife and father. *Id.* at 46:4–6.

---

emphasis in this inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place.'" *Walden v. City of Chicago*, 846 F. Supp. 2d 963, 972 (N.D. Ill. 2012) (quoting *United States v. McClellan,* 868 F.2d 210, 215 (7th Cir. 1989)); *see also U.S. v. Burge*, No. 08CR846, 2009 WL 1108488 at \*7 (N.D. Ill. Apr. 23, 2009) ("[I]n virtually every case of actual cross-examination, direct examination or redirect cross-examination, the former testimony exception will be satisfied.") (citing 1 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE MANUAL § 17.02 [3] (Matthew Bender 2009)).

While Cruz did not have evidence of police misconduct in other cases, as such information had not yet come to light, his criminal defense attorney did have evidence that Jaramillo and Rios described the shooters as Black and also had evidence, which was used during Meadors' cross-examination, that police used suggestive tactics in eliciting Meadors' identification at the live lineup. *See* [461-3] at 69:8–70:1. Cruz also does not argue that his criminal defense attorney lacked any of the following information, which would have provided additional fodder for the type of cross-examination that Cruz now claims he did not have the opportunity to conduct: (1) that Meadors' address was published in the *Chicago Tribune*; (2) that the *Chicago Tribune* attributed that information to Sergeant Capitelli; and (3) that Meadors and his family were relocated to protective services shortly after the publication of his address in the *Chicago Tribune* and before his October 8 and 9 identifications of Cruz. Indeed, Meadors laid out this timeline during his direct examination. [461-3] at 45:7–47:19.

Further, Cruz himself relies on Meadors' trial testimony to oppose summary judgment. *See*, *e.g.*, [487] ¶¶ 21, 25; [490] ¶ 41(z). He has thus waived an argument that the testimony, in its entirety, should not be admitted under Federal Rule of Evidence 804(b)(1). *See Walker*, 867 F.3d at 805. And Cruz has developed no argument as to why different portions of Meadors' trial testimony should be treated differently. He has not described which portions, in his view, are admissible under Rule 804(b)(1) and which are not, and he has cited no case law in support of this piecemeal approach to Meadors' testimony. *See* [490] at 2, n.1. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

23

Meadors next described his identifications of Cruz from the gang book, the 21-photo stack, and the live lineup. *Id.* at 47:20–52:15, 53:9–54:10. He testified plainly that his identifications were uncoerced:

Q:     Did anyone at any time tell you who to pick out?

A:     No, no.

*Id.* at 52:16–18.

The record contains no direct evidence that contradicts the Individual Officers' assertion that Meadors' identifications of Cruz were not the byproduct of police pressure or intimidation. For example, Meadors never testified to that effect and, based on the record before the Court, no one from Meadors' family has said he was coerced. The record also contains no evidence that Meadors ever recanted his statements to the police or his sworn testimony. (Meadors passed away before he could be deposed in this litigation. [490] ¶ 149.) No officer, named defendant or otherwise, has said that Meadors was coerced.

In seeking to stave off summary judgment, therefore, Cruz relies on a combination of circumstantial evidence and conjecture to create a triable issue of fact. Certainly, circumstantial evidence can be used to materially undercut direct evidence, but Cruz cannot rely on conjecture, speculation, and a mere scintilla of evidence to defeat the Individual Officers' motions for summary judgment. *See Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) ("Whether a plaintiff offers direct or circumstantial evidence ... all evidence belongs in a single pile and must be evaluated as a whole."); *but see Grant*, 870 F.3d at 568

24

(inferences cannot be based solely on speculation or conjecture); *Anderson*, 477 U.S. at 252 (the "mere existence of a scintilla of evidence" is insufficient to defeat summary judgment").

Cruz's theory of the case is that Meadors originally described his assailants as Black men at the scene of the crime on October 6. [491] at 2. Defendants then intentionally leaked Meadors' address to the *Chicago Tribune* through their colleague, Capitelli, in an effort to intimidate Meadors into making a false identification of Cruz. *Id.* at 3. Cruz alleges that the fear of retribution and Meadors' desire to ensure that his family be placed in witness protection led Meadors to agree to identify Cruz in a gang book and upon his second viewing of the 21-photo stack on October 8. *Id.* at 22. Then, the very next day, certain defendants showed Meadors a suggestive lineup, where he chose Cruz out of a group of four and where Cruz was the only one sitting on a phonebook. *Id.* at 56.

To defeat a motion for summary judgment, Cruz must direct the Court to evidence that supports a finding, or at least an inference, that Meadors' identification was fabricated by the Individual Officers. He has not done so. At this stage, the Court must draw all reasonable inferences in Cruz's favor. *Scott*, 550 U.S. at 378. But that requirement does not command or even permit the Court to adopt inferences that are not founded in evidence but in mere speculation. *Grant*, 870 F.3d at 568. The evidence Cruz presents falls short of any showing that could permit a reasonable jury to find that the Individual Officers not just coerced Meadors' identifications, but completely conjured them into existence. *See Fields*, 740 F.3d at 1110.

25

*First*, Cruz notes that other witnesses to the shooting, Jaramillo and Rios, testified that the shooters were Black. [491] at 2. The defense at Cruz's criminal trial could have used that fact to impeach the reliability of Meadors' identification, but Cruz asks too much of the Court to use that information to draw an inference that the Individual Officers fabricated Meadors' identification. "[A]n inference that veers too far into speculation fails to survive summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024) (cleaned up). An eyewitness's identification is not shown to be false or fabricated by a conflict with other eyewitnesses' recollections of events. *See Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (an eyewitness's identification can be credited even if other eyewitnesses exculpate the suspect). Even though the conflict in eyewitness recollections may have rendered Meadors' identifications less reliable for purposes of Cruz's criminal trial, it does not permit a jury to conclude for purposes of this wrongful-conviction lawsuit that they were fabricated.

*Second*, Cruz directs the Court to the GOCR, which he asserts originally indicated that Meadors identified his assailant as Black but that the Individual Officers later altered. [491] at 27–28. Cruz's theory is that the officers on the scene wrote "M1," police shorthand for a Black male, and someone later altered the 1 to a 4 by adding an "elbow." [487] ¶¶ 34–35. But the GOCR—on its face and in the close-ups Cruz has provided—does not support that theory, and the GOCR itself is the only evidence Cruz to which points to establish his narrative. *See* [478-7]; [478-8]; Appendix. Despite the single cherry-picked comparator to which Cruz draws

26

attention, [479-1] at 4, numerous other handwritten 4s in both versions of the GOCR match the one Cruz claims was altered. *See* [478-7]; [478-8]; Appendix. In an Appendix to this opinion, the Court points to several other "4s" in the GOCR in order to better illustrate its conclusion that Cruz's theory that the GOCR was altered lacks sufficient evidentiary support to create a triable issue of fact.

Cruz also argues that the Individual Officers attempted to "obliterate the description of the other two offenders, who were also listed on the original GOCR as M1 (Male Blacks)." [491] at 27. Once again, he submits a magnification of two cross-outs on the GOCR, [487] ¶ 35, and argues that a jury could see an M1 behind the cross-outs as part of "extensive" evidence that the Individual Officers altered the GOCR. [491] at 27–28. Once again, the GOCR itself does not support this theory, even when magnified. *See* [479-1] at 3; Appendix.

Cruz argues that an inspection of the GOCR for evidence of alternations is within the exclusive province of the jury. [491] at 29 (describing it as "classic jury work"). But a genuine dispute requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position." *See Anderson*, 477 U.S. at 252. Cruz cannot manufacture such a dispute by treating the GOCR like a Rorschach test, hoping that the jury will peer through black ink to see what he insists is there even though no other evidence in the record supports it. *Cf. Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.").

27

Neither does Officer Fleming's deposition support Cruz's theory of an altered GOCR. *Contra* [491] at 27–28 (citing [487] ¶¶ 30–36). Cruz's statement of facts invites the inference that because Fleming did not personally create the GOCR despite his signature being at the bottom, the document is compromised. *Id.* Fleming testified that he did not personally write or alter the GOCR and that cross-outs were common on GOCRs. [461-7] at 57:20–59:7; 62:2–64:24. He also testified that Odegard would have had authority to write his signature on the GOCR. *Id.* at 58:17–19. This evidence does not permit an inference that another officer altered the GOCR to falsely change the assailant's race from Black to Hispanic.

*Third*, Cruz suggests that the October 6, 1993 supplemental report memorializes a description of the shooters as Black and omits any identification of a Hispanic assailant by Meadors. [491] at 2 (citing [490] ¶ 41(a)). Generously, Cruz's description is an oversimplification of this supplemental report, which indicates that Jaramillo and Rios identified the shooters as Black and does not include any racial identification by Meadors. [461-6] at 4–6. This report does not permit an inference— individually or collectively, in light of the Cruz's other arguments regarding the record, [491] at 28—that Meadors initially described his assailants as Black and later changed his identification to Hispanic at the insistence of police.

*Fourth*, Cruz asserts that fabrication of Meadors' identifications can be inferred from the timing of certain events—specifically, that Meadors only identified Cruz in the gang book, the 21-photo stack, and the live lineup shortly after the *Chicago Tribune* published the location of his home, courtesy of information provided

28

to the newspaper by CPD, and only after Meadors and his family were placed in witness protection. Cruz alleges that this sequence of events supports the inference that the police provided his address to the *Tribune* to intimidate Meadors into falsely identifying Cruz, and/or that they conditioned his witness protection for Meadors and his family on his false identification. [491] at 22.

But "[a]n inference is not reasonable if it is directly contradicted by direct evidence provided at the summary judgment stage, nor is a conceivable inference necessarily reasonable." *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (cleaned up). Meadors himself provided a different account of his motivations in the form of direct, admissible evidence: that he was too frightened to serve as a witness at all when the officers first showed him a stack of photos including Cruz, but mustered his courage. [461-3] at 44:22–46:6. And as the Court has already noted, Cruz offers no evidence indicating that Meadors ever recanted his identification. The inference that Cruz asks the Court to draw based on the timeline of events—that Meadors' identifications were not just *coerced*, but also *fabricated*—is simply not a reasonable one; it is instead supported by only speculation or conjecture. *See Grant*, 870 F.3d at 568; *see also supra* at 21–22 (distinguishing between fabrication and coercion).

*Lastly*, Cruz cites evidence that the Individual Officers attempted or successfully elicited false identifications from other witnesses—both in this case and others. [491] at 4; [490] ¶ 41(i)–(j), (v). In his statement of additional facts, Cruz invokes dozens of other cases where witnesses have alleged that certain of the

29

Individual Officers coerced or manipulated them in some way, and Cruz cites to materials from those cases such as affidavits, testimony, and certificates of innocence granted by Illinois judges, as well as news articles and publications on websites discussing wrongful convictions. *See* [491] at 3; [487] ¶¶ 55–78. In response, the Individual Officers assert that the judicial opinions and evidence developed in and about other cases, involving different plaintiffs and, often, different courts, are inadmissible hearsay barred by Federal Rule of Evidence 801. *See* [506] ¶¶ 2, 55–78. The Court agrees.

These materials concerning other cases were developed outside of the current proceeding and are offered for their truth: that the Individual Officers manipulated or coerced other individuals in order to compel their testimony. *See* [506] ¶¶ 55–78. Given that Cruz is presenting these materials, he bears the burden of demonstrating why they are admissible despite being palpably hearsay. *Hartford Fire Ins. Co. v. Taylor*, 903 F. Supp. 2d 623, 640 (N.D. Ill. 2012). He has made no attempt to identify a hearsay exception that would apply here or to articulate a non-hearsay application for this evidence. Cruz gestures towards "404(b) witnesses," but does not explain who those witnesses will be and how their testimony will support his allegations. [491] at 4. "[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived." *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016).

Setting aside the hearsay hurdle, evidence of wrongdoing in other instances tends to support a line of reasoning prohibited by Federal Rule of Evidence 404(b)(1):

30

that the Individual Officers, having manipulated other witnesses and framed other criminal defendants, are more likely to have done so here. Cruz states that the evidence falls into the permitted uses laid out by Federal Rule of Evidence 404(b)(2). *See* [487] ¶ 55 ("This history reflects Defendants' opportunity, intent, preparation, plan, and knowledge to employ similar coercive tactics during the Douglas homicide investigation, which resulted in Cruz's wrongful conviction."); [490] ¶ 41(v) ("Cruz's Rule 404(b) witnesses will testify in this case that one or more of the Individual Defendants used the same coercive modus operandi to convince them to identify a defendant who did not, in fact, commit the crime charged.").

But "it's not enough for the proponent of the other-act evidence simply to point to a purpose in the 'permitted' list and assert that the other-act evidence is relevant to it." *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014); *id.* at 855 ("[I]f subsection (b)(2) of the rule allows the admission of other bad acts whenever they can be connected to the defendant's knowledge, intent, or identity (or some other plausible non-propensity purpose), then the bar against propensity evidence would be virtually meaningless."). *Gomez* requires the proponent of the other-act evidence to articulate a "propensity-free chain of reasoning." *Id.* at 856. To do so, the proponent must not just identify "the non-propensity theory that makes the other-act evidence relevant," but he must also demonstrate "*how* the evidence tends to make a particular fact of consequence more or less probable" with sufficient detail "to help expose impermissible uses of other-act evidence for pure propensity purposes." *Id.*

31

Cruz has not done the requisite analysis. He could have focused on specific items of other-act evidence and articulated a precise, propensity-free chain of reasoning as to why those particular other acts make it more probable that Meadors' identifications was fabricated; why that chain of reasoning would not lead a jury to a forbidden propensity inference; and why that evidence does not separately run afoul of Federal Rule of Evidence 403. *See id.* at 856 ("Even if other-act evidence is relevant without relying on a propensity inference, it may be excluded under Rule 403, which applies 'with full force' in this context."). But his memorandum in opposition to summary judgment contains no such analysis comparing, at the necessarily granular level, past cases involving Individual Officers with his own investigation. *See generally* [491]. Without any analysis from Cruz to demonstrate how a jury may permissibly use evidence from other cases involving the Individual Officers to find them liable here, the most obvious reading of the proffered materials is the prohibited one: that because these police officers fabricated witness identifications in other cases, it is more likely that they did so here.

At bottom: Because Cruz has failed to provide evidence sufficient to create a genuine dispute of material fact that the Individual Officers fabricated Meadors' identifications, his due process claim based on this alleged fabrication fails.

* * *

Cruz's claims of unlawful detention and malicious prosecution also fail, as each requires Cruz to show that the Individual Officers lacked probable cause. *Mustafa*, 442 F.3d at 547; *Martinez*, 900 F.3d at 849; *Thompson*, 596 U.S. at 43–44. And yet

Meadors' identifications supported probable cause, which is a low bar for law enforcement to clear. *See Kaley v. United States*, 571 U.S. 320, 338 (2014) ("Probable cause, we have often told litigants, is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act.'") (cleaned up).

Cruz contends that Meadors' identifications of him from the gang book, 21-photo stack, and the live lineup did not support probable cause because the officers were required to consider exculpatory evidence as well (namely, the fact that two other eyewitnesses had described the perpetrators as Black). [491] at 7–8. But in this Circuit, "an identification by even one eyewitness who lacks an apparent grudge against the accused person is sufficient to demonstrate probable cause." *Moorer v. City of Chicago*, 92 F.4th 715, 721 (7th Cir. 2024). That is true even if other eyewitnesses disagree. *See Brown v. City of Chicago*, 709 F. Supp. 3d 558, 570 (N.D. Ill. 2023) ("A single eyewitness identification of a suspect is sufficient to create probable cause, even if the identification is questionable or police doubt its accuracy.") (citing *Moran v. Calumet City*, 54 F.4th 483, 499–500 (7th Cir. 2022); *Coleman*, 925 F.3d at 351).

Cruz also argues that Meadors' October 9 identification of him was tainted by suggestive lineup procedures, including the fact that the lineup included only three fillers and that being seated on a phonebook drew undue attention to him. [491] at 23–27. But the police had probable cause to arrest, detain, and prosecute Cruz even before considering any issues with the live lineup, and the Seventh Circuit has held

that the police do not "violate a suspect's constitutional rights by showing witnesses a suggestive photo array or conducting a suggestive lineup." *Blackmon v. Jones*, 132 F.4th 522, 524 (7th Cir. 2025). Cruz suggests that *Blackmon* does not control in his case because it narrowly focused on a question of whether a suggestive lineup was a constitutional violation in and of itself, separate from whether police coerced witnesses to appear at trial. [491] at 23; *Blackmon*, 132 F.4th at 526. The Court has already discussed its rationale for crediting Meadors' earlier identifications of Cruz and is now focused on whether Meadors' identification of Cruz during the live lineup contributed to probable cause. As in *Blackmon*, this analysis turns on events that transpired at the stationhouse on October 9. *See id.* at 525–26.

Even the "unusual circumstances" proviso in *Blackmon* does not help Cruz. *Id.* Cruz has not "point[ed] to evidence that would make the identification[] so incredible that an officer could not reasonably believe the witness[] [was] telling the truth." *Moorer*, 92 F.4th at 722 (citing *Coleman*, 925 F.3d at 351). Indeed, Meadors had already identified Cruz in the gang book, which could have supported probable cause independently. *Id.* at 721. In addition, the lineup fillers were similar in build and complexion to Cruz, and while the Court accepts that a reasonable jury could find that the phonebook attracted undue attention to Cruz during the lineup, *see supra* at 17 n.11, a reasonable jury still could not conclude that the effect was so extreme that it rendered Meadors' lineup identification meaningless. [490] ¶ 73; *see* Appendix. And Meadors identified Cruz definitively. *See supra* at 24; *cf. Bolden v. Pesavento*, No. 17-CV-417, 2024 WL 1243004, at *27 (N.D. Ill. Mar. 23, 2024) (a lineup identification

34

did not conclusively establish probable cause where the witness initially selected a filler, then selected the plaintiff after being told by police to change his answer).

In sum, based on the record evidence, a reasonable jury could not find that the Individual Officers lacked probable cause to arrest and prosecute Cruz. The parties dispute whether Meadors' identifications were more plausible given that he was a victim and how they should be weighed against Rios' conflicting description of the shooters, as he was also a victim. [460] at 4; [491] at 11–14. This argument is immaterial; the fact stands that Meadors' identifications supported probable cause to arrest Cruz, hold him in detention, and bring criminal charges against him. *Moorer*, 92 F.4th at 721. The existence of probable cause defeats Cruz's claims for malicious prosecution and unlawful detention. *Coleman*, 925 F.3d at 350; *Thompson v. Clark*, 596 U.S. 36, 43 (2022).[15]

## B.    Remaining Fabrication of Evidence Claims

Although the Court has resolved Cruz's claim that the Individual Officers fabricated Meadors' identifications of Cruz, there are two other pieces of evidence that, in opposing summary judgment, Cruz alleges were fabricated, abrogating his Fifth and Fourteenth Amendment rights to due process. [491] at 20. The Court now addresses whether there is a genuine issue of material fact that the Individual

---

[15] The Individual Officers raise other arguments regarding Meadors' identifications besides those the Court has discussed. For instance, the Individual Officers (sans Guevara) argue that the doctrine of qualified immunity shields them from liability and that their actions were not the proximate cause of Cruz's conviction because the State's Attorney's Office charged Cruz. [460] at 7–9. For his part, Guevara argues that he had no personal involvement in "improper identification techniques" and that he is entitled to qualified immunity. [464] at 5, 7. The Court does not need to address these remaining arguments to resolve the motions at hand.

Officers fabricated (1) the GOCR, and (2) evidence that Cruz was carrying a Latin Kings Constitution and a photograph of himself displaying a Latin Kings gang sign at the time of his arrest.

### 1. Alteration of GOCR

For the reasons discussed *supra* at 26–28, Cruz has not presented evidence that could allow a reasonable jury to conclude that the GOCR was altered. The Court thus grants summary judgment to the Individual Officers on Cruz's fabrication of evidence claim with regard to the GOCR.

### 2. Photograph and Latin Kings Constitution

To prevail on his claim that the Individual Officers fabricated evidence that he was carrying a Latin Kings Constitution and a photograph of himself showing a Latin Kings gang sign at the time of his arrest, Cruz must show that this evidence was material to his conviction. *Coleman*, 925 F.3d 336; *Patrick*, 974 F.3d at 835 ("A conviction premised on fabricated evidence will be set aside if the evidence was material—that is, if there is a reasonable likelihood the evidence affected the judgment of the jury."). The record does not create a genuine dispute of material fact on that point. The purportedly fabricated evidence at issue was cumulative of several other pieces of admitted evidence at Cruz's criminal trial establishing that Douglas was murdered because he was a recognizable member of the Disciples gang in an area controlled by the rival Latin Kings, and that Cruz was not just a member of the Latin Kings, but a devoted gang member at that.

Cruz argues that evidence that the photo and Latin Kings Constitution were on his person when he was arrested was material to the prosecution's argument that

his motive for killing Douglas was a deep love and loyalty to the Latin Kings. [491] at 36–38. But Cruz himself discusses a laundry list of other evidence that the jury at his criminal trial heard concerning his membership in, and loyalty to, the Latin Kings at the time of his arrest. *Id.* at 37. Cruz points out that his gang membership was not in dispute at his criminal trial and that his own attorney acknowledged that fact during opening statements. *Id.* The jury also heard that Cruz was arrested wearing a Los Angeles Kings jacket;[16] that the jacket indicated gang loyalty; and that an identifiable member of the rival Disciples would be in grave danger in Latin Kings' territory due to animosity between the two groups. *Id.*; [461-3] at 130:13–16. This evidence supplied more than enough foundation for a jury to credit the prosecution's version of events: that Cruz murdered a member of a rival gang not simply because he was a Latin King but because he was an especially loyal one. *See Zambrano v. City of Joliet*, 141 F.4th 828, 832 (7th Cir. 2025) (plaintiff did not establish an issue of material fact as to whether evidence was fabricated when the facts the alleged fabricated evidence sought to prove were supported by multiple other pieces of evidence shown to the jury).

This conclusion is bolstered by the fact that Cruz's fabrication-of-evidence claim with respect to the photo is a narrow one. He does not dispute that the photo

---

[16] The record from Cruz's criminal trial indicates that he was arrested wearing a jacket bearing the logo of the Los Angeles Kings hockey team. [461-3] at 133:8–20; *see also* [491] at 37. A photo of Cruz from the day of his arrest shows him wearing a jacket displaying the Los Angeles Kings logo. [461-21]. At Cruz's deposition, though, he identified the jacket's logo as that of the Sacramento Kings basketball team. [461-2] at 243:10–22. Despite the conflicting accounts of which Kings sports franchise was represented on the jacket, the parties both attest that the jacket indicated affiliation with the Latin Kings street gang. *Id.*; [490] ¶ 117.

showing him flashing a Latin Kings gang sign was genuine and his own. Indeed, he admits that he kept the photo in his bedroom. [491] at 33. So, with respect to the photo, the claim of fabrication relates only to whether Cruz had this item on him at the time of his arrest—not whether he was the person in the photo and not whether the photo actually belonged to him. In other words, absent any purported fabrication, jurors at Cruz's criminal trial would have learned everything described above and also would have learned that Cruz possessed a photo of himself flashing a Latin Kings gang sign, which he kept in his bedroom. Considered in this context, "only speculation or conjecture" supports Cruz's argument that the criminal jury's judgment would have been affected by the knowledge that the photo was not actually found on Cruz's person when he was arrested, despite concurrently learning that it the items nonetheless belonged to Cruz. *Grant*, 870 F.3d at 568.

The Court is not persuaded by Cruz's argument that the location of the photograph and the Constitution must have been material—again, meaning reasonably likely to have affected the judgment of the jury, *Patrick*, 974 F.3d at 835— simply because the prosecution relied on this evidence during Cruz's criminal trial. [491] at 36. No doubt, the prosecution emphasized to the jury that Cruz had a copy of the Latin Kings Constitution and the photograph of himself flashing the Latin Kings gang sign on him at the time of his arrest. *E.g.*, [461-3] at 13:15–21 (prosecution's opening statement). But the prosecution's entire theory of the case was that Douglas' murder was motivated by animosity between rival gangs. To that end, the government presented evidence that Cruz, a Latin King, saw Douglas, a Disciple, in

38

Latin King territory, and the bitter rivalry between the two groups caused Cruz to open fire.

Specifically, the jury heard that the intersection at North and Kedzie was Latin King territory, *id.* at 126:20–127:9, and that Cruz was a Latin King, *id.* at 17:21–18:1. Wojcik testified that, when he was arrested, Cruz admitted to being a Latin King and was wearing an LA Kings jacket, a signifier of the Latin Kings. *Id.* at 131:24–132:6, 133:5–20, 164:21–24. Wojcik also testified that when he arrested Cruz, Cruz said that a Latin King had a duty to remove any gang members who were considered Folks (such as Disciples) from their territory by any means necessary. *Id.* at 165:6–166:1. The jury heard that Douglas was wearing a Duke Blue Devils shirt, which made him instantly recognizable as a member of the Disciples gang. *Id.* at 85:9–13, 129:12–130:12. The jury heard a gang expert opine that "the rivalry between the Latin Kings and the Disciples is probably one of the worst and longest rivalries I can think of." *Id.* at 125:10–12. The jury also heard that a Disciple's presence in that territory would be all the motive needed for violence. In an exchange with the government, the gang expert testified:

> Q: Would somebody wearing a Duke shirt in Latin King turf be readily identified as a Disciple?
>
> A: I would say he would be in serious trouble.

*Id.* at 130:13–16. In the same vein, the government argued that Douglas' attempt to protect himself from danger by claiming to be a Vice Lord, a gang amicable with the Latin Kings, did not overcome the obviousness of his attire. *Id.* at 11:1–8.

When examined in this fuller context, evidence at trial that Cruz had on his person the Latin Kings Constitution and a photo of himself flashing the Latin Kings gang sign at the time of his arrest was unquestionably cumulative of the other evidence the jury heard to support the prosecution's theory of the case: that Cruz killed Douglas because he recognized him as a Disciple in Latin Kings territory.

Last year, the Seventh Circuit clarified that cumulative evidence is not material when evaluating a fabrication of evidence claim. *Zambrano*, 141 F.4th at 832. In *Zambrano*, a plaintiff protested that he did not provide a police officer with information that he was with two friends at his girlfriend's apartment in the afternoon hours before the murder of which he was convicted, which the officer recorded in his police report and attributed to the plaintiff. *Id.* at 830. The court reasoned that this alleged fabrication was immaterial at trial because other evidence showed that Zambrano was at the apartment with the same friends the evening of the murder—closer to the time of the crime. *Id.* at 832—33. Likewise, in *Moran v. Calumet City*, No. 17 C 2027, 2021 WL 2823086 at *7 (N.D. Ill. July 7, 2021), *aff'd,* 54 F.4th 483 (7th Cir. 2022), the district court found that allegedly fabricated evidence that one witness identified the defendant was not material given that witness's subsequent identifications and the fact that another witness independently identified the defendant. This case is much like *Zambrano* and *Moran* in that the prosecution provided ample evidence to support a finding that Douglas' murder was a result of a violent rivalry between opposing gangs. If the jury required evidence of Cruz's gang

affiliation to solidify its verdict, the prosecution's evidence of Cruz's membership beyond the photo's location and the Latin Kings Constitution would have sufficed.

* * *

The Court thus grants the Individual Officers' motion for summary judgment on Cruz's fabrication of evidence claim (Count I) in its entirety.

### C.    *Brady* Claims

To prevail on a *Brady* claim, a plaintiff in a civil matter must show "(1) the suppressed evidence is either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice." *Petty*, 754 F.3d at 423; *see also Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022). "Prejudice exists if there is 'a reasonable probability that the suppressed evidence would have produced a different verdict.'" *See Harris v. Kuba*, 486 F.3d 1010, 1014–15 (7th Cir. 2007) (quoting *United States v. O'Hara,* 301 F.3d 563, 569 (7th Cir. 2002)). *See also id.* ("A *Brady* violation further requires 'materiality' of the evidence withheld, which 'in the *Brady* context is the same thing as prejudice.'") (quoting *United States v. Wilson,* 481 F.3d 475, 480 (7th Cir. 2007)). "Police officers must provide exculpatory and/or impeachment evidence to prosecuting attorneys—a corollary to the prosecutor's obligation to disclose such evidence to defense counsel under *Brady v. Maryland*." *Coleman*, 925 F.3d at 349 (citing *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016)). Evidence is not considered suppressed if the defendant had access to the evidence through reasonable diligence. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008).

41

Cruz asserts the Individual Officers violated his *Brady* rights when they suppressed six "baskets" of evidence: (1) evidence that the GOCR was altered and the original GOCR itself before the alleged alteration; (2) evidence that the Individual Officers coerced Meadors' identifications of Cruz; (3) evidence that Wojick and Riccio did not recover the Constitution or the photograph of Cruz flashing a Latin Kings gang sign on Cruz's person; (4) evidence that the Individual Officers attempted to coerce Jaramillo into falsely identifying Cruz; (5) evidence that passengers in the shooter's car shot at Rios; and (6) evidence that Guevara caused Jaramillo to sign a false one-page statement, which was later destroyed. [491] at 40. The Court addresses each "basket" in turn.

### 1.    Original GOCR

For Cruz to prevail on his claim that the Individual Officers suppressed the original GOCR and evidence that they altered it, he first would need to present some evidence sufficient to allow a reasonable jury to conclude that this allegedly suppressed evidence existed at all. *See Johnson v. Guevara*, No. 20 C 4156, 2025 WL 903813, at *29 (N.D. Ill. Mar. 24, 2025) (plaintiff's *Brady* claim failed where he had not established an issue of material fact that such evidence existed or that the defendant officers knew of it). Because no material issue of fact exists as to whether the GOCR was ever altered, *see supra* at 26–28, the Court grants the Individual Officers' motion for summary judgment on this aspect of Cruz's *Brady* claim.

### 2.    Evidence of Meadors' alleged coercion

Similarly, and for the reasons discussed *supra* in Section III.A, the record contains insufficient evidence from which a reasonable jury could conclude that the

Individual Officers coerced or intimidated Meadors into identifying Cruz. By extension, the record contains insufficient evidence from which a reasonable jury could conclude that the Individual Officers withheld evidence that they coerced or intimidated Meadors into identifying Cruz.

> 3. **Evidence that officers did not recover the Latin Kings Constitution or the photo of Cruz flashing a Latin Kings gang sign from Cruz's person**

For the reasons discussed *supra* at 36–41, evidence that the Latin Kings Constitution and the gang-sign photo were not found on Cruz's person is not material for purposes of Cruz's evidence-fabrication claim. That same evidence is likewise not material for purposes of Cruz's *Brady* claim. Where the jury heard significant other evidence of Cruz's membership in the Latin Kings and the gang-related motive behind Douglas's murder, there is no reasonable probability that the evidence Cruz claims was suppressed—namely, that the Constitution and the photo were not on him when he was arrested—would have produced a different verdict at his criminal trial. *See Harris*, 486 F.3d at 1014–15.

Yet in his response to the Individual Officers' motion for summary judgment, Cruz raises a second *Brady* argument regarding the photo and Constitution. And this argument warrants more unpacking, even if it ultimately proves unsuccessful. In particular, Cruz argues that the Individual Officers suppressed evidence that Wojcik, in fact, found the photo during an unlawful search of Cruz's bedroom and that the Constitution was not Cruz's at all. [491] at 45; *see also id*. at 44 (speculating that the Constitution was obtained "from another defendant's criminal file"). And this suppressed evidence, Cruz maintains, had significant impeachment value. It would

43

have cast doubt not just on Wojcik's credibility, but on the credibility of the entire police investigation underlying Cruz's convictions. *See Camm v. Faith*, 937 F.3d 1096, 1110 (7th Cir. 2019) ("[E]xposing the [defendant prosecutor's and defendant police officer's] lie … would have eroded the jury's trust in both the prosecutor and the lead case investigator … Arguments like these can help create reasonable doubt."). Put a different way: Although the location of the documents was not material for purposes of establishing Cruz's motive for the crimes, Cruz credibly argues that the true locations of the Latin Kings Constitution and photograph were *withheld* within the meaning of *Brady* because of their impeachment value.

The problem Cruz's argument runs into is an evidentiary one. Even assuming Cruz himself could have testified to the fact that these documents were not on his person at the time of his arrest, as he represented in his deposition, [461-2] at 202:17–22, that testimony could only help establish that the police committed misconduct in the course of their investigation. In other words, Cruz's testimony is evidence towards the fact that the documents were not on his person, but not evidence that the police found the photo during an illegal search of Cruz's bedroom or that police took the Constitution from another defendant's file and planted it in Cruz's. Cruz still would have to show that the evidence he claims the police suppressed actually existed. *Johnson*, 2025 WL 903813 at *29. And Cruz's testimony does not show that the police withheld evidence. *See Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015).

Cruz asserts that *Saunders-El*'s rule is limited to false confession cases. [491] at 42. But its rule is broader: *Saunders-El* stands for the proposition that "*Brady* does

44

not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El*, 778 F.3d at 562. That proposition predates *Saunders-El*. *See Harris*, 486 F.3d at 1017 (*Brady* does not provide relief if a police officer makes a false statement to a prosecutor, as *Brady* does not require police to render truthful accounts of interrogations to prosecutors); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."). Indeed, courts in this District have applied the reasoning of *Saunders-El* to cases that do not concern false confessions. *See Johnson*, 2025 WL 903813 at *27 (plaintiff in a police misconduct suit had "no colorable *Brady* claim to the extent that he asserts that the Individual Defendants should have affirmatively disclosed their fabrications" where the alleged fabrications included witness identifications); *Myvett v. Chicago Police Detective Edward Heerdt*, No. 12 C 09464, 2015 WL 12745087 at *6 (N.D. Ill. May 28, 2015) (rejecting a *Brady* claim based on police officers' failure to disclose that they fabricated witness statements).

Cruz argues that his situation is more akin to that of *Avery v. City of Milwaukee* than *Saunders-El*. [491] at 41–42. In *Avery*, police withheld evidence that they had fabricated witnesses' statements that the defendant had confessed his guilt to them. *Avery*, 847 F.3d at 436. The evidence of the fabrication was withheld in violation of *Brady* because "Avery knew that the informants' statements were false, but he

45

did *not* know about the pressure tactics and inducements the detectives used to obtain them." *Id.* at 443. But a comparison of Meadors to the supposed informants in *Avery* misses a key detail: Cruz has not presented sufficient evidence from which a reasonable jury could conclude that the evidence he claims was suppressed ever existed. Without the established existence of that evidence, police had no duty to create it even if they did falsely testify that they found the photo and the Constitution on Cruz's person.

Defendants argue that the only evidence Cruz can muster to show that the photograph and Constitution were not on his person at the time of arrest, contrary to the prosecution's theory at Cruz's criminal trial, is inadmissible hearsay evidence from Cruz's aunt, Ada Pacheco. Cruz alleges that Pacheco told him that the police found the photo during an illegal search of her basement, where he had been living at the time. But Cruz himself can testify to the fact that these documents were not on his person at the time of his arrest, as he represented in his deposition. [461-2] at 202:17–22. That could provide sufficient evidence from which a jury could conclude that the documents were not, in fact, on Cruz's person at the time of his arrest, which Cruz could have used to impeach Wojcik. Evidence within Cruz's knowledge cannot be said to have been withheld by defendants. "[E]ven if the government failed to disclose material evidence, the evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence." *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014); *Saunders-El*, 778 F.3d at 562.

46

Cruz points to only one other piece of evidence supporting his claim that Wojcik and other officers withheld evidence about the true origin of the photo and Constitution: his own testimony that several years after the fact, his aunt (Pacheco) told Cruz about an illegal search of his bedroom during which officers allegedly recovered the photograph. [487] ¶¶ 38–39. But Pacheco's alleged statement is inadmissible hearsay not falling within any exception. Cruz says that the Individual Officers' hearsay objection is "a complete non-sequitur" because "it is completely irrelevant how or when Cruz came into the knowledge of Defendants' search." [491] at 44. Not so. "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Because Cruz has not marshaled admissible evidence from which a reasonable jury could conclude that that the Individual Officers suppressed the true location of the Latin Kings Constitution and gang-sign photo, Cruz's *Brady* claim against the Individual Officers with respect to this basket of evidence cannot proceed past summary judgment. *See Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) at *4 (a plaintiff cannot proceed past summary judgment on a *Brady* claim if there is no proof that the allegedly suppressed document existed beyond plaintiff's speculation).

> ### 4. Evidence that the Individual Officers attempted to coerce Jaramillo into falsely identifying Cruz and that Guevara suppressed Jaramillo's coerced signed statement.

The Court next analyzes Cruz's *Brady* claim as it pertains to the fourth *and* sixth baskets of evidence. Both baskets involve Cruz's allegation that the Individual

47

Officers suppressed records pertaining to the coercive circumstances surrounding interviews of eyewitness Jaramillo, during which police attempted to get Jaramillo to identify Cruz, despite the fact that Jaramillo maintained the shooter was Black. [491] at 40. The alleged suppressed evidence includes police reports and notes from an interview of Jaramillo along with a one-page document that, according to Jaramillo's testimony, he signed out of fear and exhaustion, but which Jaramillo never read and which was never produced in Cruz's criminal case or in this case. [491] at 40; [506] ¶ 14(g)–(h).

Cruz has presented evidence from which a reasonable jury could conclude that Guevara coerced Jaramillo to sign a fabricated statement, which Guevara then destroyed. Jaramillo testified to the existence of such a document at his deposition, and his story could be supported by a potential negative inference that jurors may permissibly draw from Guevara's invocation of his Fifth Amendment rights against self-incrimination when asked whether he threatened Jaramillo. [461-5] 118:14–122:17; [487] ¶ 80–81. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592 (7th Cir. 2019) ("When a defendant in a civil case invokes the Fifth Amendment, juries are permitted, but not required, to draw a negative inference against the defendant.").

Defendants argue that evidence showing the alleged coercion of Jaramillo is not exculpatory or impeaching. [508] at 22. The Court disagrees. The false document, if produced, "would have eroded the jury's trust" in the police investigation of Cruz, which could have led the jury to reasonable doubt that Cruz was the shooter. *See Camm*, 937 F.3d at 1110. While *Brady* does not require police to create exculpatory

evidence, *Saunders-El*, 778 F.3d at 562, the Fifth Amendment prohibits police officers from destroying potentially exculpatory or impeaching evidence once it exists, *see Armstrong v. Daily*, 786 F.3d 529, 548 (7th Cir. 2015).

Jaramillo's testimony only identifies Guevara as the individual who pressured him to sign the false statement. Jaramillo's testimony also identifies an alleged falsity about Jaramillo's identification in an October 10 supplemental report authored by Wojcik and Riccio: that Jaramillo described the shooter as either Hispanic or Black, while Jaramillo maintains that he exclusively described the shooter's race as Black. [490] ¶ 41(k). As a result, Cruz's *Brady* claim with respect to the attempted coercion of Jaramillo may proceed against Guevara, Wojcik, and Riccio alone. Cruz has not presented evidence that the other Individual Officers participated in the suppression.[17]

### 5.    Evidence that perpetrators shot at Rios

The fifth basket of evidence for which Cruz brings a *Brady* claim is evidence that the perpetrators shot at Rios. Rios was a member of the Latin Kings in 1993, and Cruz and Rios were acquaintances at the time. [461-12] at 41:18–42:10, 65:1–23. Therefore, evidence that Rios was shot by the same perpetrators who shot Douglas and Meadors could have caused the jury to doubt that Cruz was the shooter, as Cruz likely would not have shot at someone whom he knew was a Latin King.

---

[17] The Individual Officers argue that this *Brady* theory is barred as to officers besides Guevara because Cruz did not identify these other officers in response to contention interrogatories. [508] at 21. But the interrogatory response they cite clearly lays out this allegation. [461-56] at 30–31. While the response focuses on Guevara, it is broad enough to encompass all Individual Officers. *Id.*

49

Rios testified during his deposition that he informed police that the perpetrators had shot at him. *Id.* at 145:23–146:24. However, neither the October 6 supplemental report credited to Rutherford, McDonald, and Boris, nor the handwritten notes that Rutherford took from his discussion with Rios reflected that the perpetrators attempted to shoot Rios. [461-6] at 1, 5–6; [479-2]; [461-10] at 55:8–14. If a jury credited Rios' testimony, it could reasonably find that Rutherford and Boris knew that the perpetrators had attempted to shoot Rios but omitted this information from their reports and failed to otherwise provide it to the state prosecutors, violating the requirements of *Brady*.

Defendants argue that the Court must bar this claim because Cruz did not include this basket of evidence in responses to interrogatories that he provided on October 22, 2024. [508] at 23; [461-56]. But the evidence that Rios informed police that the perpetrators had attempted to shoot him came to light in Rios' deposition on October 28, 2024. [461-12] at 1:14. The Individual Officers do not dispute that their attorneys were at that deposition. *Id.* at 5:11–19. Parties are not required to update interrogatory responses if the additional information was made known to the other parties during the course of the discovery process. Fed. R. Civ. P. 26(e)(1)(A). The Court therefore declines to grant summary judgment on these grounds.

The Individual Officers also assert that evidence of the perpetrators shooting at Rios would not have influenced the outcome of Cruz's trial and was not favorable to Cruz. [508] at 23–24.[18] The Court disagrees. As explained above, this evidence

---

[18] The Individual Officers also assert that Cruz has waived an argument as to the materiality of this evidence. [508] at 23. But materiality is a central element of a *Brady* claim. *Brady*,

could have cast doubt on Cruz's identity as the shooter because evidence in the record indicates that Cruz and Rios were acquainted and that Cruz knew of Rios' Latin Kings membership. At this juncture, the Court draws all reasonable inferences in Cruz's favor, *Scott*, 550 U.S. at 378, and reasonably infers that the jury may have concluded that Cruz would not have been likely to shoot at a fellow member of the Latin Kings, changing their analysis of the evidence at his criminal trial. *See Harris*, 486 F.3d at 1014–15 ("prejudice exists if there is 'a reasonable probability that the suppressed evidence would have produced a different verdict'"). Cruz is therefore entitled to have a jury in this case decide whether the suppression of this evidence occurred and, if so, whether it prejudiced him.

This aspect of Cruz's *Brady* claim may proceed against Rutherford and Boris only. Cruz has not marshaled evidence that the other defendants were aware that Rios had been shot at.

### D.   Conspiracy Claims

The Individual Officers move for summary judgment on Cruz's conspiracy claims brought under Illinois and federal law. "To hold an officer liable for conspiracy under [42 U.S.C.] § 1983, a plaintiff must prove: (1) the defendants reached an agreement to deprive him of his constitutional rights, and (2) the defendants took overt acts in furtherance of actually depriving him of those rights." *Johnson*, 2025

---

373 U.S. at 87. It is implied that a plaintiff bringing a *Brady* claim based on the alleged suppression of a specific type of evidence believes that evidence would have been material. And the argument that this evidence would have been material strikes the Court as straightforward. *See Woods v. Illinois Dept. of Children and Fam. Services*, 710 F.3d 762, 764 (7th Cir. 2013) (a perfunctory argument was not waived when it was straightforward such that development was unnecessary).

WL 903813 at *32 (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015)). Similarly, a conspiracy claim under Illinois law requires a plaintiff to prove "'(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused the injury to the plaintiff.'" *Washington*, 2022 WL 4599708 at *25 (quoting *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007)) (cleaned up). As both claims require (1) an agreement, and (2) an overt act in furtherance of that agreement, the Court analyzes them together. *See Smith v. City of Chicago*, 785 F. Supp. 3d 356 (N.D. Ill. 2025) (asserting that "Illinois state conspiracy jurisprudence largely tracks the federal requirements" and analyzing the two in tandem).

To the extent the Court has granted summary judgment on the underlying conduct, the Court also grants summary judgment in favor of the Individual Officers on the derivative conspiracy claims. *See Johnson*, 2025 WL 903813 at *32. That leaves the Court to consider conspiracy with respect to Cruz's *Brady* claim on the surviving baskets of evidence: evidence related to the attempted coercion of Jaramillo and evidence that the perpetrators of the murder shot at Rios. The Court also considers Cruz's federal conspiracy claim that the Individual Officers conspired to discriminate against him on the basis of race.

The Court starts with the last claim first. Cruz asserts that because the Individual Officers had "indisputable" evidence that the shooters were Black (presumably through Rios' and Jaramillo's descriptions) but instead chose to

52

investigate him, a Hispanic suspect, this framing of events "is certainly a description that includes invidious racial discriminatory animus in that Guevara always fabricated cases against Hispanics because those were the ones he wanted off the streets and out of his Area." [491] at 51–52. The Court does not credit this argument, as Meadors' description of the shooter and subsequent identifications of Cruz established probable cause for the Individual Officers to investigate and prosecute Cruz. *See supra* at Section III.A. Separately, Cruz does not assist the Court's analysis of this claim with any citations to the factual record or legal authority. *See* [491] at 51–52. "Seventh Circuit precedent is clear that 'perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived.'" *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (quoting *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021)). For this reason as well, this aspect of Cruz's conspiracy claims fails.

The Court now returns to Cruz's conspiracy claims that are premised on alleged *Brady* violations. As discussed earlier, *see supra* at 47–49, Cruz has presented evidence from which a reasonable jury could find that Guevara, Wojcik, and Riccio worked together to create a false statement attributed to Jaramillo, which they never produced to Cruz's defense counsel. Cruz also has provided evidence sufficient to permit a reasonable jury to conclude that Rutherford and Boris both knew of Rios' claim that he was shot at by the perpetrators, which was also never communicated to Cruz's criminal defense counsel. *See supra* at 49–51. A jury could infer from this same body of evidence that Rutherford and Boris agreed to the omission. This

evidence thus is sufficient to allow Cruz to move forward on his federal and state conspiracy claims attendant to each alleged *Brady* violation.

Put more precisely: Cruz's conspiracy claims can move forward on the premise that (1) an alleged agreement existed among Guevara, Wojcik, and Riccio related to the withheld Jaramillo statement and (2) an agreement existed between Rutherford and Boris related to the withholding of exculpatory information provided by Rios. The Court otherwise grants summary judgment on all other theories on which, and as to all other Individual Officers against whom, Cruz brings conspiracy claims.

### E.      Failure to Intervene Claim

Cruz asserts claims that the Individual Officers all failed to intervene in each of the constitutional infringements he alleges. [491] at 52. A police officer is liable under § 1983 if he was present and failed to intervene to prevent other officers from infringing on a citizen's constitutional rights if the officer had reason to know "that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.'" *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Because failure to intervene claims must be premised on the deprivation of a constitutional right, *see Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005), Cruz's failure to intervene claim fails as to each underlying claim that the Court already has rejected. *See also Johnson*, 2025 WL 903813 at *31. That leaves the Court to analyze Cruz's failure to intervene claim with respect to the remaining baskets of evidence under Cruz's *Brady* claim. And despite Cruz's argument otherwise, *see* [491] at 52,

54

the claim can only move forward where the record supports a material factual dispute as to specific officers. Cruz and the Individual Officers agree that *Byrd v. Brishke* represents a right of action for failure-to-intervene in the § 1983 context. 466 F.2d 6 (7th Cir. 1972); [460] at 21; [491] at 52, n.13. *Byrd* held that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person *in his presence or otherwise within his knowledge*." 466 F.2d at 11 (emphasis added). *Byrd* does not undermine the requirement that a proponent of a failure-to-intervene claim must present evidence that an officer had a realistic opportunity to intervene. *Doxtator*, 39 F.4th at 864. A realistic opportunity to intervene in wrongdoing requires knowledge of that wrongdoing. *Johnson*, 2025 WL 903813 at *31 ("[B]ecause no evidence indicates that Healy or Daley knew of the alleged Constitutional violations, Johnson's claims against them for failure to intervene fail as well."); *Jakes v. Boudreau*, No. 19 CV 2204, 2023 WL 3585629 at *15 (N.D. Ill. May 22, 2023) (same).

As already discussed, Cruz has shown that an October 10 Supplemental Report authored by Wojcik and Riccio said that Jaramillo described the shooter as potentially olive-complected, which Jaramillo denies he ever said. That creates a genuine issue of material fact that allows Cruz to proceed with his claim that Wojcik, Riccio, or both failed to intervene in Guevara's suppression of Jaramillo's false signed statement, to the extent they did not participate in the suppression itself. *See Jackson v. City of Chicago*, No. 20 C 5886, 2024 WL 1142015, at *13 (N.D. Ill. Mar. 15, 2024) ("Because

55

an officer cannot fail to intervene in his own conduct, the failure-to-intervene claims against Defendant Eichman must be dismissed.").

With regard to the suppression of information from Rios, Cruz's failure to intervene claim is not supported by record evidence. If Rios did indeed tell Boris and Rutherford that he had been fired upon, and if Boris and Rutherford failed to relay that information to prosecutors, there is no failure to intervene claim against Boris and Rutherford because each would have participated in the suppression itself. *See id.* There is no other evidence in the record from which a reasonable jury could find that any other officer named as a defendant in this matter knew of this suppression and failed to act.

Thus, the Court grants summary judgment on Cruz's failure to intervene claim to the Individual Officers, except Wojcik and Riccio, in the alternative to Cruz's surviving *Brady* claim against them.

### F.    IIED Claim

Cruz brings a state-law claim of intentional infliction of emotional distress against the Individual Officers. In Illinois, a plaintiff alleging IIED must show: "(1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). Courts in this District have found on numerous occasions that police misconduct resulting in wrongful conviction can create the basis for an IIED claim because "[a]n average member in the community would consider it outrageous for police officers to

56

falsely frame, arrest and imprison an innocent citizen." *Washington*, 2022 WL 4599708 at *25; *see also Johnson*, 2025 WL 903813 at *38 (collecting cases). If Cruz is able to convince a jury that Guevara, Wojcik, Riccio, Rutherford, and Boris, or some subset thereof, intentionally suppressed evidence in an attempt to wrongfully convict an innocent man, a reasonable jury also could find that any officer who did so acted outrageously and knew that severe emotional distress would follow. *See Johnson*, 2025 WL 903813 at *38.

Cruz's IIED claim can only go forth against those officers for whom he has established a triable issue of material fact as to whether they participated in depriving him of a constitutional right. *See id.* It therefore cannot succeed against the remaining Individual Officers: Gawrys, Mingey, or Yanow (as representative of Halvorsen's estate).

### G. *Monell* Claim

The Court now turns to Cruz's claim, brought pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), that the City of Chicago maintained an express policy or de facto widespread practice that violated his constitutional rights.

The Court first takes stock of what remains of Cruz's *Monell* claim in light of how it has resolved the Individual Officers' motions for summary judgment. Cruz contends that he is advancing "*one Monell* claim and one *Monell* theory" that "the City maintained a broken and dysfunctional police accountability and disciplinary system that failed to identify, track, and discipline officers who repeatedly engaged in malicious misconduct." [491] at 57. For its part, the City argues that "[i]f no

57

constitutional violation occurred, the alleged City policies cannot support *Monell* liability." [466] at 5 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), and *Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (7th Cir. 2012)).

On that last point, the Court sees more nuance than the City does in the relevant case law. In *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010), the municipal entity "push[ed] for a rule that requires individual officer liability before a municipality can *ever* be held liable for damages under *Monell*." (Emphasis added.) *Thomas* called this position "an unreasonable extension of *Heller*." *Id. Thomas* continued: "The actual rule, as we interpret it, is much narrower: a municipality can be held liable under *Monell,* even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Id.* (citing *Heller,* 475 U.S. at 798–99). The Seventh Circuit recognized this same wrinkle in *Matthews.* 675 F.3d at 709 (discussing how under *Thomas*, 604 F.3d at 304, a municipality could still be found liable when its officers committed no constitutional violation in arresting the plaintiff because "if the officers were acquitted based on a defense of good faith … there is still an argument that the city's policies caused the harm, though the officer was acting in good faith.").

Regardless, in response to the City's motion for summary judgment, Cruz does not articulate an argument as to how his *Monell* claim could survive without an underlying constitutional claim against the officers. Rather, Cruz assumes that the merits of his *Monell* claim will rise and fall with the merits of his claims against the Individual Officers. *See* [491] at 66–67. It is not the Court's job to make arguments

for Cruz, *see Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999), and a failure to advance an argument under these circumstances results in waiver, *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). As a result, Cruz's *Monell* claim can proceed past summary judgment only if there is sufficient evidence in the record from which a reasonable jury can find that the City maintained an express policy or de facto widespread practice that caused the alleged *Brady* violations that survive summary judgement or the derivative conspiracy or failure-to-intervene injuries.

### 1. The City's Motion to Bar Cruz's Police Practices Expert

The City moves to bar Timothy Longo, Cruz's police practices expert, from providing expert testimony in this case. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Cruz offers Longo's testimony to support his *Monell* claim, [491] at 63, so the Court resolves the City's *Daubert* motion before resolving the City's summary judgment motion. If Longo's testimony is inadmissible, Cruz cannot use it to defeat summary judgment. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Given the manner in which the Court has narrowed Cruz's *Monell* claim (in light of its resolution of the Individual Officers' summary-judgment motions), the Court's *Daubert* analysis will be limited to assessing the admissibility of opinions from Longo relevant to whether the City maintained a policy or widespread practice that caused the still-viable *Brady* violations.

The admission of expert testimony is governed by Rule 702 and the principles outlined in *Daubert*, 509 U.S. at 579. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Rule 702 provides that expert testimony is admissible if the proponent demonstrates to the Court that it is more likely than not that:

59

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Courts perform a gatekeeping function, preliminarily assessing expert testimony to ensure it is reliable and relevant, in compliance with Rule 702. *Daubert*, 509 U.S. at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). At the same time, courts should not be quick to exclude expert testimony. *Washington*, 2022 WL 4599708 at *6 ("Under Rule 702, exclusion of expert testimony 'is the exception rather than the rule.'") (quoting Fed. R. Evid. 702 Advisory Comm.'s Notes to 2000 Amends.). Rather, *Daubert* instructs that "[c]ross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, rather than wholesale exclusion … is the appropriate means by which evidence based on valid principles may be challenged." 509 U.S. at 580.

The expert at issue here, Longo, has a background in police practices that includes 19 years as a member of the Baltimore Police Department, 16 years as the Chief of Police in Charlottesville, Virginia, and his present role as the Chief of Police and Associate Vice President for Safety and Security at the University of Virginia. [468-1] at 1. Longo formulated his proffered opinions for this case by reviewing

60

materials provided by Cruz's counsel and analyzing them in connection with his experience in policing. *Id.* at 2.

With respect to Cruz's argument that the City's policies or practices led to officers suppressing evidence in his case, Longo opines that the City had "a broken and dysfunctional accountability system for disciplining police misconduct, as well as allowed for and facilitated a 'code of silence' within the CPD, allowed officers to suppress exculpatory and impeachment information, and failed to train and supervise its officers." *Id.* at 3. Longo further opines that the widespread CPD practice of maintaining "street files" separate from official investigation reports led to the suppression of potentially exculpatory information. *Id.* at 20–21. Longo describes other allegations against Chicago police officers, including multiple that he contends put the City on notice of allegations that officers had suppressed evidence before Cruz's investigation. *Id.* at 12–13. Longo also explains how despite the City's awareness that there was a widespread problem of evidence suppression within CPD, the City failed to properly investigate and discipline repeat offending officers or to train officers on their duty to disclose evidence. *Id.* at 23. Finally, Longo discusses Cruz's allegations in connection with his opinion that the City maintained a de facto policy of allowing police officers to suppress evidence and concludes that this policy led to Cruz's injuries. *Id.* at 21–22.

The City argues that Longo's opinions on these points are not product of reliable principles and methods, are based on insufficient facts and data, and are

61

otherwise not helpful to the jury. [468] at 14–16, 16–18, 19–20. The Court takes each of these critiques in turn.

With respect to his methodological approach, Longo asserts that he reached his conclusions by reading and reviewing materials provided by Cruz's counsel. [468-1] at 2. He extensively documents those materials. *Id.* at 5–9; 12–17. Longo goes on to explain that he considered these materials in light of "what I have come to know through my years of specialized education, training, and experience as accepted practices in the field of law enforcement." [468-1] at 3. While this methodology is more interpretive and less quantitative than that of experts in other fields, the Court is nonetheless satisfied that Longo filtered the materials he reviewed "through his knowledge and experience with policing" and, in so doing, applied a methodology acceptable under Rule 702 to reach his opinions regarding a widespread practice of evidence suppression. *See Washington*, 2022 WL 4599708 at *8; *see Kumho Tire Co.*, 526 U.S. at 150 (1999) (courts may apply *Daubert* flexibly, considering that experts whose expertise is not in a purely scientific field may use less rigorous methodology).

The City argues that Longo "merely collected allegations [against Chicago police officers] without assessing individual cases or analyzing underlying disciplinary investigations." [511] at 1. But Longo is a professional practices expert. "An expert in professional practices is not a scientific expert that applies rigorously scientific methods. Such experts describe professional standards and identify departures from those standards." *Mendez v. City of Chicago*, No. 18-CV-5560, 2024 WL 4661139, at *5 (N.D. Ill. Sept. 20, 2024). As Longo explains in his report, he

assessed the body of accusations as a whole, evaluated trends over time, and determined that the City's remedial efforts were insufficient based on those trends when viewed through the lens of his experience. [468-1] at 2, 4, 23–24; *see also Mendez*, 2024 WL 4661139 at *5 ("[A] police practices expert must explain how he reaches his conclusions—either by linking them to generally accepted standards in the field or by citing information within his own practical experience.") (citing *Andersen v. City of Chicago*, 454 F. Supp. 3d 808, 814 (N.D. Ill. 2020)). For these reasons as well, the Court is not persuaded by the City's argument that Longo's pertinent opinions are too conclusory to pass muster simply because he devoted only a limited number of pages to them in his report. [468] at 14.

With respect to the City's argument that Longo's opinions are based on insufficient facts and data, the Court is not persuaded by the City's efforts to marginalize Longo's reliance on the *Palmer* litigation. *See id.* at 14–16; *see Palmer v. City of Chicago*, 755 F.2d 560, 579 (7th Cir. 1985). The City argues that the plaintiffs in *Palmer* "lost that case because they failed to develop evidence that any material exculpatory evidence was withheld." [468] at 15. But the Court agrees with Cruz's assertion that the *Palmer* litigation nonetheless constitutes "part of the historical record" wherein CPD took notice of a widespread practice of failing to disclose evidence and attempted to address it, notwithstanding the failure of the plaintiffs in that case to win relief. [493] at 15–16. In 1982, before the *Palmer* plaintiffs ultimately were unsuccessful in proving that the police had suppressed evidence in their own cases, *see Palmer v. City of Chicago*, 806 F.2d 1316, 1320–21 (7th Cir. 1986), police

63

leadership reacted to an order in the litigation by acknowledging the existence of street files and directing officers not to remove "documents, materials, or notes" from such files. [468-1] at 21.

The fact that the *Palmer* plaintiffs ultimately did not prove that evidence material to their cases had been suppressed from their individual cases through this system does not undermine the impact the *Palmer* litigation had in putting the City on notice of the system, as evidenced by subsequent reform attempts. Longo follows his reference to *Palmer* by citing three civil cases as evidence that the City was aware that this problem persisted after the reform attempts in the wake of *Palmer*: *Fields v. City of Chicago*, No. 10 CV 1168, 2017 WL 4553411 (N.D. Ill. Oct. 12, 2017), *Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018), and *Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022). *Id.* While Longo's report did not include the facts of those cases, he concludes that ongoing litigation on this topic tended to show that the City was aware of allegations regarding evidence suppression in the years following *Palmer*. The City is free to attack Longo's line of reasoning, for example by arguing that the allegations in *Palmer* are not comparable to Cruz's and that multiple unproven accusations do not prove wrongdoing, *see* [468] at 13, 15–16; such attacks are fodder for cross-examination, but not a basis for exclusion. *See Daubert*, 509 U.S. at 580.

Finally, the City's contention that Longo's opinion will not aid the jury also does not persuade the Court. Longo is an expert in police practices, and jurors without specialized experience cannot easily evaluate best practices for preserving evidence

64

or compare events at CPD to industry norms without expert testimony. *Cf.* [468-4] at 16:10–21 (district court in *Solache v. Guevara at al.*, 18-cv-2312, and *Reyes v. Guevara et al.*, 18-cv-1028, critiques plaintiff's proffered expert in part because "Dr. Leo feels more like a summary witness than an expert witness. He's just summarizing what he sees in documents … Dr. Leo is not displaying any particular expertise.").

Of course, just because expert testimony is admissible does not necessarily mean it is true or correct. A jury ultimately will decide how much weight to give to Longo's opinions, no doubt aided by the City's cross-examination. *See Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination."). The precise scope of Longo's trial testimony also still needs to be refined, and the Court anticipates additional pretrial motions on this issue. For instance, the Court recognizes that even if portions of Longo's expert testimony are admissible under Rule 702, they may still be excluded under Rule 403's balancing test. The Court postpones conducting that more context-specific analysis until the parties are more fully immersed in pretrial and trial proceedings.

At this juncture, however, the Court denies the City's motion to bar Longo's expert testimony and considers Longo's opinion on a widespread municipal practice related to the suppression of exculpatory evidence when resolving the City's motion for summary judgment.

65

### 2. Cruz's Claim of a Widespread Practice of Suppression of Exculpatory and Impeaching Evidence.

To prevail on a § 1983 claim against a municipal entity such as the City, a plaintiff must establish that he suffered a constitutional injury. *See Heller*, 475 U.S. at 799. Then he must show that the injury stemmed from a policy or practice maintained by the City, which can take three forms:

(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making authority.

*Palmer v. Marion Cnty.*, 327 F.3d 588, 595 (7th Cir. 2003) (quoting *Garrison v. Burke*, 165 F.3d 565, 571–72 (7th Cir. 1999)). At the end of the day, the critical question under *Monell* is whether a municipal policy or custom gave rise to the harm, "or if instead the harm resulted from the acts of the entity's agents." *Iglesias v. Guevara et al*, No. 19-CV-06508, 2025 WL 4749907 at *2 (N.D. Ill. Nov. 26, 2025) (quoting *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)).

Cruz asserts two theories connecting his *Brady* claim and his *Monell* claim: that the City's express policies governing maintenance of police records were deficient and that the CPD condoned a de facto "code of silence" wherein police officers covered up misconduct for one another. [491] at 72–73, 75.

First, Cruz alleges that the City's formal police policies were inadequate to protect criminal defendants' rights under *Brady* because the policies, as applied, did not effectively ensure that officers preserved exculpatory and impeaching evidence and provided it to prosecutors, despite reform attempts between 1982 and 1992. [509]

66

¶¶ 31–38; *see Rivera v. Guevara,* 319 F. Supp. 3d 1004 (N.D. Ill. 2018), *opinion clarified,* No. 12-CV-04428, 2018 WL 11469072, *1059–61 (N.D. Ill. May 17, 2018) (providing a summary of CPD policy changes during this time). Prior to 1982, CPD officers often maintained informal notes and investigatory materials, known as "street files," in parallel with official investigation files, which created a risk that exculpatory or impeaching material would not be turned over to a criminal defendant who received only the official investigatory file. [509] ¶ 31–33; *Rivera,* 2018 WL 11469072 at *1059–61. Cruz alleges that reform efforts were deficient and failed to remedy the problem, in part because CPD officers continued to believe that notes they took in the course of investigations were their own personal property that they were not required to include in official investigatory files. [509] ¶¶ 33–35.

As part of his support for his allegations, Cruz invokes other cases, including two class action cases from the early 1980s in which plaintiffs brought claims related to CPD's document preservation and production policies: *Jones v. City of Chicago*, 83-cv-2430 (N.D. Ill.) and *Palmer v. City of Chicago*, 82-cv-2349 (N.D. Ill.). *E.g.*, [509] ¶ 31. The Court agrees with the City's objection that settlements cannot be interpreted as evidence of wrongdoing and legal opinions cannot be used for the truth of the matter asserted. [468] at 9–10. But as the Court discussed in connection with its *Daubert* analysis, *see supra* at 63–64, the fact of these lawsuits can be used to demonstrate that the City was aware of allegations that its police officers had suppressed evidence in violation of criminal defendants' constitutional rights.

67

Cruz also relies upon Longo's testimony, as summarized earlier, [491] at 63; past admissions of City representatives discussing CPD policies and practices at the time of Cruz's arrest and investigation, [491] at 60–62; and evidence of what the City has said about police misconduct during that time, including the Chicago Police Accountability Task Force 2016 Report, [491] at 62–63; *see also* [479-26]. The City argues that its statements well after the time of Cruz's alleged constitutional injury are not relevant. The Court disagrees. The long gaps between Cruz's arrest and investigation and the City's public remarks on CPD police misconduct during the same time period present a question of weight for the jury. "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province of the jury." *Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025) (internal quotation omitted).

Through this evidence, Cruz has established a genuine issue of material fact as to whether CPD's express and de facto policies from October 1993 through December 1995 led to the unconstitutional suppression of exculpatory and impeaching evidence in his case. He argues that documents and notes regarding officer interactions with Rios and Jaramillo were never produced to him. If Cruz succeeds in proving those allegations to a jury, he may also succeed in convincing a jury that those documents were suppressed because they were not included in the official investigative file for his case due to deficiencies in CPD's official document preservation and management policies and their enforcement. *See Johnson*, 2025 WL 903813 at \*37.

68

To defeat summary judgment, Cruz "does not have to meet a burden of being 'likely to prevail,' but need only show that a reasonable jury *could possibly allow* [him] to prevail." *Tempco Elec. Heater Corp. v. Temperature Engr. Co.*, No. 02 C 3572, 2004 WL 1254134, at *9 (N.D. Ill. June 3, 2004). This he has done. Cruz may present his *Monell* claim to a jury as curtailed by the Court's opinion. Summary judgment is granted in the City's favor as to any other *Monell* theories.

### H. *Respondeat Superior* and Indemnification Claims

Claims for *respondeat superior* and indemnity against a municipal entity "are derivative liability claims that depend on [Plaintiff] prevailing against at least one of the individual defendants." *Moran*, 54 F.4th at 500. Summary judgment is thus denied for *respondeat superior* on Cruz's surviving state claims and indemnification on any claims against the Individual Officers that have survived summary judgment. The Court otherwise grants summary judgment for claims that have failed to move past the summary judgment stage.

## IV. Conclusion

For the foregoing reasons, the Individual Officers' motion to strike is denied, [494]; the motions for summary judgment by the Individual Officers and the City are granted in part and denied in part, [459], [463], [465]; and the City's motion to exclude expert testimony from Timothy Longo is denied, subject to other limitations set forth in this opinion [468]. More specifically:

The Court grants summary judgment on all of Cruz's claims against defendants Gawrys, Mingey, and Yanow (as the representative of Halvorsen's estate). These defendants are dismissed from the case.

69

The Court denies summary judgment on Cruz's claim that defendants Guevara, Wojcik, and Riccio violated his *Brady* rights in connection with his claims concerning a false statement attributed to Jaramillo. The Court denies summary judgment on Cruz's claim that defendants Rutherford and Boris violated his *Brady* rights in connection with information allegedly provided by Rios concerning the shooting. The Court denies summary judgment on Cruz's claims of conspiracy, failure to intervene, and intentional infliction of emotional distress to the extent those claims relate to the *Brady* violations that survive summary judgment.

The Court grants summary judgment in favor of the Individual Officers on all other claims and theories advanced by Cruz.

The Court grants summary judgment in favor of the City on Cruz's claims for *respondeat superior* and indemnification to the extent those claims relate to Cruz's claims against the Individual Officers on which the Court has granted summary judgment. Claims against the City for *respondeat superior* and indemnification may proceed only with respect to the surviving claims against Guevara, Wojcik, Riccio, Rutherford, and Boris.

The Court denies summary judgment on Cruz's *Monell* claim against the City to the following extent: Cruz may proceed on a theory that the City's express and/or de facto policies caused the *Brady* violations and the derivative conspiracy or failure-to-intervene injuries that survive summary judgment.

The Court sets a status hearing for Thursday, July 23, 2026 at 11:00 a.m. Before that hearing, the parties must meet and confer regarding (1) the effect of the

70

Court's summary judgment order on the anticipated length of the October 2026 jury trial; and (2) whether the parties are mutually interested in a referral to the assigned Magistrate Judge for purposes of a settlement conference. The parties must come prepared to address these topics with the Court at the July 23 hearing.

ENTER:

_____
Georgia N. Alexakis
United States District Judge

Date: 7/10/2026

## APPENDIX

**A. GOCR provided by Individual Officers. [461-4].**



**B. First version of the GOCR provided by Cruz. [478-7].**



**C. Second version of the GOCR provided by Cruz. [478-8].**



**D. The "4" Cruz alleges was altered from a "1." [479-1] at 2.**



E.  The "4" that Cruz highlights as a comparator. [479-1] at 4.



**F. Examples of other "4s" on the GOCR. [478-7].**









**G. Cross-outs that Cruz alleges conceal "M1." [479-1] at 3.**



**H. October 9, 1993 lineup with red arrow indicating phone book. [490] ¶ 73.**

